UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

MOTION INFORMATION STATEMENT

Docket Number(s): 25-1506_____     Caption [use short title]

Motion for: Injunction Pending Appeal_____

Set forth below precise, complete statement of relief sought:

injunction pending appeal to prohibit enforcement of section 20-699.21(a)(2) of FARE Act.

Real Estate Board of New York, Inc. v. City of New York

MOVING PARTY: Real Estate Board of New York, et al.     OPPOSING PARTY: City of New York, et. al._____

☐ Plaintiff          ☐ Defendant
☑ Appellant/Petitioner   ☐ Appellee/Respondent

MOVING ATTORNEY: Claude G. Szyfer_____     OPPOSING ATTORNEY: Jamison Davies_____
[name of attorney, with firm, address, phone number and e-mail]

Hogan Lovells US LLP                          New York City Law Department

390 Madison Avenue, New York, NY 10017        100 Church Street, New York, NY 10007

(212) 918-3100 / claude.szyfer@hoganlovells.com   (212) 356-1148 / jdavies@law.nyc.gov

Court- Judge/ Agency appealed from: SDNY/Hon. Ronnie Abrams_____

Please check appropriate boxes:

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes  ☐ No (explain):_____

Opposing counsel's position on motion:
☐ Unopposed ☑ Opposed ☐ Don't Know
Does opposing counsel intend to file a response:
☑ Yes  ☐ No  ☐ Don't Know

FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:
Has this request for relief been made below?                    ☑ Yes ☐ No
Has this relief been previously sought in this court?           ☐ Yes ☑ No
Requested return date and explanation of emergency:  _____

Is oral argument on motion requested?  ☑ Yes ☐ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?  ☐ Yes ☑ No If yes, enter date:_____

Signature of Moving Attorney:

/s/ Claude G. Szyfer_____   Date: 07/11/2025   Service by: ☑ CM/ECF  ☐ Other [Attach proof of service]

Form T-1080 (rev.12-13)

# 25-1506-cv

IN THE

## United States Court of Appeals
## for the Second Circuit

———————————

REAL ESTATE BOARD OF NEW YORK, INC.; NEW YORK STATE ASSOCIATION OF REALTORS, INC.; BOHEMIA REALTY GROUP; BOND NEW YORK REAL ESTATE CORP.; REAL NEW YORK LLC; LEVEL GROUP INC.; FOUR CORNERS REALTY, LLC; 21 WEST 74 CORP.; AND 8 WEST 119TH STREET HDFC,

*Plaintiffs-Appellants*,

v.

THE CITY OF NEW YORK, *a municipal entity*, and VILDA VERA MAYUGA, *as Commissioner of New York City Department of Consumer and Worker Protection*,

*Defendants-Appellees*,

———————————

Appeal from the United States District Court
for the Southern District of New York

———————————

## MOTION FOR INJUNCTION PENDING APPEAL
———————————

SEAN MAROTTA
J. ANDREW MACKENZIE
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600

CLAUDE G. SZYFER
DARYA D. ANICHKOVA
HOGAN LOVELLS US LLP
390 Madison Ave.
New York, N.Y. 10017
(212) 918-3000
claude.szyfer@hoganlovells.com

*Counsel for Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENT

The Real Estate Board of New York, Inc. has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.

New York State Association of Realtors, Inc. has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.

Bohemia Realty Group has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.

Bond New York Real Estate Corp. has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.

Level Group Inc. has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.

REAL New York LLC has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.

Four Corners Realty, LLC has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.

21 West 74 Corp. has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.

8 West 119th Street HDFC has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ...........................................................i

TABLE OF AUTHORITIES.................................................................... iii

INTRODUCTION ................................................................................1

BACKGROUND ................................................................................3

ARGUMENT ..................................................................................10

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE
MERITS...................................................................................11

    A.    The Publication Bar is Subject to Heightened Scrutiny
Because It Uses A Speech Restriction As An Indirect
Means To End Tenant-Pay Open Listings .........................................11

    B.    The Publication Bar Fails Even Intermediate Scrutiny ....................14

        1.    *The publication bar prohibits far more speech than
necessary to advance the City Council's stated
interest in aligning the principal-agent relationship* ...............15

        2.    *The City Council's putative interest in increasing
housing mobility is a post-hoc rationalization, and
the Council had no evidence that the publication
bar would actually do that* .........................................16

        3.    *The City Council's putative interests in regulating
the fairness, transparency, and negotiability of
broker fees are either conclusory or fully
addressed without the publication bar* ............................19

    C.    Plaintiffs Have At The Very Least Shown "Serious
Questions" On The Merits ................................................20

II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM
ABSENT AN INJUNCTION PENDING APPEAL AND THE
CITY AND PUBLIC WILL NOT BE HARMED BY ONE ....................20

CONCLUSION ................................................................................23

# TABLE OF AUTHORITIES

Page

CASES:

*44 Liquormart, Inc. v. Rhode Island*,
  517 U.S. 484 (1996) ............................................................................17

*Agudath Israel of Am. v. Cuomo*,
  983 F.3d 620 (2d Cir. 2020) ...............................................................20

*Art & Antique Dealers League of Am., Inc. v. Seggos*,
  121 F.4th 423 (2d Cir. 2024) .................................................15, 16, 20

*Central Hudson Gas & Electric v. Public Service Commission*,
  447 U.S. 557 (1980) ...................................................................11, 14

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master*
  *Fund Ltd.*,
  598 F.3d 30 (2d Cir. 2010) ..................................................................20

*Cornelio v. Connecticut*,
  32 F.4th 160 (2d Cir. 2022) ................................................................16

*IMS Health, Inc. v. Sorrell*,
  630 F.3d 263 (2d Cir. 2010) ...............................................................19

*In re NTE Conn. LLC*,
  26 F.4th 980 (D.C. Cir. 2022) .............................................................21

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*,
  596 F.2d 70 (2d Cir. 1979) ..................................................................20

*Linmark Assocs., Inc. v. Willingboro Tp.*,
  431 U.S. 85 (1977) ..............................................................................14

*Loveridge v. Pendleton Woolen Mills, Inc.*,
  788 F.2d 914 (2d Cir. 1986) ...............................................................21

*N.Y. Progress & Prot. PAC v. Walsh*,
  733 F.3d 483 (2d Cir. 2013) ...............................................................22

# TABLE OF AUTHORITIES—Continued

Page

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
　592 U.S. 14 (2020).................................................................10

*Rubin v. Coors Brewing Co.*,
　514 U.S. 476 (1995).............................................................19

*Safelite Grp., Inc. v. Jepsen*,
　764 F.3d 258 (2d Cir. 2014) ...............................................11

*Sorrell v. IMS Health Inc.*,
　564 U.S. 552 (2011)......................................................*passim*

*Thompson v. Western States Med. Ctr.*,
　535 U.S. 357 (2002).............................................................15

*Turner Broad. Sys., Inc. v. FCC*,
　512 U.S. 622 (1994).......................................................16, 17

*Veterans Guardian VA Claim Consulting LLC v. Platkin*,
　133 F.4th 213 (3d Cir. 2025) .............................................11

*Vugo, Inc. v. City of New York*,
　931 F.3d 42 (2d Cir. 2019) .................................................12

**STATUTES:**

15 U.S.C. §§ 1-7........................................................................20

N.Y.C. Admin. Code § 20-699.20 ..........................................13

N.Y.C. Admin. Code § 20-699.21(a)(2) ....................1, 7, 13, 23

N.Y.C. Admin. Code § 20-699.22(a)..........................................8

N.Y. Real Prop. Law § 443(3)(b) ......................................16, 20

N.Y. Real Prop. Law § 443(4) ................................................16

**RULE:**

Fed. R. App. P. 8(a)(1)(C) ......................................................10

iv

**TABLE OF AUTHORITIES—Continued**

Page

OTHER AUTHORITIES:

Gabrielle Fahmy, *Rents jumping shocking 15% after NYC ditches broker fees: 'It's discouraging'*, N.Y. Post (June 21, 2025), https://perma.cc/ZHS3-D6MB ...................................................................2, 9

Rebecca Picciotto, *New York's Housing Crisis Is So Bad That a Socialist Is Poised to Become Mayor*, Wall St. J. (updated June 25, 2025), https://www.wsj.com/real-estate/nyc-mayor-primary-rent-housing-affordability-78e26691?st=kH4RkN&reflink=desktopweb share_permalink ..........................................................................1, 2, 3, 9

## INTRODUCTION

Plaintiffs move for an injunction pending appeal prohibiting New York City and its Commissioner of Consumer and Worker Protection from enforcing section 20-699.21(a)(2) of the Fairness in Apartment Rental Expenses Act ("FARE Act"), which prohibits licensed real-estate brokers from publishing listings with the permission of a landlord when the broker will seek to have the tenant pay the broker's fee.

The Act's publication bar arose from the City Council's belief that a tenant should not have to pay a broker who is not the tenant's fiduciary. But rather than require that a broker owe fiduciary duties to a party it charges fees, the Council unconstitutionally burdened brokers' commercial-speech rights by barring any broker—fiduciary or not—who publishes a listing from seeking compensation from the tenant. The First Amendment does not permit the Council to use a speaker- and content-based speech restriction as an indirect means of achieving a policy objective—aligning the broker-client agency relationship—that can be better accomplished without trammeling protected speech.

The FARE Act's publication bar has also wreaked havoc on New York City's rental market. Landlords able to absorb the cost of brokers' fees have passed them on to tenants through higher rents, which have increased an average 16% since the law went into effect. Rebecca Picciotto, *New York's Housing Crisis Is So Bad That*

1

*a Socialist Is Poised to Become Mayor*, Wall St. J. (updated June 25, 2025), https://www.wsj.com/real-estate/nyc-mayor-primary-rent-housing-affordability-78e26691?st=kH4RkN&reflink=desktopwebshare_permalink. Landlords who cannot afford the broker fee have simply stopped listing their properties, leading to a nearly 30% drop in listings. Gabrielle Fahmy, *Rents jumping shocking 15% after NYC ditches broker fees: 'It's discouraging'*, N.Y. Post (June 21, 2025), https://perma.cc/ZHS3-D6MB.

Before the publication bar's effective date, Plaintiffs warned the District Court that the law would make New York City's infamous housing problem worse—and without directly advancing the City Council's interest in aligning the principal-agent relationship. The District Court took this to mean that Plaintiffs' First Amendment claims stemmed "not from [the FARE Act's] effects on their constitutional rights, but from a fundamental disagreement with its underlying policy." ECF 61 ("Opinion & Order") 41. But the two are inextricably bound together. The First Amendment requires that if the City is going to abridge commercial-speech rights, it must do so in furtherance of an effective policy that fixes a real and substantial problem and without limiting more speech than necessary.

The City was already in a housing crisis before the publication bar. The Court should keep it from getting worse by enjoining the bar pending appeal.

## BACKGROUND

**The Housing Crisis.** New York City is in the midst of a housing crisis. The vacancy rate in 2023 was just 1.4 percent. Picciotto, *supra*. That is the lowest it has been since 1968. *Id*. The options are even slimmer—below one percent—for apartments with asking rents of less than $1,650 per month. ECF 26 ("Chandan Decl.") ¶ 13(d) n.6.[1]

As the available housing supply has plummeted, rents have soared, with rent for a two-bedroom apartment rising 17.5% over the last year to $5,560. Picciotto, *supra*. More than 50% of households spend more than 30% of their income on rent, and rents on new leases are amongst the highest in the Nation. Chandan Decl. ¶ 24. The combination of record-low vacancy rates and surging rents "has trapped many New Yorkers in an untenable position: they cannot afford to stay where they are, yet they have nowhere else in the city to go." Opinion & Order 4.

**Tenant-Pay Broker Fees.** Because affordable apartments are so hard to locate, "new inventory spends just days or even hours on the market." Picciotto, *supra*. Prospective tenants rely on online rental marketplaces like StreetEasy to efficiently sift through listings. *Id*. Brokers publish those listings and incur the substantial

---

[1] Unless otherwise indicated, ECF citations reference the docket below, No. 1:24-cv-09678-RA (S.D.N.Y.).

costs of advertising, photographing, staging, and preparing the property for show-ings. ECF 27 ("Saltzberg Decl.") ¶¶ 10-11. Listing brokers also provide potential tenants valuable services, including showing apartments, identifying qualified appli-cants, assisting tenants with rental applications, conducting state-mandated credit and background checks, processing applications, and guiding both landlords and ten-ants through applicable state and federal regulations. *Id*. ¶¶ 9, 14.

The listing broker often has no guarantee of being paid for these services. A significant portion of listings are "open-listings." *See e.g.*, *id*. ¶ 12 (noting that "70 percent of the available rentals in Bohemia's listing database" are open listings). The broker who publishes an open listing never signs an exclusive listing agreement with the landlord, meaning that the broker does not owe the landlord fiduciary duties and the landlord does not agree to compensate the broker for her efforts. *Id*. ¶¶ 10-11. Rather, the broker receives batches of open listings from the landlord or through a multi-listing service. *Id*. Brokers advertise these listings hoping to find a tenant interested in renting the apartment who will pay the brokerage fee. *Id*. ¶ 11.

Tenant-pay open listings "constitute a vital and material segment of the rental markets." *Id*. ¶ 12. And they benefit landlords and tenants alike. For many land-lords, the "costs of one brokerage commission could mean the difference between being in the red and making a very small profit for a building in any given month." ECF 23 ("Porco Decl.") ¶ 22. Having the tenant pay the brokerage commission

4

helps landlords keep units on the market and keep monthly rents lower. Saltzberg Decl. ¶¶ 17, 24. Indeed, many tenants prefer to pay the brokerage commission in exchange for a lower monthly rent, which saves tenants money over the lease term. ECF 70 ("Hourigan Supp. Decl.") ¶ 8 (explaining that "renters know the increased monthly rent will cause them to pay more for housing in New York City over the longer term, as the higher rent becomes compounded with every lease renewal").

**The City Council's Campaign To End Tenant-Pay Open Listings.** City councilmembers have nevertheless targeted tenant-pay open listings on the theory they undermine "basic norms around principal-agent relationships." ECF 21-9 ("Committee Report") at 6. The Council has also expressed concern over the nego-tiability, transparency, and fairness of tenant-pay open listings, asserting that prospective tenants "lack[] a meaningful ability to negotiate the amount of" the broker fee; that some brokers' representatives do not properly disclose their fees and fiduciary obligations; and that listing brokers do not provide valuable services to prospective tenants. *Id*. at 8-10.

The Council enacted the FARE Act against this backdrop. The original version of the bill would simply have required brokers to collect their fee "from the party employing" them. ECF 1-2 ("Int. No. 360") § 26-3602(a). The Council's Committee on Consumer and Worker Protection then received written and oral testimony on that proposed law from stakeholders.

5

Brokers and landlords—many of them plaintiffs here—testified that the bill would exacerbate the City's housing-mobility issues. The Committee heard testimony that "[i]f the broker's fee is to be paid by an owner, that owner will forward that cost to the tenant in the form of higher rent." ECF 21-2 at 60. As a result, because "[m]ost landlords require renters to make at least 40 times the monthly rent," many renters will no longer be able to afford apartments they previously qualified for. ECF 21-3 at 32. Worse, landlords unable to raise rents because of rent-stabilization laws may be forced to forego brokers' services and rely on "word of mouth" to find tenants. ECF 21-2 at 8; *id*. at 24 (Policy Director for the Community Housing Improvement Program explaining that owners of rent-stabilized housing would not be able to afford brokers' fees). The result would be a "shadow inventory" not seen "since the days of classified newspaper advertising" that would replace today's "widely transparent online rental marketplace showing accurate apartment listings." *Id*. at 9 (capitalization altered).

The City's First Deputy Commissioner of Housing Preservation and Development echoed these concerns, testifying that there was "no data" connecting tenant-pay open listings to housing mobility, and urging that "deeper analysis from multiple agencies" was necessary to "understand what could be the intended and unintended consequences of [the] bill." ECF 21-1 ("Hearing Testimony") 34:1-37:23; 48:18-49:10. Councilmembers similarly confessed that there was an "embarrassing" lack

of data to support the notion that ending tenant-pay broker fees would improve housing mobility. *Id*. at 37:23. But the Council insisted that data was unnecessary because "[t]he bill is not an attempt to solve the affordability crisis in the city." Committee Report 10.

**The Publication Bar.** The Council ultimately rejected the original proposal of requiring a broker to be paid by the person employing them, supposedly because "a landlord might retain a broker to publish an open listing, only to later claim that the broker is not his agent—thereby enabling the broker to impose a fee on the tenant." Opinion & Order 18; *see also* Committee Report 11. The Council instead passed the publication bar, which provides that "any agent who publishes a listing for a rental of residential real property with the permission or authorization of the landlord for such property shall not impose any fee on, or collect any fee from, a tenant related to the rental of such property." N.Y.C. Admin. Code § 20-699.21(a)(2). As the District Court summarized, the effect of the publication bar "is that a broker who publishes an open listing cannot charge her fee to the tenant who ultimately rents the property—and is therefore constrained to seek compensation from the landlord—even though the agent has no formal agency agreement with the landlord." Opinion & Order 7-8.

The Council separately addressed its transparency and negotiability concerns with a fee-disclosure requirement, under which "[e]very listing related to the rental

of residential real property shall disclose in such listing in a clear and conspicuous manner any fee to be paid by the prospective tenant for the rental of such property." N.Y.C. Admin. Code § 20-699.22(a); *see also* Committee Report 12. And the Council incorporated a significant grace period, providing that the FARE Act would not take effect until "180 days after it becomes law." Committee Report 12, 17.

**District Court Proceedings.** The FARE Act became law on December 13, 2024, and went into effect on June 11, 2025. Opinion & Order 7. Recognizing that the Act would upend the City's already beleaguered rental markets, Plaintiffs worked through the holidays and moved for a preliminary injunction nearly five months before the law took effect. ECF 20. As relevant here, Plaintiffs challenged the publication bar as abridging their freedom of speech under the First Amendment. ECF 1 ¶¶ 149-158. Defendants cross-moved to dismiss. ECF 36. The District Court asked whether Defendants wished to present evidence at a hearing, ECF 48, but Defendants declined, ECF 54. The District Court heard oral argument on both motions on May 2. ECF 63.

On the afternoon of June 10, 2025—hours before the law was set to take effect—the District Court granted the City's motion to dismiss Plaintiffs' free-speech claims and denied Plaintiffs' preliminary-injunction motion as to the publication bar as moot. Opinion & Order 25. Plaintiffs noticed this appeal two days later. ECF 62.

8

**The Publication Bar's Impact.** The publication bar has only been in effect for a few weeks, but already available listings have dropped nearly 30% and rents have jumped 16% or more. Picciotto, *supra*; Fahmy, *supra*.

That has been devastating for housing mobility. Because landlords require prospective tenants to make 40 times the monthly rent, many consumers have been priced out of apartments they previously qualified for. ECF 71 ("Rahmanian Supp. Decl.") ¶ 9. Before the publication bar, the average New Yorker would need to make $190,000 per year to qualify for the average rent of $4,750 per month. *Id*. Now that same New Yorker would need to make $220,000 per year to qualify for the same apartment. *Id*. Brokers have been "inundated" by prospective tenants asking to pay a one-time broker fee rather than the higher rent. Fahmy, *supra*. "Consumers who want the option of paying a broker fee instead of higher rent resent having the choice taken away from them by the FARE Act's publication bar." Rahmanian Supp. Decl. ¶ 8; *accord* Hourigan Supp. Decl. ¶ 8; ECF 69 ("Saltzberg Supp. Decl.") ¶ 8.

And that is assuming an available apartment can be found. The publication bar has made the housing search harder by causing landlords to pull listings "to pre-serve optionality concerning payment of the broker fee"—once a listing is published, it can no longer be tenant pay. Rahmanian Supp. Decl. ¶ 10; *accord* Hourigan Supp. Decl. ¶ 11; Saltzberg Supp. Decl. ¶ 10; Porco Decl. ¶ 20 (explaining that "[t]o pro-tect myself, I will have to stop sending available listings to other brokers"). Street

Easy lost 2,000—or 30%—of its New York City listings the day the publication bar went into effect. Rahmanian Supp. Decl. ¶ 11. Consumers therefore have access to far-fewer listings, with many units available only on a word-of-mouth "shadow market." *Id.* ¶ 10; *accord* Hourigan Supp. Decl. ¶ 11; Saltzberg Supp. Decl. ¶ 10. And rent-stabilized and priced-below-market units are the most likely to be delisted, as landlords operating small-margin units are least able to front a broker fee. Hourigan Supp. Decl. ¶ 11.

Plaintiffs sought an injunction pending appeal from the District Court on June 27, 2025, urging the court to halt enforcement of the publication bar pending appeal to prevent potentially needless exacerbation of the housing crisis. ECF 67; Fed. R. App. P. 8(a)(1)(c). The District Court denied the motion on July 10, 2025. ECF 78. Plaintiffs now seek interim relief from this Court.

## ARGUMENT

For an injunction pending appeal, Plaintiffs must show (1) "that their First Amendment claims are likely to prevail," (2) "that denying them relief would lead to irreparable injury," and (3) "that granting relief would not harm the public interest." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 16 (2020) (per curiam). Plaintiffs clear each hurdle.

## I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

The First Amendment is implicated by laws, like the publication bar, that "ban charging for speech" because a law that makes speech unprofitable "burden[s] the right to speak." *Veterans Guardian VA Claim Consulting LLC v. Platkin*, 133 F.4th 213, 219 (3d Cir. 2025); *see also* Opinion & Order 14 (agreeing that the publication bar regulates speech within the meaning of the First Amendment).

Commercial-speech regulations like the publication bar are generally subject to *Central Hudson Gas & Electric v. Public Service Commission*, 447 U.S. 557 (1980)'s intermediate-scrutiny test, under which "[c]ommercial speech that is not false or deceptive and does not concern unlawful activities . . . may be restricted only in the service of a substantial governmental interest, and only through means that directly advance that interest." *Safelite Grp., Inc. v. Jepsen*, 764 F.3d 258, 261 (2d Cir. 2014) (quotation marks omitted).  But heightened scrutiny is warranted where— as here—a government "seeks to achieve its policy objectives through the indirect means of restraining certain speech by certain speakers." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 577 (2011).  Under either standard, the publication bar fails.

### A.     The Publication Bar is Subject to Heightened Scrutiny Because It Uses A Speech Restriction As An Indirect Means To End Tenant-Pay Open Listings.

The City Council described the FARE Act as addressing "the dynamics that compel tenants to pay fees to individuals who do not represent their interests and

from whom they do not seek services." Committee Report 12. The original bill would have addressed that concern directly by requiring brokers to collect their fees "from the party employing" them. Int. No. 360 § 26-3602(a). But the publication bar that the Council ultimately enacted impermissibly attempts to achieve the Council's goals indirectly through a speaker- and content-based speech restriction. As the District Court correctly recognized, "speech itself" is not the target of the publication bar—"the agency relationship is." Opinion & Order 18.

That is precisely what the Supreme Court prohibited in *Sorrell*. Vermont there sought to achieve its goal of diminishing pharmaceutical salespersons' ability to influence prescription decisions through the indirect means of a commercial-speech restriction on salespersons using prescribing data for marketing purposes. *Sorrell*, 565 U.S. at 577. The Supreme Court held the speech restriction unlawful because the government may not "seek[] to achieve its policy objectives through the indirect means of restraining certain speech by certain speakers." *Id*.[2]

Just as Vermont sought to utilize a commercial-speech restriction to decrease the influence of pharmaceutical salespersons, the Council here seeks to achieve its

---

[2] This Court has stated that "*Sorrell* leaves the *Central Hudson* regime in place." *Vugo, Inc. v. City of New York*, 931 F.3d 42, 50 (2d Cir. 2019). But as the District Court recognized, *Vugo* "left open the possibility" that heightened scrutiny applies to " 'content- and speaker-based' restrictions that 'target[] a single category of speech by a single category of speaker.' " Opinion & Order 14-15 (quoting *Vugo*, 931 F.3d at 50 n.7). The publication bar is such a restriction.

goal of tying broker fees to the existence of a fiduciary relationship through the in-direct means of rendering brokers' tenant-pay open listings unprofitable. "There are divergent views regarding" the desirability of open listing tenant-pay broker fees. *Id*. at 578. "Under the Constitution, resolution of that debate must result from free and uninhibited speech." *Id*.

Also like Vermont's law in *Sorrell*, the publication bar "on its face burdens disfavored speech by disfavored speakers" *Id*. at 564. It applies only to "listing[s]." N.Y.C. Admin. Code § 20-699.21(a)(2). "The statute thus disfavors marketing, that is, speech with a particular content." *Sorrell*, 564 U.S. at 564. And it applies solely to an "agent," a term the Act defines as "a person who is licensed as a real estate broker or real estate salesperson." N.Y.C. Admin. Code § 20-699.20. The publica-tion bar therefore also "disfavors specific speakers, namely" brokers. *Sorrell*, 564 U.S. at 564. "[T]hat circumstance is sufficient to justify application of heightened scrutiny." *Id*. at 571.

The District Court flipped *Sorrell* on its head by holding that it was permissi-ble for the publication bar to target brokers because brokers are responsible for the tenant-pay fees the Council seeks to curtail. Opinion & Order 17 (reasoning that "application to any other group would . . . have little practical effect"). But *Sorrell*'s teaching is that governments may not single-out particular speakers for disfavored treatment because those speakers' marketing goals "are often in conflict with the

13

[government's] goals." *Sorrell*, 564 U.S. at 580 (citation omitted). The District Court also erroneously concluded that the publication bar's limited application to "listings" does not render it content based. Opinion & Order 15-17. The Supreme Court held nearly 50 years ago that regulation of real-estate "for sale" signs is "based on their content." *Linmark Assocs., Inc. v. Willingboro Tp.*, 431 U.S. 85, 94 (1977). There is no principled reason for a different result for the online equivalent.

With those errors swept aside, what is left is a speech restriction "directed at certain content and . . . aimed at particular speakers" for the purpose of achieving indirectly policy objectives that can be better achieved—and would have been achieved by the Council's original bill—without sacrificing protected speech. *Sorrell*, 564 U.S. at 567. "As a consequence," the publication bar "must be subjected to heightened judicial scrutiny." *Id*. at 557. And it cannot satisfy that standard. Indeed, it cannot even satisfy *Central Hudson*.

### B. The Publication Bar Fails Even Intermediate Scrutiny.

To succeed under *Central Hudson*, the City must demonstrate (1) that the publication bar arises from a substantial government interest; (2) that the publication bar directly advances that interest; and (3) that the publication bar "is not more extensive than is necessary to serve that interest." 447 U.S. at 566.

14

The District Court erred in holding *Central Hudson* satisfied by an amalgamation of the City Council's putative interests in (1) aligning the principal-agent relationship; (2) increasing housing mobility; and (3) promoting the negotiability, fairness, and transparency of broker fees. Opinion & Order 19-20. Some of these interests check some of *Central Hudson*'s boxes. But none checks them all.

1. *The publication bar prohibits far more speech than necessary to advance the City Council's stated interest in aligning the principal-agent relationship.*

A speech restriction fails *Central Hudson* if a more-limited restriction would adequately serve the government's asserted interest. *Art & Antique Dealers League of Am., Inc. v. Seggos*, 121 F.4th 423, 441 (2d Cir. 2024). And here, the Council's original bill requiring that brokers collect their fee "from the party employing" them, Int. No. 360 § 26-3602(a), would have accomplished the Council's goal of aligning the principal-agent relationship among brokers, landlords, and tenants, *see* Committee Report 10, without trammeling Plaintiffs' speech rights. That is dispositive: "[I]f the Government could achieve its interests in a manner that does not restrict speech, or that restricts less speech, the Government must do so." *Thompson v. Western States Med. Ctr.*, 535 U.S. 357, 371 (2002).

The District Court held otherwise based on the Council's mistaken concerns about a possible "loophole in which a landlord might retain a broker to publish an open listing, only to later claim that the broker is not his agent." Opinion & Order

15

18; *see also id*. at 24. But "[w]hen the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994) (quotation marks omitted). The Council never substantiated its worry that brokers lie about their existing fiduciary relationships— not even with anecdotal evidence. *See Seggos*, 121 F.4th at 442 (rejecting the State's argument that a narrower alternative was subject to a loophole because the argument was based on a "single anecdote"). Regardless, those concerns are already addressed by New York State law requiring that a landlord's agent must disclose his fiduciary obligations to a landlord "at the time of the first substantive contact with the . . . tenant." N.Y. Real Prop. Law § 443(3)(b), (4). The Council's loophole concern therefore cannot support the publication bar.

2. *The City Council's putative interest in increasing housing mobility is a post-hoc rationalization, and the Council had no evidence that the publication bar would actually do that.*

The District Court also credited Defendants' proffered interest in increasing housing mobility. Opinion & Order 19-20. But Defendants cannot satisfy intermediate scrutiny with post-hoc rationalizations. *Cornelio v. Connecticut*, 32 F.4th 160, 173 n.5 (2d Cir. 2022). And the Committee Report expressly disclaimed housing mobility as an interest. Rather than respond to the extensive written and oral testi-

16

mony that ending tenant-pay open listings would exacerbate the City's housing-mobility problems, *see supra* pp. 5-7, the Council dismissed those concerns as "misunderstand[ing] the purpose of the bill." Committee Report 10. The Council stated in no uncertain terms that "[t]he bill is *not* an attempt to solve the affordability crisis in the city," but is meant "to properly align the principal-agent relationship in the rental market to ensure that the principal pays the agent for services rendered, not a third party." *Id.* (emphasis added). The District Court erred by relying on the rationale the Council disavowed.

Regardless, Defendants did not demonstrate that the Council drew a "reasonable inference[] based on substantial evidence" that the publication bar would advance housing mobility. *Turner*, 512 U.S. at 666; *see also 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505 (1996) (holding that "without any findings of fact, or indeed any evidentiary support whatsoever, we cannot agree with the assertion that the price advertising ban will significantly advance the State's interest in promoting temperance"). As the testimony of the Deputy Commissioner of Housing Preservation and Development demonstrates, the Council had before it "no data" to support the notion that ending tenant-pay broker fees would improve housing mobility. Hearing Testimony 37:21. That is undoubtedly why the Council opted not to draw that inference.

In denying Plaintiffs an injunction pending appeal, the District Court stated that the City Council drew a reasonable inference of effectiveness based on "survey and investigation evidence" showing that (1) the upfront moving cost for New Yorkers is 14% of the city's median household income; (2) 60% of renters say that broker fees prevent them from moving; (3) 54% of renters would rather pay a higher monthly rent than a broker fee; and (4) broker fees are not negotiable. ECF 78 at 6. But the first and second data points demonstrate only that there is a substantial government interest in improving housing mobility. They do not support a reasonable inference that the publication bar—which does not directly bar tenant-pay broker fees, just publishing listings where the tenant will pay the broker fee—will serve that interest. Even then, eliminating tenant-pay broker fees will decrease housing mobility by reducing the affordable housing stock. *See e.g.*, Rahmanian Supp. Decl. ¶¶ 9-10.

Survey data showing that a bare majority of renters would prefer to pay a higher monthly rent similarly does not support a reasonable inference that the publication bar will improve housing mobility, particularly where the price increases caused by the Act decrease the available apartments a potential tenant may qualify for because their current salary no longer meets the 40-times-monthly-rent qualification New York City landlords use. And, as explained below, negotiability can and has been addressed without limiting protected speech. *Infra* pp. 19-20.

18

3.   *The City Council's putative interests in regulating the fairness, transparency, and negotiability of broker fees are either conclusory or fully addressed without the publication bar.*

"Intermediate scrutiny requires that the state 'demonstrate that the harms it recites are real.' " *IMS Health Inc. v. Sorrell*, 630 F.3d 263, 276 (2d Cir. 2010) (quoting *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995)), *aff'd* 564 U.S. 552 (2011). In *IMS Health*, for instance, this Court held that Vermont could not rely on its proffered interest in preserving the integrity of the prescribing process to justify its bar on using prescribing information in pharmaceutical marketing because Vermont had not shown that using prescribing information in marketing undermined the integrity of prescriber's decisions. *Id.* What little evidence the State did have was either speculative or anecdotal. *See id.*

Here, the Council asserted that brokers are not providing sufficient services to tenants to justify their fees. Committee Report 9. But the only evidence the Council offered for that contention was anecdotal testimony that when a small number of prospective tenants toured apartments, no one from the brokerage firm was present. *Id.* at 2 n.2, 9-10. But brokers do far more than show apartments, and tenants use brokerages' services every time they view an online listing on a platform like StreetEasy. *See supra* pp. 3-5.

The City Council's transparency and negotiability interests, moreover, are fully addressed by other laws. The Committee Report stated that brokers were not

19

properly disclosing the broker-fee cost and that brokers are refusing to negotiate their fees. Committee Report 8. But the Committee Report itself acknowledges that the Act's separate disclosure requirements fully address those issues. *Id*. at 12. They are also addressed by state and federal law. *See* N.Y. Real Prop. Law § 443(3)(b), (4); 15 U.S.C. §§ 1-7. Because the publication bar adds nothing, its curtailment of Plaintiffs' speech rights cannot be "in proportion to the interest served." *Seggos*, 121 F.4th at 439 (citation omitted).

### C. Plaintiffs Have At The Very Least Shown "Serious Questions" On The Merits.

For Plaintiffs to show a likelihood of success, they need not demonstrate that they are "more likely than not to succeed on [their] underlying claims." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34 (2d Cir. 2010). They can instead show "serious questions going to the merits" and that the "balance of hardships tip[s] decidedly" in their favor. *Id*. at 35 (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979)). Plaintiffs have crossed at least that threshold here.

## II. PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION PENDING APPEAL AND THE CITY AND PUBLIC WILL NOT BE HARMED BY ONE.

It is axiomatic that "the deprivation of First Amendment rights is an irreparable harm." *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020).

Every day the publication bar is in effect is one in which the broker Plaintiffs are irreparably harmed.

In addition to the constitutional interests, the publication bar has and will continue to irreparably harm Plaintiffs' businesses. *See Loveridge v. Pendleton Woolen Mills, Inc.*, 788 F.2d 914, 916 (2d Cir. 1986) (noting that "destruction of an ongoing business" may constitute irreparable harm); *In re NTE Conn. LLC*, 26 F.4th 980, 990 (D.C. Cir. 2022) (explaining that economic injuries can constitute irreparable harm if "no adequate compensatory or other corrective relief will be available at a later date" (quotation marks omitted)). The publication bar shatters the broker Plaintiffs' longstanding business model and makes it more difficult for them to earn a living. Hourigan Supp. Decl. ¶ 13. Some agents are likely to be pushed out of the industry entirely. Rahmanian Supp. Decl. ¶ 13; Hourigan Supp. Decl. ¶ 15; Saltzberg Supp. Decl. ¶ 14; Porco Decl. ¶ 23 ("The impact of the FARE Act will likely force my brokerage business to collapse.").

The publication bar hurts landlords, too, by increasing operational costs—requiring them to reduce valuable services, forego needed maintenance, and cancel upgrades. Porco Decl. ¶¶ 16-17. Those harms create serious safety issues, make properties less competitive, and damage relationships with tenants. *Id.*; *see also id.* ¶ 17 ("The margins for landlords are so thin, the FARE Act only makes them that much thinner."). That, too, justifies an injunction pending appeal.

On the other side of the scale, "securing First Amendment rights is in the public interest," and the "Government does not have an interest in the enforcement of an unconstitutional law." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (citation omitted). New York City has operated under a tenant-pay open-listing system for decades. The City will not be harmed by a few additional months' delay as the Court considers the legality of the publication bar. The accelerated briefing schedule will have briefing concluded by October 9, 2025. And that the Council already imposed a 180-day grace period between the law's enactment and its effective date demonstrates that market predictability and stability should prevail over immediate abolition of the open-listing system.

Moreover, by effectively ending tenant-pay broker fees for open listings, the publication bar has caused rents to soar and the number of publicly available listings to plunge, making it more difficult for the tenants the Act was supposed to help to find an affordable apartment. *See* Picciotto, *supra*; Fahmy, *supra*; Saltzberg Supp. Decl. ¶¶ 4-13; Hourigan Supp. Decl. ¶¶ 3-14; Rahmanian Supp. Decl. ¶¶ 3-12. The Court should act swiftly to prevent further harm to the market, Plaintiffs, and most of all, New York City renters.

## CONCLUSION

The Court should enjoin enforcement of the publication bar, N.Y.C. Admin.

Code § 20-699.21(a)(2), pending appeal.

Respectfully submitted,

SEAN MAROTTA
J. ANDREW MACKENZIE
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600

*/s/ Claude G. Szyfer*
CLAUDE G. SZYFER
DARYA D. ANICHKOVA
HOGAN LOVELLS US LLP
390 Madison Ave.
New York, N.Y. 10017
(212) 918-3000
claude.szyfer@hoganlovells.com

*Counsel for Plaintiffs-Appellants*

July 11, 2025

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limits of Fed. R. App. P. 27(d)(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,189 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman.

*/s/ Claude G. Szyfer*
Claude G. Szyfer

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was filed with the Clerk using the Appellate Case Management System ("ACMS") on July 11, 2025. All counsel of record are registered ACMS users, and service will be accomplished by the ACMS system.

*/s/ Claude G. Szyfer*
Claude G. Szyfer
