# 25-1506

## United States Court of Appeals
## for the Second Circuit

REAL ESTATE BOARD OF NEW YORK, INC., NEW YORK STATE
ASSOCIATION OF REALTORS, INC., BOHEMIA REALTY GROUP,
BOND NEW YORK REAL ESTATE CORP., LEVEL GROUP, INC.,
REAL NEW YORK LLC, FOUR CORNERS REALTY, LLC, 21
WEST 74 CORP., 8 WEST 119TH STREET HDFC,

*Plaintiffs-Appellants*,

*against*

THE CITY OF NEW YORK, a municipal entity, VILDA VERA
MAYUGA, as Commissioner of New York City
Department of Consumer and Worker Protection,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of New York

## MEMORANDUM OF LAW IN OPPOSITION TO
## MOTION FOR AN INJUNCTION PENDING APPEAL

RICHARD DEARING
CLAUDE S. PLATTON
JAMISON DAVIES
   *of Counsel*

July 21, 2025

MURIEL GOODE-TRUFANT
*Corporation Counsel*
*of the City of New York*
Attorney for Appellees
100 Church Street
New York, New York 10007
212-356-2490
jdavies@law.nyc.gov

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ........................................................1

OVERVIEW OF THE CASE .............................................................3

    A. The FARE Act ..................................................................3

    B. Procedural history .............................................................6

ARGUMENT ....................................................................................10

    THE MOTION FOR AN INJUNCTION PENDING APPEAL
    SHOULD BE DENIED .........................................................10

    A. Plaintiffs are unlikely to succeed on the merits. ...............12

        1. The challenged provision does not implicate the First
           Amendment, or at most warrants intermediate
           scrutiny.......................................................................12

        2. The challenged provision satisfies intermediate
           scrutiny.......................................................................17

    B. The remaining factors weigh against an injunction. .......21

CONCLUSION .................................................................................25

CERTIFICATE OF COMPLIANCE .................................................26

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agudath Israel of Am. v. Cuomo,*
  983 F.3d 620 (2d Cir. 2020) ............................................................ 23

*Agudath Israel of Am. v. Cuomo,*
  979 F.3d 177 (2d Cir. 2020) ............................................................ 11

*Central Hudson Gas & Electric v. Public Service Commission,*
  447 U.S. 557 (1980)............................................................ 14, 15, 16

*Clementine Co., LLC v. Adams,*
  74 F.4th 77 (2d Cir. 2023) ............................................................ 13

*Gazzola v. Hochul,*
  2022 U.S. App. LEXIS 36416 (2d Cir. Dec. 21, 2022), ................... 12

*Loveridge v. Pendelton Woolen Mills, Inc.,*
  788 F.2d 914 (2d Cir. 1986) ............................................................ 23

*Maryland v. King,*
  567 U.S. 1301 (2012)........................................................................ 21

*Mo. Broadcasters Ass'n v. Lacy,*
  846 F.3d 295 (8th Cir. 2017) ............................................................ 15

*New York v. U.S. Dep't of Homeland Sec.,*
  974 F.3d 210 (2d Cir. 2020) ............................................................ 11

*Nken v. Holder,*
  556 U.S. 418 (2009)........................................................................ 21

*In re NTE Conn. LLC,*
  26 F.4th 980 (D.C. Cir. 2022) .................................................... 23, 24

*Ohio Citizens for Responsible Energy, Inc. v. Nuclear Regulatory Comm'n,*
  479 U.S. 1312 (1986)........................................................................ 11

*Respect Maine PAC v. McKee,*
  562 U.S. 996 (2010)........................................................................ 12

*Retail Dig. Network, LLC v. Prieto,*
  861 F.3d 839 (9th Cir. 2017) ............................................................ 15

iii

# TABLE OF AUTHORITIES

Page(s)

*Roman Catholic Diocese v. Cuomo*,
  592 U.S. 14 (2020).................................................................... 11, 12

*Sorrell v. IMS Health, Inc.*,
  564 U.S. 552 (2011)...................................................... 14, 15, 16, 17

*The Art & Antique Dealers League of Am., Inc. v. Seggos*,
  121 F.4th 423 (2d Cir. 2024)........................................................... 20

*TikTok Inc. v. Garland*,
  145 S. Ct. 57 (2025) .................................................................. 13, 17

*Tom Doherty Assocs. v. Saban Entm't, Inc.*,
  60 F.3d 27 (2d Cir. 1995) ................................................................ 23

*Turner Broad. Sys., Inc. v. FCC*,
  512 U.S. 622 (1994)......................................................................... 16

*Vugo, Inc. v. City of New York*,
  931 F.3d 42 (2d Cir. 2019) .............................................................. 15

*Winter v. Nat. Res. Def. Council*,
  555 U.S. 7 (2008)............................................................................. 10

*Zauderer v. Off. of Disciplinary Counsel*,
  471 U.S. 626 (1985).......................................................................... 6

## Statutes

N.Y.C. Administrative Code § 20-699.21(a) ...............................*passim*

N.Y.C. Administrative Code § 20-699.21(c)......................................... 6

N.Y.C. Administrative Code § 20-699.21(d) ........................................ 6

N.Y. Real Prop. L. § 440(1)............................................................... 17

N.Y. Real. Prop. L. § 440-a ............................................................... 17

## Other Authorities

Alyce McFadden, *What to Know About Broker Fees in
  New York City*, N.Y. Times (Nov. 14, 2024), *at*
  https://www.nytimes.com/2024/11/14/nyregion/bro-
  ker-fees-nyc.html ................................................................................ 4

iv

# TABLE OF AUTHORITIES

**Page(s)**

Kenny Lee, *NYC Rental Market Remains Stable Since the FARE Act*, StreetEasy (July 11, 2025), *at* https://streeteasy.com/blog/nyc-rental-market-stable-since-fare-act ................................................................................. 22

## PRELIMINARY STATEMENT

On June 11, 2025, legislation working a major change in New York City's residential rental market took effect. Historically, New York was one of only two major U.S. cities where prospective tenants commonly paid a broker whom they did not hire and who provided no services to them. Broker fees often amounted to thousands of dollars, inflating the up-front costs of moving and reducing housing mobility. In response, the City enacted Local Law 119 of 2024, referred to as the FARE Act, to prohibit a broker who is a landlord's agent, or who publishes an apartment listing with the landlord's permission, from charging the tenant their fee. Plaintiffs—landlords and real-estate brokers, and trade groups representing them—challenged the FARE Act on several grounds and moved for a preliminary injunction against its enforcement. The U.S. District Court for the Southern District of New York (Abrams, J.) denied a preliminary injunction and dismissed all of plaintiffs' claims save one—a challenge under the Constitution's Contracts Clause.

Plaintiffs now ask this Court for the extraordinary relief of enjoining a law that has been in effect for over a month, to which renters and brokers have adjusted, based on a First Amendment claim that the district court concluded had *zero* likelihood of success. They cannot meet their heavy burden of showing entitlement to an injunction.

To start, plaintiffs have no likelihood of success on the merits of their First Amendment claim. Though they insistently refer to the provision they challenge as a "publication bar," it does not bar the publication of anything by anyone. Instead, it provides that, if a broker lists an apartment with the permission of a landlord, the broker cannot later collect a fee from the tenant who rents it. Brokers are still free to advertise any listing they like, and landlords are free to retain brokers to list their apartments. The provision thus does not even implicate the First Amendment. And if the law did impose some burden on plaintiffs' speech, it would easily satisfy intermediate scrutiny under the commercial-speech doctrine, as the district court held.

Moreover, the balance of equities favors permitting the City to continue to enforce its law pending appeal. Lurching back to the old system now—after the law has been in place for over a month, and tenants and brokers alike have relied on it—would create chaos. And plaintiffs' dire assertions about the FARE Act's effects are either demonstrably incorrect or amount to mere policy objections. Plus, plaintiffs have not shown any irreparable harm. They largely complain of the monetary impact on their business model, which does not carry their burden. And their attempt to establish irreparable harm based on a constitutional injury fails because they have no viable First Amendment claim.

2

## OVERVIEW OF THE CASE

### A. The FARE Act

The FARE Act, Local Law 119 of 2024, amended the New York City Administrative Code to address a market failure in the City's residential rental market where tenants are often forced to pay a fee to a broker who was retained by the landlord (SDNY ECF Dkt. ("ECF") 21, Ex. C at 3-10 ("Committee Report")). Tenants do not bear this burden in any other major rental market, save Boston (*id.* at 6).

Before the law's enactment, the New York City Council's Committee on Consumer and Worker Protection took testimony from the public and received feedback from stakeholders (*see generally* ECF 21, Exs. B, D). The City Council also investigated the practice of brokers' fees to determine whether tenants' rights were properly protected. The Committee considered this information before amending and approving the bill, which passed the City Council on November 13, 2024 (ECF 21 Ex. D). The FARE Act did not go into effect until June 11, 2025 to provide affected businesses and individuals time to prepare for the change in the market (ECF 38, Ex. A). The local law's passage was widely publicized. *See, e.g.*, Alyce McFadden, *What to Know About Broker Fees in New York City*, N.Y. Times (Nov. 14, 2024), *at* https://www.nytimes.com/2024/11/14/nyregion/broker-fees-nyc.html.

The legislative record reflects that tenants were commonly required to pay a broker's fee when renting an apartment, notwithstanding that the broker was chosen by, retained by, and works on behalf of the landlord (Committee Report 8-10). These fees represented large upfront costs for renters—thousands of dollars or more (*id.* at 7). They could be an insurmountable barrier to moving, and they contributed to the City's low apartment-turnover rate (*id.*). In one survey the Council consulted, 60% of respondents said these fees prevented them from moving, and 54% said they would be willing to pay a higher monthly rent to avoid upfront broker fees (*id.*).

Brokers retained by the landlord typically conducted the work necessary to fill a landlord's vacancy but might not provide comparable (or any) assistance to the tenant who paid their fee (*id.* at 9-10). However, industry norms and the City's competitive rental market weakened tenants' bargaining power relative to landlords' and brokers', and, in practice, tenants could not negotiate the often-insurmountable broker's fee (*id.* at 9). Accordingly, the City Council decided to "properly align the principal-agent relationship in the rental market to ensure that the principal pays the agent for services rendered" (*id.* at 10).

The FARE Act provides that "a landlord's agent shall not impose any fee on, or collect any fee from, a tenant related to the rental of

4

residential real property." N.Y.C. Administrative Code ("Admin. Code") § 20-699.21(a)(1). In response to concerns that a previous version of the bill "did not articulate what it means to hire a broker, and it did not address the relationship between parties in an open listing,"[1] the bill was amended to add § 20-699.21(a)(2) (Committee Report 11).[2] That provision clarifies that a broker who lists a property after being authorized to do so on the landlord's behalf may not charge a fee to a tenant, even if the broker had no formal relationship with the landlord (*id*.).

Representatives of some of these plaintiffs testified that this change was necessary because the bill's original text that would have made it such that "open listing[s] would result in a fee to the tenant" when they were published with the authorization of the landlord, but the broker had not specifically been hired by the landlord (ECF 21, Ex. B at 8 (testimony of Sarah Salzberg of Bohemia Realty); *see id*. at 9 (testimony of Douglas Wagner of Bond New York noting that, under prior

_____

[1] In an "open listing" a landlord provides information about an available property to brokers and permits the brokers to market it on a nonexclusive basis (ECF 1 ¶ 36). The brokers then advertise the property and, when they successfully broker a lease, seek compensation from the tenant (*id*. ¶¶ 36-38).

[2] In full, it provides that "any agent who publishes a listing for a rental of residential real property with the permission or authorization of the landlord ... shall not impose any fee on, or collect any fee from, a tenant ... ." Admin. Code § 20-699.21(a)(2).

text, if landlords offered open listings, it would require tenants to "pay our commission")).

Section 20-699.21(a)(2) does not regulate the content of any listing; it merely prevents the agent from later collecting a fee from the tenant relating to that listing. Other provisions of the Act further make it unlawful for a landlord to require a tenant to pay the broker's fee for the landlord's broker or to require the tenant to retain a broker to rent a unit. Admin. Code § 20-699.21(c).[3]

## B. Procedural history

Shortly after the FARE Act passed, plaintiffs, comprising industry groups and entities who operate in the real-estate industry, filed suit seeking to invalidate the law (ECF 1). They alleged that it violates the First Amendment and the Contracts Clause of the U.S. Constitution and the Free Speech Clause of the New York Constitution and that it is preempted by state law. Nearly a month later, plaintiffs sought a preliminary injunction against the law's enforcement (ECF 19).

---

[3] Separately, § 20-699.21(d) prohibits "post[ing] a listing for the rental of residential real property that represents that fees must be paid in a manner that would violate this section." That provision is not at issue here. In any event the government may regulate "commercial speech that ... proposes an illegal transaction." *Zauderer v. Off. of Disciplinary Counsel*, 471 U.S. 626, 638 (1985).

Defendants opposed the preliminary injunction and moved to dismiss. The district court granted the motion to dismiss except as to the Contracts Clause claim and denied the motion for a preliminary injunction (ECF 61 ("Opinion") 41-42). As relevant here, the district court first found that § 20-699.21(a)(2) burdens speech because a broker's speech, in the form of a listing, is a "predicate for the application of the prohibition" (*id.* at 13). The court then concluded that the provision is subject to intermediate scrutiny as a regulation of commercial speech (*id.* at 18). The court found that the law affects listings "regardless of their content," addressing "only the *actions* that a broker may take after publishing a listing" (*id.* at 16 (emphasis added)). And it does not impose a suspect speaker-based limitation though it applies only to brokers, because that limit reflects that only brokers advertise relevant apartment listings (*id.* at 17).

Having established that intermediate scrutiny applied, the court concluded that the law met that test. First, the court determined that the City's asserted interest is substantial (*id.* at 20). The law's goal is to correct a market failure and reduce punishing upfront costs for tenants seeking apartments. The legislative record supports that concern, noting that there was a significant "financial burden that brokers' fees

7

impose on renters," the fees were not negotiable, and brokers provided "minimal consideration" to "prospective tenants in return" (*id.*).

Next, the court found that the City had "substantiated the existence of the harm it seeks to address" and that the law would alleviate those harms "to a material degree" (*id.* at 20-21). The court recounted evidence supporting the "City's contention that the misalignment of the principal-agent relationship in New York City's rental market causes real harm" (*id.* at 21 (cleaned up)). And the law directly and materially advances the City's interest in addressing that harm. It aims to improve housing mobility, and the means chosen meet that goal (*id.* at 23). Whether the law might have been "tailored differently" was "beside the point"—the City was not "required to make progress on every front before it can make progress on any front" (*id.* at 23-24 (cleaned up)).

Finally, the court held that the regulation did not burden "substantially more speech than is necessary to further the government's legitimate interests" (*id.* at 24 (cleaned up)). Rather, "[b]rokers remain free to post any listing they choose" (*id.* at 25). Likewise, the law leaves open alternative channels for communication because brokers could communicate information about available properties directly to their clients, rather than by publishing a listing (*id.*).

8

Ultimately, the court concluded, plaintiffs' objections to the FARE Act stemmed from a "fundamental disagreement with its underlying policy" not any "effects on their constitutional rights" (*id.* at 41). But whether it is good policy is irrelevant to its constitutionality (*id.*).

The local law went into effect on June 11, 2025, the day after the district court issued its decision. Plaintiffs did not immediately move the district court for an injunction pending appeal. Nor did they ask the district court to enter a brief injunction against the law's taking effect while they sought an injunction pending appeal.

Instead, they waited more than two weeks after the law went into effect to file an "emergency motion" for an injunction pending appeal under FRCP 62(d) (ECF 67). They told the district court that if it didn't grant that relief within another two weeks, they would seek relief from this Court.

On July 10, the district court denied the motion, finding that it "merely repackage[d]" the arguments in plaintiffs' original motion and declining their "invitation" to "weigh their evaluation of the FARE Act's wisdom against that of the City Council" (ECF 78 at 3-5). The court also found that the "City will be substantially injured by an injunction" because when a government is "enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of

irreparable injury," and the "public has an interest in seeing its laws enforced" (*id.* at 7 (cleaned up)). Those factors, along with the "low likelihood of success on the merits, outweigh any harm Plaintiffs may suffer absent an injunction" (*id.*).

A month after the law went into effect, Plaintiffs filed the present motion in this Court seeking an injunction pending appeal.

## ARGUMENT

### THE MOTION FOR AN INJUNCTION PENDING APPEAL SHOULD BE DENIED

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). An injunction pending appeal, after the district court denied injunctive relief, is even more extraordinary, and the movant bears a correspondingly heavier burden.

To obtain an injunction from a district court, movants must show that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Id.* at 20. To obtain a stay of a district court's order pending appeal, more would be required, including a "strong showing that [the

movant] is likely to succeed on the merits." *New York v. U.S. Dep't of Homeland Sec.*, 974 F.3d 210, 214 (2d Cir. 2020) (cleaned up). But "an injunction issued in the first instance by an appellate court" is "still more drastic than a stay." *Agudath Israel of Am. v. Cuomo*, 979 F.3d 177, 180 (2d Cir. 2020) ("*Agudath I*"). "Such a request demands a significantly higher justification than a request for a stay because, unlike a stay, an injunction does not simply suspend judicial alteration of the status quo but grants judicial intervention that has been withheld by lower courts." *Id.* (cleaned up); *see also Ohio Citizens for Responsible Energy, Inc. v. Nuclear Regulatory Comm'n*, 479 U.S. 1312, 1313 (1986) (Scalia, J., in chambers) ("grant[ing] judicial intervention that has been withheld by the lower courts … demands a significantly higher justification").

Plaintiffs cite *Roman Catholic Diocese v. Cuomo*, 592 U.S. 14 (2020), which granted the injunction this Court denied in *Agudath I*, in support of a standard more akin to that for a preliminary injunction in the district court (Motion for Injunction Pending Appeal ("Mot.") 10). But the Supreme Court there did not take issue with this Court's standard of review. *Cf. Roman Catholic Diocese*, 592 U.S. at 16 (noting that the opinion provides only a "brief summary of the reasons" relief was "essential"). And the Court held that the applicants still needed to "clearly establish[]" their entitlement to relief. *Id.* The Court simply

11

concluded that the applicants had made that heightened showing. *See id.* at 17-19. And this Court has continued to apply *Agudath I*'s standard for granting an injunction pending appeal. *See Gazzola v. Hochul*, No. 22-3068, 2022 U.S. App. LEXIS 36416 (2d Cir. Dec. 21, 2022), *stay denied* 144 S. Ct. 274 (2023).

Here, plaintiffs are "asking for an injunction against enforcement of a presumptively constitutional … legislative act," *Respect Maine PAC v. McKee*, 562 U.S. 996, 996 (2010), and come nowhere near meeting the exceedingly high bar to warrant such relief.

## A. Plaintiffs are unlikely to succeed on the merits.

### 1. The challenged provision does not implicate the First Amendment, or at most warrants intermediate scrutiny.

Plaintiffs' First Amendment claim fails at the threshold because § 20-699.21(a)(2) does not burden protected speech. But, if it did burden speech to some degree, it would trigger only the intermediate scrutiny applicable to commercial-speech regulations. Plaintiffs' bid for more searching scrutiny stretches precedent beyond the breaking point.

To start, § 20-699.21(a)(2) is a regulation of conduct, not speech. Despite plaintiffs' repeated references to the provision as a "publication bar," it doesn't bar anyone from publishing anything. Nor does it dictate what anyone may or may not say. Section 20-699.21(a)(2) provides only

that, if a broker publishes a listing with a landlord's authorization, she cannot collect her fee from the tenant. By its plain terms, it prohibits *no* speech whatsoever. It affects only the *actions* that a broker may take after publishing a listing.

Thus, § 20-699.21(a)(2) is not subject to First Amendment scrutiny at all because it does not "directly regulate[] protected expressive activity[] or conduct with an expressive component" or "impose a disproportionate burden upon those engaged in protected First Amendment activities." *TikTok Inc. v. Garland*, 145 S. Ct. 57, 65 (2025). Instead, the law regulates only the *conduct* of charging a fee to a tenant, instead of a landlord, where an agent posts an apartment listing on the landlord's behalf. *See Clementine Co., LLC v. Adams*, 74 F.4th 77, 85 (2d Cir. 2023) (policy did not implicate First Amendment where it affected only what plaintiffs "must do," not what they "may or may not say" (cleaned up)).

The district court concluded otherwise despite finding that the law "impacts only the *actions* that a broker may take after publishing a listing" (Opinion 16 (emphasis added)), reasoning that the prohibition on charging a fee to the tenant applies to brokers "because of the fact that they were engaging in speech at all" (*id.* at 13). But the prohibition is on charging a fee to a tenant whenever the landlord engages a broker's

13

services. A broker's publication of a listing with the consent of the land-lord is just one way of establishing that a broker is providing services to the landlord (*see* Committee Report 11), meaning that the prohibition isn't tied to speech at all. Innumerable laws provide that speech acts affect parties' legal relationships; that does not mean that those laws *regulate* speech.

If some degree of First Amendment scrutiny applied to § 20-699.21(a)(2), it would be intermediate scrutiny under *Central Hudson Gas & Electric v. Public Service Commission*, 447 U.S. 557 (1980). If the law were deemed to regulate speech, it would unquestionably be commercial speech, as the district court held.

Plaintiffs' argument to the contrary relies on distorted reading of *Sorrell v. IMS Health, Inc.*, 564 U.S. 552 (2011). To start, plaintiffs describe *Sorrell* as applying "heightened scrutiny" to commercial speech in certain circumstances (Mot. 11). But *Sorrell* didn't go so far. The statute at issue in *Sorrell* sought to discourage prescribing brand-name drugs by imposing "content- and speaker-based restrictions on the sale, disclosure, and use of prescriber-identifying information" by pharmaceutical manufacturers and marketers, without similarly limiting other speakers such as "researchers, journalists, and the State itself." 564 U.S. at 563, 573. The Court suggested that this content- and viewpoint-based

14

discrimination might warrant "a stricter form of judicial scrutiny." *Id.* at 571. But it nonetheless applied the *Central Hudson* test because "the outcome [was] the same." *Id.* Thus, even as to a law that had blatant content- and speaker-based restrictions, the Court did not hold that "heightened scrutiny" was necessarily required. *See Vugo, Inc. v. City of New York*, 931 F.3d 42, 50 (2d Cir. 2019) ("*Sorrell* leaves the *Central Hudson* regime in place[.]").

Moreover, plaintiffs assert that the heightened scrutiny suggested by *Sorrell* is triggered by regulations directed at "certain content and … speakers" (Mot. 14 (cleaned up)). But no court of appeals has applied that rule. *See, e.g., Retail Dig. Network, LLC v. Prieto*, 861 F.3d 839, 848 (9th Cir. 2017) (en banc) (holding that the "content-and speaker-based distinction is relevant only insofar as parties dispute whether the law regulates speech" and rejecting argument that "*Sorrell*'s references to 'heightened scrutiny' mean something greater than intermediate scrutiny applies in commercial speech cases"); *Mo. Broadcasters Ass'n v. Lacy*, 846 F.3d 295, 300 n.5 (8th Cir. 2017) (reaffirming that content- and speaker-based commercial-speech restrictions are evaluated under *Central Hudson*). And *Sorrell* itself relied on the fact that the law at issue went "beyond mere content discrimination, to actual viewpoint

discrimination." *Sorrell*, 564 U.S. at 565 (cleaned up). But even then the Court nonetheless applied *Central Hudson*. *Id.* at 571.

Nor does § 20-699.21(a)(2) resemble the law at issue in *Sorrell*. As plaintiffs note, the law there sought to "diminish pharmaceutical salespersons' ability to influence prescriptions" (Mot. 12). In other words, it was a legislative thumb on the scale against pharmaceutical marketing by direct means (limiting marketers' use of prescription data) and indirect means (preventing pharmacies from selling the data for marketing purposes). *Sorrell*, 564 U.S. at 577-78. The problem was that the government "burdened a form of protected expression that it found too persuasive" and, at the same time, "unburdened those speakers whose messages are in accord with its own views." *Id.* at 580.

That analysis is inapplicable to § 20-699.21(a)(2), which does not take sides between competing messages or speakers. The FARE Act, unlike the law at issue in *Sorrell*, poses no risk of "excising certain ideas or viewpoints from the public dialogue." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994). And the law does not target any disfavored speakers for their speech. Instead, its application is limited to brokers because brokers are the only people likely to post apartment listings and then seek fees from tenants (Opinion 17). Indeed, brokers are the only people *allowed* to offer apartments in New York and charge a broker fee.

16

*See* N.Y. Real Prop. L. §§ 440(1), 440-a. In other words, the law does not affect brokers because they are disfavored speakers, but rather because they are the only relevant individuals to whom the law could apply (Opinion 17). *See TikTok*, 145 S. Ct. at 68 (heightened scrutiny unwarranted if differential treatment is "justified by some special characteristic of the particular speaker being regulated" (cleaned up)).

Ultimately, the law at *Sorrell* was suspect because it was aimed at speech, in the form of pharmaceutical marketing, that the government disliked. Here, there is no such targeting of speech; instead, § 20-699.21(a)(2) is focused on the conduct of collecting a fee from a renter.

### 2. The challenged provision satisfies intermediate scrutiny.

If it implicates the First Amendment, the challenged provision satisfies intermediate scrutiny. As the district court held, § 20-699.21(a)(2) addresses a substantial government interest, directly advances that interest, and is not more extensive than necessary to serve it (Opinion 19-25). The City has a substantial interest in addressing "the financial burden that brokers' fees impose on renters, the de facto non-negotiability of such fees, and the minimal consideration brokers often provide prospective tenants in return" (*id.* at 20). And the law serves that interest because "renters will no longer pay brokers' fees for properties rented

through open listings, which reduces the upfront cost of moving and thereby increases their ability to move" (*id*. at 22). The law also does not burden more speech than necessary because "[b]rokers remain free to post any listing they choose" (*id*. at 25).

Plaintiffs attack the district court's reasoning on various grounds. They begin by contending that § 20-699.21(a)(2) burdens more speech than necessary, asserting that it should instead just have required brokers to collect fees "from the party employing" them (Mot. 15-16). But the district court rightly credited the City Council's judgment that this alternative approach, which was reflected in the original version of the legislation, would have failed to accomplish the legislation's goals (Opinion 18). As plaintiffs concede, brokers post open listings without having a formal agreement with the landlord that would make the landlord the party retaining the broker (Mot. 4).

Plaintiffs incorrectly assert that no evidence before the City Council substantiated this concern (Mot. 16). In fact, representatives of some of the plaintiffs in this lawsuit testified that the bill's original text would have made it such that open listings resulted in the imposition of a fee on the tenant, and the Committee Report noted that § 20-699.21(a)(2) was added to address this concern (*see supra* 5-6).

Next, plaintiffs dispute whether § 20-699.21(a)(2) serves the identified interest of increasing housing mobility (Mot. 16-17). They begin by claiming the Committee Report "expressly disclaimed housing mobility as an interest," arguing that the report dismissed concerns the bill would reduce housing mobility as "misunderstand[ing] the purpose of the bill" (*id.* at 17). This is false. The report says that what "misunderst[ood] the purpose of the bill" were objections that the bill would not address "the affordable housing crisis in the city"; it did *not* disclaim that the legislation would address housing *mobility* (Committee Report 10; Opinion 22-23). The report makes clear that affordability was a separate problem "being explored by the Council in multiple other avenues" (Committee Report 10).

Further, the Committee Report is replete with evidence that broker fees reduce housing mobility, from which the Council could draw the inference that eliminating those fees would increase mobility (*id.* at 7-9; *see* Opinion 22 (noting that Committee found that tenant-paid broker fees "increase[] the upfront cost of renting and reduce[] housing mobility")).[4] As the district court found, the Council's "conclusion that

---

[4] Plaintiffs' quotation of snippets of testimony taken before the Committee Report issued, provided by the Commissioner of Housing Preservation and Development, who does not deal with broker fees, does not undercut the Committee Report's evidence (Mot. 6, 17).

eliminating such unsolicited fees would improve mobility was ... a logi-
cal inference drawn from the ample evidence before it" (ECF 78 at 6
(cleaned up)).

Finally, plaintiffs argue that § 20-699.21(a)(2) "adds nothing" be-
cause the City's interests could have been advanced sufficiently with just
the FARE Act's separate fee-disclosure requirements (Mot. 19-20). But
the Committee Report discussed the disclosure requirements, explain-
ing why they would not have gone far enough to address the Council's
concerns (Committee Report 12). As explained (*supra* 5-6), § 20-
699.21(a)(2) addresses a separate concern that representatives of some
of these very plaintiffs identified and plaintiffs now seek to ignore.

This Court should consider whether the means chosen to accom-
plish the legislature's ends are "in proportion to the interest served," not
whether they are "necessarily the single best disposition." *The Art & An-
tique Dealers League of Am., Inc. v. Seggos*, 121 F.4th 423, 439 (2d Cir.
2024) (cleaned up). As everyone agrees, the law is aimed at a significant
government interest. The law directly advances that interest, and the
burden it imposes on plaintiffs' speech—if any—is minimal. As the dis-
trict court concluded, plaintiffs cannot even state a First Amendment
claim, much less show that they are entitled to the drastic remedy of
enjoining this presumptively constitutional law pending appeal.

20

## B. The remaining factors weigh against an injunction.

The other factors also do not support injunctive relief. The balance of equities and the public-interest factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Applying this factor, the district court correctly found that "the City will be substantially injured by an injunction pending appeal" (ECF 78 at 7). This is so because any time the government "is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (cleaned up). That harm is particularly acute here because the law has been in effect for over a month, and renters, landlords, and brokers have already adjusted their conduct in response. Granting an injunction pending appeal would generate massive disruption and uncertainty, especially if this Court ultimately affirms and permits the law to take effect again months from now.

Plaintiffs' argument that the government has no interest in enforcing an unconstitutional law (Mot. 22) simply assumes what plaintiffs need to prove. But, as shown above and as the district court concluded, the challenged provision accords with the First Amendment. Likewise, plaintiffs are wrong in arguing that, because the City operated under a

tenant-pay system for decades, there is no harm in enjoining the law (*id.*). Hundreds, if not thousands, of apartments have already been rented under the new rules, brokers and renters have altered their conduct, and the public is aware of the law's effect. Enjoining it now—pending appeal—would create chaos in the rental market.

Plaintiffs also argue that the FARE Act does not advance the public interest because it has led to increased rents and decreased listings, relying on two articles citing data that is not publicly available and on vague and unsupported hearsay statements in their own declarations (Mot. 2, 9-10, 22). As the district court explained, those arguments are irrelevant because the Act "specifically sought to address the impact of unsolicited brokers' fees on the upfront cost of moving," despite concerns that it might raise rents (ECF 78 at 6). Moreover, following the initial disruptions plaintiffs highlight, those effects have dissipated. As one economist's detailed analysis showed, "rent has remained mostly stable … contrary to concerns that landlords would sharply increase rents"; "daily rental inventory increased 4.2% by the end of June"; and "[s]easonal trends and market forces—independent of the FARE Act—have been the primary drivers of rent growth." Kenny Lee, *NYC Rental Market Remains Stable Since the FARE Act*, StreetEasy (July 11, 2025), *at* https://streeteasy.com/blog/nyc-rental-market-stable-since-fare-

act. Plaintiffs' sky-is-falling alarmism based on two weeks of undisclosed data is simply wrong.

On the other side of the ledger, plaintiffs cannot show irreparable harm. In seeking to show otherwise, they rely on the argument that any harm to a litigant's First Amendment interests is necessarily irreparable (Mot. 20). Although deprivation of First Amendment rights is deemed an irreparable harm, the Court can conclude that the law would cause irreparable harm on this basis only if the "plaintiffs are likely to prevail" on their claims. *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020). Here, by dismissing the First Amendment claim outright, the district court concluded not just that plaintiffs' likelihood of success is low, but that they cannot succeed on the merits.

Plaintiffs also assert ongoing harm to their businesses (Mot. 21). But lost profits are not enough for irreparable harm. *See Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995); *Loveridge v. Pendelton Woolen Mills, Inc.*, 788 F.2d 914, 917 (2d Cir. 1986) (irreparable harm from financial loses only where a company "stands to lose its *entire* business" pending the outcome of litigation (emphasis added)). The mere fact that a business may be "less profitable" is insufficient, *Loveridge*, 788 F.2d at 917, and that is all plaintiffs have alleged in their self-serving declarations (*see* Mot. 21). Nor does *In re NTE*

*Conn. LLC*, 26 F.4th 980 (D.C. Cir. 2022), assist plaintiffs. As the Court noted, the case involved "unusual … circumstances and timing" because the plaintiff sought to stop an auction that could not have been undone once it occurred. *Id.* at 991. But here, if the FARE Act is ultimately found to be unconstitutional, brokers may simply resume charging tenants for services provided to landlords. There is no basis for the Court to intercede now.

## CONCLUSION

Plaintiffs' motion for an injunction pending appeal should be denied.

Dated:  New York, New York
        July 21, 2025

Respectfully submitted,

MURIEL GOODE-TRUFANT
*Corporation Counsel*
*of the City of New York*
Attorney for Appellees

By:   /s/ Jamison Davies
      JAMISON DAVIES
      Assistant Corporation Counsel

      100 Church Street
      New York, New York 10007
      212-356-2490
      jdavies@law.nyc.gov

RICHARD DEARING
CLAUDE S. PLATTON
JAMISON DAVIES
    *of Counsel*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this memorandum was prepared using Microsoft Word, and according to that software, it contains 5,199 words, not including the table of contents, table of authorities, this certificate, and the cover.

<u>/s/ Jamison Davies</u><br>JAMISON DAVIES