# 25-1506-cv

IN THE

## United States Court of Appeals
## for the Second Circuit

———————————

REAL ESTATE BOARD OF NEW YORK, INC.; NEW YORK STATE ASSOCIATION OF REALTORS, INC.; BOHEMIA REALTY GROUP; BOND NEW YORK REAL ESTATE CORP.; REAL NEW YORK LLC; LEVEL GROUP INC.; FOUR CORNERS REALTY, LLC; 21 WEST 74 CORP.; and 8 WEST 119TH STREET HDFC,

*Plaintiffs-Appellants*,

v.

THE CITY OF NEW YORK, *a municipal entity*, and VILDA VERA MAYUGA, *as Commissioner of New York City Department of Consumer and Worker Protection*,

*Defendants-Appellees*.

———————————

Appeal from the United States District Court
for the Southern District of New York

———————————

### BRIEF FOR PLAINTIFFS-APPELLANTS

———————————

SEAN MAROTTA
J. ANDREW MACKENZIE
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600

CLAUDE G. SZYFER
DARYA D. ANICHKOVA
HOGAN LOVELLS US LLP
390 Madison Ave.
New York, N.Y. 10017
(212) 918-3000
claude.szyfer@hoganlovells.com

*Counsel for Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENT

The Real Estate Board of New York, Inc. has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.

New York State Association of Realtors, Inc. has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.

Bohemia Realty Group has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.

Bond New York Real Estate Corp. has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.

Level Group Inc. has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.

REAL New York LLC has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.

Four Corners Realty, LLC has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.

21 West 74 Corp. has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.

8 West 119th Street HDFC has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.

i

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT .........................................i

TABLE OF AUTHORITIES ...................................................iv

JURISDICTIONAL STATEMENT ..............................................1

INTRODUCTION ............................................................2

ISSUES PRESENTED .......................................................6

STATEMENT OF THE CASE ................................................6

    A.   New York City Is In A Housing Crisis................................6

    B.   Brokers Provide Valuable Services To Prospective Tenants ............8

    C.   Brokers Can Be Compensated For Their Services In A
        Variety Of Ways, One Of Which Is The Tenant-Pay Open
        Listing .............................................................10

    D.   The City Council Considers Conditioning Tenant-Pay
        Broker Fees On The Existence Of A Fiduciary
        Relationship Between Broker And Tenant .......................12

    E.   The Council Opts For A Broader Law Barring Any
        Broker Who Publishes A Listing From Charging A
        Tenant Fee For That Listing...................................14

    F.   Plaintiffs Challenge The Law And Seek A Preliminary
        Injunction ........................................................17

    G.   The District Court Grants Defendants' Motion To
        Dismiss In Part And Denies Plaintiffs' Motion For A
        Preliminary Injunction .......................................17

STANDARD OF REVIEW .....................................................18

SUMMARY OF ARGUMENT.................................................19

ARGUMENT ................................................................23

# TABLE OF CONTENTS—Continued

Page

I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR FREE SPEECH CLAIMS ..................................... 23

   A.   The Publication Bar Is Subject To Heightened Scrutiny Because It Burdens Disfavored Speech By Disfavored Speakers ......................................................................... 24

   B.   The Publication Bar Fails Even Intermediate Scrutiny ................... 31

      1.   *The publication bar is a poor fit with the Council's stated interest in aligning the principal-agent relationship* ............................................................. 31

      2.   *The Council's putative interest in increasing housing mobility is a post-hoc rationalization, and the Council had no evidence that the publication bar would increase housing mobility* ........................................ 38

      3.   *The Council's putative interests in regulating the fairness, transparency, and negotiability of broker fees are either conclusory or fully addressed without the publication bar* ...................................... 42

II.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CONTRACTS CLAUSE CLAIM ....................... 44

   A.   The FARE Act's No-Conditioning Provision And Its Bar On A Landlord's Agent Charging A Tenant Fee Severely Impair Existing Exclusive Listing Agreements ................. 45

   B.   The Act's Impairment Of Existing Contracts Does Not Further A Legitimate Purpose ........................................... 47

   C.   The Act's Impairment Is Neither Reasonable Nor Appropriate ..................................................................... 51

III. THE REMAINING FACTORS FAVOR AN INJUNCTION ................. 56

CONCLUSION ........................................................................ 59

iii

## TABLE OF CONTENTS—Continued

<u>Page</u>

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

**CASES:**

*44 Liquormart, Inc. v. Rhode Island,*
    517 U.S. 484 (1996)...........................................................29, 30, 40, 41

*Agudath Israel of Am. v. Cuomo,*
    983 F.3d 620 (2d Cir. 2020) ................................................56

*Alessi v. Raybestos-Manhattan, Inc.,*
    451 U.S. 504 (1981)..............................................................41

*Allied Structural Steel Co. v. Spannaus,*
    438 U.S. 234 (1978)..................................................45, 47, 51

*American Civil Liberties Union v. Ashcroft,*
    322 F.3d 240 (3d Cir. 2003) ................................................57

*Arc of Cal. v. Douglas,*
    757 F.3d 975 (9th Cir. 2014) ..................................................1

*Art & Antique Dealers League of Am., Inc. v. Seggos,*
    121 F.4th 423 (2d Cir. 2024) ........................................32, 44

*Bolger v. Youngs Drug Prods. Corp.,*
    463 U.S. 60 (1983).................................................................37

*Buffalo Tchrs. Fed'n v. Tobe,*
    464 F.3d 362 (2d Cir. 2006) .........................................*passim*

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New
    York,*
    447 U.S. 557 (1980)........................................................*passim*

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster
    Bay,*
    868 F.3d 104 (2d Cir. 2017) ................................................33

*Clear Channel Outdoor, Inc. v. City of New York,*
    594 F.3d 94 (2d Cir. 2010) ............................................35, 36

# TABLE OF AUTHORITIES—Continued

Page

*Clementine Co. v. Adams*,
74 F.4th 77 (2d Cir. 2023) .................................................................36

*Connecticut State Police Union v. Rovella*,
36 F.4th 54 (2d Cir. 2022) ...........................................................48, 56

*Connecticut State Police Union v. Rovella*,
494 F. Supp. 3d 210 (D. Conn. 2020)................................................56

*Cornelio v. Connecticut*,
32 F.4th 160 (2d Cir. 2022) ...............................................................38

*DiTolla v. Doral Dental IPA of N.Y., LLC*,
100 A.D.3d 586 (2d Dep't 2012).......................................................34

*DoorDash, Inc. v. City of New York*,
692 F. Supp. 3d 268 (S.D.N.Y. 2023) ...............................................47

*Edenfield v. Fane*,
507 U.S. 761 (1993)..............................................................37, 38, 42

*Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*,
459 U.S. 400 (1983)...........................................................................51

*Gazzola v. Hochul*,
88 F.4th 186 (2d Cir. 2023) ...............................................................18

*General Motors Corp. v. Romein*,
503 U.S. 181 (1992)...........................................................................46

*Greater New Orleans Broad. Ass'n v. United States*,
527 U.S. 173 (1999)...........................................................................37

*Henneberry v. Sumitomo Corp. of Am.*,
415 F. Supp. 2d 423 (S.D.N.Y. 2006) ...............................................34

*Hudson Shore Assocs. Ltd. P'ship v. New York*,
139 F.4th 99 (2d Cir. 2025) ..........................................................18, 19

# TABLE OF AUTHORITIES—Continued

Page

*IMS Health, Inc. v. Sorrell*,
630 F.3d 263 (2d Cir. 2010) ...................................................35, 42, 43

*Iowa Utilities Bd. v. FCC*,
109 F.3d 418 (8th Cir. 1996) .................................................57

*Lamar Advert. of Penn, LLC v. Town of Orchard Park*,
356 F.3d 365 (2d Cir. 2004) ...................................................1

*Linmark Assocs., Inc. v. Willingboro Township*,
431 U.S. 85 (1977)...............................................................26, 29

*Loveridge v. Pendleton Woolen Mills, Inc.*,
788 F.2d 914 (2d Cir. 1986) .................................................57

*Lynch v. City of New York*,
589 F.3d 94 (2d Cir. 2009) .....................................................19

*Melendez v. City of New York*,
16 F.4th 992 (2d Cir. 2021) .........................................*passim*

*Ne. Gen. Corp. v. Wellington Advert., Inc.*,
82 N.Y.2d 158 (1993) ...........................................................34

*New York Progress & Prot. PAC v. Walsh*,
733 F.3d 483 (2d Cir. 2013) .................................................57

*Nken v. Holder*,
556 U.S. 418 (2009).............................................................57

*OTR Media Grp., Inc. v. City of New York*,
83 A.D.3d 451 (1st Dep't 2011) ...........................................24

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992)..............................................................28

*Resource Grp. Int'l Ltd. v. Chishti*,
91 F.4th 107 (2d Cir. 2024) .................................................19

# TABLE OF AUTHORITIES—Continued

Page

*Rubin v. Coors Brewing Co.*,
 514 U.S. 476 (1995) ................................................................42

*Safelite Grp., Inc. v. Jepsen*,
 764 F.3d 258 (2d Cir. 2014) ...............................................24

*Sanitation & Recycling Indus., Inc. v. City of New York*,
 107 F.3d 985 (2d Cir. 1997) .........................................48, 51

*Sonnenschein v. Douglas Elliman-Gibbons & Ives*,
 96 N.Y.2d 369 (2001) ...........................................................34

*Sorrell v. IMS Health Inc.*,
 564 U.S. 552 (2011) ....................................................*passim*

*Sullivan v. Nassau Cnty. Interim Fin. Auth.*,
 959 F.3d 54 (2d Cir. 2020) ..................................................44

*Sveen v. Melin*,
 584 U.S. 811 (2018) ..............................................44, 45, 46

*Thompson v. Western States Med. Ctr.*,
 535 U.S. 357 (2002) .............................................................32

*Turner Broad. Sys., Inc. v. FCC*,
 512 U.S. 622 (1994) ......................................................32, 40

*United States v. Caronia*,
 703 F.3d 149 (2d Cir. 2012) ...............................................26

*United States v. National Treasury Emps. Union*,
 513 U.S. 454 (1995) .............................................................24

*U.S. Tr. Co. of N.Y. v. New Jersey*,
 431 U.S. 1 (1977) .................................................................51

*Veterans Guardian VA Claim Consulting LLC v. Platkin*,
 133 F.4th 213 (3d Cir. 2025) ..............................................23

## TABLE OF AUTHORITIES—Continued

Page

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976) .................................................28, 29, 33, 41

*Vugo, Inc. v. City of New York*,
931 F.3d 42 (2d Cir. 2019) ...........................................26, 35

*Warren v. Pataki*,
823 F.3d 125 (2d Cir. 2016) .............................................19

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*,
471 U.S. 626 (1985)..........................................................24

CONSTITUTIONAL PROVISION:

U.S. Const. art. I, § 10, cl. 1 ...........................................44

STATUTES:

15 U.S.C. §§ 1-7.......................................................22, 44

28 U.S.C. § 1292(a)(1)....................................................1

28 U.S.C. § 1331 .........................................................1

28 U.S.C. § 1367 .........................................................1

N.Y.C. Admin. Code § 20-699.20 .......................15, 25, 27, 38

N.Y.C. Admin. Code § 20-699.21(a)(1).......................*passim*

N.Y.C. Admin. Code § 20-699.21(a)(2).......................*passim*

N.Y.C. Admin. Code § 20-699.21(b)(2).........................15

N.Y.C. Admin. Code § 20-699.21(c).................16, 17, 45, 59

N.Y.C. Admin. Code § 20-699.21(e).............................15

N.Y.C. Admin. Code § 20-699.22(a)............................16

ix

## TABLE OF AUTHORITIES—Continued

Page

N.Y.C. Admin. Code § 20-699.23(a) ........................................................16

N.Y.C. Admin. Code § 20-699.23(c) ........................................................16

N.Y. Real Prop. Law § 238-a(1)(b) .........................................................43

N.Y. Real Prop. Law § 443(1)(n) ..............................................................9

N.Y. Real Prop. Law § 443(3)(b) .............................................22, 33, 44

N.Y. Real Prop. Law § 443(3)(c) ...........................................................9, 38

N.Y. Real Prop. Law § 443(4) ..............................................23, 33, 44

**REGULATION:**

19 N.Y.C.R.R. § 175.25(b)(2) .................................................................15

**OTHER AUTHORITIES:**

Brad Lander, *Spotlight: New York City's Rental Housing Market* (Jan. 17, 2024), *available at* https://comptroller.nyc.gov/wp-content/uploads/documents/January-2024-Spotlight.pdf .....................................7

Rebecca Picciotto, *New York's Housing Crisis Is So Bad That a Socialist Is Poised to Become Mayor*, Wall St. J. (updated June 25, 2025), https://www.wsj.com/real-estate/nyc-mayor-primary-rent-housing-affordability-78e26691?st=kH4RkN&reflink=desktop webshare_permalink ..............................................................................8

Jennifer Senior, *In Conversation: Antonin Scalia*, N.Y. Magazine (Oct. 4, 2013), https://perma.cc/HMK5-VUW4 ................................................41

Mihir Zaveri, *New York City's Housing Crunch Is the Worst It Has Been in Over 50 Years*, N.Y. Times (Feb. 8, 2024) ............................................7

# JURISDICTIONAL STATEMENT

Plaintiffs-Appellants filed this suit alleging, as relevant here, free-speech claims under the First Amendment of the U.S. Constitution and Article I, Section 8 of the New York State Constitution, as well as a claim under the Contracts Clause of the U.S. Constitution. JA13-58. The District Court had federal-question jurisdiction over the federal-constitutional claims under 28 U.S.C. § 1331, and it had supplemental jurisdiction over the state-constitutional claim under 28 U.S.C. § 1367.

The District Court denied Plaintiffs a preliminary injunction on June 10, 2025. SPA1-42. Plaintiffs timely appealed two days later. JA1001. This Court has jurisdiction to review the denial of the preliminary injunction under 28 U.S.C. § 1292(a)(1). And because the District Court's sole basis for denying a preliminary injunction on the free-speech claims was its conclusion that Plaintiffs had failed to state a claim, this Court has pendent appellate jurisdiction over the District Court's Rule 12(b)(6) ruling. *See Lamar Advert. of Penn, LLC v. Town of Orchard Park*, 356 F.3d 365, 371 (2d Cir. 2004) (Sotomayor, J.) (explaining that pendent appellate jurisdiction attaches to matters "inextricably bound up with the preliminary injunction") (citation and brackets omitted); *Arc of Cal. v. Douglas*, 757 F.3d 975, 994 (9th Cir. 2014) (exercising pendent appellate jurisdiction over Rule 12(b)(6) ruling where "the district court refused to grant a preliminary injunction . . . for the selfsame reason it dismissed those claims").

1

## INTRODUCTION

New York City is in the midst of a housing crisis. There are far-too-many renters chasing far-too-few apartments, and the rise in monthly rent outpaces inflation every year. Over half of the City's residents are rent burdened, meaning that they spend more than 30 percent of their income on rent.

When the New York City Council proposed the Fairness in Apartment and Rental Expenses Act (FARE Act), both its sponsors and the public thought that the bill was meant to address the housing crisis. The first iteration of the bill would have required that the brokerage fee be paid by the person employing the broker, so that tenants would not need to pay a broker fee to agents that they did not hire. Debate over the bill centered on whether the Council's pay-the-broker-you-hire solution would actually make it harder for New Yorkers to move by causing rents to rise even more and by reducing brokers' incentive to publish listings on widely accessible websites like StreetEasy. Industry participants warned that the bill would make things worse, and councilmembers expressed frustration over the lack of evidence supporting their hypothesis that barring landlords' brokers from charging tenants fees would improve housing mobility.

But rather than marshal evidence to refute the bill's detractors, the Council slapped a new label on the Act. Now, the Council claimed, the FARE Act was *not*

meant to improve housing mobility at all, but was instead designed to align the principal-agent relationships among tenants, landlords, and their brokers. The Council also abandoned the initial proposal's straightforward approach of forbidding brokers from charging fees when they are not the payor's fiduciary, putting two prohibitions in its place. First, no landlord's broker may charge a tenant a broker fee. That prohibition standing alone would not cover so-called tenant-pay open listings because a broker who publishes an open listing is not a fiduciary of the landlord. A tenant-pay open listing is one for which a landlord permits multiple brokers to advertise a listing with the expectation that the broker whose tenant-client is selected to rent the apartment will receive her fee from her tenant. But the landlord does not enter into a listing agreement with the broker. So the Council forbid a broker who published a listing with the landlord's permission to thereafter collect a fee from a tenant related to the rental of the listed apartment. And to prevent a landlord's broker from circumventing the prohibition on tenants paying landlords' brokers by becoming a dual agent, the final FARE Act prohibits landlords and agents from conditioning a rental on the tenant hiring a broker.

In trying to paper over the FARE Act's lack of economic justification, the Council stepped into a thicket of constitutional issues. The First Amendment does not permit the government to use a commercial-speech restriction like the FARE Act's publication bar as an indirect means of achieving a nonspeech policy objective,

3

and the Supreme Court has subjected speech laws that apply to only certain disfavored speakers and content to heightened scrutiny.

The publication bar also cannot satisfy the intermediate scrutiny applicable to ordinary commercial-speech restrictions. The District Court repeatedly criticized Plaintiffs below for supposedly asking the court to scrutinize the Council's policy judgments. Yet that is precisely what the First Amendment requires. If the government is going to abrogate First Amendment-protected commercial-speech rights, it needs to *show*—not just claim—that its restriction directly and materially advances a substantial government interest, and that the government could not accomplish its goals as effectively without restricting speech or by restricting less speech.

Defendants cannot meet that burden here. The Council's goal of tying tenant fees to fiduciary obligations could have been achieved directly by requiring that brokers be paid only by the party employing them—just as the Council initially proposed. The publication bar will not decrease the number of broker fees paid by tenants to non-fiduciaries in any event. If a broker is not acting as a landlord's agent—in which case she would already be covered by the FARE Act's separate prohibition on a landlord's agent charging a tenant fee—then she will be acting as the tenant's fiduciary when she charges her tenant fee, and therefore would not be undermining the Council's interest in tenants paying fees to non-fiduciaries.

The publication bar is not the FARE Act's only constitutional defect. The Act's prohibition on a landlord's agent charging a tenant fee, in combination with its prohibition on conditioning an apartment on the tenant engaging a broker, burdens existing contracts between brokers and landlords in violation of the Contracts Clause. Brokers and landlords regularly enter into exclusive-listing arrangements that require landlords to refer inquiries about their property to the broker and that require the broker to seek compensation from the tenant. The FARE Act now renders those provisions permanently unenforceable. Defendants can name no legitimate public purpose for the severe impairment of these contractual agreements, nor can Defendants demonstrate the impairment constitutes a reasonable and necessary means of addressing its purported public purpose.

Plaintiffs are entitled to a preliminary injunction. Every day these unconstitutional provisions remain in effect, they inflict irreparable harm on Plaintiffs' constitutional rights, not to mention devastating harm to Plaintiffs' businesses. Plaintiffs will not be able to recoup the opportunities they have lost because they have not been able to advertise tenant-pay listings or enforce their contractual rights. Defendants' interests will not be harmed and the public's interests favor an injunction, as both Defendants and the public have an interest in vindicating constitutional rights. The public interest also favors economic stability, and the provisions challenged here

5

have and will continue to exacerbate New York City's housing crisis if they are allowed to remain in effect.

The Court should reverse and remand with instructions to issue a preliminary injunction.

## ISSUES PRESENTED

1. Whether Plaintiffs are entitled to a preliminary injunction on their free-speech claims.

2. Whether Plaintiffs are entitled to a preliminary injunction on their Contracts Clause claim.

## STATEMENT OF THE CASE

### A.    New York City Is In A Housing Crisis.

"Few would dispute that New York City is in the midst of a 'housing emergency.' " SPA4 (citation omitted). That includes Plaintiffs—brokers, their professional associations, and landlords—who navigate the City's residential rental market on a daily basis.

New York City's housing market is unlike other cities'. It is dominated by renters, with rental apartments comprising approximately 70 percent of the City's available housing. JA830. It is also consistently supply-constrained. Under the Emergency Tenant Protection Act of 1974, a vacancy rate below five percent constitutes a housing emergency, allowing the New York City Council to maintain the

City's rent stabilization laws. JA817. Since the law's enactment over 50 years ago, the vacancy rate has never surpassed five percent. *Id*. And the problem is now at its worst. In 2024, the New York Times reported that only 1.4 percent of the City's housing stock was available to rent, representing "the lowest vacancy rate since 1968." Mihir Zaveri, *New York City's Housing Crunch Is the Worst It Has Been in Over 50 Years*, N.Y. Times (Feb. 8, 2024). The shortage is even more pronounced for low-income New Yorkers. For units with asking rents below $1,100, the vacancy rate was just 0.4 percent in 2023. JA818. And rent-stabilized units showed a 0.98 percent vacancy rate. JA819. The highest vacancy rate was for units with $2,400-or-more asking rents—and even then, that is just 3.4 percent. JA818. By comparison, the national rental vacancy rate was 6.9 percent in the third quarter of 2024, nearly five times higher than the City's. *Id*.

Compounding the difficulty of finding an apartment in New York City is the difficulty of affording one. Very high population density, very low turnover rates, and rent regulations all combine to keep rental costs persistently high. JA816. Median asking rent in 2023 was a whopping $3,500 per month. Brad Lander, *Spotlight: New York City's Rental Housing Market* 4 (Jan. 17, 2024), *available at* https://comptroller.nyc.gov/wp-content/uploads/documents/January-2024-Spotlight.pdf. And rents have only continued to rise. "The monthly rent for a two-bedroom apartment has climbed 17.5 percent over the past year to $5,560 . . . the most of any U.S. city."

Rebecca Picciotto, *New York's Housing Crisis Is So Bad That a Socialist Is Poised to Become Mayor*, Wall St. J. (updated June 25, 2025), https://www.wsj.com/real-estate/nyc-mayor-primary-rent-housing-affordability-78e26691?st=kH4RkN&reflink=desktopwebshare_permalink. In practical terms, that means New Yorkers are paying far-too-much for housing. More than half of New York City households are rent burdened, spending 30 percent or more of their income on rent. JA821.

But it is not just tenants who are suffering. Landlords of low-rent and rent-stabilized units have likewise been pushed to—or past—the breaking point. The paper-thin profit margins for many of these units are quickly subsumed by mortgage payments, operation-and-maintenance costs, property taxes, utilities, and repairs. JA789-791, JA807-808. Worse, landlords forbidden by rent regulations from raising rents to cover their expenses have been forced to take their rent-stabilized units off the market, further decreasing supply. *See* JA837 (explaining that "[t]ens of thousands of rent stabilized units have been warehoused because it is cost prohibitive to renovate them").

## B. Brokers Provide Valuable Services To Prospective Tenants.

Brokers play a vital role in connecting tenants with apartments. "The fierce competition among renters often means that new inventory spends just days or even hours on the market." Picciotto, *supra*. Tenants are therefore heavily dependent on online rental marketplaces like StreetEasy to quickly identify eligible apartments.

8

But although online listings are free to view, they are not free to create. Brokers incur the substantial expense of advertising, photographing, staging, and preparing the property for showings. JA831-832.

Many of these listings are "open listings," meaning that the broker has not entered into any formal agreement with the landlord and thus has no fiduciary relationship with the landlord. JA831-832, JA837. The broker or her firm simply receives permission, often through a multiple listing service—technology platforms used by large numbers of real estate professionals to organize and syndicate listings—to publicize batches of available units. JA831-832. Because a broker who publishes an open listing does not sign an exclusive listing agreement with the landlord, she is not guaranteed compensation for her work. *Id.* Rather, brokers advertise these listings because they hope to find a tenant interested in hiring them to broker the property. JA832. Once a tenant hires a broker for an open listing, the broker becomes that tenant's fiduciary and represents the tenant's interests going forward. *See* N.Y. Real Prop. Law § 443(1)(n), (3)(c). The broker and tenant will negotiate a compensation arrangement that might include the landlord paying the broker fee, the tenant paying the broker fee, or the landlord and the tenant splitting the fee. JA792, JA831-832.

If a landlord instead wants the broker to represent his interests, the landlord must contract directly with the broker. JA831. Under this "exclusive listing" model,

the broker agrees to represent the landlord's interests with respect to the landlord's property and the landlord, in turn, agrees to refer all inquiries regarding the property to the broker. *E.g.*, JA785. As with open listings, exclusive listings can either be tenant-pay, landlord-pay, or something in between. JA831.

Brokers also show apartments, identify qualified applicants, assist tenants in preparing rental applications, conduct state-mandated background checks, process applications, and guide both landlords and tenants through applicable state and federal regulations. JA831, JA833. Because of their training, brokers are far-more-knowledgeable than landlords about federal and state laws concerning the renting of properties, including fair housing laws, as well as state and federal housing vouchers and other subsidy programs. JA833. Landlords, particularly small landlords, could not provide the same level of service without significantly increasing rents to pay additional administrative staff. JA836.

## C. Brokers Can Be Compensated For Their Services In A Variety Of Ways, One Of Which Is The Tenant-Pay Open Listing.

Tenants have historically had a variety of options for compensating the broker for her services. Tenants interested in saving money over the life of a lease could opt for a listing that allows the tenant to pay the broker fee upfront instead of having it rolled into the monthly rent. JA824-825. A tenant who stays in an apartment for several years—as most New Yorkers do—could end up paying for the broker fee several times over if she chose a higher rent instead of the upfront broker fee. JA834-

835; JA410 (explaining that "a tenant who pays a broker commission is purchasing a cheaper lease term"). New Yorkers tend to reside in their rental apartments longer than the national average, so reducing the monthly rent creates significant long-terms savings for consumers. JA824-825.

But there are some New Yorkers who would prefer to pay a higher rent over the upfront cost of the broker fee. JA504. No-fee listings are available at all price points for these tenants. JA503. Brokers will even often advertise a property with two monthly rental prices: one (lower) price if the tenant pays the broker fee upfront, and another (higher) price if the broker fee is rolled into the monthly rent. JA834-835.

But higher rent is not always an option for tenants, because the increased rent attributable to the broker fee can price a prospective tenant out of an apartment altogether. Most landlords require that tenants earn 40 times the monthly rent. JA498. Thus, a New Yorker making $110,000 per year would be financially qualified to rent a $2,700 per month apartment with a broker fee, but would not qualify for that same unit listed at $3,000 per month without a broker fee. JA835.

The no-fee option might also be impossible for the landlord. For many landlords, the "costs of one brokerage commission could mean the difference between being in the red and making a very small profit for a building in any given month." JA792. Without the tenant-pay system, numerous landlords—especially landlords

11

of rent-stabilized units already at their regulatory-maximum rent—would be unable to publicize their vacant units and would have to rely on word of mouth to fill vacant apartments. JA837.

### D. The City Council Considers Conditioning Tenant-Pay Broker Fees On The Existence Of A Fiduciary Relationship Between Broker And Tenant.

The City Council decided last year to target tenant-pay listings on the theory that they undermine "basic norms around principal-agent relationships." JA672. The Council worried about what it perceived to be the norm that "the principal pays the agent for services rendered, not a third party." JA676. The City Council also expressed concern over the negotiability, transparency, and fairness of broker fees, asserting that tenants using tenant-pay listings "lack[] a meaningful ability to nego-tiate the amount of" the broker fee; that brokers were not properly disclosing their fees and fiduciary obligations; and that brokers were not providing valuable services to prospective tenants. JA674-676.

The Council initially proposed a bill that would have simply required brokers to collect their fee "from the party employing" them. JA66. The Council's Com-mittee on Consumer and Worker Protection received written and oral testimony on that proposal from stakeholders. Brokers and landlords—many of them plaintiffs here—understandably thought that the bill was designed to address the housing cri-sis, and warned that the bill would exacerbate the crisis by making it more difficult

for New Yorkers to move. The Committee heard testimony that "[i]f the broker's fee is to be paid by an owner, that owner will forward that cost to the tenant in the form of higher rent." JA454. As a result, because "[m]ost landlords require renters to make at least 40 times the monthly rent," many renters will no longer be able to afford apartments they previously qualified for. JA498. Worse, landlords unable to raise rents because of rent-stabilization laws may be forced to forego brokers' services and rely on "word of mouth" to find tenants. JA402; JA418 (Policy Director for the Community Housing Improvement Program explaining that owners of rent-stabilized housing would not be able to afford broker fees). The result would be a "shadow inventory" not seen "since the days of classified newspaper advertising" instead of today's "widely transparent online rental marketplace showing accurate apartment listings." JA403 (capitalization altered).

The City's First Deputy Commissioner of Housing Preservation and Development echoed these concerns, testifying that there was "no data" connecting tenant-pay open listings to housing mobility, and urging that "deeper analysis from multiple agencies" was necessary to "understand what could be the intended and unintended consequences of [the] bill." JA107-110, JA121-122. Councilmembers similarly confessed that there was an "embarrassing" lack of data to support the notion that ending tenant-pay broker fees would improve housing mobility. JA110.

But the Council failed to perform a deeper analysis. The Council instead waved away detractors' economic concerns, insisting that "[t]he bill is not an attempt to solve the affordability crisis in the city." JA676. The Council contended that the bill's "purpose" was actually "to properly align the principal-agent relationship in the rental market to ensure that the principal pays the agent for services rendered, not a third party." *Id*.

### E. The Council Opts For A Broader Law Barring Any Broker Who Publishes A Listing From Charging A Tenant Fee For That Listing.

The Council ultimately rejected the original proposal of simply requiring that a broker be paid by the person employing them, supposedly because "a landlord might retain a broker to publish an open listing, only to later claim that the broker is not his agent—thereby enabling the broker to impose a fee on the tenant." SPA18; *see also* JA677. The Council instead came up with the publication bar, which prohibits a broker who publishes a listing with the landlord's permission from charging the tenant. JA676. The publication bar provides that "any agent who publishes a listing for a rental of residential real property with the permission or authorization of the landlord for such property shall not impose any fee on, or collect any fee from, a tenant related to the rental of such property." N.Y.C. Admin. Code § 20-699.21(a)(2).

"Agent" is defined as a state-licensed broker who "is acting in a fiduciary capacity," and "listing" is defined as "an advertisement or written notice conveying that a property is available for lease." *Id*. § 20-699.20. There is a "rebuttable presumption" that "an agent who publishes a listing . . . does so with the permission or authorization of the landlord." *Id*. § 20-699.21(e). But that presumption should always be true because state regulations prohibit brokers from publishing rental advertisements without the landlord's authorization. 19 N.Y.C.R.R. § 175.25(b)(2). A landlord can also be held vicariously liable for a broker's violation of the publication bar. N.Y.C. Admin. Code § 20-699.21(b)(2). As the District Court summarized, the "effect of these provisions is that a broker who publishes an open listing cannot charge her fee to the tenant who ultimately rents the property—and is therefore constrained to seek compensation from the landlord—even though the agent has no formal agency agreement with the landlord." SPA 7-8.

The City Council separately provided that a broker who has entered into a listing agreement with a landlord must recover her fee from the landlord. N.Y.C. Admin. Code § 20-699.21(a)(1) (providing that "a landlord's agent shall not impose any fee on, or collect any fee from, a tenant related to the rental of residential real property"); *see also id*. § 20-699.20 (defining "landlord's agent" to mean "a listing agent"); *id* (defining "listing agent" to mean "a person who has entered into a listing agreement to act as an agent of the landlord for compensation"). It also provided

15

that "[n]o person shall condition the rental of residential real property on a tenant engaging any agent, including but not limited to a dual agent." *Id*. § 20-699.21(c). "These provisions effectively prohibit tenant-pay exclusive listings, and further prevent landlords with exclusive listing agreements from requiring prospective tenants to engage the landlord's agent as a dual agent." SPA8. They also outlaw contract terms—found in every tenant-pay exclusive brokerage contract—that the landlord must refer all inquiries regarding an apartment to his retained broker. JA777; JA785.

The City Council also addressed its transparency and negotiability concerns. The FARE Act includes a fee-disclosure requirement, under which "[e]very listing related to the rental of residential real property shall disclose in such listing in a clear and conspicuous manner any fee to be paid by the prospective tenant for the rental of such property." N.Y.C. Admin. Code § 20-699.22(a); *see also* JA678 (acknowledging that notice and fee-disclosure requirements "would address . . . the lack of transparency in fees and their negotiability").

Finally, the City Council incorporated a significant grace period, providing that the FARE Act would not take effect until "180 days after it becomes law." JA678, JA683. Once effective, the City's Department of Consumer and Worker Protection can enforce the Act by seeking civil penalties of up to $2,000 along with restitution for allegedly harmed tenants. N.Y.C. Admin. Code § 20-699.23(a), (c).

**F.     Plaintiffs Challenge The Law And Seek A Preliminary Injunction.**

The FARE Act became law on December 13, 2024, with an effective date of June 11, 2025.  SPA7.  Recognizing that the Act would upend New York City's already beleaguered rental markets, Plaintiffs moved for a preliminary-injunction nearly five months before the law went into effect.  JA68-69.  As relevant here, Plaintiffs sought an injunction barring enforcement of the publication bar, N.Y.C. Admin. Code § 20-699.21(a)(2); the no-conditioning provision, *id*. § 20-699.21(c); and the bar on a landlord's agent charging a tenant fee, *id*. § 20-699.21(a)(1).  Plaintiffs explained that the publication bar runs afoul of their speech rights under the First Amendment of the U.S. Constitution and Article I, Section 8 of the New York State Constitution.  JA53-54, JA57.  Plaintiffs also explained that the no-conditioning provision and the prohibition on a landlord's agent charging a tenant fee unconstitutionally impair their existing exclusive-listing agreements.  JA55-57.  Defendants cross-moved to dismiss.  JA841-843.  The District Court invited Defendants to ask for an evidentiary hearing if they believed one was necessary, JA909, but Defendants declined, JA939-940.

**G.     The District Court Grants Defendants' Motion To Dismiss In Part And Denies Plaintiffs' Motion For A Preliminary Injunction.**

The District Court held oral argument on May 2, 2025, JA943-1000, and on June 10—hours before the FARE Act was set to take effect—granted Defendants'

17

motion to dismiss in part and denied Plaintiffs' motion for a preliminary injunction in full. SPA41-42.

The District Court held that Plaintiffs had failed to state a free-speech claim and accordingly denied Plaintiffs' preliminary-injunction motion on that claim as moot. SPA11-25. The court held that the publication bar burdened Plaintiffs' speech, but that the bar was subject only to intermediate scrutiny, which the court thought the bar satisfied. *Id.* The court also denied Plaintiffs a preliminary injunction as to their Contracts Clause claim, but declined to dismiss the claim because the court determined that fact issues remained as to whether the FARE Act's impairment of Plaintiffs' existing contracts was a reasonable and appropriate means of advancing the City Council's interests. SPA25-38.

This appeal followed. JA1001.

## STANDARD OF REVIEW

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that the injunction is in the public interest." *Hudson Shore Assocs. Ltd. P'ship v. New York*, 139 F.4th 99, 106 (2d Cir. 2025) (quoting *Gazzola v. Hochul*, 88 F.4th 186, 194 (2d Cir. 2023) (per curiam)).

18

This Court ordinarily reviews a district court's denial of a preliminary injunction for abuse of discretion. *Resource Grp. Int'l Ltd. v. Chishti*, 91 F.4th 107, 114 (2d Cir. 2024). "A district court has abused its discretion if it has (1) based its ruling on an erroneous view of the law, (2) made a clearly erroneous assessment of the evidence, or (3) rendered a decision that cannot be located within the range of permissible decisions." *Warren v. Pataki*, 823 F.3d 125, 137 (2d Cir. 2016) (quoting *Lynch v. City of New York*, 589 F.3d 94, 99 (2d Cir. 2009)).

Here, however, the District Court denied Plaintiffs a preliminary injunction as to the publication bar because of "its holding that their claims failed as a matter of law." *Hudson Shore*, 139 F.4th at 107. This Court's review of that aspect of the District Court's decision "merges into the question of whether [Plaintiffs' free-speech claims] are legally viable." *Id.* The Court must draw all reasonable inferences in Plaintiffs' favor and determine whether Plaintiffs have stated a claim for relief plausible on its face. *Id.* at 106-107.

## SUMMARY OF ARGUMENT

**I.** The FARE Act's publication bar violates the First Amendment. In *Sorrell v. IMS Health Inc.*, the Supreme Court held that laws targeting disfavored speech by disfavored speakers are subject to heightened scrutiny because of the risk that such laws are designed to achieve some separate, nonspeech policy objective by restricting speech. 564 U.S. 552, 565 (2011). The District Court nonetheless excused the

publication bar's targeting of brokers' tenant-pay open listings precisely because the Council's nonspeech policy objective was to curtail tenant-pay brokerage fees. That error alone warrants reversal.

But the publication bar fails even intermediate scrutiny under *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York*, 447 U.S. 557 (1980). Defendants have throughout this litigation offered shifting accounts of the government interest underlying the publication bar. Some of Defendants' posited interests satisfy some of *Central Hudson*'s prerequisites. But none satisfies them all. The interest that the Council actually gave when enacting the publication bar was in ensuring that tenants pay fees to only a broker who owes them a fiduciary duty. Yet that interest could be achieved directly by a law—like the one the Council originally proposed—simply requiring that brokers be paid by the party employing them. The Council's principal-agent alignment rationale therefore fails *Central Hudson*'s requirement that "if the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive." *Central Hudson*, 447 U.S. at 564.

The principal-agent-alignment rationale also fails *Central Hudson*'s criterion that a speech restriction "may not be sustained if it provides only ineffective or remote support for the government's purpose." *Id*. The publication bar cannot de-

crease the number of broker fees paid by tenants to a nonfiduciary broker. The publication bar only has independent force when the broker is acting as a tenant's agent—the publication bar only applies to fiduciaries, and the FARE Act separately provides that a landlord's agent cannot charge a tenant fee. When a broker is acting as the tenant's agent, however, the tenant paying the broker fee is consistent with the Council's stated interest in ensuring that tenants pay only their fiduciaries.

Perhaps recognizing this problem, Defendants now attempt to revive the Council's disavowed interest in improving housing mobility. But that is a bald-faced post-hoc rationale. The Council disclaimed housing mobility as an interest when enacting the FARE Act. Defendants' protestations depend on a spurious attempt to distinguish "affordability" from "mobility." But their linguistic gymnastics stumble over the record, which demonstrates that the Council was responding directly to concerns about the financial impact that limiting tenant-pay fees would have on housing mobility. In all events, Defendants have not demonstrated that the Council drew a rational inference that the publication bar would in fact "directly advance" an interest in increasing housing mobility. *Id.* The Council disclaimed that interest because there was "no data" to support it. JA110.

Defendants have also insisted that the publication bar promotes the fairness, transparency, and negotiability of broker fees. But the Council's mistaken contention that brokers do not provide services to tenants assumed that all brokers do is

21

show apartments. That assumption demonstrates, if anything, only that the Council failed to understand how the City's rental markets work. Prospective tenants use brokers' services every time they view a listing on a platform like StreetEasy. And once a prospective tenant decides to apply for an apartment, brokers provide even more valuable services to tenants ranging from assisting with mandatory credit and background checks to shepherding them through the rental application process.

The Council's transparency and negotiability interests are fully addressed by other laws. The Committee Report accompanying the FARE Act stated that brokers were not properly disclosing the broker-fee cost and that brokers were refusing to negotiate their fees. JA674-675. But the Committee Report acknowledged that the FARE Act's separate disclosure requirements fully address those issues. JA678. They are also addressed by state and federal law. *See* N.Y. Real Prop. Law § 443(3)(b), (4); 15 U.S.C. §§ 1-7. Because the publication bar adds nothing, its curtailment of Plaintiffs' speech rights cannot satisfy *Central Hudson*'s requirement that a speech restriction "extend only as far as the interest it serves." 447 U.S. at 565.

**II.** The FARE Act's prohibitions on conditioning a rental on hiring a broker and on a landlord's agent charging a tenant fee substantially and permanently impair common provisions in exclusive-listing arrangements requiring the landlord to refer all inquiries to the broker and the broker to seek her fee from the tenant. To satisfy

22

the Contracts Clause, the FARE Act's substantial impairments must be reasonable and necessary to achieve a legitimate public purpose. But the Act's impairments are not. They are incapable of advancing any of the purposes proffered by Defendants and, in any event, those purposes could be achieved just as well while exempting existing agreements.

**III.** The Court need not linger on the remaining preliminary injunction factors. Constitutional harms are irreparable, and Defendants have no interest in enforcing an unconstitutional law. The challenged provisions are also causing ongoing irreparable harm to Plaintiffs' businesses. And they are harming the public by exacerbating the housing crisis, causing rents to rise and available listings to fall in a market in which renters are already rent burdened and the housing stock is already at a historic low.

The Court should reverse and remand with instructions to grant Plaintiffs' requested preliminary injunction.

## ARGUMENT

## I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR FREE SPEECH CLAIMS.

The First Amendment is implicated by laws, like the publication bar, that "ban charging for speech" because a law that makes speech less profitable "burden[s] the right to speak." *Veterans Guardian VA Claim Consulting LLC v. Platkin*, 133 F.4th 213, 219 (3d Cir. 2025); *see also United States v. National Treasury Emps. Union*,

513 U.S. 454, 468 (1995) (a law's "prohibition on compensation unquestionably imposes a significant burden on expressive activity"); SPA14 (agreeing that the publication bar regulates speech within the meaning of the First Amendment). Commercial-speech regulations are generally subject to *Central Hudson*'s intermediate-scrutiny test, under which "[c]ommercial speech that is not false or deceptive and does not concern unlawful activities . . . may be restricted only in the service of a substantial governmental interest, and only through means that directly advance that interest." *Safelite Grp., Inc. v. Jepsen*, 764 F.3d 258, 261 (2d Cir. 2014) (quoting *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 637 (1985)). But heightened scrutiny is warranted where—as here—a government "imposes a speaker- and content-based burden on protected expression." *Sorrell*, 564 U.S. at 571. The publication bar fails regardless of which standard the Court employs.[1]

### A. The Publication Bar Is Subject To Heightened Scrutiny Because It Burdens Disfavored Speech By Disfavored Speakers.

The publication bar must survive heightened scrutiny because it targets disfavored speech—rental listings—by disfavored speakers—brokers. In *Sorrell v. IMS*

---

[1] The New York Constitution affords commercial speech protection identical to the First Amendment. *OTR Media Grp., Inc. v. City of New York*, 83 A.D.3d 451, 452 (1st Dep't 2011). The Court may therefore consider both of Plaintiffs' free-speech claims together under the applicable First Amendment standard. SPA12.

*Health*, the Supreme Court addressed a similar challenge against a Vermont law restricting the sale and use of pharmaceutical prescribing data. 564 U.S. at 557. The Court held the law was particularly suspect because it applied solely to the use of prescriber information by pharmaceutical salespersons for marketing purposes. *Id.* at 563-564. Others could use the same prescribing data however they wanted, and salespersons could use the information so long as they did not use it for marketing. *Id.* The Court concluded that the law was subject to heightened scrutiny because it "on its face burden[ed] disfavored speech by disfavored speakers." *Id.* at 564.

The same is true here. Like Vermont's law in *Sorrell*, the FARE Act's publication bar imposes a speaker-specific, content-based burden on protected expression. It applies only to "listing[s]," N.Y.C. Admin. Code § 20-699.21(a)(2), which the Act defines as "an advertisement or written notice conveying that a property is available for lease," *id.* § 20-699.20. "The statute thus disfavors marketing, that is, speech with a particular content." *Sorrell*, 564 U.S. at 564. As the District Court recognized, a broker can still charge a tenant fee if she avoids using a published listings, such as by "communicat[ing] information about available properties . . . directly." SPA25.

The FARE Act also "disfavors specific speakers"—brokers. *Sorrell*, 564 U.S. at 564.; *see* N.Y.C. Admin. Code § 20-699.20 (defining an "agent" as "a person

25

who is licensed as a real estate broker or real estate salesperson"). StreetEasy may continue to profit from listings unencumbered by the publication bar. Only brokers are singled out for disfavored treatment. Under *Sorrell*, that "is sufficient to justify application of heightened scrutiny." 564 U.S. at 571; *see also United States v. Caronia*, 703 F.3d 149, 164-165 (2d Cir. 2012) (confirming that "content- and speaker-based restrictions on [commercial] speech [are] subject to heightened scrutiny" rather than "*Central Hudson*'s less rigorous intermediate [scrutiny] test").

The District Court erroneously concluded that the publication bar's limited application to "listings" is not content based. SPA15-17. But nearly a half-century ago, the Supreme Court held that limitations on posting real estate "for sale" signs were "based on their content." *Linmark Assocs., Inc. v. Willingboro Township*, 431 U.S. 85, 94 (1977). There is no principled basis to distinguish the open listings targeted by the publication bar, which are just the online equivalent of a "for lease" sign.

More recently, in *Vugo, Inc. v. City of New York*, this Court explained that although "regulations that apply generally to 'advertising' (without regard for whether the advertisements are commercial) may not necessarily be content-based," regulations "construed as applying only to commercial advertising, [are] content-based." 931 F.3d 42, 49 n.6 (2d Cir. 2019). It follows *a fortiori* that the publication

26

bar is content based. The publication bar is even more targeted than a ban on commercial advertising, as it regulates only a specific subset of commercial advertisements: residential rental listings. And, indeed, the speech restriction at issue in *Sorrell* was held to be content based because it applied only to "marketing." *Sorrell*, 564 U.S. at 564. A "listing" is just a category of marketing—the marketing of a "property . . . available for lease." N.Y.C. Admin. Code § 20-699.20.

The publication bar is also speaker based. The District Court flipped *Sorrell* on its head by holding that it was permissible for the publication bar to target brokers because brokers are responsible for the tenant-pay fees the Council seeks to curtail. SPA17 (reasoning that "application to any other group would . . . have little practical effect"). The whole reason courts must subject speaker- and content-based commercial-speech restrictions to heightened scrutiny is to ensure that the government is not using a commercial-speech restriction as an indirect means of singling out for disfavored treatment those whose goals are "in conflict with the goals of the state." *Sorrell*, 564 U.S. at 565 (citation omitted).

Thus, in *Sorrell*, formal legislative findings demonstrating that "the law's express purpose" was to "diminish the effectiveness of marketing by manufacturers of brand-name drugs" was proof of a First Amendment violation. *Id.* A law calibrated "to target [particular] speakers and their messages for disfavored treatment" " 'goes even beyond mere content discrimination, to actual viewpoint discrimination.' " *Id.*

(quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391 (1992)). The Council's attempt to do that with the publication bar fails to obviate the constitutional violation—it confirms it. The District Court erred by upholding the publication bar based on the very rationale that should have struck it down.

That the publication bar effectively bans advertising a lawful transaction—tenant-pay open-listing brokerage services—is particularly offensive to the First Amendment. "[T]he State may not seek to remove a popular but disfavored product from the marketplace by prohibiting truthful, nonmisleading advertisements," and the fact "[t]hat the State finds expression too persuasive does not permit it to quiet the speech or to burden its messengers." *Id*. at 577-578.

A ban on advertising as an indirect means of suppressing a disfavored service offends the First Amendment's core principle that "information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 770 (1976). The theory behind the publication bar appears to be that tenant-pay fees are bad for tenants, and that if brokers are permitted to advertise their tenant-pay listings, they "will be taken up on [their] offer by too many unwitting customers." *Id*. at 769. But "[t]he First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for

28

what the government perceives to be their own good." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 503 (1996). The Council can of course express its own views. "But a State's failure to persuade does not allow it to hamstring the opposition. The State may not burden the speech of others in order to tilt public debate in a preferred direction." *Sorrell*, 564 U.S. at 578-579. The publication bar's "highly paternalistic approach" conflicts with the choice "that the First Amendment makes for us" "between the dangers of suppressing information, and the dangers of its misuse if it is freely available." *Virginia State Bd.*, 425 U.S. at 770.

The Constitution's preference for more rather than less information applies with special force here. New York City is in the midst of a housing crisis, and a "consumer's interest in the free flow of commercial information" regarding pricing and availability of vacant apartments is much "more than a convenience." *Id.* at 763-764. It involves access to "basic necessities." *Id.* Indeed, "it may bear on one of the most important decisions [consumers] have a right to make: where to live and raise their families." *Linmark*, 431 U.S. at 96.

Relatedly, advertising bans like the publication bar "impede debate over central issues of public policy" by depriving the public of information about the policy's success, *44 Liquormart,* 517 U.S. at 503, and by "screen[ing] from public view the underlying governmental policy" altogether. *Central Hudson*, 447 U.S. at 566 n.9. In *44 Liquormart*, for instance, Rhode Island sought to increase the price—and

thereby decrease the consumption—of alcohol by banning advertisements that listed the price of covered products. 517 U.S. at 489. But in doing so the State "deprive[d] the public of their chief source of information about the reigning price level of alcohol." *Id*. at 503 n.13.

So too here. The District Court thought that "the City Council's goal of realigning the principal-agent relationship was intended to serve the purpose of reducing the upfront cost of moving, thereby improving housing mobility amongst renters." SPA30. That is inconsistent with the Council's own explanation of what it was doing and underscores the Act's direct financial impact—notwithstanding the Council's disclaiming housing affordability as its goal. *See* JA676; *infra* pp. 38-39. That aside, however, the publication bar deprives the public of a "key barometer of the ban's effectiveness." *44 Liquormart*, 517 U.S. at 503 n.13. Open listings are a vital source of information about apartment availability and pricing, yet the publication bar promises to replace New York's "widely transparent online rental marketplace" with a "shadow inventory" of word-of-mouth listings whose prices and fees will escape the robust competition that comes from easy comparison. JA403 (capitalization altered).

"There are divergent views regarding" the capacity of tenant-pay open listings to improve housing mobility. Many prospective tenants find tenant-pay open listings to be helpful, both in locating an affordable apartment and in saving money over

time. *See supra* pp. 8, 10-11; *see also Sorrell*, 564 U.S. at 578 (noting that "[t]he defect in Vermont's law is made clear by the fact that many listeners find detailing instructive"). "Under the Constitution, resolution of th[e] debate must result from free and uninhibited speech." *Sorrell*, 564 U.S. at 578

### B.    The Publication Bar Fails Even Intermediate Scrutiny.

The FARE Act's publication bar cannot satisfy *Central Hudson*'s less-exacting test, either.  To succeed under *Central Hudson*, Defendants must demonstrate that the publication bar arises from a substantial government interest; that the publication bar directly advances that interest; and that the publication bar "is not more extensive than is necessary to serve that interest."  447 U.S. at 566.

The District Court erred in holding *Central Hudson* satisfied by an amalgamation of the Council's putative interests in (1) aligning the principal-agent relationship, (2) increasing housing mobility, and (3) promoting the negotiability, fairness, and transparency of broker fees.  SPA19-20.  Some of these interests check some of *Central Hudson*'s boxes.  But none checks them all.

#### 1.    *The publication bar is a poor fit with the Council's stated interest in aligning the principal-agent relationship.*

The Committee Report identified the FARE Act's purpose as "properly align[ing] the principal-agent relationship in the rental market to ensure that the principal pays the agent for services rendered, not a third party."  JA676.  The Council's original bill requiring that brokers collect their fee "from the party employing" them,

31

JA66, would still be bad economic policy, but would have accomplished the Council's goal directly, and without trammeling protected speech.  That is dispositive under *Central Hudson*:  "[I]f the Government could achieve its interest in a manner that does not restrict speech, or that restricts less speech, the Government must do so."  *Thompson v. Western States Med. Ctr.*, 535 U.S. 357, 371 (2002).

The District Court concluded otherwise based on Defendants' argument that the publication bar was necessary to close a supposed "loophole in which a landlord might retain a broker to publish an open listing, only to later claim that the broker is not his agent."  SPA18; *see also* SPA24.  But "[w]hen the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured."  *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994) (quotation marks omitted).  And the City Council never substantiated a concern that brokers would lie about their existing fiduciary obligations.  *See Art & Antique Dealers League of Am., Inc. v. Seggos*, 121 F.4th 423, 442 (2d Cir. 2024) (rejecting the State's argument that a narrower alternative to a challenged commercial-speech restriction was subject to a loophole because the argument was based on a "single anecdote").  The District Court's illusory loophole concern therefore cannot demonstrate "that a more limited restriction . . . would not serve adequately the [Council's] interests."  *Id.* at 441 (quoting *Central Hudson*, 447 U.S. at 570).

If the Council *had* sought to substantiate this loophole concern, it would have discovered that existing law already requires brokers to identify their fiduciary obligations to prospective tenants. A landlord's agent must disclose her status "at the time of the first substantive contact with the . . . tenant." N.Y. Real Prop. Law § 443(3)(b), (4); *see also Virginia State Bd.*, 425 U.S. at 768 (explaining that a government's proffered interest in regulating commercial speech is "greatly undermined" if that interest is already addressed by other laws that do not touch on speech). At most, the publication bar "adds a speech-based component to [that] already existing prohibition," which is fatal to any contention that the publication bar is narrowly drawn. *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 118 (2d Cir. 2017).

Defendants have abandoned in this Court the loophole rationale that they pressed before the District Court. *Compare* ECF 37 at 11-12, *with* Dkt. 27.1 at 5.[2] Defendants now contend that brokers who advertise with a landlord's permission are somehow *de facto* landlords' fiduciaries. Dkt. 27.1 at 5. But the publication bar applies whenever the landlord authorizes the broker to advertise her property. N.Y.C. Admin. Code § 20-699.21(a)(2). That does not create a fiduciary relationship under New York law because "[a] conventional business relationship, without

---

[2] Dkt." citations reference this Court's docket, No. 25-1506; "ECF" citations reference the docket below, No. 1:24-cv-09678-RA (S.D.N.Y.).

more, is insufficient to create a fiduciary relationship." *DiTolla v. Doral Dental IPA of N.Y., LLC*, 100 A.D.3d 586, 587 (2d Dep't 2012). "Absent extraordinary circumstance . . . parties dealing at arm's length in a commercial transaction lack the requisite level of trust or confidence between them necessary to give rise to a fiduciary obligation." *Henneberry v. Sumitomo Corp. of Am.*, 415 F. Supp. 2d 423, 460 (S.D.N.Y. 2006).

"[A] fiduciary relationship does not arise by operation of law, but must spring from the parties themselves, who agree to and accept the responsibilities that flow from such a contractual bond." *Ne. Gen. Corp. v. Wellington Advert., Inc.*, 82 N.Y.2d 158, 160 (1993). Even the existence of a commission agreement is insufficient to establish fiduciary obligations if it lacks language evincing a "clear intent to create . . . a fiduciary relationship," such as an express agreement by the broker to act on the landlord's behalf. *Sonnenschein v. Douglas Elliman-Gibbons & Ives*, 96 N.Y.2d 369, 374 (2001). The publication bar is not premised on any bilateral agreement whatsoever. *See* JA837. Because the broker who publishes an open listing has not entered into a "relationship of higher trust" with the landlord, this Court should not "transport them to the higher realm of relationship and fashion the stricter duty for them." *Ne. Gen. Corp..*, 82 N.Y.2d at 162. Indeed, even Defendants eventually conceded that when "brokers post open listings without having a formal agreement

34

with the landlord," the landlord is not "the party retaining the broker." Dkt. 27.1 at 18.

The District Court waved away the publication bar's fit problems, citing *Clear Channel Outdoor, Inc. v. City of New York*, 594 F.3d 94 (2d Cir. 2010)'s admonition that governments are "afforded 'considerable leeway in determining the appropriate means to further a legitimate government interest.' " SPA24 (quoting *Clear Channel*, 594 F.3d at 105). But this Court has since limited *Clear Channel*'s statement to "a regulation of commercial billboards." *IMS Health Inc. v. Sorrell*, 630 F.3d 263, 279 (2d Cir. 2010), *aff'd* 564 U.S. 552 (2011). As *IMS Health* explained, commercial billboards "pose[] unique problems such as the potential to distract drivers and [are] therefore particularly amenable to government regulation." *Id*. *Clear Channel* does not alter the general rule that a speech restriction fails *Central Hudson* "if the governmental interest could be served as well by a more limited restriction." *Id*. at 279 (quoting *Central Hudson*, 447 U.S. at 564).

The District Court similarly thought that, under *Vugo*, it could not "second-guess the City's judgment." SPA24 (brackets omitted) (quoting *Vugo*, 931 F.3d at 58). But *Vugo* did not forbid courts from scrutinizing the policy judgments underlying a commercial-speech restriction. *Vugo*, 931 F.3d at 58. *Vugo* instead analyzed whether the "City's determination . . . about how to regulate in-ride advertising

35

[was] 'reasonable,' " including by critically assessing the city's evidence and reasoning. *Id.* (quoting *Clear Channel*, 594 F.3d at 104).

The District Court finally believed under *Clementine Co. v. Adams*, 74 F.4th 77 (2d Cir. 2023), that "[t]he issue is not whether other means of advancing the City's interest might be adequate, because that determination is left to the City's elected officials." SPA21-22 (brackets omitted) (quoting *Clementine Co.*, 74 F.4th at 88). But *Clementine* does not help Defendants for two reasons. *First*, it did not involve a direct regulation of speech. It involved a challenge to a mayoral initiative requiring indoor theaters to verify patrons' vaccination status. 74 F.4th at 81. This Court held the program "regulated conduct, not speech" because it "affected what indoor theaters 'must *do*'—check the vaccination status of patrons and staff—'not what they may or may not *say*.' " *Id.* at 86 (citation omitted). The publication bar, by contrast, directly regulates what brokers may and may not say—so long as they wish to retain their ability to charge tenants a broker fee. As the District Court recognized, the publication bar makes a broker's speech "the predicate for the application of the prohibition." SPA13.

*Second*, *Clementine* states that "a content-neutral regulation that imposes incidental burdens on speech" is adequately tailored "so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." 74 F.4th at 88 (citation omitted). But the publication bar is

not content neutral, *supra* pp. 24-27, and Defendants have never shown how the Council's goal of tying broker fees to a fiduciary relationship would be achieved less effectively absent the publication bar.

In addition to prohibiting far-more speech than necessary, the publication bar will not advance "in a direct and material way" the City Council's interest in ensuring that tenants pay a brokerage commission to only a fiduciary. *Edenfield v. Fane*, 507 U.S. 761, 767 (1993). "It is well established that 'the party seeking to uphold a restriction on commercial speech carries the burden of justifying it.' " *Edenfield*, 507 U.S. at 770 (alteration omitted) (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 71 n.20 (1983)). A commercial-speech restriction therefore must be invalidated under this prong when "it provides only ineffective or remote support" for the government's interest. *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 188 (1999) (quoting *Central Hudson*, 447 U.S. at 564).

The publication bar cannot possibly decrease transactions in which tenants are paying non-fiduciaries. It will not decrease transactions in which a tenant is paying a landlord's agent because the FARE Act's separate prohibition on a tenant paying a landlord's agent already covers that. *See* N.Y.C. Admin. Code § 20-699.21(a)(1). Nor will the publication bar decrease the number of transactions in which a tenant is paying a broker who is no one's fiduciary, as the publication bar applies only to

37

fiduciaries. *Compare* N.Y.C. Admin. Code § 20-699.21(a)(2) (applying the publication bar to "any agent"), *with* N.Y.C. Admin. Code § 20-699.20 (defining "agent" to mean a broker who is "acting in a fiduciary capacity"). The publication bar has independent relevance only when, as in the open-listing model, the broker is acting solely as a tenant's agent. *See* JA837; N.Y. Real Prop. Law § 443(3)(c). But that is precisely when a tenant-pay fee would be consistent with the Council's stated interest in ensuring that tenants are paying fees only to their fiduciaries. The publication bar therefore cannot advance the Council's principal-agent alignment interest "to a material degree." *Edenfield*, 507 U.S. at 770-771.

> 2. *The Council's putative interest in increasing housing mobility is a post-hoc rationalization, and the Council had no evidence that the publication bar would increase housing mobility.*

The District Court also credited Defendants' proffered interest in increasing housing mobility. SPA19-20. But Defendants cannot satisfy intermediate scrutiny with post-hoc rationalizations. *Cornelio v. Connecticut*, 32 F.4th 160, 173 n.5 (2d Cir. 2022). And the Committee Report expressly disclaimed housing mobility as an interest. Rather than respond to the extensive written and oral testimony that ending tenant-pay open listings would exacerbate the City's housing-mobility problems, *see supra* pp. 12-13, the Council dismissed those concerns as "misunderstand[ing] the purpose of the bill." JA676. The Council stated in no uncertain terms that "[t]he bill is *not* an attempt to solve the affordability crisis in the city," but is meant "to

properly align the principal-agent relationship in the rental market to ensure that the principal pays the agent for services rendered, not a third party." *Id.* (emphasis added).

The District Court never addressed this post-hoc rationalization problem, despite Plaintiffs raising it below. *Compare* ECF 49 at 13-14, *with* SPA19-20. The District Court simply asserted that the Committee Report expressed "concern[] with the financial burden that brokers' fees impose on renters." SPA20. But the Report also stated that solutions to those concerns were "being explored by the Council in multiple *other* avenues." JA676 (emphasis added). That the Report acknowledged the existence of a housing crisis that warrants further government intervention does not undo its unambiguous statement that *this* "bill is not an attempt to solve the affordability crisis in the city." *Id.* The District Court erred by relying on the very rationale the Council disavowed.

Defendants in this Court have attempted to revive a housing-mobility interest by distinguishing "affordability" from "mobility." Dkt. 27.1 at 19. But their linguistic gymnastics stumble over the record, which is replete with warnings about the negative impact restricting tenant-pay broker fees would have specifically on housing mobility. *See e.g.*, JA107-110, JA121-122; JA402-403; JA418; JA498. It was against that backdrop that the Council dismissed the bill's detractors as "misunderstand[ing] the purpose of the bill." JA676.

39

The District Court also did not hold Defendants to their burden of demonstrating that the Council drew "reasonable inferences based on substantial evidence" that the publication bar would be an effective means of achieving the Council's putative interest in increasing housing mobility. *Turner*, 512 U.S. at 666; *see also 44 Liquormart*, 517 U.S. at 505 (holding that "without any findings of fact, or indeed any evidentiary support whatsoever, we cannot agree with the assertion that the price advertising ban will significantly advance the State's interest in promoting temperance"). As the Deputy Commissioner of Housing Preservation and Development's testimony demonstrates, the Council had before it "no data" to support the notion that ending tenant-pay broker fees would improve housing mobility. JA110. The District Court even gave Defendants the opportunity to build out the record through an evidentiary hearing, but Defendants declined. JA909; JA939-940.

Though the burden was Defendants', Plaintiffs offered substantial evidence that prohibiting tenant-pay open listings will in fact worsen the housing crisis, including by exacerbating housing-mobility issues. *See* ECF 20 at 25; ECF 49 at 12-13. But like Defendants, the District Court never grappled with Plaintiffs' analysis showing that the publication bar will (1) decrease housing transparency by eliminating brokers' incentive to publish open listings; (2) decrease the housing stock by pricing many landlords out of the market entirely; and (3) price consumers out of apartments because of increased rents. *See* JA808; JA814-815; JA832, JA836.

The District Court shrugged off these economic objections, criticizing Plaintiffs for "ask[ing] the Court to enjoin the enforcement of legislation that they view as bad policy." SPA2. Citing rational-basis cases, the District Court excused itself from "second-guess[ing] the policy decisions of the legislature." *Id.* (quoting *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 521 (1981)). But the First Amendment requires "close[r] inspection" than does the Due Process Clause. *Virginia State Bd.*, 425 U.S. at 769. The Due Process Clause may tolerate Justice Scalia's fictional "stupid but constitutional" stamp. Jennifer Senior, *In Conversation: Antonin Scalia*, N.Y. Magazine (Oct. 4, 2013), https://perma.cc/HMK5-VUW4 (capitalization altered). But when First Amendment freedoms are on the line, courts must ensure that the government is solving real problems in an effective way.

The Supreme Court has therefore repeatedly applied *Central Hudson*'s searching review to strike down commercial-speech restrictions when a government could not meet its burden to demonstrate that the restriction would prove an effective policy solution to achieve a substantial government interest.[3] The District Court should have done the same here.

---

[3] *See e.g.*, *Virginia State Bd.*, 425 U.S. at 769 (holding advertising ban unconstitutional after determining that it would not prevent "the cutting of corners" by pharmacists, and thus would not directly advance the government's purported interest in preserving "professional standards"); *44 Liquormart*, 517 U.S. at 505-507 (holding that " 'speculation or conjecture' " is "an unacceptable means of demonstrating that a restriction on commercial speech directly advances the State's asserted interest")

41

3.    *The Council's putative interests in regulating the fairness, transparency, and negotiability of broker fees are either conclusory or fully addressed without the publication bar.*

"Intermediate scrutiny requires that the state 'demonstrate that the harms it recites are real.' " *IMS Health*, 630 F.3d at 276 (quoting *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995)). In *IMS Health*, for instance, this Court held that Vermont could not rely on its proffered interest in preserving the integrity of the prescribing process to justify its bar on using prescribing information in pharmaceutical marketing because Vermont had not shown that using prescribing information in marketing undermined the integrity of prescribers' decisions. *Id.* What little evidence the State did have was either speculative or anecdotal. *See id.*

The Council here asserted that brokers are not providing sufficient services to tenants to justify their fees. JA675. But the only evidence the Council offered for that contention was anecdotal testimony that when a small number of prospective tenants toured apartments, no one from the brokerage firm was present. JA668 n.2, JA675-676. Brokers do far more than show apartments, and prospective tenants use brokerages' services every time they view an online listing on a platform like

---

(citation omitted); *Edenfield*, 507 U.S. at 771 (holding *Central Hudson*'s second prong unsatisfied where the government relied on conclusory statements to support its contention that its ban on solicitation would "help prevent fraud and preserve CPA independence"); *Sorrell*, 564 U.S. at 572-573 (explaining that Vermont had failed to show how the ban on the sale and use of prescribing data would advance its interest in keeping prescribing data confidential, given that prescribing data could still be sold for a host of other purposes).

StreetEasy. JA831-833. Once a prospective tenant decides to move forward with a listing, the broker provides even more services. The broker helps the prospective tenant navigate the application process, runs credit and background checks, and ensures that state and federal laws are complied with. *Id.* Those services benefit the tenant by facilitating the tenant's ability to rent the apartment; that the services may also incidentally benefit the landlord by resulting in a paying tenant for her apartment does not negate the very real benefits the tenant receives from the broker's services.

In any case, the District Court had an obligation to "consider whether there are any reasonable alternatives that would be less speech-restrictive than" the publication bar to achieve the Council's goal of better aligning broker fees to the value of their services. *IMS Health*, 630 F.3d at 280. But the District Court did not consider any narrower alternatives, such as tying fees to particular services, or capping fees as New York has done with background-check fees. *See* N.Y. Real Prop. Law § 238-a(1)(b) (providing that landlords can charge the lesser of either the actual cost of background checks or $20). Those steps would be unnecessary, as broker fees are determined by robust market competition. But they demonstrate that the Council did not need to forbid speech to achieve its objective.

The Council's transparency and negotiability interests are fully addressed by other laws. The Committee Report stated that brokers were not properly disclosing

43

the broker-fee cost and that brokers were refusing to negotiate their fees. JA674. Plaintiffs dispute that contention. But even if transparency and negotiability were an issue, the Committee Report itself said that the issue was resolved by the Act's separate disclosure requirements. JA678. They are also covered by state and federal law. *See* N.Y. Real Prop. Law § 443(3)(b), (4); 15 U.S.C. §§ 1-7. Because the publication bar adds nothing, its curtailment of Plaintiffs' speech rights cannot be "in proportion to the interest served." *Seggos*, 121 F.4th at 439 (citation omitted).

## II. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CONTRACTS CLAUSE CLAIM.

The Contracts Clause prohibits "impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. Despite its absolute terms, however, "not all laws affecting pre-existing contracts violate the Clause." *Sveen v. Melin*, 584 U.S. 811, 819 (2018). This Court employs a three-part test to determine when an impairment crosses the constitutional line, asking "(1) whether the contractual impairment is substantial" and, if so, "(2) whether the law serves a legitimate public purpose such as remedying a general social or economic problem" and, if such purpose is demonstrated, "(3) whether the means chosen to accomplish that purpose are reasonable and necessary." *Sullivan v. Nassau Cnty. Interim Fin. Auth.*, 959 F.3d 54, 63 (2d Cir. 2020) (quotation marks omitted).

The FARE Act's infringement of Plaintiffs' existing exclusive listing agreements fails at each step: it permanently abrogates the tenant-pay and landlord-referral terms that served as the primary inducement for the broker to provide her services; it is incapable of advancing any of the vacillating purposes Defendants identified; and, in any event, those purposes could be achieved just as well without impairing Plaintiffs' contract rights.

### A. The FARE Act's No-Conditioning Provision And Its Bar On A Landlord's Agent Charging A Tenant Fee Severely Impair Existing Exclusive Listing Agreements.

"The threshold issue is whether the [challenged] law has 'operated as a substantial impairment of a contractual relationship.' " *Sveen*, 584 U.S. at 819 (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978)). "In answering that question, the Court has considered the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Id*.

The District Court correctly held that the FARE Act substantially impairs Plaintiffs' tenant-pays exclusive-listing agreements by prohibiting landlord's agents from collecting fees for those listings from tenants, *see* N.Y.C. Admin. Code § 20-699.21(a)(1), and by prohibiting landlords from conditioning the rental of a property on the tenant engaging a broker, *see id*. § 20-699.21(c); *see also* SPA28-29. The fundamental elements of an exclusive-listing agreement include: (1) the broker will

45

attempt to secure tenants ready, willing, and able to rent the landlord's vacant apartments; (2) the broker will seek payment for her services from the tenant, not the landlord; and (3) the landlord will refer any inquiries about his vacant apartments to the broker. *See* JA777, JA780; JA913-922; JA938. The FARE Act outlaws the second and third elements, "undermin[ing] the contractual bargain" and upending both brokers' and landlords' "reasonable expectations" about how the broker would be paid. *Sveen*, 584 U.S. at 819; *see also Buffalo Tchrs. Fed'n v. Tobe*, 464 F.3d 362, 368 (2d Cir. 2006) (noting that "[c]ontract provisions" that go to compensation "are the most important elements" of a contract).

As the District Court explained, because the Act removes brokers' ability to seek compensation from tenants directly, their promise to forgo seeking payment from the landlord is " 'converted into a mere promise' to provide [their] services free of charge, 'thereby impairing the contract's obligatory force.' " SPA29 (ellipses and brackets omitted) (quoting *General Motors Corp. v. Romein*, 503 U.S. 181, 189 (1992)). The contractual guarantee that a landlord will not cut the broker out is likewise rendered unenforceable by the no-conditioning provision. The FARE Act thus invalidates the very provisions that motivated the broker and landlord to enter into the contract in the first place. "After all, brokers who have existing tenant-pays exclusive listing agreements cannot be expected to work for free." SPA29.

46

It bears emphasizing—because it impacts "the weight any purpose and means showing must bear to avoid unconstitutionality," *Melendez v. City of New York*, 16 F.4th 992, 1035 (2d Cir. 2021)—that the Act's impairment is not merely "a temporary alteration" of existing contractual relationships, *Spannaus*, 438 U.S. at 250. The Act "work[s] a severe, permanent, and . . . irrevocabl[e]" change. *Id*. The Council provided Plaintiffs with no opportunity to reinstate their contractual rights. As in *Melendez*, Plaintiffs "can never seek to recover" the benefit of their bargain. 16 F.4th at 1033. Not now, not after the housing crisis has been abated, "[n]ot ever." *Id*. Their contractual rights are "permanently and completely unenforceable." *Id*. at 1034.

## B. The Act's Impairment Of Existing Contracts Does Not Further A Legitimate Purpose.

Because "the City's legislation has deprived Plaintiffs of the benefit of their bargains and is causing them to lose money in their operations in New York City," "the justification for the City's legislation must withstand very careful examination." *DoorDash, Inc. v. City of New York*, 692 F. Supp. 3d 268, 292 (S.D.N.Y. 2023); *see also Melendez*, 16 F.4th at 1035 (explaining that "severe impairment will push the inquiry to a careful examination of the nature and purpose" of the challenged legislation) (brackets and ellipses omitted) (quoting *Spannaus*, 438 U.S. at 245).

"In general, a legitimate public purpose is one that is 'aimed at remedying an important general social or economic problem rather than providing a benefit to special interests." *Connecticut State Police Union v. Rovella*, 36 F.4th 54, 63 (2d Cir. 2022) (quoting *Buffalo Tchrs.*, 464 F.3d at 368). A legislature acts in the public interest when it passes a law "in the service of 'a broad societal goal, not the pursuit of the interests of a narrow class.' " *Id.* (quoting *Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 994 (2d Cir. 1997)).

Defendants cannot identify any legitimate public purpose demonstrably served by the Act's impairment of existing exclusive listing agreements. The District Court once again relied on Defendants' proffered housing-mobility interest. SPA30. But just as the First Amendment is not satisfied with post-hoc rationales, *supra* p. 38, the Contracts Clause is not satisfied by a public interest lacking "record support" indicating that the interest proffered in litigation "was in fact the law's purpose." *Melendez*, 16 F.4th at 1036. The Council expressly disclaimed an interest in improving housing mobility in the face of overwhelming criticism from those who recognized that curtailing tenant-pay broker fees would cause rents to increase, reduce transparency in the rental marketplace, and price many renters out of apartments they could previously afford. JA402; JA403; JA418; JA454; JA498.

For those same reasons, even if Defendants could rely on an interest in improving housing mobility, ending tenant-pay fees will make moving harder, not easier. Defendants have yet to offer any response to these economic realities. This Court will not defer to legislative judgments about the effectiveness of a contractual impairment "in the absence of some record basis to link purpose and means." *Melendez*, 16 F.4th at 1041. The District Court's insistence on "defer[ing] to legislative judgment," SPA36 (quoting *Melendez*, 16 F.4th at 1041), is again misplaced. As with the First Amendment, the Contracts Clause is "more demanding than the rational basis review that applies when legislation is challenged under the Due Process Clause." *Melendez*, 16 F.4th at 1032.

Indeed, when combined with the evident hostility that the Council exhibited toward brokers and landlords during consideration of the Act, the lack of fit between the Act and the shifting and irrational nature of the Council's asserted interests is more suggestive of a desire to benefit a favored group—tenants—at the expense of a disfavored group—brokers and landlords—than it is of a desire to "protect a basic societal interest." *Melendez*, 16 F.4th at 1037 (citation omitted); *see also DoorDash*, 692 F. Supp.3d at 292 ("The shifting rationale provided for the adoption of the legislation supports the contention that the public purpose proffered by Defendant for the legislation now is pretextual.").

49

Councilmembers cast brokers as the villains responsible for the housing crisis throughout the legislative process. Supporters of the Act accused brokers of "acting out of greed," "taking hard earned money, flooding online rental options and holding people back from finding an apartment that would otherwise be affordable and accessible to them." JA522, JA531. Another stated that "[t]he current system is . . . a blatant exploitation [by] brokers, making it increasingly challenging for everyday New Yorkers to secure affordable housing." JA491. Councilmember Nurse echoed those sentiments, opining during the hearing that when it comes to wrongdoing by brokers, "[t]he worst case scenario is generally what the rule is." JA151. The Council's overt contempt for the brokers who testified at the hearing led one observer to decry the Council's "vitriol towards brokers," with councilmembers "star[ing] at [their] phones and laptops as [brokers] spoke, while listening intently to anyone in favor of the bill." JA494. The online campaign of the FARE Act's sponsor was even more caustic, complete with t-shirts stating "F*CK BROKER FEES." JA758.

The Council was similarly callous to concerns that landlords would be unable to shoulder the broker fee's added cost. *See, e.g.*, JA410 (testifying that "[t]he notion that all landlords are wealthy and swimming in money and all tenants are struggling is ridiculous" and that "there are just as many wealthy tenants as there are struggling tenants and as many wealthy landlords as there are struggling landlords"). The Council did not bother to investigate those concerns or to consider whether landlords

50

were better able to endure the financial impact of paying a brokerage fee. There was, in short, no evidence that barring tenant-pay exclusive brokerage contracts would materially improve New Yorkers' housing mobility.

### C. The Act's Impairment Is Neither Reasonable Nor Appropriate.

The Act is neither a reasonable nor appropriate piece of legislation. A law that substantially impairs the contractual relations of the parties "must be specifically tailored to meet the societal ill it is supposedly designed to ameliorate." *Sanitation & Recycling Indus.*, 107 F.3d at 993. The more severe the impairment, the greater the level of scrutiny required. *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983). A telltale sign that a substantial impairment is unreasonable is when "an evident and more moderate course would serve [the law's] purposes equally well." *U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 31 (1977); *see Spannaus*, 438 U.S. at 247.

The District Court held that Plaintiffs raised sufficient reasonableness concerns to preclude dismissal of their Contracts Clause claim, SPA31, but denied a preliminary injunction after concluding that Plaintiffs are unlikely to succeed on the merits based on a balance of the relevant factors, SPA32-38. The District Court agreed with Plaintiffs that the permanent nature of the impairment, as well as the Council's failure to provide a means for contracting parties to recoup the benefit of their bargain, point against its reasonableness. SPA33, SPA36; *see also Melendez*,

51

16 F.4th at 1040 (noting "that a permanent and complete impairment of contract, by contrast to a temporary and limited one, will weigh heavily against a finding of reasonableness"); *id.* at 1045 (noting that a "compensation condition" has been an "important factor" in previous cases). But the District Court thought other factors pointed in the opposite direction. That analysis suffered from multiple errors.

The District Court recognized, for instance, that a "drastic impairment" such as the FARE Act's is not reasonable "when an evident and more moderate course would serve [the government's] purpose equally well." SPA34 (quoting *Buffalo Tchrs.*, 464 F.3d at 371). But the District Court held that the Council reasonably rejected an exemption for existing agreements because "an exemption would have permitted landlords and brokers to enter long-term tenant-pays exclusive listing agreements while the bill was pending." *Id.* That is false. Contracts entered into during the pendency of the FARE Act would not be enforceable under the rule that foreseeable impairments do not violate the Contracts Clause—they do not interfere with contracting parties' *reasonable* expectations. *See Melendez*, 16 F.4th at 1034-35. That said, the Council could have written the FARE Act to exempt only those contracts entered into before the date of the bill's introduction. Or it could have grandfathered-in contracts entered into during the bill's pendency that were limited to a reasonable period, such as one year. It was neither reasonable nor necessary for the Council to forego these "more moderate" alternatives in favor of a wholesale

nullification of all existing exclusive listing agreements. *Buffalo Tchrs.*, 464 F.3d at 371.

The District Court also recognized that the Act's no-conditioning and land-lord's agent prohibitions come "at the expense of a discrete group of private persons: residential landlords." SPA34 (brackets omitted) (quoting *Melendez*, 16 F.4th at 1042). This Court has held that "reasonableness and appropriateness concerns are raised by a legislative decision to provide financial relief to certain persons not through public funds but by destroying the contract expectations of other persons." *Melendez*, 16 F.4th at 1042. But the District Court thought this factor weighed in Defendants' favor based on the court's mistaken belief that landlords "cause the public harm that the City Council sought to mitigate." SPA34 (brackets omitted) (quoting *Melendez*, 16 F.4th at 1042). Not even Defendants have argued that land-lords are somehow responsible for New York City's housing mobility problems. As in *Melendez*, Defendants "here do not argue that landlords are in any way responsible for the economic problem that the [contractual impairment] seeks to address." 16 F.4th at 1042.

The District Court also recognized that the challenged provisions are not con-ditioned on need—that is, they are not limited to those tenants for whom the broker fee is a barrier to moving. SPA35; *see also Melendez*, 16 F.4th at 1043 (noting that

the "omission of any need condition weighed against the reasonableness of" an impairment). But the District Court thought "the City Council could reasonably have concluded that the effect of brokers' fees on housing mobility weighs disproportionately on low-income New Yorkers, making a need condition unnecessary." SPA35. The District Court appears to have gotten turned around. The relevant question is not whether low-income tenants are disproportionately more likely to have problems paying the up-front costs of moving. Of course they are. The question is whether a disproportionate number of tenants who now benefit from the Act's impairment of existing exclusive listing agreements would have been able to move without the impairment.

The record is bereft of any evidence the Council analyzed this operative question. The District Court's holding about what the Council "could reasonably have concluded" is based on third-party sources cited in the Committee Report. *Id.* The sources' mere presence in the Report does not demonstrate that the Council actually discussed the possibility of a need condition, much less that it provided "a stated reason for not including such a condition in the challenged law." *Melendez*, 16 F.4th at 1044. And even what the District Court found is "more indicative of shared hardships than of a singular burden on" tenants. *Id.* at 1045. The third-party sources note that no-fee listings are more likely to be offered by luxury apartments, and that tenants who move tend to have higher incomes. SPA35 (citing JA671, JA673). But

54

that result is unsurprising given that small-business landlords often operate on threadbare margins and cannot absorb the upfront cost of the broker fee the way luxury apartments with fatter profit margins can. *See* JA789-791; JA807-808. The cited sources fail to demonstrate "that a particular landlord is better able than a particular [tenant] to bear the financial burden" of the broker fee, and this factor weighs against constitutionality. *Melendez*, 16 F.4th at 1043.

The District Court dismissed the notion that landlords are also burdened by broker fees, reasoning that brokers can always "pass the cost to tenants" by increasing rents. SPA36. But that ignores the very hardship that the District Court credited as justifying the impairment in the first place: the distinct hardship posed by upfront costs. Landlords can in fact make more money over the long term by paying the broker fee upfront and then charging a higher rent across the lease term. JA824-825. Many of them simply cannot afford to do so. The District Court likewise ignored that many landlords cannot recoup the cost of the broker fee through higher rent because they are already renting at the maximum level permitted by rent-stabilization laws—but the Act applies equally to those apartments. JA837.

The District Court again appears to have gotten turned around with its final, "additional factor." SPA37. The court reasoned that the "miniscule" number of contracts covered by Plaintiffs' Contracts Clause claim relative to "the infinite number of potential future agreements the Act prohibits" will not "have a statistically

significant effect on affordability or mobility." *Id*. But that is why it was not reasonable or appropriate for the Council to impair existing contract rights. The Contracts Clause does not permit "a drastic impairment when an evident and more moderate course would serve [the government's] purposes equally well." *Buffalo Tchrs.*, 464 F.3d at 371 (citation omitted). The District Court should have concluded that Plaintiffs were likely to succeed on their Contract Clause claim.

## III.  THE REMAINING FACTORS FAVOR AN INJUNCTION.

Brokers and landlords throughout New York City are already suffering irreparable harm from enforcement of the publication bar and impairment of their existing exclusive listing agreements. As for the ban on publishing tenant-pay open listings, it is axiomatic that "the deprivation of First Amendment rights is an irreparable harm." *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020). The impairment of brokers' and landlords' listing agreements in violation of the Contracts Clause likewise "raises 'a presumption of irreparable harm.'" *Connecticut State Police Union v. Rovella*, 494 F. Supp. 3d 210, 220 (D. Conn. 2020) (citation omitted), *aff'd*, 36 F.4th 54 (2d Cir. 2022).

In addition to harming Plaintiffs' constitutional interests, the challenged provisions are causing ongoing irreparable harm to Plaintiffs' businesses. Absent an injunction, Plaintiffs will lose business opportunities that will not be recoverable in

future litigation. *Iowa Utilities Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996). Plaintiffs cannot double-back after prevailing at final judgment and collect fees they would have been entitled to while the challenged provisions were in effect. Many Plaintiffs are also at risk of losing their businesses altogether as they rely on tenant-pay open listings for their work and cannot easily shift to a landlord-pay model. *See* JA792-793 ("The impact of the FARE Act will likely force my brokerage business to collapse."); JA830 ("The FARE Act threatens Bohemia's business, and threatens the livelihood of its real estate brokers and agents"); JA776; JA796; JA807. And it is well established that the "destruction of an ongoing business" may constitute irreparable harm. *Loveridge v. Pendleton Woolen Mills, Inc.*, 788 F.2d 914, 916 (2d Cir. 1986).

The balance of equities and the public-interest factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Defendants "do[] not have an interest in the enforcement of an unconstitutional law," and the public always benefits from the vindication of constitutional rights. *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (quoting *American Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003)).

There are concrete public benefits to a preliminary injunction as well. By placing the burden of brokerage commissions largely on landlords, the challenged provisions will substantially reduce the number of open listings, a crucial means of

locating an apartment in New York City's incredibly supply-constrained market. JA835-836. At the same time that these provisions cause the number of publicly available listings to plunge, they will cause rents to rise, pricing many tenants out of apartments that were previously affordable. JA834-835. And there is a substantial risk that landlords unable to raise rents because of rent-stabilization laws will be forced to warehouse their units, further decreasing the housing supply. JA837. Even if landlords are able to keep their units online, they will likely only be able to do so by reducing valuable services, such as by foregoing needed maintenance or canceling planned upgrades. JA790-791. Those delays and deferrals create safety issues, make properties less competitive, and damage relationships with tenants. The Court should accordingly reverse and remand with instructions to issue Plaintiffs' requested preliminary injunction.

## CONCLUSION

The Court should reverse the District Court's order and remand with instructions to grant a preliminary injunction (1) barring enforcement of the publication bar, N.Y.C. Admin. Code § 20-699.21(a)(2) and (2) barring enforcement of N.Y.C. Admin. Code § 20-699.21(a)(1) and (c) as applied to exclusive-listing contracts entered into before December 13, 2024, and in effect on June 10, 2025.

Respectfully submitted,

SEAN MAROTTA
J. ANDREW MACKENZIE
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600

*/s/ Claude G. Szyfer*
CLAUDE G. SZYFER
DARYA D. ANICHKOVA
HOGAN LOVELLS US LLP
390 Madison Ave.
New York, N.Y. 10017
(212) 918-3000
claude.szyfer@hoganlovells.com

*Counsel for Plaintiffs-Appellants*

July 31, 2025

59

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limits of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 13,623 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman.

*/s/ Claude G. Szyfer*
Claude G. Szyfer

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was filed with the Clerk using the Appellate

Case Management System ("ACMS") on July 31, 2025.  All counsel of record are

registered ACMS users, and service will be accomplished by the ACMS system.

*/s/ Claude G. Szyfer*
Claude G. Szyfer