# 25-1506-cv

IN THE

## United States Court of Appeals
## for the Second Circuit

───────────────

REAL ESTATE BOARD OF NEW YORK, INC.; NEW YORK STATE ASSOCIATION OF
REALTORS, INC.; BOHEMIA REALTY GROUP; BOND NEW YORK REAL ESTATE CORP.;
REAL NEW YORK LLC; LEVEL GROUP INC.; FOUR CORNERS REALTY, LLC; 21
WEST 74 CORP.; and 8 WEST 119TH STREET HDFC,

*Plaintiffs-Appellants*,

v.

THE CITY OF NEW YORK, *a municipal entity*, and VILDA VERA MAYUGA, *as
Commissioner of New York City Department of Consumer and Worker Protection*,

*Defendants-Appellees*.

───────────────

Appeal from the United States District Court
for the Southern District of New York

───────────────

**JOINT APPENDIX**
**VOLUME I OF IV (JA1 to JA241)**

───────────────

MURIEL GOODE-TRUFANT
CORPORATION COUNSEL OF
  THE CITY OF NEW YORK
100 Church Street
New York, NY 10007
(213) 356-2490

*Counsel for Defendants-Appellees*

CLAUDE G. SZYFER
DARYA D. ANICHKOVA
HOGAN LOVELLS US LLP
390 Madison Ave.
New York, N.Y. 10017
(212) 918-3000
claude.szyfer@hoganlovells.com

*Counsel for Plaintiffs-Appellants*

*Additional counsel listed on inside cover*

RICHARD DEARING
CLAUDE S. PLATTON
JAMISON DAVIES
CORPORATION COUNSEL OF
   THE CITY OF NEW YORK
100 Church Street
New York, NY 10007
(213) 356-2490

*Counsel for Defendants-Appellees*

SEAN MAROTTA
J. ANDREW MACKENZIE
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

Page

**VOLUME I**

District Court Docket Sheet ..................................................................... JA1

Complaint (12/16/2024) (ECF 1) ............................................................ JA13

    Exhibit A – Final FARE Act (ECF 1-1) ....................................... JA59

    Exhibit B – Int. No. 360 (ECF 1-2) .............................................. JA65

Notice of Motion re: Motion for a Preliminary Injunction
(01/13/2025) (ECF 19) ........................................................................... JA68

Declaration of Claude G. Szyfer in Support of Plaintiffs' Motion for a
Preliminary Injunction (01/13/2025) (ECF 21) .............................................. JA70

    Exhibit A – June 12, 2024 Hearing Transcript (ECF 21-1) ........................... JA73

**VOLUME II**

    Exhibit A – June 12, 2024 Hearing Transcript (ECF 21-1)
      (continued) ........................................................................... JA242

    Exhibit B – June 2024 Written Testimony (Part 1 of 7) (ECF 21-2) .......... JA394

    Exhibit B – June 2024 Written Testimony (Part 2 of 7) (ECF 21-3) .......... JA467

**VOLUME III**

    Exhibit B – June 2024 Written Testimony (Part 3 of 7) (ECF 21-4) .......... JA506

    Exhibit B – June 2024 Written Testimony (Part 4 of 7) (ECF 21-5) .......... JA545

    Exhibit B – June 2024 Written Testimony (Part 5 of 7) (ECF 21-6) .......... JA583

    Exhibit B – June 2024 Written Testimony (Part 6 of 7) (ECF 21-7) .......... JA625

## TABLE OF CONTENTS—Continued

Page

Exhibit B – June 2024 Written Testimony (Part 7 of 7) (ECF 21-8) .......... JA649

Exhibit C – November 13, 2024 Committee Report (ECF 21-9)................ JA666

Exhibit D – November 13, 2024 City Council Hearing Transcript
    (ECF 21-10) ............................................................................................ JA685


**VOLUME IV**

Exhibit E – FARE Act (ECF 21-11)............................................................ JA748

Exhibit F – Int. No. 360 (ECF 21-12)......................................................... JA754

Exhibit G – Chi Osse X Post (ECF 21-13) ................................................. JA757

Exhibit H – Brick Underground Article (ECF 21-14)................................. JA759

Declaration of Douglas Wagner in Support of Plaintiffs' Motion for a
    Preliminary Injunction (01/13/2025) (ECF 22) ........................................ JA775

Exhibit A - Bond Exclusive Right to Rent Agreement (ECF 22-1) ............ JA784

Declaration of Eric Porco in Support of Plaintiffs' Motion for a
    Preliminary Injunction (01/13/2025) (ECF 23) ........................................ JA787

Declaration of Robert Rahmanian in Support of Plaintiffs' Motion for
    a Preliminary Injunction (01/13/2025) (ECF 24) ...................................... JA795

Declaration of Ryan Foregger in Support of Plaintiffs' Motion for a
    Preliminary Injunction (01/13/2025) (ECF 25) ........................................ JA805

Declaration of Sam Chandan in Support of Plaintiffs' Motion for a
    Preliminary Injunction (01/13/2025) (ECF 26) ........................................ JA809

Declaration of Sarah Saltzberg in Support of Plaintiffs' Motion for a
    Preliminary Injunction (01/13/2025) (ECF 27) ........................................ JA829

Notice of Motion re: Motion to Dismiss (02/28/2025) (ECF 36)..................... JA841

# TABLE OF CONTENTS—Continued

Page

Declaration of Aimee K. Lulich (02/28/2025) (ECF 38) .................................JA844

    Exhibit A – Local Law 119 of 2024 (ECF 38-1)..........................................JA848

    Exhibit B – Minutes and Agenda for City Council Stated Meeting
        held February 28, 2024 (ECF 38-2) ......................................................JA854

    Exhibit C – June 12, 2024 Committee Report (ECF 38-3) .........................JA861

    Exhibit G – November 13, 2024 Committee Hearing Transcript
        (ECF 38-7) ...........................................................................................JA869

    Exhibit I – Letter to Mayor (ECF 38-9).....................................................JA876

    Exhibit J – Bill Jacket for Chapter 672 of the Laws of 1922
        (ECF 38-10) .........................................................................................JA878

    Exhibit K – Unpublished Decision in *Real Estate Bd. of N.Y., Inc.*
        *v. N.Y. Dept. of State*, Index No. 901586-20 (Albany County
        Apr. 12, 2021)......................................................................................JA899

Order re: Evidentiary Hearing (04/08/2025) (ECF 48) ....................................JA909

Supplemental Declaration of Claude G. Szyfer in Further Support of
    Plaintiffs' Motion for a Preliminary Injunction and in Opposition
    to Defendants' Motion to Dismiss (04/11/2025) (ECF 50).........................JA910

    Exhibit A – REAL NY Agreements - Redacted (ECF 50-1) .....................JA912

    Exhibit B – DOS Legal Memorandum (ECF 50-2)....................................JA923

    Exhibit C – Chi Osse FARE Act FAQs 2.0 (ECF 50-3) ............................JA926

    Exhibit D – July 29, 2024 Proposed Int. 360-A (ECF 50-4)......................JA931

Declaration of Thijs Menger in Further Support of Plaintiffs' Motion
    for a Preliminary Injunction and in Opposition to Defendants'
    Motion to Dismiss (04/11/2025) (ECF 51)................................................JA937

City of New York Letter re: Evidentiary Hearing (04/14/2025)
    (ECF 54)......................................................................................................JA939

## TABLE OF CONTENTS—Continued

Page

Order re: Evidentiary Hearing (04/15/2025) (ECF 55) ................................... JA941

May 2, 2025 Oral Argument Transcript (filed 06/20/2025) (ECF 63) ............ JA943

Notice of Appeal (06/12/2025) (ECF 62) ...................................................... JA1001

APPEAL,ECF

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:24-cv-09678-RA

Real Estate Board of New York, Inc. et al v. The City Of New York , et al
Assigned to: Judge Ronnie Abrams
Cause: 28:2201 Constitutionality of State Statute(s)

Date Filed: 12/16/2024
Jury Demand: Defendant
Nature of Suit: 950 Constitutional - State Statute
Jurisdiction: Federal Question

**Plaintiff**

**Real Estate Board of New York, Inc.**

represented by **James Andrew Mackenzie**
Hogan Lovells US LLP
555 Thirteenth Street, NW
Washington, DC 20004-1109
202-637-5600
Email: drew.mackenzie@hoganlovells.com
*ATTORNEY TO BE NOTICED*

**Sean Marotta**
Hogan Lovells US LLP
555 Thirteenth Street, NW
Washington, DC 20004-1109
202-637-4881
Email: sean.marotta@hoganlovells.com
*ATTORNEY TO BE NOTICED*

**Claude Gabriel Szyfer**
Hogan Lovells US LLP
390 Madison Avenue
New York, NY 10017
212-918-3000
Fax: 212-918-3100
Email: claude.szyfer@hoganlovells.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**New York State Association of Realtors, Inc.**

represented by **James Andrew Mackenzie**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sean Marotta**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Claude Gabriel Szyfer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Bohemia Realty Group**

represented by **James Andrew Mackenzie**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JA1**

**Sean Marotta**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Claude Gabriel Szyfer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Bond New York Real Estate Corp.**          represented by   **James Andrew Mackenzie**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sean Marotta**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Claude Gabriel Szyfer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Level Group Inc.**          represented by   **James Andrew Mackenzie**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sean Marotta**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Claude Gabriel Szyfer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Real New York LLC**          represented by   **James Andrew Mackenzie**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sean Marotta**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Claude Gabriel Szyfer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Four Corners Realty, LLC**          represented by   **James Andrew Mackenzie**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sean Marotta**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Claude Gabriel Szyfer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JA2**

**Plaintiff**

**21 West 74 Corp.**　　　　　　　　　　　　　represented by **James Andrew Mackenzie**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sean Marotta**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Claude Gabriel Szyfer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**8 West 119th Street HDFC**　　　　　　　　represented by **James Andrew Mackenzie**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sean Marotta**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Claude Gabriel Szyfer**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**The City Of New York ,**
*a municipal entity*　　　　　　　　　　　　represented by **Aimee Kara Lulich**
Nyc Law Department
100 Church St.
New York, NY 10007
(212)-356-2369
Fax: (212)-356-1148
Email: alulich@law.nyc.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jessica Lynn Katzen**
New York City Law Department
100 Church Street
New York, NY 10007
718-419-4186
Email: jkatzen@law.nyc.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Vilda Vera Mayuga**
*as Commissioner of New York City Department*
*of Consumer and Worker Protection*　　　represented by **Aimee Kara Lulich**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jessica Lynn Katzen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**JA3**

| | |
|---|---|
| **Neighbors Together Corp.** | represented by **Evan Henley**<br>The Legal Aid Society<br>49 Thomas Street<br>Ste Floor 5<br>New York, NY 10013<br>212-298-5233<br>Email: ewhenley@legal-aid.org<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Edward Joseph Josephson**<br>The Legal Aid Society<br>199 Water Street<br>New York, NY 10038<br>917-697-6449<br>Email: ejosephson@legal-aid.org<br>*ATTORNEY TO BE NOTICED* |

<u>**Amicus**</u>

| | |
|---|---|
| **Neighbors Together Corp.** | represented by **Evan Henley**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

<u>**Amicus**</u>

| | |
|---|---|
| **State of New York** | represented by **Judith Naomi Vale**<br>Office of The Attorney General(NYS)<br>28 Liberty Street, 21st Floor<br>New York, NY 10005<br>(212) 416-6274<br>Email: judith.vale@ag.ny.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

<u>**Amicus**</u>

| | |
|---|---|
| **New York Department of State** | represented by **Judith Naomi Vale**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 12/16/2024 | 1 | COMPLAINT against Vilda Vera Mayuga, The City Of New York,. (Filing Fee $ 405.00, Receipt Number ANYSDC-30339853)Document filed by Real New York LLC, Bohemia Realty Group, Four Corners Realty, LLC, 8 West 119th Street HDFC, New York State Association of Realtors, Inc., 21 West 74 Corp., Real Estate Board of New York, Inc., Bond New York Real Estate Corp., Level Group Inc.. (Attachments: # 1 Exhibit A - Final FARE Act, # 2 Exhibit B - Int. No. 360).(Szyfer, Claude) (Entered: 12/16/2024) |
| 12/16/2024 | 2 | CIVIL COVER SHEET filed..(Szyfer, Claude) (Entered: 12/16/2024) |
| 12/16/2024 | 3 | REQUEST FOR ISSUANCE OF SUMMONS as to The City of New York, and Vilda Vera Mayuga, re: 1 Complaint,. Document filed by Real Estate Board of New York, Inc., New York State Association of Realtors, Inc., Bohemia Realty Group, Bond New York Real Estate Corp., Level Group Inc., Real New York LLC, Four Corners Realty, LLC, 21 West 74 Corp., 8 West 119th Street HDFC..(Szyfer, Claude) (Entered: 12/16/2024) |
| 12/16/2024 | 4 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Real Estate Board of New York, Inc., New York State Association of Realtors, Inc., Bohemia Realty Group, |

**JA4**

| | | |
|---|---|---|
| | | Bond New York Real Estate Corp., Level Group Inc., Real New York LLC, Four Corners Realty, LLC, 21 West 74 Corp., 8 West 119th Street HDFC..(Szyfer, Claude) (Entered: 12/16/2024) |
| 12/17/2024 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Alvin K. Hellerstein. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district-judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf-related-instructions..(sj) (Entered: 12/17/2024) |
| 12/17/2024 | | Magistrate Judge Jennifer Willis is designated to handle matters that may be referred in this case. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (sj) (Entered: 12/17/2024) |
| 12/17/2024 | | Case Designated ECF. (sj) (Entered: 12/17/2024) |
| 12/17/2024 | 5 | ELECTRONIC SUMMONS ISSUED as to Vilda Vera Mayuga, The City Of New York,. (sj) (Entered: 12/17/2024) |
| 12/17/2024 | | NOTICE OF CASE REASSIGNMENT to Judge Ronnie Abrams. Judge Alvin K. Hellerstein is no longer assigned to the case. (vba) (Entered: 12/17/2024) |
| 12/18/2024 | 6 | ORDER AND NOTICE OF INITIAL CONFERENCE: IT IS FURTHER ORDERED that counsel for all parties appear for an initial status conference on January 17, 2025 at 1:30 p.m. If Defendants have not yet been properly served, have not filed a responsive pleading, and/or the parties otherwise seek to adjourn the conference, they shall notify the Court by no later than January 10, 2025. Unless the parties request otherwise, the Court will hold this conference by telephone. The parties shall use the following dial-in information to call in to the conference: Call-in Number: (855) 244-8681; Meeting ID: 23055424735. This conference line is open to the public. If Defendants have been properly served and the parties are available to proceed with an initial status conference prior to January 17, 2025, the parties shall notify the Court and propose an earlier date for the conference, as well as for submission of the status letter and proposed case management plan and further set forth in this Order. Initial Conference set for 1/17/2025 at 01:30 PM before Judge Ronnie Abrams. (Signed by Judge Ronnie Abrams on 12/18/2024) (rro) (Entered: 12/18/2024) |
| 12/24/2024 | 7 | AFFIDAVIT OF SERVICE of Summons and Complaint,. The City Of New York, served on 12/19/2024, answer due 1/9/2025. Document filed by Real New York LLC; Bohemia Realty Group; Four Corners Realty, LLC; 8 West 119th Street HDFC; New York State Association of Realtors, Inc.; 21 West 74 Corp.; Real Estate Board of New York, Inc.; Bond New York Real Estate Corp.; Level Group Inc...(Szyfer, Claude) (Entered: 12/24/2024) |
| 12/24/2024 | 8 | AFFIDAVIT OF SERVICE of Summons and Complaint,. Vilda Vera Mayuga served on 12/19/2024, answer due 1/9/2025. Document filed by Real New York LLC; Bohemia Realty Group; Four Corners Realty, LLC; 8 West 119th Street HDFC; New York State Association of Realtors, Inc.; 21 West 74 Corp.; Real Estate Board of New York, Inc.; Bond New York Real Estate Corp.; Level Group Inc... (Szyfer, Claude) (Entered: 12/24/2024) |
| 01/03/2025 | 9 | ORDER: An initial conference was previously scheduled in this matter for January 17, 2025. Due to a scheduling conflict, the conference is hereby rescheduled to January 16, 2025 at 2:00 p.m. Unless the parties request otherwise, the conference will be held by phone. Call-in Number: (855) 244-8681; Meeting ID: 23055424735. All other deadlines set forth in the Court's December 18, 2024 Order (ECF No. 6) remain the same. Plaintiffs are ordered to serve Defendants with a copy of this order and to file an affidavit on ECF certifying that such service has been effectuated. SO ORDERED. (Signed by Judge Ronnie Abrams on 1/3/2025) ( Initial Conference set for 1/16/2025 at 02:00 PM before Judge Ronnie Abrams.) (ks) (Entered: 01/03/2025) |
| 01/06/2025 | 10 | NOTICE OF APPEARANCE by Jessica Lynn Katzen on behalf of The City Of New York,, Vilda Vera Mayuga..(Katzen, Jessica) (Entered: 01/06/2025) |
| 01/06/2025 | 11 | NOTICE OF APPEARANCE by Aimee Kara Lulich on behalf of The City Of New York,, Vilda Vera Mayuga..(Lulich, Aimee) (Entered: 01/06/2025) |

**JA5**

| | | |
|---|---|---|
| 01/08/2025 | 12 | AFFIDAVIT OF SERVICE of 9 Order served on The City of New York on 1/7/2025. Document filed by Real Estate Board of New York, Inc., New York State Association of Realtors, Inc., Bohemia Realty Group, Bond New York Real Estate Corp., Level Group Inc., Real New York LLC, Four Corners Realty, LLC, 21 West 74 Corp., 8 West 119th Street HDFC..(Szyfer, Claude) (Entered: 01/08/2025) |
| 01/08/2025 | 13 | AFFIDAVIT OF SERVICE of 9 Order served on Vilda Vera Mayuga on 1/7/2025. Document filed by Real Estate Board of New York, Inc., New York State Association of Realtors, Inc., Bohemia Realty Group, Bond New York Real Estate Corp., Level Group Inc., Real New York LLC, Four Corners Realty, LLC, 21 West 74 Corp., 8 West 119th Street HDFC..(Szyfer, Claude) (Entered: 01/08/2025) |
| 01/08/2025 | 14 | CONSENT LETTER MOTION for Extension of Time to File Answer addressed to Judge Ronnie Abrams from Aimee K. Lulich dated January 8, 2025., JOINT LETTER MOTION for Extension of Time to File *Joint Letter and Proposed Scheduling Order* addressed to Judge Ronnie Abrams from Aimee K. Lulich dated January 8, 2025. Document filed by The City Of New York,, Vilda Vera Mayuga..(Lulich, Aimee) (Entered: 01/08/2025) |
| 01/10/2025 | 15 | MOTION for James Andrew Mackenzie to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-30438026. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Real Estate Board of New York, Inc., New York State Association of Realtors, Inc., Bohemia Realty Group, Bond New York Real Estate Corp., Level Group Inc., Real New York LLC, Four Corners Realty, LLC, 21 West 74 Corp., 8 West 119th Street HDFC. (Attachments: # 1 Affidavit of James Andrew Mackenzie, # 2 Exhibit - Certificate of Good Standing - DC, # 3 Exhibit - Certificate of Good Standing - CO, # 4 Exhibit - Certificate of Good Standing - TX, # 5 Proposed Order for Admission Pro Hac Vice).(Mackenzie, James) (Entered: 01/10/2025) |
| 01/10/2025 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 15 MOTION for James Andrew Mackenzie to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-30438026. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bc)** (Entered: 01/10/2025) |
| 01/10/2025 | 16 | ORDER granting 14 Letter Motion for Extension of Time to Answer re 1 Complaint; granting 14 Letter Motion for Extension of Time to File. Application granted. The conference previously scheduled for January 16, 2025 is hereby adjourned sine die, and thus the parties need not file a joint letter or proposed scheduling order at this time. No later than January 15, 2025, the parties shall file a joint letter proposing briefing schedules for their anticipated motions. (Signed by Judge Ronnie Abrams on 1/10/2025) (tro) (Entered: 01/10/2025) |
| 01/13/2025 | 17 | ORDER granting 15 Motion for James Andrew Mackenzie to Appear Pro Hac Vice (HEREBY ORDERED by Judge Ronnie Abrams)(Text Only Order) (arc) (Entered: 01/13/2025) |
| 01/13/2025 | 18 | MOTION for Sean Marotta to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-30449243. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Real Estate Board of New York, Inc., New York State Association of Realtors, Inc., Bohemia Realty Group, Bond New York Real Estate Corp., Level Group Inc., Real New York LLC, Four Corners Realty, LLC, 21 West 74 Corp., 8 West 119th Street HDFC. (Attachments: # 1 Affidavit of Sean Marotta, # 2 Exhibit - Certificate of Good Standing - NY, # 3 Exhibit - Certificate of Good Standing - DC, # 4 Exhibit - Certificate of Good Standing - NJ, # 5 Proposed Order for Admission Pro Hac Vice). (Marotta, Sean) (Entered: 01/13/2025) |
| 01/13/2025 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 18 MOTION for Sean Marotta to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-30449243. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (rju)** (Entered: 01/13/2025) |
| 01/13/2025 | 19 | MOTION for Preliminary Injunction . Document filed by Real Estate Board of New York, Inc., New York State Association of Realtors, Inc., Bohemia Realty Group, Bond New York Real Estate Corp., Level Group Inc., Real New York LLC, Four Corners Realty, LLC, 21 West 74 Corp., 8 West 119th Street HDFC..(Szyfer, Claude) (Entered: 01/13/2025) |
| 01/13/2025 | 20 | MEMORANDUM OF LAW in Support re: 19 MOTION for Preliminary Injunction . . Document filed by Real Estate Board of New York, Inc., New York State Association of Realtors, Inc., Bohemia Realty Group, Bond New York Real Estate Corp., Level Group Inc., Real New York LLC, Four Corners Realty, LLC, 21 West 74 Corp., 8 West 119th Street HDFC..(Szyfer, Claude) (Entered: 01/13/2025) |

| | | |
|---|---|---|
| 01/13/2025 | 21 | DECLARATION of Claude G. Szyfer in Support re: 19 MOTION for Preliminary Injunction .. Document filed by Real Estate Board of New York, Inc., New York State Association of Realtors, Inc., Bohemia Realty Group, Bond New York Real Estate Corp., Level Group Inc., Real New York LLC, Four Corners Realty, LLC, 21 West 74 Corp., 8 West 119th Street HDFC. (Attachments: # 1 Exhibit Exhibit A - June 2024 Hearing Transcript, # 2 Exhibit Exhibit B (Part 1 of 7) - June 2024 Written Testimony, # 3 Exhibit Exhibit B (Part 2 of 7) - June 2024 Written Testimony, # 4 Exhibit Exhibit B (Part 3 of 7) - June 2024 Written Testimony, # 5 Exhibit Exhibit B (Part 4 of 7) - June 2024 Written Testimony, # 6 Exhibit Exhibit B (Part 5 of 7) - June 2024 Written Testimony, # 7 Exhibit Exhibit B (Part 6 of 7) - June 2024 Written Testimony, # 8 Exhibit Exhibit B (Part 7 of 7) - June 2024 Written Testimony, # 9 Exhibit Exhibit C - November 2024 Committee Report, # 10 Exhibit Exhibit D - November 2024 Hearing Transcript, # 11 Exhibit Exhibit E - FARE Act, # 12 Exhibit Exhibit F - Int. No. 360, # 13 Exhibit Exhibit G - Chi Osse X Post, # 14 Exhibit Exhibit H - Brick Underground Article).(Szyfer, Claude) (Entered: 01/13/2025) |
| 01/13/2025 | 22 | DECLARATION of Douglas Wagner in Support re: 19 MOTION for Preliminary Injunction .. Document filed by Real Estate Board of New York, Inc., New York State Association of Realtors, Inc., Bohemia Realty Group, Bond New York Real Estate Corp., Level Group Inc., Real New York LLC, Four Corners Realty, LLC, 21 West 74 Corp., 8 West 119th Street HDFC. (Attachments: # 1 Exhibit Exhibit A - Bond Exclusive Right to Rent Agreement).(Szyfer, Claude) (Entered: 01/13/2025) |
| 01/13/2025 | 23 | DECLARATION of Eric Porco in Support re: 19 MOTION for Preliminary Injunction .. Document filed by Real Estate Board of New York, Inc., New York State Association of Realtors, Inc., Bohemia Realty Group, Bond New York Real Estate Corp., Level Group Inc., Real New York LLC, Four Corners Realty, LLC, 21 West 74 Corp., 8 West 119th Street HDFC..(Szyfer, Claude) (Entered: 01/13/2025) |
| 01/13/2025 | 24 | DECLARATION of Robert Rahmanian in Support re: 19 MOTION for Preliminary Injunction .. Document filed by Real Estate Board of New York, Inc., New York State Association of Realtors, Inc., Bohemia Realty Group, Bond New York Real Estate Corp., Level Group Inc., Real New York LLC, Four Corners Realty, LLC, 21 West 74 Corp., 8 West 119th Street HDFC..(Szyfer, Claude) (Entered: 01/13/2025) |
| 01/13/2025 | 25 | DECLARATION of Ryan Foregger in Support re: 19 MOTION for Preliminary Injunction .. Document filed by Real Estate Board of New York, Inc., New York State Association of Realtors, Inc., Bohemia Realty Group, Bond New York Real Estate Corp., Level Group Inc., Real New York LLC, Four Corners Realty, LLC, 21 West 74 Corp., 8 West 119th Street HDFC..(Szyfer, Claude) (Entered: 01/13/2025) |
| 01/13/2025 | 26 | DECLARATION of Sam Chandan in Support re: 19 MOTION for Preliminary Injunction .. Document filed by Real Estate Board of New York, Inc., New York State Association of Realtors, Inc., Bohemia Realty Group, Bond New York Real Estate Corp., Level Group Inc., Real New York LLC, Four Corners Realty, LLC, 21 West 74 Corp., 8 West 119th Street HDFC..(Szyfer, Claude) (Entered: 01/13/2025) |
| 01/13/2025 | 27 | DECLARATION of Sarah Saltzberg in Support re: 19 MOTION for Preliminary Injunction .. Document filed by Real Estate Board of New York, Inc., New York State Association of Realtors, Inc., Bohemia Realty Group, Bond New York Real Estate Corp., Level Group Inc., Real New York LLC, Four Corners Realty, LLC, 21 West 74 Corp., 8 West 119th Street HDFC..(Szyfer, Claude) (Entered: 01/13/2025) |
| 01/14/2025 | 28 | ORDER granting 18 Motion for Sean Marotta to Appear Pro Hac Vice (HEREBY ORDERED by Judge Ronnie Abrams)(Text Only Order) (arc) (Entered: 01/14/2025) |
| 01/15/2025 | 29 | JOINT LETTER addressed to Judge Ronnie Abrams from Jessica Katzen dated January 15, 2025 re: Proposed Briefing Schedule. Document filed by The City Of New York,, Vilda Vera Mayuga..(Katzen, Jessica) (Entered: 01/15/2025) |
| 01/16/2025 | 30 | MEMO ENDORSEMENT on re: 29 Letter filed by Vilda Vera Mayuga, The City Of New York. ENDORSEMENT: Application granted. The Court adopts the briefing schedule and page limits proposed above. SO ORDERED. ( Responses due by 3/28/2025, Replies due by 4/11/2025.) (Signed by Judge Ronnie Abrams on 1/16/2025) (tg) (Entered: 01/16/2025) |
| 02/11/2025 | 31 | MOTION to Intervene . Document filed by Neighbors Together Corp.. (Attachments: # 1 Supplement Memorandum of Law in Support of Motion to Intervene, # 2 Affidavit Declaration of Amy Blumsack, # 3 Affidavit Declaration of Joel Gil, # 4 Exhibit Exhibit A: Proposed Cross-Motion to Dismiss and Opposition to Plaintiffs' Motion for a Preliminary Injunction).(Henley, Evan) (Entered: 02/11/2025) |

**JA7**

| | | |
|---|---|---|
| 02/11/2025 | 32 | NOTICE OF APPEARANCE by Edward Joseph Josephson on behalf of Neighbors Together Corp... (Josephson, Edward) (Entered: 02/11/2025) |
| 02/12/2025 | 33 | ORDER: The Court has received a motion to intervene filed by Neighbors Together Corp. See ECF No. 31. Pursuant to Local Civil Rule 6.1, Plaintiffs' opposition to the motion must be filed no later than February 25, 2025, and proposed intervenor's reply, if any, must be filed within seven (7) days of the opposition. If the motion to intervene is granted: (1) Plaintiff's opposition to the intervenor's cross-motion to dismiss and reply to the intervenor's opposition to the motion for a preliminary injunction will be due on March 28, 2025; and (2) the intervenor's reply to Plaintiff's opposition to the cross-motion to dismiss will be due on April 11, 2025. If the motion to intervene is denied, the briefing schedule will remain unchanged from the Court's January 16, 2025 order. See ECF No. 30. SO ORDERED. ( Responses due by 3/28/2025, Replies due by 4/11/2025.) (Signed by Judge Ronnie Abrams on 2/12/2025) (tg) (Entered: 02/12/2025) |
| 02/25/2025 | 34 | MEMORANDUM OF LAW in Opposition re: 31 MOTION to Intervene . . Document filed by Real Estate Board of New York, Inc., New York State Association of Realtors, Inc., Bohemia Realty Group, Bond New York Real Estate Corp., Level Group Inc., Real New York LLC, Four Corners Realty, LLC, 21 West 74 Corp., 8 West 119th Street HDFC..(Szyfer, Claude) (Entered: 02/25/2025) |
| 02/27/2025 | 35 | REPLY MEMORANDUM OF LAW in Support re: 31 MOTION to Intervene . . Document filed by Neighbors Together Corp...(Henley, Evan) (Entered: 02/27/2025) |
| 02/28/2025 | 36 | MOTION to Dismiss . Document filed by The City Of New York,, Vilda Vera Mayuga. Responses due by 3/28/2025.(Lulich, Aimee) (Entered: 02/28/2025) |
| 02/28/2025 | 37 | MEMORANDUM OF LAW in Support re: 36 MOTION to Dismiss . *and in Opposition to Motion for a Preliminary Injunction*. Document filed by The City Of New York,, Vilda Vera Mayuga..(Lulich, Aimee) (Entered: 02/28/2025) |
| 02/28/2025 | 38 | DECLARATION of Aimee K. Lulich in Support re: 36 MOTION to Dismiss .. Document filed by The City Of New York,, Vilda Vera Mayuga. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K).(Lulich, Aimee) (Entered: 02/28/2025) |
| 03/03/2025 | 39 | MEMORANDUM OPINION & ORDER re: 31 MOTION to Intervene . filed by Neighbors Together Corp. For the foregoing reasons, the motion to intervene is denied. However, in light of Neighbors Together's specialized knowledge, the Court invites it to serve as amicus curiaewith Plaintiff's consent, see Opp'n at 2if it wishes to do so. If Neighbors Together seeks to participate as amicus, it shall file a letter motion no later than one week from the date of this order attaching its proposed submission. The Clerk of Court is respectfully directed to terminate the motion pending at ECF No. 31. SO ORDERED. (Signed by Judge Ronnie Abrams on 3/3/2025) (jca) (Entered: 03/03/2025) |
| 03/06/2025 | 40 | LETTER MOTION to File Amicus Brief addressed to Judge Ronnie Abrams from Evan Henley dated March 6, 2025. Document filed by Neighbors Together Corp.. (Attachments: # 1 Exhibit Exhibit A: Proposed Amicus Memorandum of Law).(Henley, Evan) (Entered: 03/06/2025) |
| 03/10/2025 | 41 | ORDER granting 40 Letter Motion to File Amicus Brief. Application granted. SO ORDERED. (Signed by Judge Ronnie Abrams on 3/10/2025) (tg) (Entered: 03/10/2025) |
| 03/25/2025 | 42 | JOINT LETTER MOTION for Extension of Time to File Response/Reply addressed to Judge Ronnie Abrams from Aimee K. Lulich dated March 25, 2025. Document filed by Vilda Vera Mayuga, The City Of New York,..(Lulich, Aimee) (Entered: 03/25/2025) |
| 03/26/2025 | 43 | ORDER granting 42 Letter Motion for Extension of Time to File Response/Reply. Application granted. The Court adopts the briefing schedule proposed above. SO ORDERED. Responses due by 4/11/2025 Replies due by 4/25/2025. (Signed by Judge Ronnie Abrams on 3/26/2025) (tg) (Entered: 03/26/2025) |
| 03/26/2025 | | Set/Reset Deadlines: Motions due by 3/28/2025. (tg) (Entered: 03/26/2025) |
| 03/28/2025 | 44 | NOTICE OF APPEARANCE by Judith Naomi Vale on behalf of State of New York, New York Department of State..(Vale, Judith) (Entered: 03/28/2025) |
| 03/28/2025 | 45 | MOTION to File Amicus Brief . Document filed by New York Department of State, State of New York..(Vale, Judith) (Entered: 03/28/2025) |

**JA8**

| | | |
|---|---|---|
| 03/31/2025 | 46 | ORDER granting 45 Letter Motion to File Amicus Brief The motion by the State of New York and the New York Department of State for leave to file a brief as amici curiae is granted. The Clerk of Court is respectfully directed to terminate the motion pending at ECF No. 45. SO ORDERED.. (Signed by Judge Ronnie Abrams on 3/31/2025) (jca) (Entered: 03/31/2025) |
| 04/08/2025 | 48 | ORDER: No later than April 14, 2025, Defendants shall submit a letter advising the Court whether they seek an evidentiary hearing on Plaintiffs' preliminary injunction motion. Plaintiffs shall file their response, if any, by April 17, 2025. (Signed by Judge Ronnie Abrams on 4/8/2025) (tro) (Entered: 04/08/2025) |
| 04/09/2025 | | ***DELETED DOCUMENT. Deleted document number 47 ORDER. The document was incorrectly filed in this case. (tg) (Entered: 04/09/2025) |
| 04/11/2025 | 49 | REPLY MEMORANDUM OF LAW in Support re: 19 MOTION for Preliminary Injunction . *and IN OPPOSITION TO 36 MOTION to Dismiss*. Document filed by 21 West 74 Corp., 8 West 119th Street HDFC, Bohemia Realty Group, Bond New York Real Estate Corp., Four Corners Realty, LLC, Level Group Inc., New York State Association of Realtors, Inc., Real Estate Board of New York, Inc., Real New York LLC..(Szyfer, Claude) (Entered: 04/11/2025) |
| 04/11/2025 | 50 | DECLARATION of Claude G. Szyfer (Supplemental) in Support re: 19 MOTION for Preliminary Injunction and in Opposition re: 36 MOTION to Dismiss .. Document filed by 21 West 74 Corp., 8 West 119th Street HDFC, Bohemia Realty Group, Bond New York Real Estate Corp., Four Corners Realty, LLC, Level Group Inc., New York State Association of Realtors, Inc., Real Estate Board of New York, Inc., Real New York LLC. (Attachments: # 1 Exhibit A - REAL NY Agreements - Redacted, # 2 Exhibit B - DOS Legal Memorandum, # 3 Exhibit C - Chi Osse FARE Act FAQs 2.0, # 4 Exhibit D - July 29, 2024 Proposed Int. 360-A).(Szyfer, Claude) (Entered: 04/11/2025) |
| 04/11/2025 | 51 | DECLARATION of Thijs Menger in Support re: 19 MOTION for Preliminary Injunction and in Opposition re: 36 MOTION to Dismiss .. Document filed by 21 West 74 Corp., 8 West 119th Street HDFC, Bohemia Realty Group, Bond New York Real Estate Corp., Four Corners Realty, LLC, Level Group Inc., New York State Association of Realtors, Inc., Real Estate Board of New York, Inc., Real New York LLC..(Szyfer, Claude) (Entered: 04/11/2025) |
| 04/11/2025 | 52 | CONSENT LETTER MOTION for Leave to File Document in Redacted Form addressed to Judge Ronnie Abrams from Claude G. Szyfer dated April 11, 2025. Document filed by 21 West 74 Corp., 8 West 119th Street HDFC, Bohemia Realty Group, Bond New York Real Estate Corp., Four Corners Realty, LLC, Level Group Inc., New York State Association of Realtors, Inc., Real Estate Board of New York, Inc., Real New York LLC. (Attachments: # 1 Exhibit A - REAL NY Agreements - Redacted). (Szyfer, Claude) (Entered: 04/11/2025) |
| 04/11/2025 | 53 | ***EX-PARTE***REDACTION re 50 Declaration in Opposition to Motion,, *to Defendants' Motion to Dismiss and in in Further Support of Plaintiffs' Motion for Preliminary Injunction* by 21 West 74 Corp., 8 West 119th Street HDFC, Bohemia Realty Group, Bond New York Real Estate Corp., Four Corners Realty, LLC, Level Group Inc., New York State Association of Realtors, Inc., Real Estate Board of New York, Inc., Real New York LLCMotion or Order to File Under Seal: 52 .(Szyfer, Claude) (Entered: 04/11/2025) |
| 04/14/2025 | 54 | LETTER addressed to Judge Ronnie Abrams from Jessica Katzen dated April 14, 2025 re: Evidentiary Hearing. Document filed by Vilda Vera Mayuga, The City Of New York,..(Katzen, Jessica) (Entered: 04/14/2025) |
| 04/15/2025 | 55 | MEMO ENDORSEMENT on re: 54 Letter filed by Vilda Vera Mayuga, The City Of New York. In light of the above, Defendants have waived their right to an evidentiary hearing. See Fengler v. Numismatic Americana, Inc., 832 F.2d 745, 748 (2d Cir. 1987). The Court will hold oral argument Plaintiffs' motion for a preliminary injunction and Defendants' motion to dismiss on May 12, 2025 at 11:00 a.m. at the Thurgood Marshall United States Courthouse, Courtroom 1506, 40 Foley Square, New York, NY, 10007. SO ORDERED. (Signed by Judge Ronnie Abrams on 4/15/2025) (Oral Argument set for 5/12/2025 at 11:00 AM in Courtroom 1506, 40 Centre Street, New York, NY 10007 before Judge Ronnie Abrams.) (ar) (Entered: 04/15/2025) |
| 04/15/2025 | 56 | ORDER granting 52 Letter Motion for Leave to File Document. Application granted. SO ORDERED. (Signed by Judge Ronnie Abrams on 4/14/2025) (tg) (Entered: 04/15/2025) |

**JA9**

| 04/16/2025 | 57 | FIRST LETTER MOTION to Adjourn Conference *currently scheduled for May 12, 2025* addressed to Judge Ronnie Abrams from Aimee K. Lulich dated April 16, 2024. Document filed by Vilda Vera Mayuga, The City Of New York,..(Lulich, Aimee) (Entered: 04/16/2025) |
|---|---|---|
| 04/18/2025 | 58 | LETTER RESPONSE to Motion addressed to Judge Ronnie Abrams from Claude G. Szyfer dated April 18, 2025 re: 57 FIRST LETTER MOTION to Adjourn Conference *currently scheduled for May 12, 2025* addressed to Judge Ronnie Abrams from Aimee K. Lulich dated April 16, 2024. . Document filed by 21 West 74 Corp., 8 West 119th Street HDFC, Bohemia Realty Group, Bond New York Real Estate Corp., Four Corners Realty, LLC, Level Group Inc., New York State Association of Realtors, Inc., Real Estate Board of New York, Inc., Real New York LLC..(Szyfer, Claude) (Entered: 04/18/2025) |
| 04/18/2025 | 59 | ORDER granting 57 Letter Motion to Adjourn Conference. The oral argument previously scheduled for May 12, 2025 is hereby rescheduled to May 2, 2025 at 12:30 p.m. at the Thurgood Marshall United States Courthouse, Courtroom 1506, 40 Foley Square, New York, NY, 10007. If the parties are unavailable on this date and time they shall promptly notify the Court. SO ORDERED. Oral Argument set for 5/2/2025 at 12:30 PM in Courtroom 1506, 40 Centre Street, New York, NY 10007 before Judge Ronnie Abrams. (Signed by Judge Ronnie Abrams on 4/17/2025) (tg) (Entered: 04/18/2025) |
| 04/25/2025 | 60 | REPLY MEMORANDUM OF LAW in Support re: 36 MOTION to Dismiss . . Document filed by Vilda Vera Mayuga, The City Of New York,. (Attachments: # 1 Exhibit Word Count Certification). (Katzen, Jessica) (Entered: 04/25/2025) |
| 05/02/2025 | | Minute Entry for proceedings held before Judge Ronnie Abrams: Oral Argument held on 5/2/2025 re: 36 MOTION to Dismiss . filed by Vilda Vera Mayuga, The City Of New York,, 19 MOTION for Preliminary Injunction . filed by 21 West 74 Corp., 8 West 119th Street HDFC, Level Group Inc., Real Estate Board of New York, Inc., New York State Association of Realtors, Inc., Four Corners Realty, LLC, Bohemia Realty Group, Real New York LLC, Bond New York Real Estate Corp. (Court Reporter George Malinowski) (arc) (Entered: 05/02/2025) |
| 06/10/2025 | 61 | OPINION AND ORDER re: 36 MOTION to Dismiss . filed by Vilda Vera Mayuga, The City Of New York,, 19 MOTION for Preliminary Injunction . filed by 21 West 74 Corp., 8 West 119th Street HDFC, Level Group Inc., Real Estate Board of New York, Inc., New York State Association of Realtors, Inc., Four Corners Realty, LLC, Bohemia Realty Group, Real New York LLC, Bond New York Real Estate Corp.. For the foregoing reasons, the motion to dismiss is granted with respect to Plaintiffs' First Amendment, New York State Constitution, and state law preemption claims, and denied with respect to Plaintiffs' Contracts Clause claim. The motion for a preliminary injunction is denied in its entirety. The Clerk of Court is respectfully directed to terminate the motions pending at ECF Nos. 19 and 36. SO ORDERED. (Signed by Judge Ronnie Abrams on 6/10/2025) (tg) (Entered: 06/10/2025) |
| 06/12/2025 | 62 | NOTICE OF INTERLOCUTORY APPEAL from 61 Memorandum & Opinion,,,. Document filed by 21 West 74 Corp., 8 West 119th Street HDFC, Bohemia Realty Group, Bond New York Real Estate Corp., Four Corners Realty, LLC, Level Group Inc., New York State Association of Realtors, Inc., Real Estate Board of New York, Inc., Real New York LLC. Filing fee $ 605.00, receipt number ANYSDC-31227714. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit.. (Szyfer, Claude) (Entered: 06/12/2025) |
| 06/12/2025 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 62 Notice of Interlocutory Appeal,..(nd) (Entered: 06/12/2025) |
| 06/12/2025 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 62 Notice of Interlocutory Appeal, filed by 21 West 74 Corp., 8 West 119th Street HDFC, Level Group Inc., Real Estate Board of New York, Inc., New York State Association of Realtors, Inc., Four Corners Realty, LLC, Bohemia Realty Group, Real New York LLC, Bond New York Real Estate Corp. were transmitted to the U.S. Court of Appeals..(nd) (Entered: 06/12/2025) |
| 06/20/2025 | 63 | TRANSCRIPT of Proceedings re: ORAL ARGUMENT held on 5/2/2025 before Judge Ronnie Abrams. Court Reporter/Transcriber: George Malinowski, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/11/2025. Redacted Transcript Deadline set for 7/21/2025. Release of Transcript Restriction set for 9/18/2025..(McGuirk, Kelly) (Entered: 06/20/2025) |
| 06/20/2025 | 64 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a ORAL ARGUMENT proceeding held on 5/2/2025 has been filed by the court reporter/transcriber |

JA10

| | | |
|---|---|---|
| | | in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 06/20/2025) |
| 06/24/2025 | 65 | ANSWER to 1 Complaint, with JURY DEMAND. Document filed by Vilda Vera Mayuga, The City Of New York,..(Lulich, Aimee) (Entered: 06/24/2025) |
| 06/27/2025 | 66 | **FILING ERROR - DEFICIENT DOCKET ENTRY (SEE 67 Motion)** - NOTICE of Motion for Injunction Pending Appeal. Document filed by 21 West 74 Corp., 8 West 119th Street HDFC, Bohemia Realty Group, Bond New York Real Estate Corp., Four Corners Realty, LLC, Level Group Inc...(Szyfer, Claude) Modified on 7/1/2025 (db). As per ECF-ERROR Email Correspondence Received on 6/30/2025 @ 10:33am. (Entered: 06/27/2025) |
| 06/27/2025 | 67 | MOTION for Preliminary Injunction . Document filed by 21 West 74 Corp., 8 West 119th Street HDFC, Bohemia Realty Group, Bond New York Real Estate Corp., Four Corners Realty, LLC, Level Group Inc., New York State Association of Realtors, Inc., Real Estate Board of New York, Inc., Real New York LLC..(Szyfer, Claude) (Entered: 06/27/2025) |
| 06/27/2025 | 68 | MEMORANDUM OF LAW in Support re: 67 MOTION for Preliminary Injunction . . Document filed by 21 West 74 Corp., 8 West 119th Street HDFC, Bohemia Realty Group, Bond New York Real Estate Corp., Four Corners Realty, LLC, Level Group Inc., New York State Association of Realtors, Inc., Real Estate Board of New York, Inc., Real New York LLC..(Szyfer, Claude) (Entered: 06/27/2025) |
| 06/27/2025 | 69 | DECLARATION of Sarah Saltzberg in Support re: 67 MOTION for Preliminary Injunction .. Document filed by 21 West 74 Corp., 8 West 119th Street HDFC, Bohemia Realty Group, Bond New York Real Estate Corp., Four Corners Realty, LLC, Level Group Inc., New York State Association of Realtors, Inc., Real Estate Board of New York, Inc., Real New York LLC..(Szyfer, Claude) (Entered: 06/27/2025) |
| 06/27/2025 | 70 | DECLARATION of Brian Hourigan in Support re: 67 MOTION for Preliminary Injunction .. Document filed by 21 West 74 Corp., 8 West 119th Street HDFC, Bohemia Realty Group, Bond New York Real Estate Corp., Four Corners Realty, LLC, Level Group Inc., New York State Association of Realtors, Inc., Real Estate Board of New York, Inc., Real New York LLC..(Szyfer, Claude) (Entered: 06/27/2025) |
| 06/27/2025 | 71 | DECLARATION of Robert Rahmanian in Support re: 67 MOTION for Preliminary Injunction .. Document filed by 21 West 74 Corp., 8 West 119th Street HDFC, Bohemia Realty Group, Bond New York Real Estate Corp., Four Corners Realty, LLC, Level Group Inc., New York State Association of Realtors, Inc., Real Estate Board of New York, Inc., Real New York LLC..(Szyfer, Claude) (Entered: 06/27/2025) |
| 06/30/2025 | 72 | ORDER: The Court has received Plaintiffs' motion for an injunction pending appeal. Defendants shall file their response, if any, no later than July 7, 2025 at 5:00 p.m. Plaintiffs may reply by July 8, 2025 at 5:00 p.m. SO ORDERED. ( Responses due by 7/7/2025, Replies due by 7/8/2025.) (Signed by Judge Ronnie Abrams on 6/30/2025) (tg) (Entered: 06/30/2025) |
| 07/07/2025 | 73 | MEMORANDUM OF LAW in Opposition re: 67 MOTION for Preliminary Injunction . . Document filed by Vilda Vera Mayuga, The City Of New York,..(Lulich, Aimee) (Entered: 07/07/2025) |
| 07/08/2025 | 74 | ORDER: On June 27, 2025, Plaintiffs filed a motion seeking a preliminary injunction pending their appeal of this Court's June 10, 2025 Order. See ECF No. 67. Defendants have opposed that motion. By no later than 2:00 p.m. on July 9, 2025, Plaintiffs and Defendants shall each file a letter setting forth their respective positions on whether the Court has jurisdiction to grant the relief Plaintiffs seek. See Goldstein v. Hochul, No. 22-CV-8300 (VSB), 2023 WL 4622598, at *2 (S.D.N.Y. July 19, 2023). SO ORDERED. ( Responses due by 7/9/2025) (Signed by Judge Ronnie Abrams on 7/8/2025) (tg) (Entered: 07/08/2025) |
| 07/08/2025 | 75 | REPLY MEMORANDUM OF LAW in Support re: 67 MOTION for Preliminary Injunction . . Document filed by 21 West 74 Corp., 8 West 119th Street HDFC, Bohemia Realty Group, Bond New York Real Estate Corp., Four Corners Realty, LLC, Level Group Inc., New York State Association of Realtors, Inc., Real Estate Board of New York, Inc., Real New York LLC..(Szyfer, Claude) (Entered: 07/08/2025) |

## JA11

| | | |
|---|---|---|
| 07/09/2025 | 76 | LETTER addressed to Judge Ronnie Abrams from Jessica Katzen dated July 9, 2025 re: July 8, 2025 Order. Document filed by Vilda Vera Mayuga, The City Of New York,..(Katzen, Jessica) (Entered: 07/09/2025) |
| 07/09/2025 | 77 | LETTER addressed to Judge Ronnie Abrams from Claude G. Szyfer dated July 9, 2025 re: in response to the Court's order asking for the parties' positions on the Court's jurisdiction to grant Plaintiffs' pending motion for an injunction pending appeal 74 . Document filed by 21 West 74 Corp., 8 West 119th Street HDFC, Bohemia Realty Group, Bond New York Real Estate Corp., Four Corners Realty, LLC, Level Group Inc., New York State Association of Realtors, Inc., Real Estate Board of New York, Inc., Real New York LLC..(Szyfer, Claude) (Entered: 07/09/2025) |
| 07/10/2025 | 78 | MEMORANDUM OPINION & ORDER re: 67 MOTION for Preliminary Injunction: Accordingly, Plaintiffs motion for an injunction pending appeal is denied. The Clerk of Court is respectfully directed to terminate the motion pending at docket number 67. (Signed by Judge Ronnie Abrams on July 10, 2025) (arc) (Entered: 07/10/2025) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 07/29/2025 15:09:06 | | |
| PACER Login: | sharedlogin | Client Code: | 707424-000300 |
| Description: | Docket Report | Search Criteria: | 1:24-cv-09678-RA |
| Billable Pages: | 14 | Cost: | 1.40 |

**JA12**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

REAL ESTATE BOARD OF NEW YORK, INC., NEW     :
YORK STATE ASSOCIATION OF REALTORS, INC.,    :
BOHEMIA REALTY GROUP, BOND NEW YORK REAL :
ESTATE CORP., REAL NEW YORK LLC, LEVEL       :
GROUP INC., FOUR CORNERS REALTY, LLC, 21     :
WEST 74 CORP., 8 WEST 119TH STREET HDFC,       :
                                             :  Civ. No. _____
                              Plaintiffs,    :
                                             :
          v.                                 :  **COMPLAINT**
                                             :
THE CITY OF NEW YORK, *a municipal entity*, VILDA :
VERA MAYUGA, *as Commissioner of New York City* :
*Department of Consumer and Worker Protection,* :
                                             :
                              Defendants.    :
                                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

        Plaintiffs Real Estate Board of New York, Inc. ("REBNY"), New York State Association

of Realtors, Inc. ("NYSAR"), Bohemia Realty Group ("Bohemia"), Bond New York Real Estate

Corp. ("Bond New York"), Level Group Inc. ("Level Group"), REAL New York LLC ("REAL

New York"), Four Corners Realty, LLC ("Four Corners Realty"), 21 West 74 Corp. ("21 West

74"), and 8 West 119th Street HDFC (collectively "Plaintiffs"), by their attorneys, Hogan Lovells

US LLP, for their complaint against Defendants (collectively the "City of New York" or the

"City"), hereby allege as follows on personal knowledge, except as to matters not within their

personal knowledge, which are alleged on information and belief:

<u>**NATURE OF THE ACTION**</u>

        1.      As many can attest, finding a rental apartment in New York City can be hard.  In

a city where rental apartments make up nearly 70% of the housing stock, availability is at an all-

time low and rents have increased.  In response to this city-wide predicament, on November 13,

2024, the New York City Council passed Int. No. 360-A, a profoundly misguided piece of

legislation, the Fairness in Apartment Rental Expenses ("FARE") Act.

2.      While the FARE Act may have the "right intention," it will wreak havoc on the

New York City rental markets and unleash a host of unintended consequences, causing

immediate and irreparable harm to the consumers it purports to protect, as well as harm brokers

and landlords around the city.

3.      Far from restoring fairness to the New York City housing market, the FARE Act

will lead to higher rents, fewer properties advertised, and decreased overall transparency of the

markets for consumers.

4.      The FARE Act, however, is constitutionally defective and preempted by New

York state law.

5.      First, the FARE Act violates Plaintiffs' right to free commercial speech under the

First Amendment to the U.S. Constitution.  The FARE Act makes it illegal for brokers to

"publish" an apartment listing and then seek to receive compensation from a tenant—regardless

of whether the landlord has actually retained that broker.  Because of the draconian penalties and

fines that could be levied against them under the FARE Act, both brokers and landlords will

likely stop advertising "open listing" apartments, which not only infringes on the First

Amendment rights of brokers and landlords, but will have the net effect of reducing the level of

advertising of open listings—making it even harder for consumers to find affordable apartments.

6.      Second, the FARE Act severely impairs brokers' and landlords' contracts in direct

violation of the Contracts Clause of the U.S. Constitution.  For brokers and landlords who do

execute listing agreements which require the broker to negotiate and seek compensation from a

tenant, the FARE Act makes those contracts now void and unenforceable.  In addition, its

**JA14**

confusing prohibition on "condition[ing]" the rental of a property on the purported retention of a broker will make it impossible for landlords and brokers to comply with the terms of their exclusive listing agreements. The effect of the FARE Act is to permanently and completely void contracts entered into validly—something the Contracts Clause directly forbids.

7. Last, the FARE Act is preempted by New York state's comprehensive regime of laws and regulations governing the conduct, compensation, and procedures of real estate brokers, including the ability to file complaints and investigate potential unlawful conduct. The New York state senate and assembly have passed a comprehensive regime of laws governing the compensation of real estate brokers and salespersons (Article 12-A of New York's Real Property Law), and 19 N.Y.C.R.R. § 175 includes additional regulations governing the practice of real estate brokerage, including Section 175.7, which sets forth when a broker may receive compensation from "more than one party," and Section 175.25, which specifically governs the advertising of real estate listings. Moreover, the New York Department of State and the New York State Real Estate Board oversee the regulation and conduct of real estate brokers. The FARE Act both misunderstands the nature of New York state fiduciary law, and conflicts with provisions already enacted by state legislators and promulgated by state regulators. And as First Deputy Commissioner Ahmed Tigani, of the City's Department of Housing, Preservation & Development ("HPD") made clear during the June 2024 hearing on the FARE Act, "*[F]ees of this nature are typically subject to state regulation* . . . . [I]n addition to the licenses, which are overseen by the Department of State, *both seem to be on a state level regulation*." (emphasis added). Accordingly, the FARE Act is preempted by New York State's comprehensive set of laws and regulations, which already cover issues such as compensation, advertising, and the "principal/agent" relationship.

3

**JA15**

8.      Finally, in addition to its constitutional infirmities, and other problems, the FARE Act is just bad public policy, which will also have the ultimate effect of causing rents to increase—not decrease.  Forced to incur the costs of brokerage commissions, landlords will have no other recourse than to increase the rent for their apartments.  The net effect of the FARE Act will not only be angry brokers and landlords, but, most of all, angry consumers.

9.      This Court should strike down the FARE Act because of its numerous constitutional infirmities, and prevent the imminent spike in New York City rents, which will make it even more difficult for New Yorkers to find a place to live.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action under 28 U.S.C. § 1331.  The Court has jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a).  Plaintiffs' state law claims arise from the same facts and circumstances as Plaintiffs' federal claims and are so related to those claims that they form part of the same case or controversy.

11.     Venue properly lies in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to this action occurred in New York County, which is located within this District.

## THE PARTIES

**I.      Plaintiffs**

12.     Plaintiff REBNY is a New York not-for-profit trade association founded in 1896. REBNY represents commercial, residential, and institutional property owners, builders, managers, investors, brokers, and salespeople; banks, financial service companies, utilities, attorneys, architects, and contractors; corporations, co-partnerships, and individuals professionally interested in New York City real estate.  In particular, REBNY represents the

**JA16**

interests of close to 14,000 real estate brokerage professional members in the five boroughs of

New York City, and provides business and other services related to the operation of real estate

brokerage firms and individual real estate licensees throughout New York City. REBNY brings

this action on behalf of itself, and its almost 14,000 members directly impacted by the harm

created by the FARE Act. REBNY and its members will suffer an injury in fact as the result of

the FARE Act and REBNY's members are within the zone of interests of the regulations

governing this dispute.

13.    Plaintiff NYSAR is a New York not-for-profit trade association established in

1905. It represents the interests of approximately 60,000 real estate brokerage professional

members throughout New York, including New York City. NYSAR provides business services

related to the operation of real estate brokerage firms and real estate licensees. NYSAR and its

27 local boards/associations of REALTORS® and their individual real estate licensee members

are affiliated with the National Association of REALTORS®, Inc. NYSAR brings this action on

behalf of itself and its approximately 60,000 members directly impacted by the harm created by

the FARE Act. NYSAR and its members will suffer an injury in fact as the result of the FARE

Act and NYSAR's members are within the zone of interests of the regulations governing this

dispute.

14.    Plaintiff Bohemia is a real estate brokerage firm incorporated in the State of New

York and founded approximately 15 years ago. It maintains offices at 2101 Frederick Douglass

Boulevard, New York, New York, 10026 and 3880 Broadway, New York, New York 10032.

Approximately 140 real estate licensees are currently affiliated with Bohemia. Bohemia, and

each of its licensees, are members of REBNY and NYSAR. Bohemia's brokers and salespersons

commonly engage in rental transactions in New York and are often compensated by tenants in

transactions involving listing agreements where they are appointed by a landlord to serve as the landlord's agent.  In addition, Bohemia's brokers and salespersons often publish and/or advertise open listings transmitted to them by landlords, with whom they have not entered into a broker/customer relationship nor entered into a listing agreement governing compensation terms should Bohemia find a suitable tenant who rents a landlord's apartment.

15.    Plaintiff Bond New York is a real estate brokerage firm incorporated in the State of New York and founded in 2000.  Bond maintains its corporate headquarters at 810 Seventh Avenue, New York, New York 10019.  Over 500 real estate licensees are currently affiliated with Bond.  Bond, and each of its licensees, are members of REBNY.  Bond's brokers and salespersons commonly engage in rental transactions in New York and are often compensated by tenants in transactions involving listing agreements where they are appointed by a landlord to serve as the landlord's agent.  In addition, Bond's brokers and salespersons often publish and/or advertise open listings transmitted to them by landlords, with whom they have not entered into a broker/customer relationship nor entered into a listing agreement governing compensation terms should Bond find a suitable tenant who rents a landlord's apartment.

16.    Plaintiff Level Group Inc. is a real estate brokerage firm incorporated in the State of New York.  It maintains offices at 211 East 43rd Street, New York, New York 10017.  Level Group, and each of its licensees, are members of REBNY.  Level Group's brokers and salespersons commonly engage in rental transactions in New York and are often compensated by tenants in transactions involving listing agreements where they are appointed by a landlord to serve as the landlord's agent.  In addition, Level Group's brokers and salespersons often publish and/or advertise open listings transmitted to them by landlords, with whom they have not entered into a broker/customer relationship nor entered into a listing agreement governing compensation

JA18

terms should Level Group find a suitable tenant who rents a landlord's apartment.

17.      Plaintiff REAL New York is a real estate brokerage firm incorporated in the State of New York.  It maintains offices at 164 Ludlow Street, New York, New York 10002.  REAL New York has approximately 140 agents and each of its licensees is a member of REBNY. REAL New York is also a member of NYSAR.  REAL New York's brokers and salespersons commonly engage in rental transactions in New York and are often compensated by tenants in transactions involving listing agreements where they are appointed by a landlord to serve as the landlord's agent.  In addition, REAL New York's brokers and salespersons often publish and/or advertise open listings transmitted to them by landlords, with whom they have not entered into a broker/customer relationship nor entered into a listing agreement governing compensation terms should REAL New York find a suitable tenant who rents a landlord's apartment.

18.      Plaintiff Four Corners Realty is a New York LLC.  Four Corners Realty is a real estate brokerage firm which primarily brokers rental transactions in Manhattan.

19.      Plaintiff 21 West 74 is a New York corporation that owns a building with 13 rental units located at 21 West 74th Street, New York, NY.

20.      8 West 119th Street HDFC ("8 West 119th Street") is a not-for-profit cooperative corporation created and operating in the State of New York.  8 West 119th Street received a loan from the Housing Development Fund Corporation operated by the State of New York.  8 West 119th Street maintains four apartment units which it rents to consumers in New York.  8 West 119th Street will often work with real estate brokers in New York City to assist with the marketing and renting of their apartment units.

21.      Each of the plaintiffs which operates a brokerage shall be referred to individually as a "Brokerage Plaintiff," and collectively, as the "Brokerage Plaintiffs."  8 West 119th Street

and 21 West 74 may be collectively referred to as the "Landlord Plaintiffs."

## II. Defendants

22.     Defendant City of New York is a municipal entity created under the laws of the State of New York.

23.     Defendant Vilda Vera Mayuga ("Commissioner Mayuga") is the Commissioner of New York City's Department of Consumer and Worker Protection ("DCWP"). Commissioner Mayuga is an employee of New York City and is the principal administrator for DCWP.  Commissioner Mayuga is responsible for the operations of DCWP and the application of DCWP's policies, including the enforcement of New York City's Administrative Code.  As will be set forth more fully, the FARE Act provides Commissioner Mayuga and the DCWP with the authority to enforce the FARE Act.

## FACTUAL BACKGROUND

## I. The New York City Rental Market

24.     New York is a majority-renter city:  rentals make up nearly 70 percent of the available housing stock in the city.  In 2023, the rental vacancy rate fell to a 50-year low:  only 1.4 percent of the city's rentals were available, down from 4.5 percent in 2021.  City officials have acknowledged the current situation as a "housing emergency."

25.     Even as rental availability in New York City has decreased, rents continue to increase.  The median rent in New York City for active rental listings has increased from $3,495 in 2019 to $4,053 in 2024, an increase of almost 16%.  During the same time period, the median rent for rented listings has grown by over 23%, from $3,414 to $4,200.

26.     Household incomes have not kept pace with growing rents.  In 2019, real median renter household income was 119 percent of its 2007 level.  In 2021, however, real median renter

household income fell to 110 percent of its 2007 level.  In 2022, 52.1 percent of New York City households were moderately or severely rent burdened—defined as spending 30 percent or more of their income on rent.  Real estate brokers are not excluded from these challenges:  many are renters and suffer from the same rent burdens as their customers.

27.     The New York City rental market is the largest and most complex in the country, with significant variety among and within the different stakeholder groups of landlords, brokers, and consumers.

28.     Apartments owned by small business landlords make up a significant portion of the City's housing stock.  Around half of New York's rental units are owned by landlords who own fewer than 20 buildings in their portfolio.

29.     Owners of rental residential properties use different methods to market and maximize exposure of their properties.

### A.     Exclusive Listings

30.     Landlords sometimes elect to contract directly with one residential real estate brokerage firm to market and advertise a property exclusively.  This agreement is commonly referred to as an exclusive listing.  In an exclusive listing arrangement, the broker will sometimes be compensated by the landlord if the broker successfully secures a tenant for the listing.  This arrangement is called a "no-fee listing," meaning that the renter does not pay the broker's fee upfront.

31.     In other instances, a landlord may elect to give a broker the exclusive right to market and rent a listing, *but make clear that the broker must seek compensation from the renter*.  This arrangement is called a "fee" or "tenant pays" listing.

32.     Such "tenant pays" exclusive listings are common in the New York rental real

estate market.  For years, brokers and landlords who are parties to such agreements substantially relied on the terms of their exclusive listing agreements, established their respective businesses based on the consideration set forth in these exclusive listing agreements, and premised their respective substantial investments of time and resources on these terms.  Plaintiff Bond has many such contracts and the FARE Act's provisions prohibiting a broker from receiving compensation from the tenant when retained by the landlord directly and permanently impair those agreements.  Indeed, the FARE Act makes all tenant pays exclusive listings void and unenforceable.

33.     In addition to marketing and showing the apartment, a broker working pursuant to an exclusive agreement often provides valuable services to the renter despite having been hired by the landlord, including:  shepherding the renter through the application process, including, but not limited to, assisting with the preparation of the rental applications, assisting with the compilation of all necessary information required by the application, and other related tasks; conducting the necessary credit and background checks required in the application process; assisting with the overall administrative process, and ultimately reviewing and supplementing the application where necessary.  These services directly benefit the tenant—in short, even when retained by the landlord, brokers help navigate tenants through what can be a confusing and difficult process.

34.     Importantly, landlords who rely on brokers to provide such services do not need to create and maintain the administrative in-house infrastructure to market and rent their own units, which reduces landlords' overhead costs and helps to keep rents lower.  As First Deputy Commissioner Tigani, of HPD, told the City Council during the Committee on Consumer and Worker Protection Hearing over the FARE Act on June 12, 2024 (the "June 2024 Hearing"), brokers provide "tremendous value" to consumers engaged in the housing search:

> [T]here is tremendous value in housing search support and the
> operational knowledge that brokers can provide both tenants
> looking to find a home, especially in communities where listings
> are harder to find, and property owners navigating the process of
> making their units available . . . . [1]

**B.  Open Listings**

35.    In addition to exclusive listings, landlords provide a large volume of residential

listings, called "open listings," to brokers for advertising purposes only, without ever entering

into an exclusive listing agreement.  Nor do the landlords enter into a "broker/customer"

relationship with the brokers and salespersons that receive their open listings for advertising

purposes.

36.    While exclusive listings can be "no-fee" or "tenant pays," open listings generally

operate on a tenant pays basis.  Landlords send open listings to brokers, or to the broker's listings

technology provider (such as RealtyMX),with whom they are familiar (or worked with in the

past), knowing that brokers will likely advertise such listings on the brokers' website, or

syndicate listings to third-party real estate portals such as StreetEasy, RentHop, and other leading

websites which display rental properties.

37.    If a broker advertises a listing on its own website or on a site like StreetEasy,

however, it does not mean that the landlord hired the broker, or agreed to pay the broker's

commission—it means only that the landlord circulated an open listing to multiple brokers, and

may have authorized one of those brokers to post the property to StreetEasy.

38.    Brokers advertise open listings, notwithstanding the absence of a commission

arrangement with the landlord, because of the potential of finding a tenant who might be

interested in renting the apartment, and who in turn will negotiate a compensation arrangement

---

[1] Unless noted otherwise, quotations are to the transcript of the June 2024 Hearing and written testimony submitted
in connection with that hearing.

and pay the broker's commission for bringing about the rental of the property.

39.     Open listings are a vital and material segment of the New York rental market. For example, approximately half of the listings on Bohemia's website currently are open listings. Other Brokerage Plaintiffs similarly have hundreds of open listings currently advertised on their websites.

40.     Open listings benefit consumers as well as landlords and brokers in several ways.

41.     First, the open listings model generates efficiencies and savings, which landlords pass on to tenants in the form of lower rents: "tenant pays" apartments have lower monthly rents than no-fee apartments. Renters who find an apartment "on their own" through a third party real estate portal have a broker to thank for photographing, staging, and making that listing accessible online. The brokers incur the costs (currently $8.00 per day per listing on a site like StreetEasy) of advertising and marketing the listing. The brokers—not the landlords—also engage in the often time-consuming administrative tasks related to rental transactions described above, which many landlords are simply not equipped to handle, lacking both the staff and the infrastructure to efficiently handle such tasks. Thus, for the thousands of open listings currently on the market, the brokers absorb the same advertising and marketing costs for the apartment. These advertising costs can become significant, as a rental property that may stay on the market for a month can cost a broker at least $240 just to advertise on StreetEasy, and that cost does not include the costs of other websites.

42.     In addition to those advertising costs, the brokers and agents working an open listing will also absorb the costs of compiling, processing, and reviewing rental applications for landlords. Importantly, landlords do not need to maintain staff on premises to show apartments or process applications. Open listings allow landlords—particularly smaller landlords, who

12

**JA24**

account for around half of the rental market—to focus their energy and financial resources on other issues, most important of which is maintaining their rental properties.

43. In addition, brokers and agents are available to show apartments to consumers seven days per week—including during and after business hours, providing flexibility for consumers who need to find an apartment while still working full-time. Landlords could never provide the same level of services to consumers without significantly increasing the price of rental properties.

44. Most important, because tenants negotiate the compensation terms with the brokers in connection with "open listings," and then pay such compensation, landlords avoid incurring the costs of a commission, which would otherwise be passed on to the consumer resulting in higher overall rents—and in more detrimental long-term financial implications for consumers.

45. Second, open listings promote market transparency and consumer access to information. The advent of real estate advertising websites has empowered consumers by providing a trove of instantly-accessible information about the rental market, availability, and prices. The dissemination of open listings by landlords, whether through a broker's website or third party advertising portals, helps maximize exposure for available units and puts more information in the hands of potential tenants.

46. Third, by involving brokers in the rental process, open listings protect prospective tenants' rights. Because of New York state licensing requirements, brokers are far more knowledgeable about the relevant New York State and federal regulations, including fair housing laws, as well as the processing of state and federal housing vouchers and other subsidy programs (such as Section 8 housing vouchers). Landlords depend on real estate brokers to ensure that the

legal and administrative requirements for compliance with these programs are met and complied with during the transaction process.

### C.    Fee and No-Fee Apartments

47.    New York City rental listings are split fairly evenly between fee and no-fee apartments.  About half of rental listings in 2023 were marked as "no fee" for the tenant— meaning the tenant does not pay any brokerage fee to rent the apartment.

48.    The same apartment may be advertised as a "fee" or "no-fee" apartment.  Indeed, a "fee" apartment (where the tenant pays) may list for $2,700 per month, while the same apartment advertised as "no fee" to the tenant may list for $3,000 per month.  The higher base rent means that over the course of the tenancy, the tenant will likely pay more than if they just paid the initial brokerage fee at the time they enter into the lease for the apartment.

49.    The FARE Act will target the tenant pays or fee apartments, which make up the other half of the rental market.  Tenant pays apartments are more likely to be owned by small landlords and have lower rents.

50.    The current system evolved to accommodate landlords' and tenants' varying needs.

51.    A tenant may have a preference for fee or no-fee properties depending on a host of factors, including liquidity.  A tenant with limited liquidity may prioritize the lower upfront costs of a no-fee apartment.  On the other hand, a tenant who pays a broker commission is effectively purchasing a cheaper lease term.

52.    Landlords, too, are a diverse group, each with their own preference that also depends on a host of factors.  Large landlords with in-house administrative and leasing staff are better suited to market and rent units themselves and more likely to take the no-fee route.

53.     Small landlords, however, who have less money and fewer or no in-house resources, rely on brokers to market and rent out units under a tenant pays arrangement.  Smaller, more affordable buildings with fewer amenities and lower rent are also more likely to be tenant pays.  Broker fees can always be negotiated, and in many cases, the landlord and tenant will agree to split the broker fee.  Among other things, the FARE Act wholly eliminates the ability of the landlord and the tenant to negotiate an agreement to share payment of the broker fee.

**D.      Market Rate and Rent Stabilized Apartments**

54.     Around 40 percent of New York City's rentals are market rate.  Almost half of the city's rental apartments—and the majority of its affordable housing—are rent stabilized.  Rent stabilized apartments are most often located in buildings built before 1974 and containing six or more units.  The New York City Rent Guidelines Board ("NYCRGB") determines rent increases for lease renewals of rent stabilized apartments.

55.     Rent stabilized apartments can be further classified into those already renting at the maximum rent allowed by law (which tend to be older buildings) and those charging market rent that is below the maximum allowed by law (which tend to be new development).

56.     Thousands of rent stabilized units currently sit vacant, because the cost of operating them exceeds the maximum legal rent.  Because the FARE Act will shift the costs of brokerage commissions to landlords in many transactions, the Act will likely cause even more rent stabilized units to become warehoused and taken off the market.

**E.      Broker Compensation and Agency Relationships are Regulated at the State Level**

57.     The New York State Legislature has enacted a comprehensive and detailed regulatory scheme to regulate licensed real estate brokers.  In addition, real estate brokers and agents are required by law to complete mandatory fair housing and other continuing education

courses to maintain their license with the Department of State ("DOS"), and can be fined or have

their license suspended or revoked by the DOS for fair housing violations.

58.    The State likewise regulates broker compensation, as well as agency relationships

between brokers and landlords, and between brokers and consumers.

59.    Article 12-A of New York's Real Property Law ("RPL") establishes a

comprehensive set of laws that govern broker and salesperson licensing requirements, broker and

salesperson compensation, and the nature of fiduciary relationships recognized under New York

State law.  Article 12-A assures, by means of licensing, that standards of competency, honesty,

and professionalism are observed by real estate brokers and salesmen.  Article 12-A also

establishes the New York State Real Estate Board (the "Board").  With certain exceptions, the

Board has general authority to "promulgate rules or regulations affecting brokers and sales

persons in order to administer and effectuate the purposes of … [A]rticle [12-A]."  RPL § 442-

k(1).  As part of its duties, the Board is also statutorily required to "study the operation of laws

and regulations with respect to the rights, responsibilities and liabilities of real estate licensees

arising out of the transfer of interests in real property," and to "make recommendation[s] on

pending or proposed legislation affecting the same."  *Id*. at § 442-k(4).  Article 12-A likewise

empowers the DOS to promulgate rules and regulations to administer or implement provisions

relating to the granting and revocation of real estate licenses, addressed in Section 441.  *Id.* at §

442-k(1).

60.    Article 12-A governs, among other things, "fee[s], commission[s and] other

compensation" that real estate brokers, associate real estate brokers, and salespersons can receive

(*id.* at § 442); with whom brokers can split their commissions (*id.*); salespersons' ability to

receive compensation only from the real estate brokers with whom they are affiliated (*id.* at §

16

**JA28**

442-a); when a licensee can bring an action for an unpaid commission (*id.* at § 442-d); and prohibiting after-the-fact referral fees (*id.* at § 442-l).

61. Article 12-A also comprehensively addresses real estate agency relationships and defines many of the terms that feature in the FARE Act. *See, e.g.*, *id.* at § 443 (defining "Agent," "Tenant's agent," "Landlord's agent"). Section 443 requires agents in the rentals of condominiums, co-ops, and dwellings housing one to four families, to provide the parties with disclosure forms. *Id.* Article 12-A explicitly contemplates dual agency in the real estate context (defined as an agent "who is acting as a . . . tenant's agent and a landlord's agent in the same transaction") and allows such dual agency relationships, provided that disclosure requirements are met. *Id.*

62. The RPL provides penalties for violations of Article 12-A, including criminal penalties, disgorgement of commission income, and the revocation and suspension of real estate licenses. *See, e.g.*, *id.* at §§ 441-c, 442-e.

63. ***Nothing in the plain text of Article 12-A creates a fiduciary/agency relationship between a broker and landlord arising out of the mere fact of advertising or "publishing" a rental listing***.

64. The state law framework of broker compensation and agency is supplemented by rules and regulations promulgated by the DOS that, among other things, set forth the circumstances where a real estate broker may "receive compensation from more than one party" (19 N.Y.C.R.R. § 175.7) and prohibit real estate brokers from entering into a "net listing" contract (*id.* at § 175.19).

65. In addition, the DOS has promulgated extensive rules and regulations concerning advertising by real estate brokers and salespersons. In particular, Section 175.25, adopted by the

DOS in 2020, contains a broad range of requirements for real estate advertising, including its content and placement. *Id.* at § 175.25. Section 175.25(b)(2)(i) addresses authorization in the advertisement context, providing that "[n]o property shall be advertised ***unless the real estate broker has obtained authorization*** for such advertisement from the owner of the property . . . ." (emphasis added). Notably, while Section 175.25 requires "authorization" for advertising, *it does not require a principal/agent or contractual relationship, either express or implied, between a landlord and broker, and does not create a principal/agent or contractual relationship simply on the basis of advertising. Nor does Section 175.25 state anywhere that by virtue of advertising a listing, the broker must recover their fee from the landlord, and cannot be compensated by the tenant.* To the contrary, nowhere in either Article 12-A or Section 175.25 is there any provision mandating that an advertising by a real estate broker creates (or requires) a principal/agent (or broker/customer) relationship between the broker and the landlord. Nor is there any requirement that if a broker advertises a rental apartment, then that broker is limited to only receiving compensation from the landlord.

66.     At the June 2024 Hearing, HPD Deputy Commissioner Tigani emphasized that broker fees are "subject to state regulation":

> ***[F]ees of this nature are typically subject to state regulation*** . . . .
> [I]n addition to the licenses, which are overseen by the Department of State, ***both seem to be on a state level regulation***.

(emphasis added).

67.     When challenged by Councilmember Chi Ossé, who introduced the bill, on "[the] point you made about this being a state regulation," Commissioner Tigani elaborated:

> So, on the licenses, I think it's [] fairly well-documented where licenses for real estate brokers exist, and so anything related to that profession would live there. On—*When it comes to things related to rental payments in the private market, non-HPD regulated*

*housing, we would—**we usually defer that to state regulation***.

(emphasis added).

68.    Indeed, Councilmember Ossé himself recognized that "the laws in Article 12-A that deal with compensation are laws that talk about who the broker can split fees with, ***or who a real estate salesperson can receive compensation from***."  (emphasis added).

## II.    The FARE Act

### A.    Provisions of the FARE Act

69.    On November 13, 2024, the New York City Council passed the FARE Act, and on December 16, 2024, the Act became law.  The FARE Act added a new Subchapter 15 to Chapter 4 of Title 20 of the Administrative Code of the City of New York and will become law 180 days after being signed into law.  N.Y.C. Admin. Code § 20-699.20-25.  The full text of the FARE Act is attached as **Exhibit A**.

70.    Section 20-699.21(a)(1) of the FARE Act bars a broker who has been retained by a landlord, defined as the "landlord's agent," from receiving any compensation from the tenant for consummating the rental transaction.  Similarly, Section 20-699.21(a)(2) of the FARE Act bars a broker from receiving any compensation from a tenant when a broker "publishes" a listing with a landlord's permission—notwithstanding the fact that there is no brokerage agreement or broker/customer relationship between the broker and the landlord.

71.    Section 20-699.21(b)(1) of the FARE Act makes landlords liable for the conduct of the "landlord's agent" who receives compensation from a tenant.  Similarly, Section 20-699.21(b)(2) makes the landlord liable for a broker's receipt of compensation from a tenant if the broker has "publish[ed]" the listing with the landlord's permission or authorization (*e.g.*, such as an open listing).  Section 20-699.21(b)(2) creates this violation even in the absence of any

brokerage/customer relationship or compensation agreement between the landlord and the broker. Thus, pursuant to the FARE Act, landlords who currently send their open listings to brokers (or other technology providers used by brokers) in order to maximize exposure of the listings may now be found in violation of New York City law for an advertisement (or other form of "publish[ing]" a listing) which they did not place, based on a broker's fee they neither collected nor shared.

72.     Section 20-699.21(c) prohibits the "condition[ing]" of the rental of residential real property on a tenant engaging any agent, "including but not limited to a dual agent." The FARE Act, however, fails to define what "condition" means and provides no guidance on whether a simple request by a broker to be retained by a tenant could constitute "conditioning" a rental on engaging the services of the broker.

73.     In addition, Section 20-699.21(e) establishes a "rebuttable presumption that an agent who publishes a listing for a rental of residential real property does so with the permission or authorization of the landlord of such property." Notwithstanding the absence of any provision in Article 12-A or Section 175.25 which creates such a fiduciary relationship, this "rebuttable presumption" imputes a "brokerage/fiduciary" relationship between any real estate agent that "publishes" or advertises a rental listing and the landlord, such as in the context of an open listing.

74.     Section 20-699.22 requires landlords and brokers to disclose all fees a tenant is required to pay in their listings and prior to the execution of a rental agreement.

75.     Section 20-699.23 establishes a civil penalty scheme for violations of the FARE Act, to be enforced by the DCWP. Section 20-699.24 establishes a private cause of action for consumers who believe a violation of the FARE Act has occurred.

76.    An earlier version of the bill, Int. 360, provided that it "only applies to residential real estate transactions involving the rental of real property entered into **or after the effective date of this law**." (emphasis added).  Importantly, this limitation was removed in the final version of the FARE Act enacted by the City Council.

77.    Finally, the FARE Act states that it will ultimately become effective 180 days after it becomes law.  That date appears to be June 14, 2025.

### B.    Stated Purpose of the FARE Act

78.    The November 13, 2024 Committee Report from the Committee on Consumer and Worker Protection ("November 13 Committee Report") stated the purpose of the FARE Act was to "properly align" agency relationships rather than address the housing shortage in New York City:

> Opponents of the bill testified at the June 12, 2024 hearing that the bill was not a solution to the affordable housing crisis in the city. This sentiment misunderstands the purpose of the bill.  The bill is not an attempt to solve the affordability crisis in the city. Solutions to that problem are being explored by the Council in multiple other avenues.  The purpose of this bill is **to properly align the principal-agent relationship in the rental market** to ensure that the principal pays the agent for services rendered, not a third party.

(emphasis added).

79.    The November 13 Committee Report also compared New York to other major cities, noting that "[i]n most of the United States, it is the landlord's responsibility to pay the broker's fee for listing their property and finding a tenant.  This almost universal system **aligns with basic norms around principal-agent relationships**." (emphasis added).  Of course, the Committee Report failed to identify the "basic norms" upon which it was relying.  It similarly failed to consider distinguishing characteristics between New York and other major cities that

may contribute to their different approaches.

80.    Moreover, in the Committee Report, the City Council criticized dual agency and stated that "[i]n addition, states including Alaska, Colorado, Florida, Kansas, Maryland, Oklahoma, Texas, Vermont, and Wyoming have banned dual agency because it fosters inadequate representation and creates negotiation issues."

81.    But in New York, the state legislature has made clear that dual agency is lawful and sanctioned by state law and the DOS.

82.    The record behind the FARE Act belies the City's disingenuous, after-the-fact justification concerning "align[ing] the principal-agent relationship in the rental market. . . ." Indeed, the Committee Report itself included an entire section on "Issues and Concerns Related to Broker Fees" focusing on how broker fees create a "financial burden for New York City renters who wish to move."

83.    Similarly, when promoting the bill publicly, Councilmembers have not focused on the alleged stated purpose of "***align[ing] the principal-agent relationship in the rental market***." Instead, the FARE Act has been heralded as a win for affordability, not a means for realigning agency relationships.

84.    At the June 2024 Hearing, Councilmember Chi Ossé gave the following examples of "the magnitude of the crisis we are here to solve":

> The union worker unable to move near her job; the young couple that wants to have a child but [cannot] afford to trade in their studio for a two bedroom, so they put off building a family; the graduate moving to the city . . . for work; and the artist moving here to add to the rich fabric of the world's cultural capital; the woman seeking to leave her toxic relationship, but who stays because she lacks the savings for a new apartment; the immigrant working hard to build a life here; the young man finally ready to move out of his family home, but stay in his childhood neighborhood [who] is instead driven from New York City

altogether.

Councilmember Ossé's discussion of the "crisis" omits any mention of "align[ing] the principal-agent relationship" and focuses squarely on housing affordability—while saying absolutely nothing about agency relationships. He went on to say: "In short, the FARE Act will *put downward pressure on rents*." (emphasis added).

85.    In a November 12, 2024 social media post, Councilmember Ossé repeated: "The #FAREAct *puts DOWNWARD pressure on rents* by increasing bargaining power for tenants. It also saves thousands upfront." (emphasis added). Councilmember Ossé's other social media posts promoting the FARE Act likewise avoided any mention of "aligning" agency relationships:

- "I swear that the main reason they're trying to ban TikTok is so that NYC tenants have to be forced to pay broker fees" (June 10, 2024);

- "Come be a part of history, *and you'll never have to pay a broker fee again* . . ." (October 23, 2024) (emphasis added);

- "*We just voted to kill broker fees* . . ." (November 13, 2024) (emphasis added).

86.    The FARE Act's other proponents similarly emphasized housing affordability, particularly for low- and moderate-income tenants, avoiding any mention of problems with the "alignment" of principal/agent relationships.

87.    For example, Antonio Reynoso, Brooklyn Borough President, testified at the June 2024 Hearing that broker fees are "a barrier to entry" to housing and "can mean the difference between a family being able to secure housing in this city and not." He stressed that "[f]ewer apartments are available across all rent levels, meaning *it's especially difficult right now for low- and moderate-income New Yorkers to find and secure housing*." (emphasis added).

88.    Another supporter of the FARE Act testified that "*[b]roker fees can cost thousands of dollars* and make apartments that might otherwise be attainable out of reach to

low- and moderate-income tenants." (emphasis added).

89.    The November 13, 2024 Stated Meeting of the City Council likewise never delved into the nuances of New York agency law.

90.    Councilmember Ossé stated: "You get what you pay for, and you pay for what you get," emphasizing that the passage of the FARE Act "is a win for all New Yorkers."  Other Councilmembers—both supporters and opponents of the FARE Act—emphasized the legislation's impact on rents and affordability.  Councilmember Feliz, voting in favor of the Act, emphasized its impact on low-income New Yorkers.  Councilmember Paladino, who voted no, observed that the Act "will fundamentally break the rental market, driving up prices and limiting availability," and further exacerbate—rather than alleviate—the shortage of rental housing in the city.

### C.    Legislative Process

91.    The record reveals that the City Council acknowledged a lack of data to support the assumptions underlying the FARE Act, but nevertheless conducted no further analysis. Instead, the Council credited anecdotal and conclusory evidence—some of it baldly disparaging to brokers—over statistically rigorous data and economic analysis, failed to consider any meaningful alternatives to the FARE Act, and disregarded extensive warnings about the many negative unintended consequences that the FARE Act will have on New York City's rental markets and the people it is ostensibly meant to help—namely low- and moderate-income renters.

### 1.    The City Council Acknowledged the Lack of Data but Conducted No Further Analysis

92.    Thus, Public Advocate Jumaane Williams, who supported the FARE Act, described the legislative process in June 2024 as "trying to . . . find the balance" in order to

"make sure that brokers can get paid for the work that they're doing, while releasing some of the pressures o[n] tenants."

93.     But the record reveals no such effort at finding a "fairer balance."  Indeed, at the June 2024 Hearing, Councilmembers and members of the Adams Administration acknowledged the lack of any key data and analysis to inform the legislative process.

94.     Councilmember Powers observed "the actual difficulty [of] finding real data on [broker fees and their prevalence] because they're a series of private transactions happening."

95.     When asked whether "entry into housing, including brokers fees," was among the forces contributing to the shortage of rental housing, HPD Deputy Commissioner Tigani testified:  "***That's not a data point that I have, so I can't speak to it in any quantitative manner***."  (emphasis added).  He also testified that HPD had no data on complaints about broker fees.

96.     Importantly, DCWP, the agency empowered to enforce the FARE Act, did not even attend the June 2024 Hearing, leading Councilmember Hudson to observe that DCWP's absence

> . . . ***hinders our ability*** as Councilmembers to ask the most appropriate questions and to get relevant answers . . . . ***[W]ithout the agency solely responsible for the implementation of this bill, it makes it really difficult for us to get the answers and to have the productive and constructive hearing*** that we were hoping to have this morning.

(emphasis added).

97.     Councilmember Nurse expressed a similar frustration, and echoed Councilmember Hudson's remarks, adding:

> So, you right now are basically saying you have ***zero data points to offer*** in this hearing, a hearing that you knew was going to be about broker fees . . . . [T]his administration has wasted our time

25

today.  You all knew that many people were going to be here today, because this clearly impacts so many New Yorkers, and ***you all showed up with no data, no input, nothing conclusive, no analysis to offer on this bill***.  It's embarrassing, truly embarrassing.

(emphasis added).

98.     Brooklyn Borough President Reynoso said:

It is embarrassing, and it is sad that there are many people here for or against this legislation that would love to ***really get to the bottom of data that supports the case that's being made by Councilmember Chi Ossé*** and his legislation.  ***Instead, we're going to be relegated to having a conversation that we've already had in the public.  We are wasting time***.

(emphasis added).

99.     Councilmember Avilés observed:

[I]t is unconscionable that in a housing crisis, we have an Administration that ***won't even come to the table with some analysis***, that won't contribute to a constructive conversation, ***because this impacts so many lives, both the brokers who are here, the renters who are here, and families who cannot live in neighborhoods because they can no longer afford to do so***.  We need to do better.

(emphasis added).

100.    Thus despite being charged with enforcing the FARE Act, the DCWP failed to even appear at the June 2024 Hearing, much less provide vital data that could have informed the legislative process.

101.    When asked for the Administration's perspective, HPD Deputy Commissioner Tigani recognized that more analysis was needed to understand the impact of the FARE Act on other costs associated with housing and on the city's brokers:

. . . particularly in non-regulated, non-rent-regulated housing, market housing as it's often referred to, costs can be pushed into other areas of the housing search and lease-up process.  So we're

> trying to look at the different ways that that may happen, different
> permutations.  Additionally, we want to understand better the
> impact this may have on an industry that employs many New
> Yorkers here within the city.  ***And those two factors . . . require a***
> ***deeper analysis from multiple agencies, both in the housing***
> ***front, housing supply, access, and economic development front,***
> ***and workforce development front***.

(emphasis added).

102.    The City Council, however, did not perform or solicit any "deeper analysis." Instead, it relied on anecdotal evidence and conjecture.

103.    The Committee Report tries in vain to set forth the information the Committee purportedly considered.  Indeed, the Committee report notes that it "heard an earlier version of this legislation on June 12, 2024 and received testimony from the Department of Housing Preservation and Development, members of the real estate and brokerage industries, tenant advocates, and other interested members of the public."  The Council also "[met] with stakeholders including real estate associations, real estate marketplaces, real estate brokers, property owners, tenants and legal advocates to gather feedback on the legislation," including "[REBNY], Zillow/StreetEasy, the Legal Aid Society and the New York Apartment Association."  In September and October 2024, the Council's Oversight and Investigations Division ("OID") conducted an "investigation" of brokers' fees in the residential rental market. A closer look at that investigation reveals no methodology other than obtaining rental applications for 99 units across the five boroughs, touring 50 of those apartments, and extrapolating those observations in an attempt to bolster the Council's flimsy assumptions.

104.    Moreover, it bears significant mention that the version of the FARE Act voted on November 13, 2024 bears very little resemblance to the first version of the FARE Act, which was the subject of the June 2024 Hearing.  Indeed, the first version of the FARE Act did not

contain the ambiguous provision concerning "condition[ing]" the rental of a property on a consumer retaining an agent or broker.  In addition, the first version of the FARE Act also did not include the "rebuttable presumption" language included in the version of Intro 360-A voted on November 13.  Furthermore, the first version of Intro 360-A did not include any penalties, nor did it contain a private right of action.  Most of all, the first version of Intro 360-A did not make it unlawful for a broker or agent to negotiate and receive compensation from a tenant simply because the broker or agent "published" a real estate listing.  Indeed, the main thrust of the first version of Intro 360-A was that  a real estate agent seeking to collect a fee in connection with a real estate transaction must be paid by the party that retained them:

> § 26-3602 Fees in rental real estate transactions. a. A person collecting fees in connection with a rental real estate transaction, whether such person is a representative or an agent of the owner of the property or of the tenant or prospective tenant in such transaction, shall collect such fees from the party employing such person in such transaction.

A copy of the first version of the FARE Act is attached hereto as **Exhibit B.**

105.    Amazingly, when voting on the second version of the FARE Act in November, the City Council failed to obtain the missing data that it sought during the June 2024 Hearing, and the Committee Report is bereft of any data or statistics concerning whether "entry into housing, including brokers fees" contributed to the shortage of rental housing.  In short, despite its complaints about the lack of data concerning a critical piece of legislation under its review, and despite having nearly five months of time to find such data, the City Council failed to conduct any considered or serious analysis of the new version of Intro 360-A, the legislation that it ultimately passed.

    2.    The City Council Relied on Anecdotal Evidence

106.    Much of the testimony in favor of the FARE Act relied on personal anecdotes of

28

**JA40**

renters—many of them carping about conduct that not only falls outside the FARE Act umbrella but is already illegal.

107.    Multiple speakers at the June 2024 Hearing described being lied to by brokers and being "subjected to astronomical and unfair hidden and broker's fees." Councilmember Nurse reported: "I have seen ads on the internet that don't say there's a broker fee, and then when you show up there is suddenly a broker fee." Public Advocate Jumaane Williams stated that "some of the worst examples we've seen are stories of someone paying a broker fee, and not being connected to housing." One speaker testified about encountering a "broker [who] knew almost nothing about the apartment/building, and lied to me about multiple things in lease riders that ended up costing me extra money in the long run."

108.    In the same vein, the November 13 Committee Report recounted instances of OID investigators receiving a rental application but not the New York State Disclosure Form for Landlord and Tenant. Other anecdotal testimony in favor of the FARE Act focused on unsafe and dangerous conditions and landlords who refused to remediate them. For example, one tenant testified: "Over the last four years my landlord has raised my rent by nearly 30% and **neglected to make much-needed repairs** because he knows that moving within NYC is a huge burden." (emphasis added).

109.    As one Corcoran agent explained, these and other anecdotes reflect a fundamental misapprehension of existing regulations that already prohibit much of the behavior highlighted in testimony at the June 2024 Hearing:

> As others in my industry testified, prior to showing an apartment for rent, **agents must give three state mandated forms** (annexed to this testimony) **and disclose if there is a broker's fee. The law already requires that these fees not be "hidden" as those who support this legislation claim.** Unfortunately, some agents do not follow the law, and this leads to confusion and a belief that we all

> do not follow the law . . . . A broker fee is never supposed to be
> disclosed at the last minute.

(emphasis added).

110.    For example, the "hidden" broker fees of which speakers complained are

prohibited under Article 12-A of the RPL, which requires a landlord's agent to provide the

potential tenant with the New York State Disclosure Form for Landlord and Tenant "at the time

of the first substantive contact with the . . . tenant." RPL § 443.  The Disclosure Form, in turn,

informs the tenant that "New York State law requires real estate licensees who are acting as

agents of landlords and tenants of real property to advise the potential landlords and tenants with

whom they work of the nature of their agency relationship and the rights and obligations it

creates."  DOS-1735-f.  Existing regulations likewise require brokers to deal honestly and in

good faith: as the Disclosure Form explains, "[i]n dealings with the tenant, a landlord's agent

should (a) exercise reasonable skill and care in performance of the agent's duties; (b) deal

honestly, fairly and in good faith; and (c) disclose all facts known to the agent materially

affecting the value or desirability of property, except as otherwise provided by law."  *Id.*

Likewise, pursuant to 19 N.Y.C.R.R. Section 175.25(c)(9), real estate "[a]dvertisements shall

include an honest and accurate description of the property to be . . . leased."

3.    <u>The City Relied on Conjecture and Ignored Evidence About Negative
Consequences</u>

111.    The City Council heard extensive testimony about the negative consequences that

would flow from the FARE Act, including higher rents for renters and lower market

transparency.  These warnings fell on deaf ears.  The City Council failed to conduct further

analysis, discounted evidence against the FARE Act, and credited conjecture and generalizations.

112.    The City Council heard extensive testimony that the FARE Act would result in

higher rents for tenants, particularly as small landlords struggled to absorb the cost of broker

fees.  Brian Phillips, a small landlord and real estate broker specializing in rentals, testified that,

as a small landlord, he "faced significant financial pressures due to rising real estate taxes,

homeowners[] insurance[,] and maintenance costs.  These increases have forced me to increase

rents, a situation shared by many of my landlord clients."  The FARE Act's requirement that

landlords pay the brokerage fee when hiring agents on an exclusive basis "could lead to two

likely outcomes," Mr. Phillips said:

> Landlords may either incorporate the broker fee into the rent,
> spreading it over the entirety of the lease.  This would result in
> ***higher monthly rents and increased lease renewal rates***, which
> are based on a last rented price.  Alternatively, ***landlords might opt
> not to hire agents on an exclusive basis***.  This means tenants
> would have to pay the brokerage fee, and listings would not appear
> on platforms like StreetEasy, which require exclusive listings.

(emphasis added).

113.    Mr. Phillips' remarks were echoed by other brokers and small landlords.

114.    In a social media post [after the June 2024 Hearing,] Councilmember Ossé

dismissed the critics, stating that "The #FAREAct puts DOWNWARD pressure on rents by

increasing bargaining power for tenants."

115.    The City Council and other supporters likewise responded with conjecture.

Among the refrains often heard in support of the FARE Act was the argument that "any rent

increases that do occur would be ameliorated over a 12- or 24-month lease, ***which is preferable

to paying a large sum up front*** and ***could*** still reduce tenants' long-run costs and increase their

future bargaining power." (emphasis added).

116.    The City Council explicitly assumed—with no data to back up that assumption—

that New York City tenants prefer the lower upfront cost of not paying a broker fee over greater

**JA43**

long-term costs.  In doing so, the City Council ignored extensive testimony regarding the long-term costs the FARE Act will exacerbate for renters.  One speaker explained the increased long-term costs for tenants as follows:

> Most tenants in NY stay in their units for more than a year. Landlords increase their rent based on perceived value, rate of inflation, and the CPI.  This increase will be on top of the already inflated rent.  ***Therefore, the tenant is now paying the fee several times over several years instead of paying a onetime fee when they initially signed the lease***.  The fee is significantly less expensive over the length of the lease as we do not charge repeatedly for multiple years.

(emphasis added).

117.    The Council also heard testimony that "[m]ost landlords require renters to make at least 40 times the monthly rent," which will cause some renters to become priced out as a result of higher rents.  Other renters will have to turn to third party guarantors, incurring additional expense:

> [I]nsurance companies . . . offer insurance products . . . as an additional upfront fee of roughly one month's rent, which unlike security deposits, do NOT get returned to [the tenant] at the end of their lease terms.  This policy has to be renewed each year.  These tenants are essentially purchasing a security deposit from an insurance company which then gives that deposit to the landlord.

118.    Nor did the City Council address the implications for renters with housing assistance vouchers, despite testimony that the FARE Act harms some voucher holders by "remov[ing] one of the primary financial advantages voucher holders have over other prospective renters, which is that vouchers cover brokers fees."

119.    The City Council also discounted the FARE Act's impact on the availability of rent stabilized housing and market transparency.  At the June 2024 Hearing, Councilmember Ossé argued that rents would not go up in part because "nearly half of New York City rental

units are rent stabilized, meaning rent legally can't be raised beyond the levels established each year by the rent guidelines board . . . ." Of course, Councilmember Ossé's logic omits the roughly half of rental units which are not rent stabilized. Moreover, Councilmember Ossé's logic is also defied by the fact that rent stabilized apartments rarely come up for rental as families try to remain in such lower priced apartments, and pass them on to younger generations.

120.    In written testimony submitted to the City Council, Sarah Saltzberg, of Bohemia Realty Group observed that "tens of thousands of [rent stabilized] units [] sit offline, due to a mandate that allows for almost no rent increase regardless of the funds needed for renovation." She also cautioned that the FARE Act would have similar unintended consequences on the availability and exposure of rent stabilized units: if owners of rent stabilized units that already rent at their legal threshold cannot afford to pay a broker fee, they "may choose to simply have their supers list the units, or not—and rentals will happen via word of mouth."

121.    The result, another broker warned, would be a "shadow inventory" not seen "since the days of classified newspaper advertising" instead of today's "widely transparent online rental marketplace showing accurate apartment listings."

122.    Adam Roberts, from the Community Housing Improvement Program, whose members operate rent-stabilized housing, echoed these remarks:

> [The FARE Act] adds more cost to provide rent-stabilized housing, despite those buildings having no means of recouping these additional expenses. This is particularly troubling because rent-stabilized housing finds itself in a major financial crisis. Net operating income for older rent-stabilized buildings has fallen consistently across the city for three years in a row. In 2022 alone, there was a 20% drop for Bronx buildings. Meanwhile, the lenders who fund capital expenditures have either collapsed or are near collapse . . . or have severely restricted lending . . . .

123.    The FARE Act's negative repercussions would not be limited to rent-stabilized

housing, and in particular, the City Council heard that the FARE Act would disproportionately impact *owners and tenants of color*:

> Small rental units have the largest share of owners of color; 13 percent of owners are Black, and 15 percent are Hispanic . . . . COVID-19 has disproportionately affected Black and Hispanic households, and their greater representation both as tenants and landlords in two-to-four unit buildings may further exacerbate wealth inequality if no action is taken to protect these landlords from losing their property due to the decline in rental income.

124. The City Council also heard testimony about the "major financial impact" the FARE Act would have on honest and hard-working brokers by hurting their livelihoods as landlords forego exclusive and open listings: "[d]espite reality TV shows the starting income for a New York City agent is $52,000 a year."

125. But rather than consider the impact on brokers in earnest, the June 2024 Hearing and written testimony submitted at the Hearing were replete with generalizations and disparaging comments about brokers, accusing brokers of merely "opening doors," "acting out of greed," "taking hard earned money, flooding online rental options and holding people back from finding an apartment that would otherwise be affordable and accessible to them." One FARE Act supporter stated: "The current system is . . . a blatant exploitation of brokers, making it increasingly challenging for everyday New Yorkers to secure affordable housing." Without any supporting evidence, Councilmember Nurse stated that when it came to wrongdoing by brokers, "[t]he worst case scenario is generally what the rule is . . . . The worst case scenario is generally the most common experience."

126. The vitriol against brokers led one observer to describe the hearing as follows in written testimony submitted to the City Council:

> I also take issue with how you conducted yourselves during the hearing today. I heard nothing but vitriol toward brokers who

34

**JA46**

> testified. ***I watched as you stared at your phones and laptops as they spoke, while listening intently to anyone in favor of the bill.*** You asked follow-up questions to those in favor, while only making quick comments and moving onto the next group after anyone in opposition spoke. ***I observed a dais of city council members who, for the most part, seemed to have already made up their minds.***

(emphasis added).

127.     Most important, the City Council heard from no party about the need to more "***properly align the principal-agent relationship in the rental market***," ***or that any of the existing laws failed to properly take into account the nature of agency relationships in the brokerage transaction.***

    4.   <u>The City Council Did Not Consider Less Burdensome Alternatives</u>

128.     Despite the extensive testimony about the many negative consequences that this ill-considered legislation would have on New Yorkers and the rental markets, the City Council did not meaningfully consider other, less burdensome alternatives for addressing the FARE Act's stated purpose.

129.     The Council heard repeated testimony that New York City is one of only two cities in the country where renters pay broker fees.  In response, at least two witnesses testified about the factors that make New York's market different, highlighting factors such as the prevalence of co-ops, rent laws, and tenant protections:

> In Manhattan, co-ops constitute approximately 75% of the housing market, which makes for lengthy application and stringent approval processes that experienced agents know how to navigate well.  Unlike many other cities and markets surrounding Manhattan, where a centralized Multiple Listing Service (MLS) simplifies property searches and transactions, NYC—particularly Manhattan, downtown Brooklyn, and northwest Queens—relies heavily on platforms like StreetEasy, which is owned by Zillow and often requires exclusive listings.  In Manhattan, rental listings do not syndicate to Zillow unless they are first listed on StreetEasy.

This limits the visibility of available rentals and complicates the process for tenants.

Additionally, you asked about New York versus other cities so I looked up Miami's rental situation.  In Miami, *tenants must pay 3 months [sic] rent up front: first and last month's rent and their security deposit which is more than our permitted first month's rent and security.  Plus in Miami, landlords give 3 day notice for eviction of non-payment unlike our laws which mandate 30, 60, or 90 day notice and then you're stuck in housing court for at least a year.*

(emphasis added).

130.    The City Council did not explore these distinguishing characteristics between New York and other markets, instead assuming that because the New York market is an outlier in its approach to broker fees, it must be in the wrong.

131.    The City Council also heard testimony about the disproportionate impact that the FARE Act will have on small landlords, whose buildings are a crucial source of affordable housing:

Exempting the smallest buildings, which have the lowest eviction filing rates, from the broker fee requirement is another critical aspect to consider.  These buildings are often managed by owners who are not full-time professional property managers and often provide some of New York City's least expensive and most stable housing.  Protecting these small landlords is crucial to maintaining affordable housing options and preventing further displacement in our communities.

132.    The City Council did not consider exempting small landlords from the FARE Act.

133.    Nor did the City Council consider whether it could create a need requirement for renters.  In a city as economically diverse as New York, there is a wide range of potential renters and not every renter in New York City needs the potential financial advantage provided by the FARE Act.

134.    Moreover, the City Council failed to identify any evidence or hear any testimony

or data from the any City department demonstrating that all landlords are better and more financially equipped to absorb the costs of a brokerage commission.

135.    Indeed, the City Council did not consider any alternatives to mitigate the FARE Act's negative consequences on landlords, brokers, and tenants.

## III.    The Impact of the FARE Act

136.    The FARE Act fundamentally misunderstands the New York City rental markets and will cause irreparable harm to all stakeholders.

137.    The FARE Act completely invalidates all existing listing agreements between Plaintiff real estate brokers and landlords which provide that while the landlord retains the services of one of the Brokerage Plaintiffs, the broker must seek compensation only from the tenant rather than the landlord. Indeed, the FARE Act permanently and completely voids all existing listing agreements which require that the broker must seek compensation from the tenant. This fundamental and permanent impairment of listing agreements between brokers and landlords violates the Contracts Clause of the Constitution.

138.    For example, Plaintiff Bond New York includes a provision in its "Exclusive Right to Rent" agreement with landlords that states that despite entering into an exclusive agreement with that landlord, BOND New York must seek to negotiate any compensation arrangement with the tenant, and can only receive such compensation from the tenant:

> If the Property is rented pursuant to this Agreement, BOND will collect its fee from the tenant.

The FARE Act, however, permanently makes this provision void, and in fact makes any attempt by BOND, or any other Brokerage Plaintiff, to negotiate a compensation arrangement with any consumer illegal and punishable with a fine. In short, the FARE Act severely impairs the contractual rights of the Brokerage Plaintiffs, as well as the

37

**JA49**

landlords who have entered into exclusive listing agreements with the Brokerage Plaintiffs containing such provisions, fundamentally undermines the expectations of the parties to the exclusive listing agreement, and makes clear that such impairment is permanent.  In addition to the contracts of the Brokerage Plaintiffs at issue, the FARE Act will also impact likely thousands of other exclusive listing agreements already entered into by brokerages across New York City.

139.    Moreover, the FARE Act prohibits any "person" from "condition[ing] the rental of residential real property on a tenant engaging any agent, including but not limited to a dual agent."  This prohibition directly impairs countless existing exclusive listing agreements between landlords and the Brokerage Plaintiffs—including those where the landlord has agreed to pay the brokerage commission—by making it impossible for landlords to fulfill their explicit contractual obligation to refer all inquiries regarding their property to the broker.

140.    Plaintiff Bond, for instance, includes a provision in its "Exclusive Right to Rent" Agreement which requires the landlord to direct all "inquiries, proposals and offers regarding" a property to Bond:

> During the term of this Exclusive Agreement, you agree to refer to BOND New York all inquiries, proposals and offers regarding the Property; this includes all principals and any other real estate brokers.

141.    Thus, even those exclusive listing agreements where a landlord has agreed to compensate the broker also suffer a permanent and severe impairment due to the arbitrary "conditioning" provision of the FARE Act.  As noted earlier, the FARE Act never defines what it means to "condition the rental of" a unit on the "tenant engaging any agent," and fails to provide brokers and landlords with any guidance as to what constitutes lawful conduct.

142.    The loss of the fees from exclusive listing agreements will be permanent and

impose substantial hardship on brokers by upending the longstanding business model on which they have come to rely.

143.    Landlords of both market rate and rent stabilized apartments will likewise suffer substantial hardship because the FARE Act requires them to pay for broker fees, incurring increased costs.

144.    In the process, the FARE Act also harms renters.  The FARE Act puts the financial burden of paying a brokerage commission exclusively on the shoulders of landlords, without regard to whether they are better situated than renters to bear that cost.  The tenant pays rentals at the heart of the FARE Act are more likely to be rent-stabilized apartments and lower priced units owned by small landlords.  Small landlords operate with thin margins, and paying broker fees on top of taxes, maintenance, and operating costs will push many of those landlords into the red.

145.    Landlords of market rate apartments who cannot afford the extra costs will be forced to amortize the broker fee (plus any additional administrative costs they incur) over the course of the lease term.  As a result, tenants will incur higher long-term costs due to higher rents and higher lease renewal rents.

146.    Higher base rents will also make it more difficult for prospective renters who need to demonstrate income which is 40 times the monthly rent of an apartment.  While a New Yorker making $120,000 per year may qualify for an apartment with rent of $3,000 or less, because of the impact of the FARE Act, that same apartment may now rent for $3,300 per month or even more.  That New Yorker would no longer qualify for the apartment based on income alone.  In that case, the renter can keep looking for a place to live, or they can pay a third-party guarantor or insurer to make up the difference, further exacerbating the high cost of housing.

147.    Unlike landlords of market rate apartments, landlords of rent stabilized apartments *already* renting at their maximum cannot raise rents.  As a result, they may have to make significant cutbacks on building maintenance or even take units off the market entirely if they become prohibitively expensive to operate, adding to the thousands of rent-stabilized units already sitting vacant in New York City.  This "warehousing" of units would further exacerbate the extremely low vacancy rate, especially for more affordable apartments:  as the City Council heard during the June 2024 Hearing, the net rental vacancy rate is below one percent for units renting under $2,400 per month. Landlords who choose to move leasing in-house will inevitably have less availability and less education about fair housing laws than licensed brokers—ultimately harming consumers.

148.    Finally, the FARE Act violates landlords' and brokers' right to free commercial speech in the form of open listing advertisements.  Because of the FARE Act's prohibition on "publish[ing]" an apartment and seeking to receive compensation from the tenant, brokers will stop advertising open listings where they are not retained and paid by the landlord—which is the case with most open listings.  Faced with potential liability for the acts of brokers whom they have not retained and do not control, landlords will likewise stop sending open listings to brokers to advertise.  The "open listing" model will be completely upended.  Thus in addition to infringing on brokers' and landlords' First Amendment rights, the FARE Act will also lead to the loss of advertising.  Listings will not appear on brokers' proprietary websites, nor will they appear on third party websites.  Renters will have to rely on word of mouth, or hire a broker—and then still pay the fee—to find an apartment. The FARE Act will be an enormous step backwards in terms of market transparency and information available to consumers—running counter to the Council's goal of "mak[ing] residential real estate transactions more transparent

40

**JA52**

and more equitable."

## CLAIMS FOR RELIEF

## COUNT I

### Violation of the First Amendment to the U.S. Constitution
### 42 U.S.C. § 1983 and 28 U.S.C. § 2201
### (Against All Defendants)

149.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 148 of this

Complaint as if fully set forth herein.

150.    At all relevant times, Defendants, their agents, and their employees were persons

acting under color of State law.

151.    At all relevant times, Plaintiffs were "citizen(s) of the United States or other

person(s) within the jurisdiction thereof" entitled to bring suit under 42 U.S.C. § 1983.

152.    The First Amendment of the U.S. Constitution, as incorporated through the

Fourteenth Amendment, prohibits a state or municipality from abridging the freedom of speech.

153.    The FARE Act imposes content-based restrictions on Plaintiffs' lawful

commercial speech by directly infringing on their ability to "publish" or advertise open listing

advertisements.  By prohibiting the Brokerage Plaintiffs from "publish[ing]" a listing and

seeking to receive compensation from the tenant, the FARE Act inhibits brokers from advertising

open listings where they are not retained and paid by the landlord.  By rendering the Landlord

Plaintiffs potentially liable for the acts of brokers whom it has not retained and does not control,

the FARE Act likewise chills the Landlord Plaintiffs' commercial speech.  In short, the FARE

Act disfavors specific speech—the "publishing" of open listings—and disfavors certain

speakers—real estate brokers and agents.

154.    Defendants cannot show that the FARE Act advances a substantial interest

through means that is no more extensive than necessary. Indeed, the legislative record reflects that in passing the FARE Act, the City Council relied on anecdotal evidence while failing to conduct any meaningful tailoring analysis.

155. Because of Defendants' actions, all of the Plaintiffs have suffered or will imminently suffer irreparable harm from the denial of their First Amendment rights.

156. Plaintiffs are entitled to a declaratory judgment that Defendants have violated their First Amendment right to freedom of speech.

157. Plaintiffs are also entitled to injunctive relief enjoining the enforcement of the FARE Act.

158. Plaintiffs are entitled to recover their attorneys' fees and costs.

<u>**COUNT II**</u>

**Preemption Under New York State Law**
**(Against All Defendants)**

159. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 158 of this Complaint as if fully set forth herein.

160. The FARE Act legislates in a field fully occupied by the New York State Legislature and the DOS.

161. New York has enacted a comprehensive regime of statutes and regulations regarding the licensing, conduct, and nature of fiduciary relationships for real estate licensees. Those state laws also govern how, and by whom, real estate licensees are compensated. Article 12-A of the RPL and attendant regulations form a comprehensive and detailed regulatory scheme that evinces the State's intent to occupy the field with respect to the law governing real-estate transactions and real-estate brokers.

162. Similarly, the DOS has also promulgated additional state-wide regulations which

govern the conduct of real estate brokers, including rules that set forth when a real estate broker

may be compensated by more than one party (Section 175.7) and how real estate brokers and

salespersons can advertise listings (Section 175.25).

163.    Plaintiffs are entitled to a declaration that the FARE Act is preempted by New

York State Law.

164.    Plaintiffs are also entitled to injunctive relief enjoining the enforcement of the

FARE Act.

## COUNT III

**Violation of the U.S. Constitution's Contracts Clause
42 U.S.C. § 1983 and 28 U.S.C. § 2201
(Against All Defendants)**

165.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 164 of this

Complaint as if fully set forth herein.

166.    At all relevant times, Defendants, their agents, and their employees were persons

acting under color of State law.

167.    At all relevant times, Plaintiffs were "citizen(s) of the United States or other

person(s) within the jurisdiction thereof" entitled to bring suit under 42 U.S.C. § 1983.

168.    Article I, Section 10, Clause 1 of the U.S. Constitution provides that "[n]o State

shall . . pass any . . . law impairing the obligation of contracts."

169.    The FARE Act permanently impairs the Brokerage Plaintiffs' existing contracts.

By prohibiting a broker from receiving compensation from the tenant when they have executed

an exclusive listing agreement with a landlord, the FARE Act makes all tenant pays exclusive

listing agreements void and unenforceable.

170.    The FARE Act further impairs countless existing exclusive listing agreements

43

between the Brokerage Plaintiffs and landlords by prohibiting any "person" from "condition[ing]

the rental of residential real property on a tenant engaging any agent, including but not limited to

a dual agent." This prohibition makes it impossible for landlords to fulfill their explicit

contractual obligation to refer all inquiries regarding their property to the Brokerage Plaintiff

with whom a specific landlord has contracted.

171.    The loss of the fees coming from their impaired exclusive listing agreements will

be permanent and impose substantial hardship on the Brokerage Plaintiffs. The Brokerage

Plaintiffs relied upon the terms of their exclusive listing agreements, established their businesses

based on these exclusive listing agreements, and invested substantial time and resources based on

such terms.

172.    In addition, landlords have also relied upon the terms of their exclusive listing

agreements with the Brokerage Plaintiffs, and established their businesses based on these

exclusive listing agreements, and invested substantial time and resources based on such terms.

173.    The FARE Act is neither reasonable nor appropriate to address the purported

public interest of "align[ing] the principal-agent relationship," nor reasonable and appropriate to

solve its true aim of improving housing affordability.

174.    In placing the economic responsibility for broker fees squarely on the shoulders of

landlords, the City Council relied on no economic analysis demonstrating that landlords are

better equipped or capable of absorbing the costs of the brokerage commission. Nor does the

Act make any distinction between tenants who may demonstrably need assistance to pay a

brokerage commission and tenants who can readily afford to pay the fee.

175.    The Brokerage Plaintiffs are entitled to a declaratory judgment that Defendants

have violated the Brokerage Plaintiffs' rights under the Contracts Clause.

176.    The Brokerage Plaintiffs are also entitled to injunctive relief enjoining the enforcement of the FARE Act.

177.    The Brokerage Plaintiffs are entitled to recover their attorneys' fees and costs.

## COUNT IV

### Violation of the New York State Constitution's Free Speech Clause
### 28 U.S.C. § 2201
### (Against All Defendants)

178.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 177 of this Complaint as if fully set forth herein.

179.    Article I, Section 8 of the New York State Constitution provides that "[e]very citizen may freely speak, write and publish his or her sentiments on all subjects . . . and no law shall be passed to restrain or abridge the liberty of speech."

180.    For the same reasons that Defendants violated Plaintiffs' First Amendment rights under the U.S. Constitution, as alleged above, Defendants have violated Plaintiffs' rights to free speech guaranteed by the New York State Constitution.

181.    Plaintiffs are entitled to a declaration that Defendants violated their right to free speech under the New York State Constitution.

182.    Plaintiffs are entitled to injunctive relief enjoining the enforcement of the FARE Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter an order:

(a)    Declaring that Defendants violated Plaintiffs' First Amendment right to freedom of speech;

(b)    Declaring that the FARE Act is preempted by New York State Law;

45

**JA57**

(c)      Declaring that Defendants violated Plaintiffs' rights under the Contracts Clause of the U.S. Constitution;

(d)      Declaring that Defendants violated Plaintiffs' right to free speech under the New York State Constitution;

(e)      Enjoining the enforcement of the FARE Act;

(f)      Awarding Plaintiffs their attorneys' fees and costs; and

(g)      Granting such other and further relief as the Court may deem just and proper.

Dated:   New York, New York
        December 16, 2024

**HOGAN LOVELLS US LLP**

By: */s/ Claude G. Szyfer*
     Claude G. Szyfer
     Darya D. Anichkova
     390 Madison Avenue
     New York, NY 10017
     (212) 918-3000
     claude.szyfer@hoganlovells.com
     daria.anichkova@hoganlovells.com

     Sean M. Marotta (*pro hac pending*)
     Drew Mackenzie (*pro hac pending*)
     555 13th Street NW
     Washington, DC 20004
     (202) 637-5600
     sean.marotta@hoganlovells.com
     drew.mackenzie@hoganlovells.com

     *Attorneys for Plaintiffs*

# Exhibit A



# The New York City Council

City Hall
New York, NY  10007

## Legislation Text

**File #:** Int 0360-2024, **Version:** A

### Int. No. 360-A

By Council Members Ossé, Abreu, Feliz, Hudson, Krishnan, Nurse, Marte, Hanif, Brooks-Powers, Cabán, Sanchez, Louis, Won, Gennaro, Bottcher, Powers, Gutiérrez, Holden, Salaam, Restler, Joseph, Avilés, De La Rosa, Stevens, Farías, Narcisse, Williams, Salamanca, Banks, Riley, Rivera, Ayala, Hanks and the Public Advocate (Mr. Williams) (in conjunction with the Brooklyn and Queens Borough Presidents)

A Local Law to amend the administrative code of the city of New York, in relation to the payment of fees imposed in relation to the rental of residential real property

Be it enacted by the Council as follows:

Section 1. Chapter 4 of title 20 of the administrative code of the city of New York is amended by adding a new subchapter 15 to read as follows:

SUBCHAPTER 15

RENTAL REAL ESTATE AGREEMENTS

§ 20-699.20 Definitions. For purposes of this subchapter, the following terms have the following meanings:

Agent. The term "agent" means a person who is licensed as a real estate broker or real estate salesperson under section 440-a of the real property law and is acting in a fiduciary capacity.

Dual agent. The term "dual agent" means an agent who is acting as a tenant's agent and a landlord's agent with respect to an agreement regarding the same residential real property.

Engage. The term "engage" means to enter into an agreement that requires the payment of a fee by a person for the performance of services by another person.

Fee. The term "fee" means an amount of money that is charged by a person for the provision of services to one or more persons, including but not limited to a commission.

File #: Int 0360-2024, **Version:** A

Landlord. The term "landlord" means the lessor in a residential real property agreement, and includes an owner who lists residential real property for lease with an agent, whether or not a lease results, or who receives an offer to rent residential real property, except for a cooperative housing corporation leasing residential real property to a dwelling unit owner or shareholder of such cooperative housing corporation.

Landlord's agent. The term "landlord's agent" means a listing agent who acts alone, or an agent who acts in cooperation with a listing agent, acts as a landlord's subagent, or acts as a broker's agent, to find or obtain a tenant for residential real property. The term "landlord's agent" does not include a dual agent.

Lease. The term "lease" means an agreement by which a landlord conveys residential real property for a specified term and for a specified rent.

Listing. The term "listing" means an advertisement or written notice conveying that a property is available for lease.

Listing agent. The term "listing agent" means a person who has entered into a listing agreement to act as an agent of the landlord for compensation.

Listing agreement. The term "listing agreement" means an agreement between an owner of residential real property and an agent, by which the agent has been authorized to lease the residential real property or to find or obtain a lessee therefor.

Residential real property. The term "residential real property" means a dwelling unit, as defined in paragraph 13 of subdivision a of section 27-2004, including a dwelling unit held in the condominium or cooperative forms of ownership.

Tenant. The term "tenant" means a lessee in an agreement to rent residential real property and includes a person who executes an offer to rent residential real property from a landlord through an agent, or who has engaged the services of an agent with the object of entering into a residential real property agreement as a lessee.

Tenant's agent. The term "tenant's agent" means an agent who agrees to locate residential real property

File #: Int 0360-2024, **Version:** A

for a tenant or who finds a tenant for a property and presents an offer to lease to the landlord or landlord's agent and negotiates on behalf of the tenant.

§ 20-699.21 Payment of certain fees imposed in relation to the rental of residential real property. a. Except as expressly provided by subdivision 1 of section 238-a of the real property law:

1. a landlord's agent shall not impose any fee on, or collect any fee from, a tenant related to the rental of residential real property; and

2. any agent who publishes a listing for a rental of residential real property with the permission or authorization of the landlord for such property shall not impose any fee on, or collect any fee from, a tenant related to the rental of such property.

b. A landlord is in violation of subdivision a of this section if:

1. a landlord's agent of such landlord violates such subdivision; or

2. any agent who publishes a listing for a rental of residential real property with the permission or authorization of such landlord violates such subdivision.

c. No person shall condition the rental of residential real property on a tenant engaging any agent, including but not limited to a dual agent.

d. No person shall post a listing for the rental of residential real property that represents that fees must be paid in a manner that would violate this section.

e. There shall be a rebuttable presumption that an agent who publishes a listing for a rental of residential real property does so with the permission or authorization of the landlord of such property.

§ 20-699.22 Total fee disclosure. a. Every listing related to the rental of residential real property shall disclose in such listing in a clear and conspicuous manner any fee to be paid by the prospective tenant for the rental of such property.

b. Prior to the execution of an agreement for the rental of residential real property, the landlord or landlord's agent shall provide to the tenant an itemized written disclosure of any fees that the tenant must pay to

the landlord or to any other person at the direction of the landlord in connection with such rental. Such itemized written disclosure shall include a short description of each fee, and the tenant shall sign any such itemized written disclosure prior to signing an agreement for the rental of such residential real property. The landlord or landlord's agent shall retain the signed written disclosure required by this subdivision for 3 years and shall provide a copy of such signed written disclosure to the tenant.

§ 20-699.23 Penalties. a. Any person who violates the provisions of section 20-699.21 shall be subject to a civil penalty of not more than $1,000 for the first violation and not more than $2,000 for each subsequent violation occurring within a two-year period.

b. Any person who violates the provisions of section 20-699.22 shall be subject to a civil penalty of not more than $500 for the first violation and not more than $1,000 for each subsequent violation occurring within a two-year period.

c. In a proceeding alleging a violation of this subchapter, the department may seek an order imposing all applicable civil penalties authorized pursuant to this section and requiring restitution of any fees charged in violation of this subchapter.

§ 20-699.24 Private cause of action. Any person alleging a violation of this subchapter may bring a civil action, in accordance with applicable law, in any court of competent jurisdiction. Such court may order compensatory, injunctive and declaratory relief.

§ 20-699.25 Outreach and education. a. The commissioner shall establish an outreach and education campaign about the provisions of this subchapter. Such outreach and education shall be provided to real estate brokers, tenants, prospective tenants and members of the public who are likely to be affected by this law.

b. The materials required by this section shall be made available on the department's website in English and the designated citywide languages as provided in section 23-1101.

§ 2. This local law takes effect 180 days after it becomes law.

DPM/SS

**File #:** Int 0360-2024, **Version:** A

LS #12679
11/4/24

# Exhibit B

Int. No. 360

By Council Members Ossé, Abreu, Feliz, Hudson, Krishnan, Nurse, Marte, Hanif, Brooks-Powers, Cabán, Sanchez, Louis, Won, Gennaro, Bottcher, Powers, Gutiérrez, Holden, Salaam, Restler, Joseph, Avilés, De La Rosa, Stevens, Farías, Narcisse, Williams, Salamanca, Banks, Riley, Rivera, Ayala and the Public Advocate (Mr. Williams) (in conjunction with the Brooklyn and Queens Borough Presidents)

A Local Law to amend the administrative code of the city of New York, in relation to the fees charged in a residential rental real estate transaction

Be it enacted by the Council as follows:

1        Section 1. Title 26 of the administrative code of the city of New York is amended by adding

2    a new chapter 36 to read as follows:

3                                        CHAPTER 36

4                FEES ASSOCIATED WITH RENTAL REAL ESTATE TRANSACTIONS

5        § 26-3601 Definitions. As used in this chapter, the term "rental real estate transaction"

6    means a residential real estate transaction involving the rental of real property.

7        § 26-3602 Fees in rental real estate transactions. a. A person collecting fees in connection

8    with a rental real estate transaction, whether such person is a representative or an agent of the

9    owner of the property or of the tenant or prospective tenant in such transaction, shall collect such

10   fees from the party employing such person in such transaction.

11       b. This section does not apply to the collection of fees by the owner or landlord of a

12   residential rental property.

13       § 2. This local law takes effect 60 days after it becomes law, and only applies to residential

14   real estate transactions involving the rental of real property entered into on or after the effective

15   date of this law.

Session 13
LS #12679
1/25/2024

1

**JA66**

Session 12
DPM
LS #12679
6/15/2023 3:06 PM

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

REAL ESTATE BOARD OF NEW YORK, INC., NEW :
YORK STATE ASSOCIATION OF REALTORS, INC., :
BOHEMIA REALTY GROUP, BOND NEW YORK REAL :
ESTATE CORP., REAL NEW YORK LLC, LEVEL :
GROUP INC., FOUR CORNERS REALTY, LLC, 21 :
WEST 74 CORP., 8 WEST 119TH STREET HDFC, :
                                    : Civ. No. 24-cv-09678 (RA)
                Plaintiffs, :
                                    : Oral Argument Requested
    v. :
                                      : **NOTICE OF MOTION**
THE CITY OF NEW YORK, *a municipal entity*, VILDA :
VERA MAYUGA, *as Commissioner of New York City* :
*Department of Consumer and Worker Protection,* :
                                      :
                Defendants. :
                                        :
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

      **PLEASE TAKE NOTICE** that, upon the Declaration of Claude G. Szyfer, dated

January 13, 2025, the Declaration of Douglas Wagner, dated December 20, 2024, the Declaration

of Eric Porco, dated December 20, 2024, the Declaration of Robert Rahmanian, dated December

23, 2024, the Declaration of Ryan Foregger, dated December 22, 2024, the Declaration of Sarah

Saltzberg, dated December 23, 2024, the Declaration of Sam Chandan, dated January 10, 2025,

together with the exhibits annexed thereto, and the accompanying Memorandum of Law,

Plaintiffs Real Estate Board of New York, the New York State Association of Realtors, Inc.,

Bohemia Realty Group, Bond New York Real Estate Corp., Real New York LLC, Level Group

Inc., 4 Corners Realty, LLC, 21 West 74 Corp., and 8 West 119th Street HDFC (collectively,

"Plaintiffs"), by and through their undersigned counsel, Hogan Lovells US LLP, hereby move

this Court before the Honorable Ronnie Abrams, United States District Judge, as soon as counsel

may be heard, at the Thurgood Marshall United States Courthouse, 40 Foley Square, New York,

New York 10007, pursuant to Federal Rule of Civil Procedure 65, 28 U.S.C. § 2201, and 42

U.S.C. § 1983, for an order: (1) granting Plaintiffs' Motion for a Preliminary Injunction, and (2)

enjoining Defendants from enforcing the Fairness in Apartment Rental Expenses Act, N.Y.C.

Admin. Code §§ 20-699.20-25.

      **PLEASE TAKE FURTHER NOTICE** that, pursuant to the Court's Order dated

January 10, 2025 (ECF No. 16), the parties will propose a briefing schedule for Plaintiffs'

Motion for a Preliminary Injunction no later than January 15, 2025.


Dated:  New York, New York
       January 13, 2025

                                      **HOGAN LOVELLS US LLP**

                                      */s/ Claude G. Szyfer*

                                      Claude G. Szyfer

Sean Marotta*                          Darya D. Anichkova

J. Andrew Mackenzie (*pro hac vice*)     390 Madison Ave.

555 Thirteenth Street, N.W.         New York, N.Y. 10017

Washington, D.C. 20004            Telephone: (212) 918-3000

Telephone: (202) 637-5600        Facsimile: (212) 918-3100

Facsimile: (202) 637-5910         claude.szyfer@hoganlovells.com

                                        *Counsel for Plaintiffs*

                                      *\* Pro Hac Vice Application Pending*

2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

REAL ESTATE BOARD OF NEW YORK, INC., NEW      :
YORK STATE ASSOCIATION OF REALTORS, INC.,     :
BOHEMIA REALTY GROUP, BOND NEW YORK REAL :
ESTATE CORP., REAL NEW YORK LLC, LEVEL        :
GROUP INC., FOUR CORNERS REALTY, LLC, 21      :
WEST 74 CORP., 8 WEST 119TH STREET HDFC,      :
                                              :  Civ. No. 24-cv-09678 (RA)
                            Plaintiffs,       :
                                              :
        v.                                    :
                                              :
THE CITY OF NEW YORK, *a municipal entity*, VILDA :
VERA MAYUGA, *as Commissioner of New York City* :
*Department of Consumer and Worker Protection,* :
                                              :
                            Defendants.       :
                                              :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DECLARATION OF CLAUDE G. SZYFER IN SUPPORT OF PLAINTIFFS' MOTION**
**FOR A PRELIMINARY INJUNCTION**

**CLAUDE G. SZYFER**, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

1.      I am a Partner at Hogan Lovells US LLP, attorneys for Plaintiffs Real Estate

Board of New York ("REBNY"); the New York State Association of Realtors, Inc.; Bohemia

Realty Group; Bond New York Real Estate Corp.; Real New York LLC; Level Group Inc.; 4

Corners Realty, LLC; 21 West 74 Corp.; and 8 West 119th Street HDFC (collectively

"Plaintiffs") in the above-captioned action.

2.      I respectfully submit this declaration in support of Plaintiffs' motion for a

preliminary injunction to enjoin enforcement of the Fairness in Apartment Rental Expenses Act,

N.Y.C. Admin. Code §§ 20-699.20-25.

**JA70**

3.      Attached as **Exhibit A** is a true and correct copy of the transcript of the minutes of the New York City Council Committee on Consumer and Worker Protection hearing held on June 12, 2024 (the "June 12, 2024 Hearing").

4.      Attached as **Exhibit B** is a true and correct copy of written testimony submitted in connection with the June 12, 2024 Hearing.

5.      Attached as **Exhibit C** is a true and correct copy of a report from the New York City Council Committee on Consumer and Worker Protection regarding Proposed Int. No. 360-A, dated November 13, 2024.

6.      Attached as **Exhibit D** is a true and correct copy of the transcript of the minutes of the New York City Council Committee on Consumer and Worker Protection Stated Meeting held on November 13, 2024.

7.      Attached as **Exhibit E** is a true and correct copy of Int. No. 360-A, as enacted by the New York City Council.

8.      Attached as **Exhibit F** is a true and correct copy of Int. No. 360.

9.      Attached as **Exhibit G** is a true and correct copy of a post from the official X account of Councilmember Chi Ossé, dated November 14, 2024, available at: https://x.com/OsseChi/status/1857088032400155103.

10.     Attached as **Exhibit H** is a true and correct copy of a Brick Underground article titled "2025 NYC real estate forecast: Buyers and sellers tango, renters hold their breath," by Jennifer White Karp, dated January 2, 2025, available at:

https://www.brickunderground.com/rent/what-renters-buyers-sellers-need-to-know-real-estate-forecast-predictions-nyc-2025.  The article reports that:

> [T]he week after the FARE Act passed, Rachel Fiegler, co-founder of the Pinpointe Group, a boutique brokerage, told Brick that a few

2

**JA71**

landlords they work with updated pricing across their portfolios. The owners are offering to pay the fee and have increased rent across all rent on average about 8 percent, she said. "Renters don't care that the law doesn't go into effect till June. They read the news and expect results immediately," Fiegler said.

Ex. H at 4-5.

11.    I declare under penalty of perjury that the foregoing is true and correct.


Dated: New York, New York
       January 13, 2025                    _____*/s/ Claude G. Szyfer*_____
                                              Claude G. Szyfer

# Exhibit A

1

CITY COUNCIL
CITY OF NEW YORK

------------------------ X

 TRANSCRIPT OF THE MINUTES

          Of the

   COMMITTEE ON CONSUMER
   AND WORKER PROTECTION

------------------------ X

                    Wednesday, June 12, 2024
                    Start:   10:07 a.m.
                    Recess:   4:49 p.m.


HELD AT:          COUNCIL CHAMBERS, CITY HALL

B E F O R E:      Julie Menin, Chairperson

COUNCIL MEMBERS:
                  Gale A. Brewer
                  Amanda Farias
                  Shekar Krishnan
                  Chi A. Ossé

**World Wide Dictation** 545 Saw Mill River Road – Suite 2C, Ardsley, NY 10502
Phone: 914-964-8500 * 800-442-5993 * Fax: 914-964-8470
**www.WorldWideDictation.com**

JA74

                                                                    2

          A P P E A R A N C E S (CONTINUED)

          Ahmed Tigani
          First Deputy Commissioner
          Department of Housing, Preservation, and
          Development
          FIRST DEPUTY COMMISSIONER TIGANI:

          President Antonio Reynoso
          Brooklyn Borough President

          Gary Mallon
          Resident of New York City

          Bess Friedman
          Resident of New York City

          Brian Phillips
          Associate Broker
          Douglas Solomon Real Estate

          Ryan Monell
          REBNY

          Jeffrey Hannon
          Real Estate Agent

          Rob Solano
          Executive Director
          Churches United for Fair Housing

          Andrea Joseph
          President
          United Auto Workers Local 4100

          Annie Abreu

3

Law Student

Bradley Tusk
Citizen of New York

Douglas Wagner
Bond New York

Sarah Salzberg
Owner
Bohemia Realty Group

Hal Govsie
Douglas Elliman

Melissa Gomez
Real Estate Agent and Landlord

Anna Klenkar
Broker

Samuel Stein
Senior Policy Analyst
Community Service Society of New York

Allia Mohamed
Co-Founder and CEO
Open Igloo

Michael Corley
Principal Broker
Corley Realty Group

Brendan Griffith
Chief of Staff
New York City Central Labor Council

4

AFL-CIO

Jason Haber
Co-Founder
American Real Estate Association

Anthony Domathoti
Bronx Real Estate Broker

Brian Hourigan
BOND New York

Keyan Sanai
Douglas Elman

Blanca Perez
Citizen of Brooklyn

Augustina Velez
Citizen of Queens

Gladys Pugio[SP?]

Bruno Ricciotti
Co-founder
BOND New York

Mackenzie Ryan
Citizen of Manhattan

Judith Goldiner
Attorney
Civil Law Reform Unit
Legal Aid Society

Gali Davar

5

Legal Intern
Mobilization For Justice

Shasta Spicer
Met Council

Christina Kremidas
Associate Broker
Douglas Elliman Real Estate

Nancy Elton
BOND New York

Barbara Ann Rogers
Associate Broker
Compass

Greg Lynn
Resident, Hell's Kitchen

Ashley Chen
Policy Analyst
Chinese American Planning Council

Alexandra Martinez
Project Manager
New York City Economic Development
Corporation

Marc Burnett
Resident, New York City

Jed Wilder
Living New York

Evan Osur

6

Living New York

Priscilla Jacobs
EXP Realty

Ausar Burke
Organizer
Churches United for Fair Housing

Amy Blumsack
Neighbors Together

Logan Ferris
Political Director
Open New York

Jordan Melkin
NC Pepe Real Estate

Destiny Cruz
New York City Senior Organizer
New York Working Families Party

Arturo Enamorado
PSC CUNY
Professor, Kingsborough Community College

Jonna Stark
Real Estate in Queens

Galloway
Advocacy Manager
Ali Forney Center

Nadia Swanson
Director of Advocacy

7

Ali Forney Center

Esteban Girón
Crown Heights Tenant Union

Adam Graubart
Rabbinical Student

Jimmy Brett
Associate Broker
BOND New York Properties

Michael Matos
US Military Veteran

Yvette Vasquez
Queen's Political Organizer
1199 SEIU

Anna Gardner
Citizen of New York

Sean Davis
Citizen of New York

Claire Baging[SP?]
Resident of Cobble Hill, Brooklyn

Tuval Mor
Corcoran

Elvin Royman[SP?]
Citizen of New York

Dina Lee
Citizen of New York

8

Philip Johnson
Citizen of New York

Boris Youssefov
Citizen of New York

Andrew Funk
Citizen of New York

Delaney Maisel
Citizen of New York

Gordon Lee
Citizen of Brooklyn

Justin DeGulio
Citizen of New York

Benjamin Ellis
Citizen of New York

Allie Seekely
Citizen of Queens

Ajifanta Marenah
Advocacy Program Manager
Muslim Community Network

Jared Gold
Citizen of Queens

Miranda Coplin
Citizen of New York

Summar Omar

9

Public Interest Attorney

Neil Cudjoe
Citizen of New York

Lucy Sexton
New Yorkers for Culture and Arts

Amber Guidati
Citizen of New York

Sharon Brown
Citizen of New York

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION          10

2        SERGEANT AT ARMPITS:  Good morning, ladies and

3    gentlemen--  At this time once again, good morning.

4    Good morning and welcome.

5        [BACKGROUND VOICES]

6        Okay, good morning, and welcome to today's New

7    York City Council hearing for the Committee on

8    Consumer and Worker Protection.  At this time, we ask

9    that you silence all cell phones and electronic

10   devices to minimize disruptions throughout the

11   hearing.  If you have testimony you wish to submit

12   for the record, you may do so via email at

13   testimony@council.nyc.gov.  Once again, that is

14   testimony@council.nyc.gov.  At any time throughout

15   the hearing, do not approach the dais.  We thank you

16   for your cooperation.  Chair, we are ready to begin.

17       [GAVEL]

18       CHAIRPERSON MENIN:  Good morning.  I am

19   Councilmember Julie Menin.  I'm Chair of the consumer

20   and Worker Protection Committee, and I want to

21   welcome all of you to our committee hearing.  Before

22   I begin, let me first acknowledge my colleagues who

23   are present:  Councilmember Hudson, Councilmember

24   Ossé, Councilmember De La Rosa, and I will

25

**JA83**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        11

2    acknowledge additional colleagues as they come in.

3    And we've also been joined by the Public Advocate.

4        So thank you for joining today the hearing on

5    Intro 360 also known as the FAIR Act.  I appreciate

6    that so many people feel so strongly about this bill.

7    We're very appreciative that so many people came out

8    to testify today, and we really look forward to

9    hearing from each and every one of you.

10        Two thirds of New York City's residents are

11    renters, and most of us have had first-hand

12    experience with the stressful and frustrating

13    apartment hunting process.  In many instances, that

14    process includes paying a broker fee to a licensed

15    real estate agent or broker hired by the property

16    owner to advertise the apartment, arrange showings,

17    and put together applications.

18        Brokers fees typically range from one month's

19    rent or 8.3% of the annual rent to 15% of the annual

20    rent or more.  There are currently over 21,000

21    licensed real estate brokers in New York City who

22    assist prospective tenants and property owners by

23    filling vacant apartments with tenants.  Real estate

24    brokership tenants navigate this complex rental

25    market and help property owners facilitate showings

**JA84**

```
 1  COMMITTEE ON CONSUMER AND WORKER PROTECTION        12

 2  and market their available units.  The bill that we

 3  are hearing today, Intro 360, sponsored by

 4  councilmember Ossé, would require that any broker fee

 5  associated with a residential real estate transaction

 6  for a rental property be paid by the individual who

 7  hired the broker to facilitate the transaction.

 8      We look forward to hearing from tenants about how

 9  this bill would impact their ability to lease an

10  apartment.  We look forward to hearing from real

11  estate agents and brokers about how this bill would

12  affect the services they provide.  And we look

13  forward to hearing from the Administration and other

14  stakeholders about how we can make residential real

15  estate transactions more transparent and more

16  equitable.

17      Before we get started, I want to emphasize that

18  today's hearing must be conducted in an orderly

19  manner to ensure that the public has a full

20  opportunity to be heard.  I know we have a lot of

21  speakers today.  So, we want to just make sure

22  everyone understands the Council's rules.  Do not

23  clap, boo, or shout approval or disagreement from the

24  audience.  If you have agreement, this is fine.

25  [MAKES JAZZ HANDS SIGN]  But again, we do not want
```

**JA85**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        13

2    anyone clapping, booing, shouting, or making other

3    noise, because it disrupts the proceedings.

4        If you wish to make a statement, fill out a

5    witness slip with the Sergeant at Arms who are around

6    this room.  Every speaker will have two minutes for

7    the public to be able to testify.

8        I'm now going to turn it over to my colleague,

9    Councilmember Chi Ossé to make a statement on his

10   bill.  Thank you.

11   COUNCILMEMBER OSSÉ:  Thank you so much, Chair

12   Menin, and good morning to everyone here today.  I

13   really appreciate the amount of people that have

14   showed up to testify, both for this bill as well as

15   against.  I thank you for participating in our

16   wonderful democracy.

17       Thank you also to my colleagues and members of

18   the committee.

19       New York City is one of just two major cities in

20   our nation in which tenants are forced to pay the fee

21   for a broker they did not hire.  That system is bad

22   for the economy, brutal for renters, and plainly

23   unfair.  The FARE Act, which stands for Fairness In

24   Apartment Rental Expenses Act, will finally bring

25   fairness to apartment rental expenses.

**JA86**

```
 1  COMMITTEE ON CONSUMER AND WORKER PROTECTION        14

 2      The average move in cost for New Yorkers and new

 3  people living in New York City is now over $10,000.

 4  This is a burden very few people and families can

 5  bear.  We should name those who suffer under the

 6  system of forced broker fees in order to solve the

 7  magnitude of the crisis we are here to solve:  The

 8  union worker unable to move near her job; the young

 9  couple that wants to have a child but can afford to

10  trade in their studio for a two bedroom, so they put

11  off building a family; the graduate moving to the

12  city of for work; and the artist moving here to add

13  to the rich fabric of the world's cultural capital;

14  the woman seeking to leave her toxic relationship,

15  but who stays because she lacks the savings for a new

16  apartment; the immigrant working hard to build a life

17  here; the young man finally ready to move out of his

18  family home, but stay in his childhood neighborhood

19  and is instead driven from New York City altogether.

20      There are a million of these stories and more in

21  the greatest city in the world.  Each story is

22  unacceptable and caused by an exploitative system

23  that exists virtually nowhere else.

24      The FARE Act would end this abuse and be an

25  economic boon to the five boroughs.
```

**JA87**

1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        15

2       Some are here today to argue against this bill.

3   They are mistaken to do so, and I will briefly

4   explain why.

5       They will argue, in testimony prepared largely by

6   the Real Estate Board of New York that the FARE Act

7   is bad for tenants because it will lead to increased

8   rents.

9       This assertion is disingenuous and wrong,

10  primarily for three reasons:  One, nearly half of New

11  York City rental units are rent stabilized, meaning

12  rent legally can't be raised beyond the levels

13  established each year by the rent guidelines board;

14  two rent is determined by market forces, not

15  landlords.  If a landlord could magically raise your

16  rent by several thousand dollars tomorrow, he surely

17  would have yesterday.  The fact that he did not

18  indicates that he cannot, because he is already

19  charging the highest that the market forces of supply

20  and demand will allow.  A landlord can ask for any

21  rent he'd like, but he will only receive only what a

22  tenant can pay.  It's ECON-101.

23      During COVID, when demand fell, rents plummeted,

24  thanks to supply and demand.  If rent were indeed set

25  by landlords and not market forces, they would not

**JA88**

```
 1  COMMITTEE ON CONSUMER AND WORKER PROTECTION        16

 2  have voluntarily slashed it during a period of low

 3  demand.

 4       Three, under the current system of forced broker

 5  fees, tenants are at a disadvantage during lease

 6  renewal, with $10,000 upfront move-in costs,

 7  primarily due to broker fees, a landlord can demand

 8  much higher rent at lease signing, knowing the

 9  "captive tenant" has nowhere to go.  Under the FARE

10  Act, the tenant can freely leave at the end of any

11  lease and use this fact to significantly increase

12  their bargaining power during renewal.

13       In short, the FARE Act will put downward pressure

14  on rents.

15       So now we understand the deep and unjust pain

16  inflicted by broker fees, by forced broker fees, and

17  we understand that the FARE Act would alleviate this

18  pain.  While putting downward pressure on citywide

19  rents, the bill is common sense, which is proven by

20  its endorsements of 33 Councilmembers and 12 labor

21  organizations.

22       I look forward to public testimony, and

23  ultimately bringing America's most expensive city to

24  a new equitable and fair era by passing the FARE Act.

25       Thank you Chair.
```

**JA89**

1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        17

2       CHAIRPERSON MENIN:  Thank you very much.  I'm now

3   going to call on the Public Advocate to make an

4   opening statement.  Thank you.

5       PUBLIC ADVOCATE WILLIAMS:  Thank you, Madam

6   Chair.  My name is Jumaane Williams, and I'm the

7   Public Advocate for the City of New York.  I'd like

8   to thank Chair Menin and members of the Committee on

9   Consumer and Worker Protection for holding this

10  hearing, and Chi Ossé, Councilmember Ossé for

11  introducing this legislation.

12      As a co-sponsor of Intro 360 introduced by

13  complete Ossé, I'm in support of the bill, as it

14  would help shift the significant housing cost to

15  whomever contracts the broker, instead of always

16  falling on the prospective tenant.  To rent an

17  apartment today, prospective tenants usually have to

18  pay a brokerage fee on top of the cost to move in

19  their building, the traditional first month of rent,

20  as well as security deposit for a month or two.

21      Additionally, while illegal, some brokers and

22  property owners do ask for a key fee to transfer the

23  key to the new tenant.  According to StreetEasy, it

24  costs an average of $10,500 to move into an

25  apartment, with the largest portion going to brokers

**JA90**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        18

2    fees.  This system contributes to the city's housing

3    affordability crisis.  As of February 2024, New York

4    City's Department of Housing and Preservation

5    Development, HPD, reported the initial findings of

6    the latest NYC housing and vacancy surveys on HBS to

7    the City Council, and shared the vacancy rate reached

8    a historic low of 1.4%.  Additionally, quote/unquote,

9    "among units renting for under $2,400 the net rental

10   vacancy rate is below 1%."  The vacancy rate dropped

11   over the last two years, even as city has added

12   60,000 new homes.  And findings also communicate that

13   86% of households who earn less than $50,000, without

14   rental assistance are rent burdened.  At the recent

15   2024 preliminary vote meeting, the rent guidelines

16   board proposed further rent increases on rent

17   stabilized tenants, both for one-year and two-year

18   leases.  By removing brokerage fees, this legislation

19   would help the NYC housing market become more

20   elastic, giving tenants more access to housing by

21   allowing them to move more easily and affordably.

22      No other city in the US besides Boston has this

23   unique practice of requiring tenants to pay brokers.

24   It is time for us to ease the burdens of these up-

25   front costs.  And some of the worst examples we've

**JA91**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        19

 2   seen are stories of someone paying a broker fee, and

 3   not being connected to housing or being forced to pay

 4   these fees when they've gone through the process of

 5   finding housing without the assistance of broker

 6   agents.

 7       This bill ensures whoever hired a broker pays

 8   regardless of whether it's a landlord or potential

 9   tenant.  Tenants need to know that they can

10   compensate a broker only when they hire one to

11   represent them, which will provide them with

12   increased transparency and financial relief to up-

13   front rental costs.

14       We are in the midst of trying to build more

15   affordable housing and preserve the housing that we

16   have, while fixing our public housing and other

17   housing systems.  We are trying to help New Yorkers

18   and assist asylum seekers with connecting to home

19   from shelter residents.  All of this can be done with

20   less financial burden on tenants, who should not have

21   to pay additional costs to obtain residents to begin

22   with.

23       I'm coming with experience of having the fear of

24   being a tenant and trying to rent an apartment,

25   having to pay that fee, and also being a landlord,
```

**JA92**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION      20

 2   being told I won't pay the fee, and was very much

 3   relieved back then, not even understanding how that

 4   burden might be felt to the person who will be paying

 5   it.

 6       I did want to just make clear that we are in this

 7   crisis, and our leaders are not doing the best to

 8   help us.  The Mayor rent guidelines board appointees

 9   will now be the second year in a row putting the

10   highest rent that we've seen in the past two decades.

11   The Mayor is fighting the City Council on changes

12   made to rent vouchers.  The Mayor and the Governor

13   have not been very supportive of Good Cause Eviction.

14   The Governor now put money in for new housing

15   vouchers.

16       We have to make some changes, some place, to try

17   to ease the housing crisis that we have.  Those

18   changes are going to be difficult, but we have to

19   find the best way to do it.  I did not support the

20   first iteration ideas of these that were lowering and

21   taking away the broker's fees, but this one seems to

22   be a much fairer balance to make sure that brokers

23   can get paid for the work that they're doing, while

24   releasing some of the pressures of tenants who are

25
```

**JA93**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        21

2    unable to find the housing in this housing market as

3    homelessness increases.  Thank you.

4        CHAIRPERSON MENIN:  Thank you so much.  I also

5    want to mention we've been joined by Councilmember

6    Nurse, Councilmember Avilés, Councilmember Marte.

7        And if anyone needs a device for interpretation,

8    please go to the lobby and you can pick up a headset.

9        We will now call representatives of the

10   Administration to testify.  We'll be hearing

11   testimony from HPDs First Deputy Commissioner, Ahmed

12   Tigani.  I'll now turn it over to the Committee

13   Counsel for the affirmation.

14       COMMITTEE COUNSEL:  Do you affirm to tell the

15   truth, the whole truth and nothing but the truth

16   before this committee and to respond honestly to

17   Councilmember questions?

18       FIRST DEPUTY COMMISSIONER TIGANI:  I do.

19       COMMITTEE COUNSEL:  You may begin.

20       FIRST DEPUTY COMMISSIONER TIGANI:  Good morning,

21   Chair Menin and members of the Committee on Consumer

22   Protection.  My name is Ahmed Tigani, and I am the

23   First Deputy Commissioner at the New York City

24   Department of Housing, Preservation, and Development.

25

**JA94**

1  COMMITTEE ON CONSUMER AND WORKER PROTECTION      22

2  Thank you for the opportunity to testify on the

3  proposed legislation on today's agenda.

4      Our priority at HPD, above all else, is to

5  confront New York City's housing crisis with urgency,

6  dedication, and when needed, creativity.  We are

7  always open to new solutions and are excited by an

8  opportunity to discuss new legislation.

9      All New Yorkers should be able to choose homes in

10  neighborhoods that they love, the communities that

11  they want to build their lives in next.  Some

12  prioritize proximity to local schools, while others

13  prioritize being within arm's reach of a playground,

14  or their place of employment, and weigh numerous

15  considerations about how to make the right choice.

16      As a father to a young child, my family has been

17  faced numerous times with the question of whether

18  where we live provides us the best situation for

19  connecting him to the life we want to give him.  I

20  also think about my single mother's effort to secure

21  housing for our family, and the questions that must

22  have come up for her as a renter with limited

23  resources about how to prepare if we had to make the

24  decision to look for a different home.

25

**JA95**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        23

2         These conversations are felt by New Yorkers of

3    all backgrounds and incomes, in many ways, most

4    acutely for our most vulnerable neighbors, and the

5    decisions become tougher as the situation gets

6    compounded by other external factors.

7         I say this because with an alarmingly low rental

8    vacancy rate, finding an apartment that meets your

9    needs can feel like an impossible task.  At HPD, we

10   want to do everything we can to improve access to

11   affordable housing.  Currently, New York City's

12   vacancy rate sits at a mere 1.41%, the lowest that's

13   been since 1968.  To put that into perspective,

14   during our recent New York City Housing and Vacancy

15   Survey, out of over 2.3 million renter households,

16   there were only about 33,000 homes available for

17   rent.  For lower income New Yorkers seeking

18   affordable housing, these options are essentially

19   nonexistent.  That's why we're deeply committed to

20   improving the process of finding and renting a home

21   in New York City.

22        I firmly believe that the solution to our housing

23   crisis lies in constructing more housing,

24   safeguarding our existing stock of affordable

25

**JA96**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        24

2    housing, and ensuring that New Yorkers have

3    meaningful options in our housing market.

4        The City needs to ensure that there's enough

5    housing of all types, especially low-cost and

6    affordable housing in every neighborhood.  This

7    requires affordable housing development, but also

8    changes that allows the private market to build

9    additional housing that the city needs.  That's why

10   we're working with our partners at the Department of

11   City Planning and across the Administration to

12   implement policies to support a little more housing

13   in every neighborhood, which, taken together, will

14   have a big impact on New Yorkers housing needs.

15       Another part of ensuring that New Yorkers have

16   meaningful Housing Choice is through our tenant

17   protection work.  This includes inspections to

18   enforce the housing maintenance code enforcement

19   programs, focused on the stress buildings through the

20   Emergency Repair Program, Alternative Enforcement

21   Program, the 7A Program and the Underlying Conditions

22   Program.  HPD represents the City in 7,800 tenant-

23   initiated actions in housing court, and initiated 240

24   comprehensive litigation cases seeking civil

25

**JA97**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION      25

 2   penalties in order to correct in the calendar year

 3   2023.

 4       Our anti-harassment unit works to proactively

 5   identify bad actor owners, and when necessary,

 6   initiate litigation to address disruptions of

 7   essential services, false certifications, and failure

 8   to address hazardous violations.  It also includes

 9   ongoing research and education through classes and

10   events, often in partnership with elected officials

11   and community-based organizations to bring housing,

12   information, resources, services, and one-on-one

13   assistance directly to tenants.  We deploy our

14   outreach vans to ensure we can access New Yorkers

15   wherever they are across the five boroughs.

16       It is clear that the proposed broker fee

17   legislation strikes a chord with New Yorkers, and we

18   understand why.  For New Yorkers, moving costs can be

19   prohibitively expensive and a financial barrier to

20   securing housing amongst a limited number of options.

21   The process leading up to a housing search, either by

22   choice or due to unforeseen circumstances, for many

23   households can result in an impossible scenario where

24   you have to choose between paying rent, covering

25   basic expenses or saving for the future.
```

**JA98**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        26

2        At the same time, there is tremendous value in

3    housing search support and the operational knowledge

4    that brokers can provide both tenants looking to find

5    a home, especially in communities where listings are

6    harder to find, and property owners navigating the

7    process of making their units available is

8    invaluable.

9        The Administration is therefore actively

10   evaluating this legislation, carefully considering

11   the potential impacts, both intended and unintended,

12   on tenants, brokers, and landlords.  We take these

13   steps to do our due diligence, because with any

14   legislation, it may have consequences that are

15   difficult to identify and quantify, including

16   potentially passing fees to tenants through other

17   charges or increased rents, particularly for units

18   that are not rent stabilized.

19       We look forward to hearing the public feedback on

20   this legislation today, diving deeper into the policy

21   with the bill sponsors and stakeholders weighing in

22   on this bill, so that there is a robust conversation

23   about ways to ensure New Yorkers have transparency in

24   the rental process.

25

**JA99**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        27

2        On behalf of the Administration, we want to thank

3    the City Council for their leadership on this issue.

4        CHAIRPERSON MENIN:  Thank you very much.  I also

5    want to mention we've been joined by Majority Leader

6    Farias and Councilmember Powers.

7        So I have a number of questions, and then I will

8    turn it over to my colleagues for their questions.

9        How many complaints do you currently get from

10    tenants about brokers fees, and what is the nature of

11    those complaints?

12        FIRST DEPUTY COMMISSIONER TIGANI:  I don't have

13    exact number on complaints that we get about broker

14    fees.  Broker fees are-- as many fees related to the

15    non-regulated or the private market units are subject

16    to state regulation, so they don't normally-- or they

17    wouldn't be channeled through HPD.

18        CHAIRPERSON MENIN:  And in terms of your position

19    on Intro 360, obviously you testified about it.  What

20    would the Administration suggest in terms of

21    enforcing Intro 360?

22        FIRST DEPUTY COMMISSIONER TIGANI:  Based on my

23    understanding, the enforcement of fees of this nature

24    live within state regulation, and additionally

25    anything related to the profession of--

1   COMMITTEE ON CONSUMER AND WORKER PROTECTION       28

2       CHAIRPERSON MENIN:  I'm sorry, can you repeat

3   that?

4       FIRST DEPUTY COMMISSIONER TIGANI:  So fees of

5   this nature are typically subject to state

6   regulation, which is my understanding.  We are

7   reviewing the legislation as an administration and

8   trying to make sure that we understand it thoroughly.

9   But that, in addition to the licenses, which are

10  overseen by the Department of State, both seem to be

11  on a state level regulation.

12      CHAIRPERSON MENIN:  How does HPD interact with

13  brokers fees for projects that HPD funds?

14      FIRST DEPUTY COMMISSIONER TIGANI:  So, for HPD

15  projects, any administrative fees associated with our

16  regulated units are part of a management plan that

17  needs to be approved by HPD.  We do not have broker

18  fees in our regulated projects.  There are some fees

19  that may be allowed for special housing types like

20  Mitchell-Lama, but we have no broker fees.

21      We work-- We put our units out to the public

22  through Housing Connect, and the managing agents that

23  work with owners in that process are part of that

24  process.  There is no application fee or broker fee

25  connected to that work, in the Housing Connect work.

**JA101**

```
 1  COMMITTEE ON CONSUMER AND WORKER PROTECTION        29

 2  With voucher work, that exists in a different space,

 3  and broker fees may be involved, but for many people,

 4  they may have access to broker fee support through

 5  HRA.

 6      CHAIRPERSON MENIN:  Now, you mentioned that

 7  you're not receiving complaints directly about

 8  brokers fees.  But have you looked into any ways that

 9  tenants can convey concerns directly to HPD?

10      FIRST DEPUTY COMMISSIONER TIGANI:  I will--

11  First of all, I will go and double check and make

12  sure that-- if there is a number that we report to

13  the Council.  But since it does not typically come to

14  HPD rather than 311, the City does have, through the

15  Tenant Protection Cabinet, a tenant helpline.  The

16  Tenant Helpline is staffed by housing specialists

17  that can help direct questions about relief or

18  questions about the legality of any particular fees

19  to the right enforcement agency.

20      So, a tenant can either call 311 to be connected

21  to the Tenant Helpline, they can go online to the

22  website that has a centralized bank of information to

23  be able to get resources and know where to go, and

24  there's some automated chat features to help with

25  some basic questions.
```

**JA102**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        30

2       CHAIRPERSON MENIN:  Okay.  I'm going to pass it

3    on to my colleague, Councilmember Ossé, and then

4    other colleagues for their questions.

5       COUNCILMEMBER OSSÉ:  Thank you, Chair menin, and

6    good morning.  I know that initially, DCWP, the

7    Department of Consumer and Worker Protections, was

8    supposed to testify today, but they were unable to.

9    I know that they're going to be the, or would be the

10   potential agency to provide enforcement if this bill

11   were to pass.  I am aware that most of HPD's purview

12   and enforcement power lies with protecting existing

13   tenants in their current housing situation and

14   holding landlords accountable, not necessarily, the

15   real estate transactions that happen before a tenant

16   becomes a resident of the building.

17      Can HPD potentially expand its current programs

18   or initiatives, such as the Office of Tenant

19   Harassment, or expand their Certificate of No

20   Harassment to protect prospective tenants, landlords,

21   and brokers in a rental transaction?

22      FIRST DEPUTY COMMISSIONER TIGANI:  I-- Again,

23   these are questions that we're looking at.  I would

24   say that if these issues come up through our

25   proactive anti-harassment work, or if questions come

**JA103**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        31

 2   up through the Tenant Helpline, or in any of our

 3   outreach events and engagement activities, we would

 4   make sure that that tenant would be directed to the

 5   proper enforcement agency to seek relief.  Yes.

 6       COUNCILMEMBER OSSÉ:  And what agency would you

 7   feel is best suited to handle this enforcement then?

 8       FIRST DEPUTY COMMISSIONER TIGANI:  Uh, DCP can

 9   speak to that question.  But as I mentioned earlier,

10   the Administration is reviewing this and can come

11   back with further options.

12       COUNCILMEMBER OSSÉ:  Right.  Because I know that

13   HPD is not the agency that would provide enforcement

14   for this, and I know DCP was initially going to

15   provide testimony, I don't have any further

16   questions.  Thank you.

17       CHAIRPERSON MENIN:  Thank you.  I'm now going to

18   call on Councilmember Hudson for her question.

19       COUNCILMEMBER HUDSON:  I actually was going to

20   ask if you could speak to why DCWP isn't here.  It is

21   all of our understanding that they would be the

22   agency to enforce such a bill, and the Administration

23   sent HPD instead of DCWP.  So, I don't know if you're

24   authorized to speak on that, but I would love to know

25   why DCWP isn't actually here.
```

**JA104**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        32

2        FIRST DEPUTY COMMISSIONER TIGANI:  I can't speak

3    to why DCWP is not here.  I can say that HPD wanted

4    to be here to answer any questions about housing

5    market information, our experience with creating

6    housing.

7        The larger thought we just want to continue to

8    enforce is that now that we are in a housing crisis

9    that's been mentioned by many people here, and prior

10   to this hearing, we want to emphasize the focus on

11   making sure that we're building and creating new

12   housing and preserving housing.  But I can't speak to

13   the reason the other agency is not here.

14       COUNCILMEMBER HUDSON:  I'll say just for the

15   record.  I mean, we certainly appreciate HPD's

16   willingness to be here as a city agency that would, I

17   think, in part, be associated with, with what we're

18   talking about.

19       But I also want to state for the record that the

20   fact that DCWP, who would be the primary agency

21   responsible for such a bill is not here is noted.  It

22   also hinders our ability as Councilmembers to ask the

23   most appropriate questions and to get relevant

24   answers.  So, thank you for being here.  But I just

25   want to make clear to everybody that's here and

**JA105**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        33

2    again, for the record, that without the agency solely

3    responsible for implementation of this bill, it makes

4    it really difficult for us to get the answers and to

5    have the productive and constructive hearing that we

6    were hoping to have this morning.  So, thank you,

7    everyone for being here, but DCWP really should be

8    here as well.  Thanks.

9        FIRST DEPUTY COMMISSIONER TIGANI:  The only thing

10   I'll add, I appreciate that Councilmember, I will

11   just emphasize, as an administration, all the

12   relevant agencies, the law department, these are-- we

13   are in active conversations, so we will be listening

14   to the feedback and the questions that come out of

15   this discussion at this point in the process, and

16   making sure that we're bringing back ideas and

17   continuing the discussion with Council.

18       COUNCILMEMBER HUDSON:  Yeah.  And again, we

19   appreciate that from you, but I'm making my point

20   about DCWP.  Thank you.

21       CHAIRPERSON MENIN:  The Public Advocate?

22       PUBLIC ADVOCATE WILLIAMS:  Thank you.  And I want

23   to associate myself with everything the Councilmember

24   said.  I know you don't have specific information

25   about complaints.  The information that you do have:

**JA106**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        34

2    Has it been shown that the broker's fees have been

3    prohibitive for some folks to get into housing?

4        FIRST DEPUTY COMMISSIONER TIGANI:  I think-- I

5    think basically, the combination of both the low

6    vacancy rate and our inability to build the supply

7    that we need has-- We know that there's pressure.

8    There's a number of different pressures on the

9    market.  Both our zoning and our regulatory

10   environment is not as equipped to be able to build

11   the supply that we need, which then creates a lot of

12   pressure on both-- on all the actors in the housing

13   industry.

14       So, you know, the reason why-- I think-- As I

15   said, we're excited to talk about new legislation is

16   that we're looking for as many ways as we can to

17   create transparency, and access, and maneuverability

18   in the housing market.

19       PUBLIC ADVOCATE WILLIAMS:  You mentioned a couple

20   of forces that are making it difficult.

21       FIRST DEPUTY COMMISSIONER TIGANI:  Yes.

22       PUBLIC ADVOCATE WILLIAMS:  Is the entry into

23   housing, including brokers fees, one of those things?

24       FIRST DEPUTY COMMISSIONER TIGANI:  That's not a

25   data point that I have, so I can't speak to it in any

**JA107**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        35

 2   quantitative manner.  I know that basically we are--

 3   we are seeing that there are multiple ways that

 4   creating access to housing is difficult.  Sometimes

 5   it has to do with the availability of a unit to be

 6   rented at that point, because of the condition of

 7   that unit.  It has to do with navigating any

 8   regulatory pieces to putting a unit up and then

 9   finding and going through any process to bring a

10   tenant into that unit.

11       You know, in our regulated housing it's something

12   that we have constantly looked at.  It's the reason

13   why we've removed paperwork from the process.  We've

14   gotten rid of credit checks for tenants with rental

15   assistance.  We're looking at reducing the income

16   eligibility paperwork, so that people can move

17   through the process faster, moving the file

18   information review to the back-end audit.  We see

19   that through the overall process of bringing tenants

20   into housing, there could be improvements being made,

21   and there are similarities in the private market as

22   they go through the tenant selection process.

23       PUBLIC ADVOCATE WILLIAMS:  And you don't have

24   the-- You say you don't have the data point.  Who

25   would have the data?
```

**JA108**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        36

 2       FIRST DEPUTY COMMISSIONER TIGANI:  You know, I

 3   can go back and talk to others in the Administration.

 4   We can reach out to 311 and see what complaints that

 5   they have, and come back to you.

 6       PUBLIC ADVOCATE WILLIAMS:  Thank you.

 7       CHAIRPERSON MENIN:  Great.  Thank you so much.

 8   Now I'm going to turn it over for questions to

 9   Councilmember Nurse followed by Councilmember Avilés.

10       COUNCILMEMBER NURSE:  Thank you, Chair.  So, you

11   right now are basically saying you have zero data

12   points to offer in this hearing, a hearing that you

13   knew was going to be about broker fees.  You have

14   literally zero data you're not able to answer any

15   questions.  Can you explain to me exactly what the

16   relationship of HPD is to broker fees of any point?

17   To enforcement, to advising or putting any input on

18   this system of broker fees in the city?

19       FIRST DEPUTY COMMISSIONER TIGANI:  I can

20   Councilmember.  So, I think one thing, one role that

21   HPD is playing in the evaluation of the bill is to

22   understand what could be the intended and unintended

23   consequences of a bill.

24       COUNCILMEMBER NURSE:  So, what are those intended

25   and unintended consequences?
```

**JA109**

1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        37

2       FIRST DEPUTY COMMISSIONER TIGANI:  Sure.  So,

3   there are-- You know, basically there are costs

4   associated with renting a unit, and understanding how

5   those costs shift when things are allowed and not

6   allowed is one thing that HPD could lend its

7   expertise.

8       COUNCILMEMBER NURSE:  So do you have something

9   conclusive to offer today?

10      FIRST DEPUTY COMMISSIONER TIGANI:  As I mentioned

11  earlier, the Administration continues to review the

12  legislation and are waiting to hear more feedback,

13  talk to the Council, continue that evaluation with

14  other agency partners.

15      COUNCILMEMBER NURSE:  I just want to say, I think

16  you have wasted-- maybe not you personally, because

17  I'm sure you didn't make this call, but this

18  Administration has wasted our time today.  You all

19  knew that many people were going to be here today,

20  because this clearly impacts so many New Yorkers, and

21  you all showed up with no data, no input, nothing

22  conclusive, no analysis to offer on this bill.  It's

23  embarrassing, truly embarrassing.

24      People here-- There's a lot of people here who

25  have something to say.  They want to actually make a

**JA110**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        38
 2   system that works in the middle of a housing crisis,
 3   and they left you on the chopping block, to come here
 4   and have no input on this.  I mean, this is just--
 5   this is disgusting.  It truly is.  I'm-- I am livid
 6   right, now because I'm a tenant.  A lot of people
 7   here are a tenant.  A lot of people in this room are
 8   tenants.  We are desperate.  And you have come here
 9   with nothing to offer, not even substantive debate.
10   It's one thing if you came and said, "We disagree
11   with this bill, and here's why, point one, two,
12   three."  But you're not even coming with that.  What
13   you're saying is a lot of nonsense sentences.
14      FIRST DEPUTY COMMISSIONER TIGANI:  Councilmember
15   with due respect, I-- You know, I've come here as a
16   representative of the Administration to say that we
17   believe that there is an important discussion here.
18   We believe that there are elements of the housing
19   industry where we can continue to work to push for
20   better access for tenants into housing.  We have been
21   successful in some parts in our regulated stock.  We
22   believe that there is a discussion where we need to
23   hear from stakeholders.  That's what this hearing is
24   set up to do, what we've convened.  We want to hear
25   this information, take that into our evaluation, and,
```

**JA111**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        39

 2   like all pieces of legislation, continue the

 3   discussion with the Council after today.

 4       COUNCILMEMBER NURSE:  You knew this was coming,

 5   even if you're not the agency that has to directly

 6   deal with this.  If it was me, I would have come

 7   prepared, no matter what my boss told me, because I

 8   would never want to show up to something unprepared

 9   like this.  Thank you Chair.

10       CHAIRPERSON MENIN:  Thank you.  Now,

11   Councilmember Avilés.

12       COUNCILMEMBER AVILÉS:  Thank you Chair.  I share

13   my colleagues frustration here.  To spend time--  The

14   amount of effort that goes in to getting us all here

15   to this table, months of activity, to sit in front of

16   a dais that is empty with such a critical issue is

17   truly a slap in the face, and it seems to be a

18   hallmark of this Administration.

19       I thank you for being here, and I know you do

20   good work at HPD, but I think you've also answered

21   our question when you noted HPD projects don't have

22   broker's fees because you are working to make sure

23   that the most vulnerable New Yorkers, those with low

24   incomes, those working-class New Yorkers, are going

25   to get access to units.
```

```
 1  COMMITTEE ON CONSUMER AND WORKER PROTECTION       40
 2      So you have answered the question for us, despite
 3  having no information for us.  And I will say it is
 4  unconscionable that in a housing crisis, we have an
 5  Administration that won't even come to the table with
 6  some analysis, that won't contribute to a
 7  constructive conversation, because this impacts so
 8  many lives, both the brokers who are here, the
 9  renters who are here, and families who cannot live in
10  neighborhoods because they can no longer afford to do
11  so.
12      We need to do better.  And you have an analysis.
13  This Administration has experience, and has analysis,
14  it has research, it has capability, and it
15  demonstrates nothing.  It is truly unfortunate.  And
16  I hope everyone in this room, no matter what your
17  feeling is on this system, the fact that we cannot
18  engage in a dialogue.  That you're listening, when
19  you know this is a crisis is truly appalling.  And I
20  don't mean to direct that to you.  I am talking to
21  the Administration and the executive apparatus that
22  has millions of dollars at its disposal, many, many
23  full-time staff, that you do not come here to have a
24  full and honest discussion about what is occurring on
25  the ground.
```

**JA113**

```
1    COMMITTEE ON CONSUMER AND WORKER PROTECTION      41

2        So, I'm sorry, Chair.  Thank you for that.  Thank

3    you for the time.

4        CHAIRPERSON MENIN:  Thank you very much.  So, I'm

5    going to make a request, because quite honestly, as a

6    Chair of this Committee, we have over 400 people that

7    are signed up.  I'm going to be here honestly all

8    night, along with my colleague, Councilmember Ossé,

9    to hear from the public.  And so, no matter where one

10   stands on the bill if you're strongly for it, if

11   you're strongly against it, the data is important.

12       So, I started off the hearing with unbelievably

13   rudimentary data questions that are, you know, no

14   matter where one stands on the bill, we just want to

15   have this data.  How many broker-- complaints about

16   brokers fees?  How many tenant complaints do you have

17   about brokers fees?  What is the content of those

18   complaints?  What is HPD doing in terms of their own

19   projects and brokerage fees?

20       So, I'm going to ask that this committee get the

21   data by 5pm today.  So, while we are still here

22   speaking to the public, we have the necessary data to

23   properly conduct this hearing.

24       Thank you, and now turn it over to Councilmember

25   Ossé.
```

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        42

2        COUNCILMEMBER OSSÉ:  Thank you so much, Chair

3    Menin.  I wanted to follow up on a point you made

4    about this being a state regulation or a-- can you

5    speak to why you believe that is the case?

6        FIRST DEPUTY COMMISSIONER TIGANI:  Yes.  So, on

7    the licenses, I think it's a fairly well-documented

8    where licenses for real estate brokers exist, and so

9    anything related to that profession would live there.

10   On--  When it comes to things related to rental

11   payments in the private market, non-HPD regulated

12   housing, we would-- we usually defer that to state

13   regulation.  More often than not, it lives within the

14   Office of Rent Administration within HDR.

15       COUNCILMEMBER OSSÉ:  Okay, so that's the only

16   thing you came here with.  And I disagree with that

17   statement on multiple reasons.  One, the state deals

18   with rent and setting rents.  The broker fee is a fee

19   that is not considered rent.  It is a prepayment or a

20   payment for a service, right?

21       Two, the Albany Supreme Court struck down the

22   2020 Guidance because of two issues:  One, the

23   guidance was ordered by an agency in the Department

24   of State and not the legislative body.  The judge

25   ruled that an agency could not and does not have

**JA115**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        43

2    lawmaking authority if you are referring to the law

3    of 2020.

4        Third, the Department of State, through its real

5    estate board, governs the licensure, as you said, and

6    continuing education of real estate state

7    salespersons and brokers.  The board deals with the

8    laws written in Article 12-A of the state's real

9    property law.  Currently, there is no statute or law

10   in Article 12-A that would likely preempt the City

11   from legislating on who pays for the broker fee.

12       The primarily the--  Primarily the laws in

13   Article 12-A that deal with compensation are laws

14   that talk about who the broker can split fees with,

15   or who a real estate salesperson can receive

16   compensation from.

17       And I think you-- you hinted at a point about

18   this potentially not being a city--

19       FIRST DEPUTY COMMISSIONER TIGANI:  No.  I-- As

20   far as-- Two things:  One DOS passed guidance, not a

21   law, and it was based on a 2019, piece of state law,

22   which is why I was referring to the state law--

23       COUNCILMEMBER OSSÉ:  Okay.

24       FIRST DEPUTY COMMISSIONER TIGANI:  --and that

25   oversight.  As far as the City's position on whether-

**JA116**

1  COMMITTEE ON CONSUMER AND WORKER PROTECTION        44

2  - on the bill and regulatory power, that's still--

3  that's still something that's being reviewed.

4      COUNCILMEMBER OSSÉ:  Being discussed.  Right.

5  So, I'll just speak to that.  Because the government

6  can regulate.  The city government can regulate

7  private businesses to promote the public's health,

8  safety, welfare, and morals.  The Council has passed

9  numerous resolutions declaring an emergency with the

10  city's housing crisis.  Therefore, this is a public

11  need we need to address, and there can be legislation

12  like the FARE Act that seeks to address this public

13  need.  So, maybe bring that back to the Admin and

14  future discussions.

15      FIRST DEPUTY COMMISSIONER TIGANI:  Yes, sir.

16      COUNCILMEMBER OSSÉ:  Thank you.

17      CHAIRPERSON MENIN:  Okay, Councilmember Powers.

18      COUNCILMEMBER POWERS:  Thank you.  Nice to see

19  you, Commissioner.  Thank you Chair Menin and

20  Councilmember Ossé for having this hearing today.

21      I found last term, when looking at the data, the

22  actual difficulty is finding real data on this

23  because they're a series of private transactions

24  happening, and getting to the real data points--

25  There are data points, I think, that the

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION          45

2    Administration could look at, or even the Council

3    could look at it, which is even just a prevalence of

4    the fees.

5        I think my office looked at my district on

6    StreetEasy found about 50% of the apartments listed

7    on there (back then, I mean I could dig up the old

8    data) were-- had a fee and 50% didn't.  I don't know

9    what those datapoints are now, but in fairness, it's

10   extremely difficult to get data on this, which might

11   be the reason, whether you believe in the fee or not

12   believe in the fee, there still may be a need for

13   some regulatory action here, because I think we are

14   talking about a series of transactions with a lot of

15   money involved, that I think there are serious

16   concerns around how they impact tenants.  And of

17   course we're going to hear from brokers on their

18   impact today.

19       But I think whatever it is, I think there's a

20   need for information and regulatory action, and also

21   the City be more involved in this, because I think

22   there are--  A lot of the reason we're not getting

23   data on 311 is because New Yorkers are not going to

24   turn to the city, in my view, unless it's a really

25   predatory action or something that takes place.

**JA118**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION         46

 2       So, I think the reason we're here today is to

 3   have a conversation about the fees, but also about

 4   how we might be able to have more information in the

 5   future.  So, I recognize the challenge faced here by

 6   the Administration, and you about exactly trying to

 7   get to the type of data that you would want to be

 8   able to provide today, which is, I think, a good

 9   reason for having this hearing.

10       I just wanted to go back to a couple things.  I

11   think this was mentioned earlier, but HPD units that

12   are marketed do not have a broker fee on them.

13       FIRST DEPUTY COMMISSIONER TIGANI:  HPD units that

14   go through our finance and go through our regulatory

15   agreement process do not have a broker fee.  Any

16   administrative fees that are connected to it would go

17   through a management plan that we review and approve.

18       There's also no application fees as part of

19   Housing Connect.  There are certain housing types

20   that may have costs or fees associated, like

21   Mitchell-Lama, but those go through a review and also

22   need to be approved if any move forward.

23       COUNCILMEMBER POWERS:  And there's no fees

24   because that's a-- that's a prohibition that has been

25   put in place by HPD?  Or because you are-- have some
```

**JA119**

1   COMMITTEE ON CONSUMER AND WORKER PROTECTION   47

2   good.  Roll over those units and you're choosing not

3   to?

4     FIRST DEPUTY COMMISSIONER TIGANI:  It's a

5   different produced housing.  Like the costs and the

6   financing and the pre development process to go from

7   no project to project involves public subsidies.  So,

8   there's already been certain investments made up

9   front.  When we're working with the private market

10   and trying to connect people to housing using rental

11   assistance, depending on the rental assistance source

12   there may be-- there are broker fees sometimes

13   involved, and those broker fees can be covered by

14   different programs that we have.  CityFHEPS has a

15   broker fee voucher application eligible individuals

16   may be able to apply to.  When the federal government

17   had the emergency housing voucher program, we had the

18   ability to use broker payment vouchers as a way to

19   create more opportunities for tenants.  In fact, in

20   that situation, brokers were integral into helping us

21   navigate a low-vacancy environment and connect people

22   to housing in a time limit where we had to connect

23   many people with vouchers to housing while the

24   opportunity existed.  And there may be-- And there

25   are sometimes opportunities for standard voucher

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        48

2    holders to get broker fee assistance through help

3    with HRA if they eligible.

4       COUNCILMEMBER POWERS:  Thanks.  I think

5    Councilmember Ossé asked this question.  I just

6    wanted to repeat it.  Can you talk, as you're

7    evaluating this legislation, what are the factors

8    that you are considering?  You guys don't have a

9    stated position here today, and certainly a public

10   hearing is a good opportunity to hear from everyone

11   exactly on their sentiment.  But can you talk more

12   about what are the issues you are evaluating in the

13   process of determining the Administration's position

14   on it?  Because I-- It's fairly vague here now, and I

15   wanted to get a better understanding of what you guys

16   are thinking about as you decide if this bill passes,

17   whether to sign it, veto it, let it pass into law.

18      FIRST DEPUTY COMMISSIONER TIGANI:  Sure.  So, I

19   think that there-- there are a number of fees and

20   costs associated with housing, some of it regulated

21   by the 2019 state law that we've talked about

22   earlier, but particularly in non-regulated, non-rent-

23   regulated housing, market housing as it's often

24   referred to, costs can be pushed into other areas of

25   the housing search and lease-up process.  So, we're

**JA121**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        49

2    trying to look at the different ways that that may

3    happen, different permutations.

4        Additionally, we want to understand better the

5    impact this may have on an industry that employs many

6    New Yorkers here within the city.  And those two

7    factors, in itself, require a deeper analysis from

8    multiple agencies, both in the housing front, housing

9    supply, access, and economic development front, and

10   workforce development front.

11       COUNCILMEMBER POWERS:  Okay, thank you.

12       CHAIRPERSON MENIN:  Okay.  Thank you very much.

13   So, I'm going to ask the Sergeant Of Arms to just--

14   These are the questions that I asked at the top.  So,

15   we'd like to get answers by 5pm, so we can study

16   them.  So, Carl, do you mind passing that?  Thank you

17   so much.

18       And seeing no more questions, I want to thank you

19   for testifying today, and we are now going to move on

20   to the public comment period.

21       So, I'm now opening up the hearing for public

22   testimony.  I want to remind members of the public

23   that this is a formal government proceeding and that

24   decorum shall be observed at all times.  As such,

25   members of the public shall remain silent at all

**JA122**

1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        50

2   times.  Again, if you agree with the speaker, feel

3   free to do this [MAKES JAZZ HANDS GESTURE], but

4   otherwise people need to remain silent.

5       The witness table is reserved for people who wish

6   to testify.  No video recording or photography is

7   allowed from the witness table.  Further, members of

8   the public may not present audio or video recordings

9   as testimony, but they may submit transcripts of such

10  recordings to the Sergeant at Arms for inclusion in

11  the hearing record.

12      If you wish to speak at today's hearing, please

13  fill out an appearance card with the Sergeant at Arms

14  and wait to be recognized.  When recognized, you will

15  have two minutes to speak on today's topic, which is

16  obviously Intro 360.  If you have a written statement

17  or additional written testimony you wish to submit

18  for the record, please provide a copy of that

19  testimony to the Sergeant at Arms.  You may also e-

20  mail written testimony to testimony@council.nyc.gov

21  within 72 hours of this hearing.  Audio and video

22  recordings will not be accepted.

23      So, I'm now going to call our first panel.  So,

24  our first panel is Brooklyn Borough President Antonio

25  Reynoso.  Borough President?

**JA123**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        51

2        BOROUGH PRESIDENT REYNOSO:  Good morning,

3    Council.  I'm grateful to be an entire panel.  I just

4    want to say, I apologize.  It is embarrassing, and it

5    is sad that there are many people here for or against

6    this legislation that would love to really get to the

7    bottom of data that supports the case that's being

8    made by Councilmember Chi Ossé and his legislation.

9    Instead, we're going to be relegated to having a

10   conversation that we've already had in the public.

11   We are wasting time.  This is a literal waste of

12   time.

13       From what I understand, I don't know if anybody

14   from the Administration has even stayed to listen to

15   the testimony of all these people that care deeply

16   about this issue one way or another.

17       Another thing is putting Ahmed Tigani, who is

18   arguably one of the hardest working and most lovable

19   kind servants for the City of New York in front of

20   us:  It's not a mistake.  That is not by-- by chance,

21   that he's the one that's here.  So, I just want to

22   shout out Ahmed and the great work that he does.  And

23   this is obviously not a reflection of his work, but

24   more a reflection of this Administration.

25

**JA124**

```
 1  COMMITTEE ON CONSUMER AND WORKER PROTECTION       52

 2      I guess I'll speak to my testimony, which, again,

 3  I want to say, really I'm not happy that I'm spending

 4  time here when I could have been doing other things

 5  in Brooklyn.

 6      So, first, I am Antonio Reynoso, and I'm the

 7  President of the greatest borough in the City of New

 8  York, which is Brooklyn, New York, but I--

 9      [BACKGROUND VOICES]

10      Amanda Farías, Councilmember, is arguably from

11  one of the next-best boroughs in this city.  But it's

12  all love.  We're from Brooklyn, so we always show

13  love.

14      Good morning, Chair Menin.  Thank you for holding

15  this hearing today, and thank you to Councilmember

16  Ossé for introducing this important and common-sense

17  bill.

18      No one here, not even the landlords, needs to

19  tell me that you-- that we are experiencing a housing

20  crisis.  But because we are not building enough, New

21  York City's vacancy rate is the lowest it's been

22  since 1968.  Fewer apartments are available across

23  all rent levels, meaning it's especially difficult

24  right now for low- and moderate- income New Yorkers

25  to find secure housing.
```

**JA125**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        53

 2      [BELL RINGS]

 3      I guess--  There you go.  Thank you so much for

 4   having me.

 5      CHAIRPERSON MENIN:  If you want to--

 6      BOROUGH PRESIDENT REYNOSO:  I don't want to

 7   continue.

 8      CHAIRPERSON MENIN:  I think there's some

 9   questions for you, so...

10      BOROUGH PRESIDENT REYNOSO:  Questions I'll

11   answer, but I just don't want to waste anybody else's

12   time that's behind me, because you guys are going to

13   be here a long time, and I want to make sure they get

14   their time.  But I'm more than happy to answer

15   questions.  Thank you Chair.

16      CHAIRPERSON MENIN:  Thank you so much, Borough

17   President, for being here, and I'm going to turn it

18   going to turn it over to Councilmember Ossé, who has

19   some questions for you.

20      COUNCILMEMBER OSSÉ:  Thank you, Borough

21   President.  Has your office had any complaints from

22   constituents about the broker fee or having been

23   forced to pay a broker fee?

24      BOROUGH PRESIDENT REYNOSO:  We-- We originally

25   weren't receiving any information or gathering
```

```
 1  COMMITTEE ON CONSUMER AND WORKER PROTECTION        54

 2  information related to broker fees until your

 3  legislation came up.  Then there was deep support

 4  that was coming in for my advocacy, for the FARE Act.

 5      So, I want to say that I think your advocacy and

 6  the introduction of the legislation was the first

 7  time we started getting questions or requests for

 8  advocacy from Brooklynites for this legislation.

 9      COUNCILMEMBER OSSÉ:  Okay.

10      BOROUGH PRESIDENT REYNOSO:  So, we don't-- we

11  don't have the data, but are more than happy to pull

12  it up from our constituent services, the amount of

13  calls we've gotten to the concerns related to the--

14  to the FARE Act.

15      COUNCILMEMBER OSSÉ:  That would be really helpful

16  if you can get that whenever you can.

17      BOROUGH PRESIDENT REYNOSO:  Will do.  Will do.

18      COUNCILMEMBER OSSEE:  That would be very

19  supportive.  Thank you.

20      BOROUGH PRESIDENT REYNOSO:  Thank you.  And I

21  just-- On a personal experience, I note,

22  Councilmember, I paid $7,500 to get into my apartment

23  through a broker fee, and a first and second month's

24  rent.  I think I want to say in 2000-and-like-9.  And

25  it was very difficult for me to-- who is well-- well-
```

**JA127**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        55

 2   off.  You know, middle class.  Everyone knows my

 3   salary here.  I knew my salary when I was a

 4   Councilmember.  But when I was a Councilmember it was

 5   very difficult.  And those challenges are real, and

 6   people that experience it, you know, paying $5000

 7   versus $7500 would have been a big difference to me

 8   and my family as we were growing, and I wasn't able

 9   to experience it.  So, I'm not only here on a

10   professional level, I'm here on a personal level as

11   well.

12       COUNCILMEMBER OSSÉ:  In that experience, did you

13   go out to hire the broker?

14       BOROUGH PRESIDENT REYNOSO:  No.  I never saw the

15   broker in my life.

16       COUNCILMEMBER OSSÉ:  You never saw them?

17       BOROUGH PRESIDENT REYNOSO:  Never saw the broker.

18   I saw it online.  I went to go visit the apartment,

19   and it came with a first, second-- what was called

20   the security-- a first month's security and broker

21   fee.  And I had to pay all three of them in one shot.

22       COUNCILMEMBER OSSÉ:  $7,500?

23       BOROUGH PRESIDENT REYNOSO:  7500 bucks.  Yeah.

24   And I think that was in--  It was a long time ago.

25   It was in-- not in the apartment I am now, but in the
```

**JA128**

```
 1  COMMITTEE ON CONSUMER AND WORKER PROTECTION        56

 2  apartment I was in before.  I'm still a tenant.  I

 3  also had to pay for the broker fee for this house,

 4  which I found on my own as well.

 5      COUNCILMEMBER OSSÉ:  Twice.

 6      BOROUGH PRESIDENT REYNOSO:  So-- So, this is the

 7  second time, but this one was just the first month's

 8  and a broker fee for the new apartment.  But the

 9  broker fee was something I had to pay both times.

10      COUNCILMEMBER OSSÉ:  Thank you.

11      CHAIRPERSON MENIN:  Thank you very much, Borough

12  President, being here.

13      BOROUGH PRESIDENT REYNOSO:  Thank you so much for

14  this important hearing.

15      CHAIRPERSON MENIN:  Thank you.  I'm now going to

16  call the first panel is going to be Gary Mallon, Bess

17  Friedman, Brian Phillips, Ryan Monnel.  And while

18  they're coming up, just in the interest of time, I'm

19  going to let the second panel, know, so they can

20  start to get ready:  Rob Solano, Andrea Joseph,

21  Jeffrey Hannon, Annie Abreu, and Bradley Tusk on

22  Zoom.  Thank you. yyy

23      Okay.  Okay, thank you.  Please begin.

24      COUNCILMEMBER OSSÉ:  Press the-- Press the mic.

25
```

**JA129**

```
 1    COMMITTEE ON CONSUMER AND WORKER PROTECTION          57

 2         MR. MALLON:  Ah, thank you, ladies and gentlemen,

 3    here we find ourselves again discussing yet another

 4    broker fee bill.  It is crucial that we all

 5    understand the law of unintended consequences.  When

 6    people attempt to legislate an industry they do not

 7    know or understand, it inevitably leads to problems

 8    for everyone involved, and unfortunately, tenants

 9    will pay the price.  We all support a more affordable

10    New York.  We all want the city to be a place where

11    people can find affordable housing.  However, this

12    bill will not achieve that goal.  We face a supply-

13    and-demand issue until we address this, pricing will

14    not change.  The market will become less negotiable.

15    Landlords have become more rigid in the fees they

16    charge, and these fees will be baked into the cost of

17    rent, pushing them even higher.

18         If we truly want to affect the cost of living in

19    New York City, we need to address the lack of

20    building in New York City.  This legislation is not

21    an attempt to find a meaningful solution.  It is

22    legislation for the simple sake of legislation.  Look

23    at the 2019 rent laws:  Despite their goals, rents

24    grew by 26% since the law was enacted.  It's harder

25    than ever to find an apartment.  The bill will have
```

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        58

2    similar unintended consequences.  We currently have

3    an efficient, transparent, and fully negotiable

4    rental market.

5        Enacting this bill will reduce all of those

6    benefits on top of making everything more expensive.

7    The services that agents provide are constantly

8    devalued by this Council.  Most agents work six to

9    seven days a week, absorbing almost all of the risk

10   in this industry.  Every call they answer, every

11   showing they book, does not guarantee a signed lease.

12   Agents often spend their own time and money on

13   clients who work with multiple brokers

14   simultaneously.

15       Saying agents only open doors is far from the

16   truth.  If this fundamental change happens, there

17   will be even less availability to view apartments.

18       Unlike agents, building owners don't work seven

19   days a week.  At the end of the day, tenants have a

20   choice.  They don't have to use a broker if they

21   don't want to.  50% of the apartments available right

22   now are no fee apartments.  This disruption has the

23   potential to hurt tenants and will ultimately cost

24   them more money.

25

**JA131**

1  COMMITTEE ON CONSUMER AND WORKER PROTECTION        59

2      Along with REVNY and all residential firms, I

3  actively oppose this bill.  It will compromise market

4  transparency, and in short, tenants will pay the

5  price.  Thank you.

6      CHAIRPERSON MENIN:  Thank you.  The next

7  panelist-- Yes, thank you.

8      MS. FRIEDMAN:  Good afternoon everyone--

9      COUNCILMEMBER OSSÉ:  Turn on the mic.

10     CHAIRPERSON MENIN:  You want to turn it on so the

11 red light-- when you see the red light, it is on.

12     MS. FRIEDMAN:  Gotcha.  Thank you.  Good

13 afternoon.  Bill Intro 360 threatens not only the

14 livelihood of New York City Real Estate Agents, but

15 also the financial welfare of the very tenants the

16 bill seeks to protect.  If passed, this bill will

17 push brokerage fees onto landlords.  Landlords, in

18 response, will bake these fees into the monthly rent

19 for the tenants to absorb, and will therefore

20 increase their rents, not only the year they sign,

21 but each year they choose to renew.  Today, an

22 upfront fee in writing is transparent and negotiable.

23 This bill would make the fees hidden and progressive,

24 predatory, and incredibly misleading.  Hard working

25

**JA132**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        60

2    agents who make zero dollars unless a deal gets done

3    will also feel a major financial impact.

4        Despite reality TV shows the starting income for

5    a New York City agent is $52,000 a year.  That's less

6    than many politicians here today make, and let's not

7    forget, many of these agents are renters themselves.

8        So, here are the facts, housing affordability

9    will not be solved by this misguided and hollow

10   legislation, and in fact will be made much worse.

11   Simply put, this bill will make it harder for brokers

12   to be fairly paid, raise housing costs, and limit

13   housing access.  The last thing New York City needs

14   right now.  Housing is expensive because there's not

15   enough of it.

16       Less than 10,000 new multifamily units were

17   proposed in New York City in 2023.  A wide range of

18   experts agree we need more than 500,000 new units to

19   keep up with population growth by 2030.  The lack of

20   supply and increasing demand gets plenty-- gives

21   plenty of runway for higher rents.

22       Brokers, as mentioned here earlier, are

23   instrumental in helping incoming residents navigate

24   the unique and complex rental market in New York.

25       [BELL RINGS]

**JA133**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        61

 2       Being a broker--

 3       CHAIRPERSON MENIN:  I'm just going to ask you to

 4   wrap up, please.

 5       MS. FRIEDMAN:  Yes, being a broker is an

 6   accessible career that welcomes immigrants, single

 7   mothers, people of color, and young people just

 8   starting out.  So, along with making apartments more

 9   unaffordable, this bill is also making it harder for

10   brokers to make ends meet and taking away people's

11   livelihoods.

12       [BELL RINGS]

13       Finally, the current state of the market

14   determines whether a broker fee is paid by an owner

15   or a tenant, and whether the fee is one month's rent

16   or 15%, all of which is negotiable to the benefit of

17   renters.  This bill would take that consumer choice

18   away.

19       New Yorkers want to make decisions about their

20   housing--

21       CHAIRPERSON MENIN:  We just to-- every member of

22   the public gets two minutes.  So, really, I've got to

23   ask you to wrap up.

24       MS. FRIEDMAN:  Okay, well, here's-- I'll be

25   closing sorry.  If the City Council is a real partner
```

**JA134**

1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        62

2   in solving our housing crisis, they must stop this

3   legislation, and I hope that local lawmakers and the

4   public fully understand what is at stake before

5   considering Intro 360.  New Yorkers simply cannot

6   afford for rents to jump up at a time when so many

7   are in need of quality housing.

8       CHAIRPERSON MENIN:  Okay--

9       MS. FRIEDMAN:  This bill will do the opposite of

10  what it claims people--

11      CHAIRPERSON MENIN:  Okay.  We've got to wrap up.

12  We--

13      MS. FRIEDMAN:  --and the process will be far less

14  transparent.  Thank you.

15      CHAIRPERSON MENIN:  Thank you.  Can we hear from

16  the next panelist?  Please?  Thank you.

17      MR. PHILLIPS:  Good morning, Chair Menin and

18  members of the Committee on Consumer and Worker

19  Protection.  My name is Brian Phillips.  I'm an

20  Associate Broker with Douglas Solomon Real Estate

21  here in Manhattan, where I both live and earn a

22  living.  I actually live in Harlem, and some of my

23  colleagues who live or work in Harlem are in the room

24  with me today.

25

**JA135**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION       63

2        I'm a member of the New York State Association of

3    Realtors, where I am the 2024 Chair of the New York

4    City Issues Working Group, and I serve on the

5    legislative steering committee at NYSAR.  Many NYSAR

6    members are here in attendance today.  Additionally,

7    I'm a member of the Real Estate Board of New York.

8        As a small landlord and a real estate agent, I

9    specialize in rentals as a key part of my business.

10   As a small landlord, I have faced significant

11   financial pressures due to rising real estate taxes,

12   homeowners, insurance and maintenance costs.  These

13   increases have forced me to increase rents, a

14   situation shared by many of my landlord clients.

15   This financial strain is further complicated by the

16   proposed requirement for landlords to pay the

17   brokerage fee when hiring agents on an exclusive

18   basis.  This requirement could lead to two likely

19   outcomes:  Landlords may either incorporate the

20   broker fee into the rent, spreading it over the

21   entirety of the lease.  This would result in higher

22   monthly rents and increased lease renewal rates,

23   which are based on a last rented price.

24       Alternatively, landlords might opt not to hire

25   agents on an exclusive basis.  This means tenants

**JA136**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        64

 2   would have to pay the brokerage fee, and listings

 3   would not appear on platforms like StreetEasy, which

 4   require exclusive listings.

 5       In Manhattan, rental listings will not syndicate

 6   to Zillow unless they are first listed on StreetEasy.

 7   Consequently, available listings would become harder

 8   to find for renters.  As agents and brokers, we cover

 9   the cost of professional photography, floor plan, and

10   3d video tours, which can easily range from--

11       [BELL RINGS]

12       CHAIRPERSON MENIN:  Okay, I'm going to ask you to

13   wrap up please?

14       MR. PHILLIPS:  Okay.

15       CHAIRPERSON MENIN:  And you can submit-- Let me

16   just be clear with every member of the public:  We

17   take the written testimony.  So, please, if you don't

18   get to finish your prepared statement.  We take all

19   of that written testimony.

20       MR. PHILLIPS:  Right.  I'll just finish this

21   paragraph.  All right?

22       CHAIRPERSON MENIN:  Yeah.  If we could please--

23   We've got over 400 speakers.  We've got to make sure

24   that everyone is given the same amount of time.

25
```

**JA137**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        65
 2   Okay?  Please.  One more sentence, please, and then
 3   we really need to wrap it up.
 4      MR. PHILLIPS:  Right.  The FARE Act, while well
 5   intended, well may have unintended, unintended
 6   consequences, reducing visibility of listings and
 7   ultimately harming tenants.
 8      CHAIRPERSON MENIN:  Thank you.  Okay.  And we'll
 9   hear from the next speaker.  Thank you.
10      MR. MONELL:  Well, thanks Chair and members of
11   the committee.  I'm Ryan Monell with REBNY.  I'll try
12   to make up for a lost time here and say, you know,
13   you've heard a lot from-- from some of our leadership
14   in in the industry.  Look, I think we want to be part
15   of the solution, right?  We want to make sure that
16   we're addressing the costs that we're seeing in
17   regards to rentals across the city in a meaningful
18   way.  We actually believe this bill will go in the
19   wrong direction, as you've heard from Bess and Gary
20   and Brian, which is consequential not only for, you
21   know, obviously, renters across the city, but also, I
22   think for agents who-- it's going to make it more
23   complicated for them to do the work they do every
24   day.
25
```

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        66

2        By the way, you know, we have 1500 agents who

3    showed up today to make it loud and clear that this

4    is not the solution relevant to-- to the rising cost.

5        And I think, you know, we should listen to some

6    of the folks who are out there every day looking at

7    the market, looking at the data, and really want to

8    see costs go down.  And we know that supply is really

9    the main driver in regards to how we can solve for

10   that.  But we can't do things in the meantime that

11   are going to make it even more complicated and more

12   challenging, and actually eliminate choice in the

13   market.  And we believe this bill would do just that.

14       The last thing I'll say, as Bess mentioned, is,

15   you know, most of these agents who are your

16   constituents are renters themselves, and make $52,000

17   a year starting out.

18       And so, we're talking about eliminating the

19   livelihood for folks who really, truly want to be

20   stalwart members of their communities, do a service

21   for their neighbors, and try to make a living for

22   them and their families.  And so, passing this

23   legislation will undoubtedly have a consequential

24   impact on their ability to earn, and we need to take

25   that into account when we're considering this bill as

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION       67

2    well.  So, I'll stop there, but I appreciate all of

3    your time today.  Thank you.

4        CHAIRPERSON MENIN:  Thank you very much.  There

5    are a number of questions that colleagues have for

6    the panel, so let me just jump right into it.

7        No--  No, you're on the second panel, sir.  I

8    believe you.  Yes.  I called the second panel to say-

9    - just to get ready.  So-- No, no, that's okay.

10   We're going to be coming to you next, but we've got

11   an order to the panel, so we'll be coming to you

12   shortly.

13       So, I'm going to open it up to Councilmember

14   Ossé.  Questions?

15       COUNCILMEMBER OSSÉ:  I have no questions for this

16   panel, thank you.

17       CHAIRPERSON MENIN:  Okay.  Public Advocate, you

18   said you have questions?

19       PUBLIC ADVOCATE WILLIAMS:  Thank you so much, and

20   thank you all for being here.  First, I just want to

21   mention:  Every time-- There is no part of the

22   industry that seems to want to do their part to fix

23   the crisis, and I get there are multiple reasons why

24   we're in the housing crisis, whether we're not

25   building enough, affordability, whether it's the rent

**JA140**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        68

 2   guidelines board.  There's a whole bunch of things

 3   that are going, and every time we try to fix one part

 4   of it, that part of it says, "Don't fix that part of

 5   it."  So it's a very difficult thing to do, and I

 6   think we need "all/and", and not just "or".

 7       This is one place where I feel like it's a good

 8   balance, because we're not taking away the ability

 9   for people to make their money.  And I know the

10   average is $52k I'm interested to know if that's the

11   mean, median, or what kind of average it is.  Because

12   I know that people make considerably more than $52k.

13   As well as that there's a lot of working folks that

14   do make the $52.

15       So I want to clarify:  The 2019 rent guidelines

16   board, the rent laws were specifically to help

17   preserve the housing that we have, and keep the

18   tenants in it.  And I think it was successful in

19   doing that.

20       I had a question about other markets in other

21   cities.  It seems to me that we are only one of two

22   major cities that do this.  So, are you saying that

23   the real estate industry is not successful in other

24   cities because they have to pay who gets-- who hires

25   them?
```

**JA141**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        69
 2       MR. MONELL:  I mean, I would simply say that the
 3   size, scale, and intensity of New York City, co-ops,
 4   condos, and rental apartments, it's a completely
 5   different market than anywhere else in the country.
 6       And once again, just like in any industry,
 7   tenants have a choice.  There's either a full-service
 8   or no service, and when 50% of the market is already
 9   no fee, which means tenants have a choice to either
10   represent themselves or hire a broker to make their
11   lives easier, it's simply a free market that works,
12   and this legislation will do nothing at all to reduce
13   the cost that tenants face.
14       PUBLIC ADVOCATE WILLIAMS:  Does that mean that
15   the other cities that have this law, there is a
16   thriving realtor market?
17       MR. MONELL:  I can't speak to other cities.  All
18   I could say is this city's size, scale and density
19   cannot be compared to any other city that I'm aware
20   of with the complexity of the marketplace.
21       PUBLIC ADVOCATE WILLIAMS:  Yeah, we also have the
22   highest rents in, probably, the world and one of the
23   lowest vacancy rates that we've ever had.
24       MR. MONELL:  Because we don't build apartments
25   anymore, because politicians don't understand that
```

**JA142**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        70

 2   developers take risks to build apartments that you

 3   don't want to incentivize them to do so.

 4       [APPLAUSE]

 5       CHAIRPERSON MENIN:  Okay.  [GAVEL]  We need to

 6   maintain--

 7       SERGEANT AT ARMS:  Quiet down.  Quiet down.

 8       CHAIRPERSON MENIN:  We have to maintain order in

 9   here.  I'm going to be very clear--

10       [BACKGROUND VOICES]

11       You can--  As I said, if you agree, please feel

12   free to do this, [MAKES JAZZ HANDS GESTURE] but we

13   cannot have-- we've got to maintain decorum in here.

14   Thank you so much.

15       [BACKGROUND VOICES]

16       PUBLIC ADVOCATE WILLIAMS:  I will assure you,

17   sir, having paid brokers fees, and having had tenants

18   myself, and organizing around housing for about 20-

19   something years, I know much more than you about why

20   this housing market is the way it is, and why we're

21   not building housing.

22       And so the profitability of housing is the major

23   reason that we're having a housing crisis right now.

24   So, we're trying to figure out how to manage that.

25
```

1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        71

2       And frankly, I support building up, depending

3   what we're building.  So, to pretend that you have

4   more knowledge than those of us on here about the

5   housing market is not--

6       MR. MONELL:  I mean, I respect--

7       PUBLIC ADVOCATE WILLIAMS:  I'm not finished, is

8   not really a real thing.

9       What we're trying to figure out here is how we

10  can make sure the entry point into housing is

11  balanced.  And so that's why I'm asking about other

12  markets, because what seems to happen is we're having

13  discussion in a vacuum.  And so if the City hasn't

14  shown up, we're now just talking to ourselves, and I

15  understand that you want to keep the system the way

16  it is.  Most people do, particularly if they're

17  benefiting from it.

18      And what we're trying to do is find the balance.

19  I want to make sure you get the money that you

20  deserve for the work that you're doing.  But it seems

21  to me if someone else is hiring, which is the case in

22  every other industry, the person who hires a person

23  is the person that pays for it.  And that's why I'm

24  asking the questions, so we can have information

25  about other cities.

**JA144**

1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        72

2        MR. MONELL:  Sir, just one thing.  I've been in

3   the industry for 26 years.  I've overseen hundreds of

4   thousands of lease transactions, so I think I have a

5   little bit of experience in this business.  That's

6   just number one.

7        Number two, you talk about giving choice and you

8   talk about saving tenants money.  The simple fact is,

9   look at the 2019 rent laws.  If you have bad credit

10  or no credit, you have to pay insurance to get an

11  apartment now that you did not have to do before.

12  You've taken choice away from tenants.  If you have a

13  pet, which many New York City residents do, you now

14  have to pay extra rent each and every month for that

15  pet because you've decided to take away choice from

16  tenants.

17       Other markets are not relevant.  What's relevant

18  is this market, and the fact is there's no building

19  going on.  It's a law of supply and demand, and if

20  you fix that, you will fix pricing.  Until then, this

21  is just an attack on the brokerage community that's

22  unwarranted.

23       PUBLIC ADVOCATE WILLIAMS: :  Thank you.

24  [BACKGROND NOISE]  I am finished.

25       SERGEANT AT ARMS:  Quiet please.

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        73

 2       PUBLIC ADVOCATE WILLIAMS:  I will say, you spent

 3   26 years trying to figure out how to make money off

 4   of broker's fees.  I spent over 20 years trying to

 5   figure out how to fix the housing crisis.  It's a

 6   different system.  It's a different study than what

 7   we're trying to figure out.  So I'm glad that you

 8   made your money that way.  I'm trying to figure out

 9   how we can fix the housing crisis.  And what I'm

10   telling you is I don't mind brokers making the money.

11   I'm trying to figure out how best to do that, and how

12   we can fix the crisis that we're in, because people

13   like you want to make as much money as possible.  And

14   we're just trying to figure out how I can--  I hear

15   you, but--  I'm listening to his testimony.  But I am

16   actually trying to figure out how people can make

17   money, whether they're wealthy brokers or they're

18   making $50,000.  I'm not trying to take away people's

19   ability to make money.  All we're trying to do is

20   figure out how we can lessen the burden of tenants

21   who are trying to enter into a housing market.  That

22   is a crisis because of a lot of things that have

23   happened.  The system is not working and has been not

24   working for a very long time, not because of 2019

25   laws.  Thank you.
```

```
 1  COMMITTEE ON CONSUMER AND WORKER PROTECTION        74

 2     MS. FRIEDMAN:  But with-- with all due respect.

 3  Since this Council and Councilmember Ossé is

 4  proposing this bill, this law, shouldn't you have

 5  this-- this substance to support why this makes sense

 6  financially?  Don't-- Shouldn't you have those data

 7  points to argue those today, if you think this makes

 8  sense?  Where--  Where's the information to support

 9  it?

10     PUBLIC ADVOCATE WILLIAMS:  So what-- We do have

11  some.  The city's not here.  You should be mad at the

12  Mayor and his administration for not being here.  But

13  what we do know is the way that this thing works is

14  very prohibitive.  When I had to pay $12,000 to get

15  into an apartment:  Praise God that I have the

16  ability to do so.  Most people do not.  And so it is

17  prohibitive in the market to pay this extra fee,

18  which is ranging between 8% and 15%.  That's just a

19  real thing.  So, we're just trying to figure out how

20  to balance who pays it, not to take the money out of

21  anybody's pocket.

22     MS. FRIEDMAN:  No, but sir, with all due respect,

23  as quoted here, you can look online right now, 50--

24  almost 50% of--

25
```

```
 1  COMMITTEE ON CONSUMER AND WORKER PROTECTION          75

 2      PUBLIC ADVOCATE WILLIAMS:  I think I've taken a

 3  lot of time.

 4      MS. FRIEDMAN:  --units are no fee apartments.

 5  You don't-- Nobody's forced to--  This is all

 6  negotiable.

 7      PUBLIC ADVOCATE WILLIAMS:  That's just not--  So-

 8  - So one:  Usually after "all due respect", no

 9  respect follows.  But I appreciate what you're

10  saying.  But that is not how it happens in reality.

11  And so I have--  When I was renting, I found no fee

12  apartments.  I've also been-- apartments brought to

13  me that I didn't even know existed, that were better

14  than apartments that I saw.  And so that's a false

15  choice, to be able to say that.  Sometimes there's a

16  choice on paper, but that's not how it works out in

17  the reality of people finding apartments.

18      MR. MONELL:  All I would like to say, if you

19  actually cared about legislation that was impactful

20  and effective, you would actually engage the

21  brokerage community in the conversations versus

22  dictating to it.  Never once do you engage with the

23  brokerage community or seek our opinions.

24      PUBLIC ADVOCATE WILLIAMS:  That's what's

25  happening now, by the way.  There's a huge
```

**JA148**

```
1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        76

2    engagement.  You're right here, engaging with the

3    council.

4        MR. MONELL:  That's today.  But not about before.

5        PUBLIC ADVOCATE WILLIAMS:  Yeah, the bill hasn't

6    passed.  This is how bills get passed.

7        MR. MONELL:  Well, you should speak to the

8    community in advance.

9        COUNCILMEMBER OSSÉ:  Can I respond?  Brokers have

10   actually worked on this bill.  They'll be testifying

11   right after this panel.  So you'll-- you'll hear from

12   them in this room.  So, thank you.  We've engaged the

13   broker community.

14       MR. MONELL:  I disagree.

15       CHAIRPERSON MENIN:  Okay.  And we've got two

16   other Councilmembers who have questions,

17   Councilmember Nurse, followed by Councilmember

18   Hudson.

19       COUNCILMEMBER NURSE:  Thank you, Chair.  I'll try

20   to be brief.  You know, I think-- I think we're all

21   saying that.  No one is saying you shouldn't earn a

22   living.  We're just looking at who's paying for that.

23   This is pretty simple.  And I think you're conflating

24   it intentionally.  But I see a lot of signs about,

25   "Don't raise the rent."  And yet, I don't think I've
```

1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        77

2   seen any of the brokers here-- and you know, feel

3   free to raise your hand if you're wrong.  In any

4   housing movement actions, I've not seen you here at

5   any-- when we're discussing any housing legislation

6   that's going to impact or keep people's rents low.

7   Like, feel free to raise your hand if you participate

8   in the housing movement as a broker.

9       Yes, great.  I'm glad that some of you do, but a

10  lot of you don't.  I didn't see any of you at the RGB

11  rent guideline board meeting.  Were you there?  No.

12      Okay, so the fact is, we have a situation where

13  there's people that we don't meet who are supposed to

14  be doing work, and we have to pay for their labor

15  that we did not contract.  That's what this bill is

16  about.

17      So, I guess I'm curious, for the record:  Is

18  there any requirement that a broker shows up to a

19  viewing that they've scheduled?

20      MR. MONELL:  Yeah.  My brokers will show up at

21  every appointment.

22      COUNCILMEMBER NURSE:  Your brokers, but is there

23  a requirement by law?

24      MR. MONELL:  I can't tell you that's a

25  requirement by law.  I can tell you what our company

**JA150**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        78

2    does and what our agents do, and you guys continually

3    demean the service of what brokers do.

4        COUNCILMEMBER NURSE:  Yours might be unique, but

5    not all are.

6        MR. MONELL:  You look at exceptions about worst

7    case scenarios versus looking at the vast majority of

8    brokers.

9        COUNCILMEMBER NURSE:  The worst case scenario is

10   generally what the rule is.  That's why we're in a

11   housing crisis.

12       MR. MONELL:  I disagree with you.  I disagree

13   with you.  We're in a housing crisis because there is

14   no building.

15       COUNCILMEMBER NURSE:  The worst case scenario is

16   generally the most common experience.

17       MR. MONELL:  That's not true.

18       COUNCILMEMBER NURSE:  I have seen ads on the

19   internet that don't say there's a broker fee, and

20   then when you show up there is suddenly a broker fee.

21   Suddenly the broker fee can move.  There are bad

22   actors here, which is why we are in this situation.

23       If you want to be solutions-oriented here, that

24   is welcome.  But then you have to acknowledge the

25   fact that if I don't pay for your service, I

**JA151**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        79

2    shouldn't--  If I'm not contracting you, I should not

3    have to pay for your service.  It is a very simple

4    concept.

5        MR. MONELL:  The very simple concept is every

6    person signs a brokerage agreement in advance of

7    seeing that apartment, which clearly sets forth what

8    the broker fee is.

9        COUNCILMEMBER NURSE:  That's not how it always

10   goes down.

11       MR. MONELL:  Once again, you're looking at the

12   excep--

13       COUNCILMEMBER NURSE:  Perhaps for you, and

14   congratulations for having a great firm, but that

15   does not happen for everyone.

16       MR. MONELL:  I was talking, and you interrupted

17   me.  I didn't interrupt you.  Well, that's your

18   experience in a limited situation.  I'm telling you

19   what the law provides.  You must sign a brokerage fee

20   agreement clearly detailing what the costs are.  You

21   must sign disclosure agreements, fair housing

22   agreements.  There is tremendous amounts of

23   legislation that currently exists, but everyone

24   chooses to take the one-off situation and conflate

25   it.

**JA152**

```
 1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        80

 2        COUNCILMEMBER NURSE:  It's not a one-off

 3    situation if there are hundreds of people here.

 4        MR. MONELL:  It's not the--  It's not the rule.

 5        COUNCILMEMBER NURSE:  It's not a one-off

 6    situation if we're at this point of needing

 7    regulation.

 8        MR. MONELL:  We need regulation because we need

 9    housing.

10        COUNCILMEMBER NURSE:  Yes.  I'll move on.  Thank

11    you.

12        CHAIRPERSON MENIN:  Councilmember Hudson followed

13    by Councilmember powers.

14        COUNCILMEMBER HUDSON:  Thank you, Chair.  I

15    wanted to follow up.  The Public Advocate asked a

16    question that I had as well, but I didn't hear an

17    answer.  You mentioned in testimony that starting

18    income is $52,000 a year for a broker.  Is that an

19    average salary or the median?

20        MS. FRIEDMAN:  It's not a salary.  Agents are

21    1099s.  It's an average income-- I mean--

22        COUNCILMEMBER HUDSON:  So it's the--

23        MS. FRIEDMAN:  the starting.  It's the starting.

24        COUNCILMEMBER HUDSON:  It's the average starting.

25        MS. FRIEDMAN:  Yes.
```

**JA153**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        81

 2       COUNCILMEMBER HUDSON:  Okay, and so what

 3   percentage of annual income for brokers comes from

 4   broker fees for rentals?

 5       MS. FRIEDMAN:  I don't have that statistic.

 6       COUNCILMEMBER HUDSON:  Ryan or anybody?

 7       MR. MONELL:  We can try to get that for you.  I

 8   think it varies.  It probably fluctuates between

 9   agent to agent, quite honestly.  So, it's a really

10   difficult number to get, but we can get it.  We can

11   try to find some data that reflects that.

12       COUNCILMEMBER HUDSON:  Okay.  I think-- I think

13   an average would be helpful for us to understand, you

14   know, is it on average, 1 percent of an annual

15   income, 90 percent?

16       MR. MONELL:  In terms of the fee?

17       COUNCILMEMBER HUDSON:  Yeah.

18       MR. MONELL:  So I would say fees are probably

19   larger than 1% of their annual income, because when

20   you're talking about a-- an independent contractor

21   who's predominantly earning off of commissions, which

22   is a fee, then it's going to be a large-- a larger

23   percent than 1% but, well, we can get you more

24   information relevant to how most agents earn-- earn,

25
```

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        82

2    and number one, what their salaries are over time in

3    their career, on average.

4        COUNCILMEMBER HUDSON:  Yeah.  I think it would be

5    helpful to know what percentage of the annual salary,

6    on average, that the brokers fees make up.

7        MR. MONELL:  Yeah.  I think, though, just like,

8    you know, speaking more anecdotally, and we will get

9    you this data-- you know, look, the reason that we

10   have 1500 people here today from the brokerage

11   community is the fact that this is actually going to

12   have an impact, not only on their clients, who are

13   renters, but also on their ability to earn, right?

14   And so, we want to make sure that we're looking at

15   legislation cohesively and in a way that makes-- that

16   reflects that impact as well, which is significant.

17       COUNCILMEMBER HUDSON:  Yeah.  I think just to

18   reiterate what my colleagues have said:  Nobody here

19   is saying that brokers shouldn't make a broker's fee.

20   What we're simply saying is that if you hire the

21   broker, whoever that is, whether it's the landlord or

22   the tenant, if you hire the broker then you should

23   pay for the broker's fee.  If you don't hire the

24   broker, you shouldn't pay for the broker's fee.

25

**JA155**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION    83

2    If I-- if I hire a plumber to come in and do

3    plumbing work, I pay for the plumber.  If my neighbor

4    doesn't hire the plumber, or a tenant doesn't hire a

5    plumber, I'm not asking them to pay for the plumber's

6    work.  I'm paying for the plumber's work because I

7    asked the plumber to come in and do the work.  I

8    think it's-- it's basic--  I'm not going to go back

9    and forth because--

10    MR. MONELL:  Sure.  Understood.  We can talk

11    further about it.  Understood.  But I do think--

12    COUNCILMEMBER HUDSON:  --we are on a time

13    schedule here and I want to get back to other topics.

14    But I think having the average of-- of what the

15    broker fee makes up in an annual salary would be

16    helpful, and I'll leave it there.

17    MR. MONELL:  Yup.  Okay.  I will just say very

18    quickly--  I mean, it is certainly more nuanced, and

19    I understand the basic premise in regards to it--  it

20    seems fair to only pay what you're-- you're hiring

21    someone to do.  But the reality is, if this bill were

22    to pass into-- into law, the fee is still going to be

23    passed on to the renter.  And the challenge is:

24    Right now, despite what we have with the concerns in

25    regards to supply, you do have a choice.  You can

**JA156**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        84

2    either pay a fee up front, or you can pay the fee as

3    part of your rent over time.

4        And the reality is, you're eliminating that

5    choice if this bill were to pass, making the

6    assumption that folks don't want to have that ability

7    to make the economic decision for themselves.  So,

8    it's a little bit more convoluted relevance than just

9    saying, "Whoever hires a broker should pay the

10   broker," and we're happy to discuss that more offline

11   and I understand there's a lot of people who need to,

12   need to testify, but I do want to make sure that

13   premise is understood.

14       COUNCILMEMBER HUDSON:  Yeah.  And I think, as

15   Councilmember Ossé mentioned, you will hear from your

16   fellow brokers who are in support of the bill and who

17   have a different opinion to provide.

18       Thank you, Chair.

19       CHAIRPERSON MENIN:  Thank you very much.  Now,

20   Councilmember Powers.

21       COUNCILMEMBER POWERS:  Thank you.  You sort of

22   got to it at the end.  But the central premise of

23   this entire hearing is:  Why are tenants asked to pay

24   in instances when they have not hired the broker to

25   show them the apartment?

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        85

2        MR. MONELL:  I think--

3        COUNCILMEMBER POWERS:  And that's the premise of

4    the hearing.  And that central question is the one

5    that we should be talking about throughout all this.

6    Because I am happy all day to talk about how the

7    Council and others need to do more on the housing

8    front, and we need to find a balance between

9    regulatory schemes, and adding supply, and all the

10   stuff.  But the central premise here today is:  If a

11   tenant is looking for an apartment, and you guys are

12   saying 50% of the-- 50% of the rent--  I think that

13   number is extremely high.  I think it works against

14   you.  50% of half the units in, certainly my district

15   in Manhattan, midtown Manhattan and the Upper East

16   Side, but the housing stock of New York City, we're

17   saying 50% have an extra fee on them.  In some cases,

18   the Borough President mentioned $7,500.  That's a lot

19   of money at once.

20       The central question is:  Is that.  And I

21   appreciate Ryan's nuance and the premise of it.

22   There are other factors that go into it.  Where will

23   that fee end up?  Will they still engage brokers, the

24   landlords, if they-- if we switch over the burden?

25   But I think that's the question, and I would love to

**JA158**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        86

 2   hear a clear answer about if a landlord brings a

 3   person into the-- into the--  And we know why, right?

 4   They don't have to--  It's no overhead for them to

 5   bring that person into the equation, and it solves a

 6   problem for them.  But if they have made the decision

 7   to bring somebody into a transaction, why is the

 8   other party, in this case, required to pay for that

 9   service that they have not brought into that

10   equation?

11       And that's like the only question I think we

12   really need to be asking today.

13       MR. MALLON:  I mentioned earlier, as a small

14   landlord, that I am facing increased insurance,

15   property taxes, and maintenance costs, and I pass on

16   those costs to the tenants, and many of my landlord

17   clients do the same thing.  I don't have the--  And

18   I'm already coming out of money out-of-pocket to make

19   mortgage payments on my investment properties.

20       I don't have it.  Landlords don't have it.

21   They're going to charge the tenant.  They're going to

22   amortize it over 12 months, and the tenant's going to

23   pay that increase.  And as mentioned earlier, on the

24   lease renewal, the tenant is going to pay more

25
```

1   COMMITTEE ON CONSUMER AND WORKER PROTECTION         87

2   because that lease renewals based on the last rented

3   price.

4       COUNCILMEMBER POWERS:  I understand about

5   mortgage, insurance.  Those are like required fees

6   that you have to pay.  I don't think a tenant is

7   necessarily going to not believe that wouldn't

8   somehow end up in the cost of doing rent.  The hiring

9   the broker is an optional fee that the land--

10  Obviously, we're saying 50% don't do it.  So, there's

11  50% who have decided out of that.  So, when you make-

12  - when you as a landlord, make that decision, that's

13  making a decision that now has to be passed on to the

14  tenant.  It's not something that I think a tenant

15  would reasonably believe.  Because we know that,

16  because we hear from tenants about this all the time,

17  that they would suddenly have to pay this fee all at

18  once by the way.  I actually do think that a lot of

19  tenants would prefer to pay that over the course of a

20  few months than have to pay it all at once.  It's a

21  lot of money to pay all at once for a lot of folks

22  and who can't afford it.

23      But I think, still, it's an option, and the

24  landlord's exercising that option, but then turning

25  to the tenant to pay for it.  And I think why we are

**JA160**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        88
 2   discussing the loss of fees, I mean the loss of
 3   income is because there's a fear here that it's going
 4   to switch.  So, the idea that it's all going to get
 5   baked in-- that they just going to stop using that
 6   service, and I just recognize that challenge.  But
 7   the idea that it's all going to get baked into the
 8   rent undercuts that then.
 9        But I guess I just want to go back to that
10   question:  Why, if I'm a tenant, and to the
11   gentleman-- I'm sorry I don't remember your name-- in
12   the middle:  There is a--  There is a frequency, at
13   least in my district, where tenants show up.  They've
14   never met the individual who's standing there to open
15   the door.  There are missed appointments, and you get
16   nothing for that missed appointment.  There are-- The
17   challenge, you walk in, there's 15 other people
18   waiting there to see that apartment too.  It's like
19   Hunger Games for an apartment.  That certainly speaks
20   to the supply need.  No doubt about it.
21        But then when I get there, I'm in a race.
22   Whether-- Is there negotiating power?  Little.
23   Because there's 15 other people standing there who
24   will pay more than I will pay, or I what I will pay.
25        [BACKGROUND VOICE]
```

**JA161**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        89

 2       So, I don't know what he said.

 3       But-- So I guess--  I guess we're just back to

 4   the same old question:  I walk into an apartment.

 5   There's 10 people standing there.  They all want that

 6   apartment.  It's like first-come-first-serve.  Who's

 7   going to sign that paper and get that apartment, or

 8   pay the fee just as they do the credit check, and see

 9   the apartment.

10       And now I have to be told that in order to get

11   that apartment, I have to pay because the person that

12   I didn't employ, I didn't hire, I didn't bring into

13   interaction.  That's the--  That's the cost of entry.

14       MR. MONELL:  Well is that-- Is that a no fee

15   rent--

16       COUNCILMEMBER POWERS:  So--  Well, why?  I want

17   to know the question why--

18       MR. MONELL:  I'll explain to you why.  I'll

19   explain to you why.

20       COUNCILMEMBER POWERS:  And the last thing I'll

21   say is other cities do have relevance here, because

22   we are looking at other cities.  I'm doing a

23   scaffolding hearing in a few weeks.  We're looking at

24   every other city to look at Local Law 11 reform to

25   see how we can do scaffolding, because other cities
```

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION          90
 2   aren't doing it the way we are.  There's a lot to
 3   learn out there.
 4       Our market's complex, but there's a lot to learn
 5   out there.  So, I guess that's the question that I
 6   think we all talk about and answer today.  And I'd
 7   like to hear from everybody is why is a tenant
 8   required to pay in a transaction?
 9       MR. MONELL:  I'll explain it to you.  There's
10   something called dual agency, okay?  And if I'm
11   engaged by an owner, that's one side of a
12   transaction.  You as a tenant found the ad that I put
13   online.  I spent money advertising and marketing it
14   to bring you in.  I'm negotiating on your behalf.
15   I'm working with you to submit the application.  I'm
16   working on both sides of the transaction.
17       COUNCILMEMBER POWERS:  And who's-- And who's
18   paying the fee then?  Is it both sides paying?
19       MR. MONELL:  It depends.  There are certain
20   instances where the owner pays, and there's other
21   insurances where the tenant pays.
22       COUNCILMEMBER POWERS:  Sure.
23       MR. MONELL:  So, it's not--  You guys make
24   everything as a black and white situation.  Our
25   argument is in the middle.
```

**JA163**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        91

2        COUNCILMEMBER POWERS:  No, in fact--  No-- I'll

3    tell you what. In fact--  In fact--

4        MR. MONELL:  I was trying to-- You asked for an

5    answer, but you're not listening.

6        COUNCILMEMBER POWERS:  No, no.  I'll tell you

7    what's true.  Last term, I introduced the bill, and I

8    recognized dual agency.  I said you could split the

9    fee between the tenant and the broker, and 1500

10   brokers showed up to City Hall and protested that,

11   saying that I was taking money out of their pocket,

12   okay?

13       MR. MONELL:  You asked--

14       COUNCILMEMBER POWERS:  You want to talk about

15   dual agency?  Let's talk about dual agency.  I

16   actually, in my bill reflected the reality that there

17   is a service to the tenant provided when you post it,

18   when I see it, when you show me that thing, and-- and

19   I was told by every single broker--  I think you

20   testified here too--

21       MR. MONELL:  I did.  And I'm testifying again.

22       COUNCILMEMBER POWERS:  You did.  I remember.  And

23   you told me I was stealing money from you guys, and

24   putting you out of work and all the other things.

25       MR. MONELL:  You are.  You are.

**JA164**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        92

 2       COUNCILMEMBER POWERS:  I actually tried to do it

 3   the way you're talking about.

 4       MR. MONELL:  No, you didn't, but that's okay.

 5       COUNCILMEMBER POWERS:  I did.  I absolutely did.

 6   I tried to reflect--

 7       MR. MONELL:  You tried to limit the commission

 8   that agents should make.  You asked the question.  I

 9   was giving you an answer.

10       COUNCILMEMBER POWERS:  Okay, well I--

11       MR. MONELL:  You're not letting me finish my

12   answer.  You're interrupting.

13       COUNCILMEMBER POWERS:  Okay.  Go ahead.  Go

14   ahead.

15       MR. MONELL:  So, the simple fact is, brokers do

16   work on both sides of the transaction.  There is not

17   a black-and-white answer here.  It's a nuanced

18   situation, and every side benefits.  The simple fact

19   of the matter is this Council wants to remove

20   negotiability from the tenant to do what is in his or

21   her best interest and dictate how an industry works.

22       None of you work in the industry, so you

23   shouldn't be legislating the industry, because you're

24   going to have unintended consequences.  And the 2019

25
```

**JA165**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        93

 2   rent laws are the specific problem that we face now.

 3   I--

 4       COUNCILMEMBER POWERS:  I think-- I think the

 5   notion that a legislative body can't legislate a

 6   field that we don't work in is an absurd notion.  I

 7   just want to be clear about that.

 8       MR. MONELL:  But mistakes happen.

 9       COUNCILMEMBER POWERS:  But I do want to recognize

10   we are renters and tenants.  We have constituents.

11   We have people calling us with this problem, and

12   we've--  I've walked into these situations.  I know

13   exactly what I'm talking about, too.  I'm not saying

14   my expertise is your expertise.

15       You're there.  I respect your expertise, but that

16   notion that we can't participate in regulating a

17   field that we don't personally work in is, like the

18   entire-- it's like--  it's a ridiculous notion.

19       MR. MONELL:  We can agree to disagree.

20       MR. PHILLIPS:  Councilmember, I'll just try to

21   answer your question very quickly.  But, you know,

22   when you talk about the costs that it takes to

23   actually list a unit, show a unit, run an

24   application, do all the aspects relevant to make--

25   taking photography for an apartment to be rented, you
```

1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        94

2   know, there's a cost accrued there, right?  And, you

3   know, the reality is, an owner, by and large, is

4   going to pass that cost on one way or another, like

5   it or not, unfortunately.

6       And the reality is, I mean, if this bill were to

7   pass, obviously, two things could happen:  Number

8   one, it gets baked into the rent because, you know,

9   the fee can no longer effectively be passed on in

10  certain situations.  The second aspect (and this is

11  probably more likely for stabilized units in

12  particular, because obviously there's a cap in

13  regards to how high rent can go) is the owner could

14  basically say, I'm no longer going to hire an agent.

15  I'm going to give a multitude of agents the right to

16  list this unit, and then the fee could still be

17  passed on in that regard.  And so the reality is this

18  is not going to do anything to actually alleviate

19  that cost.

20      Relevant to other markets, you're absolutely

21  right.  I mean, obviously we should look at what

22  other-- other cities are doing.  I think the

23  assumption that we are making is that other cities

24  are more affordable.  That necessarily is not the

25  case, right?  What we need to solve for is what will

**JA167**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION       95

2    actually reduce costs here in New York City.  We are

3    telling you, as an industry, I think, that this is

4    not the way to do it.

5        MR. MALLON:  I wanted to address your question.

6    You mentioned you walked into situations where there

7    was-- you assumed there was no fee, but there's

8    suddenly a fee.  Did you respond to a no-fee ad?  If

9    you responded to no fee ad...

10       COUNCILMEMBER POWERS:  I think--  I think

11   Councilmember Nurse brought up that situation.  I

12   didn't break up the situation.  I think she talking

13   about an--

14       MR. MALLON:  [TO COUNCILMEMBER NURSE

15   SPECIFICALLY]  Was it a no-fee ad you responded to?

16   Did you go--

17       COUNCILMEMBER POWERS:  I think--  I think the

18   point that she was making was that there are

19   situations where a tenant has seen an advertised no-

20   fee apartment, walked in, and had a fee.

21       Is there--  Well, actually, it's a good question:

22   What is the recourse for the tenant in that

23   situation?

24       MR. MALLON:  Right.  You go right to the listing

25   agent.  If the listing--  If it's a no fee rental,

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        96

2    you go right to the listing agent, the landlord's

3    agent, and there's no fee.  But if you elect to have

4    your own representation, you're going to pay a fee.

5    Everyone knows that.  So, if you go right to the

6    listing agent, the agent who has the listing, there's

7    no broker fee.

8        COUNCILMEMBER POWERS:  No, but I guess if I saw

9    an advertisement online that said, "No fee

10   apartment"--

11       MR. MALLON:  You go right to the listing agent.

12       COUNCILMEMBER POWERS:  And I went to the-- I

13   showed up to the thing, and I-- the person says,

14   there it's a 10% fee.

15       MR. MALLON:  Then that's not the listing agent.

16       COUNCILMEMBER POWERS:  Understood.  But I think

17   in this particular situation, most New Yorkers are

18   not going to know how to navigate, and that's--

19       MR. MALLON:  Anyone who deals with me--  Like, if

20   I have a no-fee rental online, it's only-- most

21   people come unrepresented.  They get it.

22       MS. FRIEDMAN:  That's why, with the agency

23   disclosure form, it sort of identifies who's

24   representing who in the equation, or if people waive

25   the right to have representation.

**JA169**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION          97

 2       COUNCILMEMBER POWERS:  But if I walk into an

 3   apartment today and I-- there are, you know, three

 4   other people looking at this apartment too-- five,

 5   ten-- I mean, there's lines out the door sometimes.

 6   I walk in and am asked to sign a form, I still didn't

 7   bring you into the transaction.

 8       It's like a Hunger Games moment, where I'm asked

 9   at that point in time to sign it in order to get the

10   apartment I want.  It's like a forced disclosure form

11   to sign, to make sure that I can now get the

12   apartment I want.

13       And in the market that we're in, you're right,

14   like we're in a tight market, I am desperate to get

15   an apartment, I want to be close to my job, my

16   family, whatever it is, or I just like this

17   apartment.  I-- The competition for these apart-- at

18   least in my district-- the competition for these

19   apartments means, of course, I'm going to sign the

20   form and I'm going to pay the fee, if-- if that's

21   what gets me the apartment.  Or at least I'm going to

22   sign the form, because that gets me the apartment.  I

23   think that's a situation we're trying to solve for.

24       MR. PHILLIPS:  Yeah, I--

25
```

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        98

2        COUNCILMEMBER POWERS:  I'm not trying to-- I

3    don't want to come off as disrespectful to anybody

4    here, but I think that we-- there are situations that

5    are real, where people are fighting for these

6    apartments and asked to pay-- sign the form and pay

7    the fee.

8        MR. PHILLIPS:  Yeah.

9        COUNCILMEMBER POWERS:  And it's 50% of the

10   apartments in New York City.  So, there's a problem.

11       MR. PHILLIPS:  So, I would say--  I mean, two

12   things to that very quickly, and I know we have to

13   move on, Chair.

14       But first off, I mean, what you're describing, by

15   and large, is a creation of the 1.6 vacancy that we

16   have in the city, as you know.

17       The second aspect is, I think, you know,

18   regarding the rights that you have as a prospective

19   consumer, prospective renter, when working with an

20   agent should be more clear.  And I think it's

21   something that we as a-- as an industry could get

22   behind, relevant to making sure you know your rights

23   when you're working with an agent, you know your

24   rights when you're working with going to find an

25   apartment.  And there's a lot more that can be done

```
1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        99

2   to make that more transparent.  So, in regard to what

3   we can do to actually solve for some of the issues

4   you're seeing in your district, we should discuss

5   that more, because I think there's some low hanging

6   fruit relative to making the process even easier.

7        CHAIRPERSON MENIN:  Okay, great.  Now I'm going

8   to turn it over to Councilmember Ossé before we call

9   the next panel.

10       COUNCILMEMBER OSSÉ:  Yeah, I just wanted to

11  clarify that, you know, I--  The bill does not end

12  broker fees, and I know that there was a lot of

13  communications coming from REBNY about that, which is

14  disinformation, but it says whoever hires a broker

15  must pay.

16       I personally was happy to hire a broker when I

17  was looking for an apartment.  I believe that brokers

18  add a valuable service to the city.  So, even if this

19  bill does pass, and it seems like, if it is a

20  valuable service like we all agree, then people will

21  still be hiring a broker, right?

22       That's how it works in every other industry, and

23  how it should work in this industry as well.  And the

24  final point is, whether it's 90%, or 30%, or 50% of

25  apartments that, you know, have a no fee apartment,
```

**JA172**

1   COMMITTEE ON CONSUMER AND WORKER PROTECTION       100

2   whether it's on StreetEasy or Zillow, that number

3   should be zero in terms of those who are forced to

4   pay broker fees.  You know, that other percentage of

5   apartments that are available, and that's

6   unfortunately the case that we are seeing.  Thank

7   you.

8       CHAIRPERSON MENIN:  Okay.  Thank you very much to

9   this panel.  We are now going to move on.  So, before

10  we get to the panel that I mentioned was going to go,

11  we-- I just want to mention we've been joined by

12  Comptroller Brad Landers, State Senator Julia

13  Salazar.  So they are going to come up first.

14      [SERGEANT AT ARMS ISSUES INSTRUCTIONS TO

15  AUDIENCE.]

16      CHAIRPERSON MENIN:  Hello, Comptroller Lander,

17  welcome.

18      COMPTROLLER LANDER:  Good morning.  Thank you so

19  much, Chair Menin, and members of the Council's

20  Committee on Consumer and Worker Protection, which I

21  used to serve on and loved, and other members of The

22  Council.  Thank you for convening this important

23  hearing and providing the opportunity to testify on

24  critical legislation facing tenants across the city.

25  I strongly support Intro 360, The Fairness In

**JA173**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION      101

2    Apartment Rental Expenses, or FARE Act, sponsored by

3    Councilmember Ossé.

4        Intro 360 as you know, requires that whoever

5    hires a broker in a real estate transaction pays the

6    broker's fee.

7        The FARE Act is a common-sense bill that I urge

8    the Council to pass for two main reasons,

9    transparency and fairness.  The FARE Act would

10   require that fair, transparent contracts are

11   negotiated between parties involved in renting

12   apartments in New York City.  Over two thirds of New

13   York households are renters.  Those households are

14   disproportionately low-income compared to homeowners,

15   and they deserve to know exactly how much it will

16   cost to rent a new apartment.  This bill, in many

17   ways, will simply provide renters with the same fair

18   treatment and transparency that are already provided

19   to buyers in the home ownership market, making sure

20   that all fees and costs are known to the renter at

21   the outset of the transaction.

22       And it is also a common-sense element of fairness

23   that the party that chooses the broker should pay the

24   fee, where tenants hire a broker to help them find an

25   appropriate unit.  Of course, they should foot the

**JA174**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION      102

2    bill, but where landlords are the ones to identify

3    and hire, they should pay the fee for the broker

4    they've chosen.

5        And you were talking about this in the prior

6    panel, but I think it just bears underlining:

7    Landlords do bear a lot of costs, you know?  They

8    need to have insurance, and they need to hire a

9    super, and they need to pay for a plumber to come fix

10   the unit.  None of those things can they go and give

11   the bill to the tenant.  That is what rent is.

12   Tenants pay rent for services, and when landlords

13   choose services to be provided to them, they pay.

14   When tenants choose services to be provided to them,

15   they pay.  That's what this bill would do.  It is

16   plain and simple.

17       Look, it won't solve all of New York City's

18   housing problems.  We're in the tightest housing

19   market in generations, lowest vacancy rate, highest

20   rent burdens.  I won't go into that.  That's in my

21   testimony.

22       But families are leaving the city as alarming

23   rates as a result, and reducing the burden of hidden

24   brokers fees on families trying to find a new home

25   could potentially help to counter those trends.  With

**JA175**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION      103
 2   record high rents, an unexpected an often last-minute
 3   request or demand for a broker's fee can be the
 4   difference in a tenant's ability to afford a
 5   prospective apartment.  And with an increasingly
 6   competitive housing market, this is an inefficiency
 7   that can and must be avoided.
 8       I'm very grateful for the opportunity to testify,
 9   for you to have this important public hearing, and I
10   urge the Council to pass the FARE Act.
11       Thank you so much.
12       CHAIRPERSON MENIN:  Thank you, Comptroller.  And
13   now we will turn to State Senator Salazar.
14       SENATOR SALAZAR:  Thank you, Chair Menin and
15   members of the Committee, Councilmembers, for
16   allowing me to testify today.  I am Senator Julia
17   Salazar.  I represent communities in parts of
18   Brooklyn and Queens in the New York State Senate.
19       I want to express my support for Councilmember
20   Ossé's bill, the FARE Act, to ensure that prospective
21   tenants in our city will no longer be forced to pay
22   broker fees in cases where the tenant did not hire
23   the broker.
24       The norm within New York's rental market of
25   landlords passing brokers or agencies on to
```

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        104

2    residential tenants makes an already expensive and

3    often burdensome process of securing housing in our

4    city, even more cost prohibitive for many renters.

5        This practice is not the norm in most major

6    cities in the US, as has already been mentioned.

7    However, in New York, the practice of landlords or

8    brokers demanding the tenants pay the broker's fee is

9    not new.  In fact, the state legislature sought to

10   address this problem through the Housing Stability

11   And Tenant Protection Act, the HSTPA, an omnibus bill

12   that I voted for, which became law in 2019.

13       The intent of the legislation was to strictly

14   limit the fees that can be legally imposed on a

15   tenant, and to end the practice of compelling tenants

16   to pay additional fees, including brokers fees, as a

17   precondition to obtain housing.

18       Unfortunately, after parties representing the

19   real estate industry brought a lawsuit against the

20   Department of State for seeking to enforce this law,

21   a state court ruled against the Department of State's

22   guidance in 2021 making the broker fee component of

23   the HSTPA unenforceable.  As a result, there is

24   currently nothing preventing a landlord from

25   demanding a tenant pay the commission or fee for an

**JA177**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        105

2    agent that the tenant did not hire, and there is no

3    legal limit to how much a landlord or broker can

4    charge a tenant as a broker fee.

5        Due to this failure to restrict brokers' fees, a

6    family or a tenant who could otherwise afford the

7    upfront costs of renting an apartment often faces a

8    wildly unaffordable broker fee, costing them

9    thousands, or even in some cases, tens of thousands

10   of dollars in order to move into an apartment.

11       When the broker works for the landlord, the

12   broker should be paid by the landlord.  Brokers often

13   provide a valuable role in service to property owners

14   and to prospective tenants.  The purpose of this bill

15   is not to negatively impact brokers or their

16   livelihood, but simply to make it clear that the

17   party who hires the broker is responsible for paying

18   the broker, and they cannot stick another person with

19   their bill.

20       In a city where hundreds of thousands of our

21   neighbors are experiencing homelessness every day and

22   countless more New Yorkers are struggling with

23   housing insecurity, we cannot allow such an

24   exploitative practice to persist, that makes it

25

**JA178**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION      106

 2   impossible for many working people to secure

 3   permanent housing.

 4       For the sake of my constituents and the majority

 5   of New Yorkers who are renters, it is urgent that the

 6   City Council pass the FARE Act and protect tenants as

 7   consumers from this harmful and unjust practice.

 8       Thank you.

 9       CHAIRPERSON MENIN:  Okay.  Thank you both very

10   much.

11       COUNCILMEMBER OSSÉ:  Thank you.

12       CHAIRPERSON MENIN:  Okay.  Thank you both very

13   much for your testimony.

14       We are now going to move on to the panel that I

15   mentioned Rob Solano, Andrea Joseph, Jeffrey Hannon,

16   Annie Abreu, Bradley Tusk on Zoom.

17       Just to expedite, I'm going to let the next panel

18   know.  That doesn't mean come to the desk, but just

19   start to get ready.  The panel after will be Melissa

20   Gomez, Sarah Salzberg, Hal Govsie, and Douglas

21   Wagner, thank you.

22       MR. HANNON:  Okay.  Sorry about that.

23       CHAIRPERSON MENIN:  Okay, no problem.  Please go

24   ahead.

25       MR. HANNON:  I'd like to thank--
```

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION      107

 2       COUNCILMEMBER OSSÉ:  You've got to turn your mic

 3   on.

 4       CHAIRPERSON MENIN:  Turn your mic on.

 5       MR. HANNON:  I turned it off.  Sorry about that.

 6   I'd like to thank you the committee Chairperson.  I'd

 7   like to thank Chi for pushing this bill, listening to

 8   brokers, tweaking the bill from the earlier bill.

 9       My name is Jeffrey Hannon.  I'm a real estate

10   broker.  I own my own brokerage.  I'm a one-man shop.

11   I'm independent.  I started my brokerage in early

12   2020, before COVID, after leaving Douglas Elliman.

13       I'm here today because-- Not so much that I work

14   in rentals so much anymore.  I've been doing this

15   since 2012.  I was one of these rental brokers who

16   gets told, "You know you're going to be the next

17   Frederick Eklund, and you're going to have your

18   million-dollar listings."  And the reality is, I

19   moved here.  I was working a serving job in Midtown.

20   I had $5,000 in the bank, and I closed one deal that,

21   like, a cousin of a cousin had, and I thought I was

22   going to-- you know, this was it.  I quit my serving

23   job.  And then September came.  I made no money.  It

24   slowed down.  This was back in 2012.  I've always

25   hated having to collect a broker's fee from my
```

**JA180**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        108

 2   tenant.  There are OPs that everyone talks about.

 3   There's 50%, our Ops.  You know, I don't know where

 4   they get this data.  StreetEasy?  Because StreetEasy

 5   is not reliable.  We don't have an MLS in this city.

 6   It's one of the only ones also that doesn't have a

 7   Multiple Listing Service where brokers can look and

 8   get all the listings.  A private company had to

 9   create this, and now it's owned by like the Zillow,

10   Trulia, Naked Apartments, whatever.

11      I take issue and nothing personal against Bess.

12   She was lovely.  I met her outside.  But when was the

13   last time she's represented a tenant under $5,000

14   around this city and made--

15      [BELL RINGS]

16      I'm just going to ask you to wrap up again.

17   Everyone has two minutes.  So once the two minute

18   bell, everyone needs to wrap up.

19      MR. HANNON:  Basically, REBNY does not represent

20   agents.  They represent corporate landlords, and

21   they're lying to their agents.

22      CHAIRPERSON MENIN:  Okay.  Time is up.  Next

23   speaker.  Thank you.

24      MR. SOLANO:  Good morning.  My name is Rob

25   Solano.  I am the co-founder and Executive Director
```

**JA181**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION       109

2    of Churches United for Fair Housing.  We have over

3    25,000 members to our 40-plus church partners

4    providing affordable housing service in Brooklyn,

5    Queens, and recently in the Bronx.  I am here today

6    on behalf of hundreds of thousands of tenants we

7    represent throughout New York City to support the

8    FARE Act.

9        The FARE Act is simple and clear, making it one

10   of the easiest bills we have ever had to explain to

11   our members and faith leaders.  If you hire someone,

12   you pay for their services.  This bill doesn't stop

13   brokers from getting paid.  It just ensures that the

14   cost is covered by the party who hired them.

15       Right now, landlords can force tenants to pay for

16   brokers they didn't choose or vet, and cannot hold

17   them accountable.  We have heard many, many, many

18   hundreds of stories of tenants who would charge a

19   month's rent just to receive a lockbox code from the

20   broker.  Moving is already expensive with moving

21   related fees, first month's rent, and a deposit.  It

22   can take months to get your deposit back from your

23   current apartment, making saving up to moving nearly

24   impossible.

25

1   COMMITTEE ON CONSUMER AND WORKER PROTECTION      110

2       Adding a broker fee on top of that creates a huge

3   barrier, especially for low-income tenants that are

4   using CityFHEPS vouchers, Section 8 or HASA.  I would

5   love to see brokers who raise their hand that work

6   with those tenants.  On HRA, only pay half their

7   usual broker fees.  We've only seen landlords use

8   broker fees to exploit tenants.  For example, right

9   now, there's a listing in the Bronx for an

10  affordable, rent stabilized apartment, and it comes

11  with a broker fee, a $10,000 broker fee to the

12  tenant.

13      I urge you to support the FARE Act.  Your backing

14  will help create a fair housing system in New York

15  City.  Thank you.

16      CHAIRPERSON MENIN:  Thank you.  Next speaker.

17      MS. JOSEPH:  Is this on?

18      CHAIRPERSON MENIN:  If the red light is on, it's

19  on.

20      MS. JOSEPH:  Okay.  Thank you.

21      Good morning, Councilmembers.  My name is Andrea

22  Joseph.  I am a postdoctoral researcher at Mount

23  Sinai and the president of United Auto Workers Local

24  4100.  Today, I have the pleasure of speaking not

25  only on behalf of my members in 4100, but all our New

**JA183**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION      111

2    York City members in Region 9A.  We represent workers

3    in nonprofits, arts museums, higher education, movie

4    theaters, car dealerships, sciences, and more.  The

5    vast majority of our membership are renters.

6        We have a housing and affordability crisis in our

7    city.  Our members work hard.  We fight at the

8    bargaining table for everything we get.  I know this

9    firsthand because my shop at Mount Sinai went on

10   strike for our first contract last winter.  In our

11   strike, we won nation leading wages for postdocs.  We

12   are proud of that, but I am equally proud that we

13   stayed on strike to win housing guarantees for our

14   members.

15       The reason we did this is because we are a

16   majority immigrant workforce.  We knew that if we

17   didn't fight for it at the bargaining table, our

18   members would be subject to the open market, and they

19   would be vulnerable to exploitation by broker fees.

20       In our strike, we were also fighting for

21   childcare and to keep women in the workforce.  I've

22   heard from members across our region that they are

23   deciding to move out of the city or leave a job they

24   love because they cannot afford an apartment with

25

**JA184**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        112

2    space for their families and the broker fee that goes

3    along with that.

4        One example I heard of this was from a leader in

5    our union with an 18-month-old daughter who wanted to

6    move within his rent-stabilized building to a newly

7    vacant larger apartment one floor down.  When he

8    asked about moving into the other apartment, the

9    landlord tried to charge him a broker fee by

10   connecting him with his preferred broker instead of

11   letting him transfer.  This was someone already

12   paying a monthly rent to this exact landlord.  That

13   worker is now moving out of the building, moving

14   further from his daughter's school, friends, and

15   family because they needed more space.

16       [BELL RINGS]

17       At the bargaining table, UAW fights for workers

18   to get our fair share, but we also stand for the

19   entire working class, because not everyone is in the

20   union.  We fundamentally support Councilmember

21   Ossé's--

22       CHAIRPERSON MENIN:  Okay, I'm going to ask you to

23   wrap it up, please.  Thank you.

24       MS. JOSEPH:  That's it.

25       CHAIRPERSON MENIN:  Great.

**JA185**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION      113

2        MS. ABREU:  Is it on?  Okay?  Hello.  My name is

3    Annie Abreu.  I'm from Sunset Park in Brooklyn.  I

4    just graduated law school, so I'm actually taking a

5    break from studying for the bar to come testify and

6    convince everybody that doesn't need to be convinced.

7    Me and my mother are low income, so I faced housing

8    insecurity basically most of my life, but it's been

9    worse within the last 11 years, especially as the

10   housing crisis has worsened.

11       For the past three years, we have lived in a very

12   insecure living situation where the threat of

13   eviction basically hangs over our head every single

14   day.  And among other things, we can't really do

15   anything, because it's not a situation where the law

16   really protects us.  But my need for housing has

17   increased.  We desperately would like to move, and as

18   I step into my new employment as a housing attorney,

19   in September adequate housing is going to be

20   essential for that transition.

21       We've had two main obstacles when it comes to

22   being able to move freely within our neighborhood.

23   The first is income requirements.  Because we are low

24   income, we don't really make the 40-times-the-rent

25   requirement that a lot of landlords set.

**JA186**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION      114

2        However, even as I'm about to enter into a new

3    income bracket and finally meet that income

4    requirement, I'm faced with another obstacle, which

5    is the broker's fee.

6        It would be impossible for us to leave our

7    current insecure living situation and find an

8    apartment in my neighborhood as soon as I start

9    working, because having to pay three fees in one go

10   is basically impossible.  That means that me and my

11   mother would have to save money for at least six to

12   eight months before we even have enough money to just

13   pay the landlord.  So, that doesn't even cover moving

14   expenses.  It's literally just money going to a

15   single person, and they're going to use a portion of

16   that to pay the person they hired, not that I hired.

17       I'm fine paying one month's rent and security

18   deposit.  But given that our current expenses won't

19   just disappear to give me and my mother the ability

20   to save all of that money, it is much more feasible

21   for us to save $4,600 for a two bedroom that's going

22   for like $2,300 in my neighborhood, than it would be

23   for us to save $6,900.

24       While me and my mother would love to save every

25   paycheck that comes our way, it's impossible.  Living

**JA187**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        115

2    in New York City basically means that you pay to

3    breathe at this point.  I do not think that there's

4    any reason for me to pay one month's rent or more to

5    a person the landlord hired to post something on

6    StreetEasy, or Zillow, or God-knows-where, riddled

7    with typos and lies only for me to get the apartment

8    on my own and not get any response and not get any

9    responses to my basic questions.

10   CHAIRPERSON MENIN:  Thank you.  And we have one

11   more speaker on this panel.  We have Bradley Tusk on

12   Zoom.

13   MR. TUSK:  Thank you so much.  Since you guys

14   have a lot of people we testify, I'm going to be

15   really brief and skip my prepared remarks.  I just

16   want to make the case that from an economic

17   standpoint, this bill is excellent for New York City.

18   Everyone here has approached it from more of an

19   affordability standpoint.  That makes a lot of sense.

20   But one of the things that makes New York New York,

21   is that the best and the brightest people from all

22   over the world, every continent, every part of the

23   globe, want to come here, and they come here, and

24   they do great things.  They start businesses.  They

25   start organizations, they create great ideas.  They

**JA188**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION      116

 2   create great art.  And that's what allows so much

 3   more opportunity to happen for so many other New

 4   Yorkers.  But we are preventing their ability to do

 5   that, and to move here by charging that, the sort of

 6   artificial barrier, this totally unnecessary fee.

 7        And so unless we want a city where all we have

 8   are people can afford the broker's fee, like the

 9   consultants, and investment bankers, and things like

10   that, and who would want a city like that?  It's

11   totally boring.

12        You know, we're losing a lot of talent to Austin,

13   to Nashville, to Miami, to so many other places, that

14   we don't have to.  So from a long-term perspective,

15   from the city creating jobs, creating wealth,

16   creating more taxpayers, the best thing we can do is

17   pass the FARE Act.  Thank you.

18        CHAIRPERSON MENIN:  Thank you.  So, I think

19   Councilmember Ossé has questions for this panel.

20        COUNCILMEMBER OSSÉ:  Uh, I have a question for

21   everyone on this panel, but I'll start with Mr.

22   Hannon.  As a broker, why do you support the FARE

23   Act, and is it important that the FARE Act passes?

24        MR. HANNON:  I'm not a very good public speaker.

25   I'm sorry.  I support the FARE Act, because if my co-
```

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION       117
 2   op clients, my condo owner clients, can afford to pay
 3   a one-month fee than a landlord that has 700
 4   buildings, these huge corporate landlords, can pay
 5   the fee.  In fact, they already do.  All of us here,
 6   we always have to explain to our clients, "Oh, the
 7   no-fee versus the fee, the no-fee apartment it's
 8   built in, they offer two months free."  Net effective
 9   is the new thing.  They rent those at lower-- It's
10   just so--  There's no transparency, and the $50,000--
11   It's just like, people are on food stamps or on
12   Medicaid, and like, I'd love to know how many of them
13   are in that level, like the working class, the
14   immigrants, the ones just starting off.
15       I'm in favor of it because I have nothing to
16   lose.  I don't care.  I don't need to work in this
17   business anymore.  But I will fight for those who are
18   younger than me.
19       [BACKGROUND VOICES]
20       [GAVEL]
21       COUNCILMEMBER OSSÉ:  Thank you.  I have a
22   question for Rob Solano.  From your organizing work
23   across the city, how many New Yorkers hire brokers?
24       MR. SOLANO:  We've been doing this since 2009.
25   One of our workshops had over 2000 New Yorkers come
```

**JA190**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        118

2    to apply for housing.  And I would say-- I would say,

3    none wanted to hire a broker to pay a fee for them,

4    for ultimately something that they can find on

5    Zillow, or StreetEasy, or word of mouth to folks.

6    And most of them-- and this was going back from their

7    own experience-- the broker would pay the fee if they

8    were buying the apartment, or if they were buying a

9    condo.  They're mental already is established that

10   broker fees are paid by the landlord.

11       And I just wanted to make-- about broker fees:

12   HPD already does follow the FARE Act in their

13   marketing guideline on page 67, Attachment S1.  They

14   have embedded the FARE Act where the broker fee is

15   done by the developer.  And I have a lot of respect

16   for the HPD rep, uh, that came.  They could have gave

17   you the data, since they've been building housing

18   since 1975 at HPD.  They could have came to told you

19   what the broker fees are, and they would have told

20   you that they do it through the FARE Act.  They put

21   it on the developer, and why the market in HPD has

22   been incredibly successful for over four decades.

23   HPD has been working with the FARE Act and been

24   implementing the broker fee to the developer in all

25   of their projects, not just the Mitchell Lama throw

**JA191**

1   COMMITTEE ON CONSUMER AND WORKER PROTECTION       119

2   that he gave you.  It's been embedded in their

3   marketing system for four decades.

4       COUNCILMEMBER OSSÉ:  And the previous panel of

5   brokers stated that the current system is

6   transparent.  They were implying that prospective

7   tenants are going into these deals with the full

8   knowledge that they need to pay the broker fee.  Do

9   you feel that the bargaining and negotiating process

10  for tenants is fair under the current system?

11      MR. SOLANO:  Absolutely not, because we also work

12  with the developers that do some-- take on the

13  brokers, and they sometimes put it on the tenants on

14  our affordable housing marketing team.  And I would

15  say to-- the marketing team is relatively brokers.

16  You can just call their marketing team a marketing

17  agent.  I would say no one has any idea of what's

18  happening as a tenant in the experience.  They get

19  their first month, they get their last month, they

20  get their security.  They try to get this thing

21  going.  Then they get reminded they don't have to pay

22  last month anymore.

23      Very, very common, the broker fee is a gotcha at

24  the end that is reminded and hustled by the broker.

25  I do want to establish why I think there's a lot of

**JA192**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        120

2    energy-- why the why the brokers want to go one on

3    one with tenants and not landlords.  Landlords have

4    lawyers, landlords have staff, landlords have

5    resources and other real estate apartments to hustle

6    with that broker.

7        So, it's much easier for a broker to go one-on-

8    one with a single mom.  It's much easier for a broker

9    to go one on one with someone that doesn't have a lot

10   of resources and won't sue them.  And also a broker

11   can then ruin their credit if that specific tenant,

12   for some reason, they didn't feel like the services

13   was done well, and decided not to pay the broker fee,

14   that broker could turn around, write a report, and

15   give that person a bad credit.

16       So, there is a lot of strategy, why big broker

17   firms here today would rather handle everyday New

18   Yorkers, and why I'm appreciative of the government

19   here today taking a step forward to support the

20   tenants and everyday New Yorkers.  Let them deal with

21   the landlords as they usually do.

22       CHAIRPERSON MENIN:  Thank you for that.  And I

23   have a question for Ms. Joseph from the United Auto

24   Workers--

25       [BACKGROUND VOICES]

**JA193**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION      121

 2       COUNCILMEMBER OSSÉ:  [TO CHAIR, GESTURING:]  She

 3   was yelling liar.  The woman in the blue over there.

 4       [GAVEL]

 5       CHAIRPERSON MENIN:  Let me be clear:  Whether

 6   you're for this, against it, the rules are very

 7   clear.  We will call you out of order, and the

 8   Sergeant Of Arms will remove anyone who is

 9   disruptive.  Okay?  I just want to make sure everyone

10   understands the rules that we follow here in the

11   Council.  So if people will continue to be

12   disruptive, they will be removed.

13       COUNCILMEMBER OSSÉ:  I do have a question for

14   Ms.--  Thank you, Chair Menin.  I do have a question

15   for Ms. Joseph from the United Auto Workers Union:

16   Why is broker fee reform important for unionized

17   workers?

18       MS. JOSEPH:  Sure.  As I mentioned in local 4100,

19   and in my shop at Mount Sinai, 80% of our workers are

20   international workers.  60% of postdocs at Columbia

21   are international workers.  Many of us are parents,

22   have children.

23       Affordability is an issue that affects workers

24   and especially UAW members across the region.  It's--

25   You know us postdoc researchers are coming to New
```

**JA194**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        122

2    York City to contribute to science.  You know, study

3    cures for cancer, study neurodegenerative diseases.

4    We're relocating.  We're moving to--  We're moving to

5    a new country.  We have many--  The moving costs are

6    exceedingly high.  And you know, as the speakers

7    before me mentioned, being forced to pay first

8    month's rent, last month's rent, security deposit,

9    and, you know, broker fee on top of that is, you

10   know, makes it impossible for our workers to upgrade

11   apartments when our families grow, or when our needs

12   change.  So, it's really important to workers in our

13   union and all the working class people in the city.

14       COUNCILMEMBER OSSÉ:  Thank you.  And my last

15   question is for Miss Abreu.  How has the broker fee

16   impacted your ability to find housing for you and

17   your mother, as you testified?  How is the broker fee

18   considered an obstacle to find affordable housing for

19   working class families?

20       MS. ABREU:  So actually, I was thinking about it

21   when you asked.  I can't remember who, but when you

22   asked about the bargaining process.

23       And for me, I remember, about, like 2014 I was in

24   high school, but we were trying to move, so I was

25   like, looking for a place for us, like, as a

**JA195**

```
 1  COMMITTEE ON CONSUMER AND WORKER PROTECTION        123

 2  teenager.  And we were so desperate at the time that

 3  that fee came up, and I was so confused.  I was

 4  always used to hearing about security deposit, one

 5  month's rent.  And I was like, "Oh.  Well.  Okay.  I

 6  guess we're desperate, so we'll pay it," but the

 7  income requirement was the main obstacle then.  But

 8  that was when rent was $1,400.  Now rent for a two-

 9  bedroom, or even a one-bedroom, is like over $2,000.

10  I was passively searching on StreetEasy the other

11  day.  I found like 32 apartments that were listed.

12  Only two of those didn't have a fee.  One of them

13  that didn't have a fee was a two-bedroom apartment

14  that was going for $3,200.  Why would I go for that

15  option when there is a two-bedroom apartment that's

16  available for $2,000?  But then the problem with that

17  one is that there is a broker's fee.  So I would have

18  to save $6,000 to be able to actually access that

19  apartment.  So, for me, that means that if I want to

20  move within New York City, I can't move freely.  I

21  have to save for six to eight months, like I

22  mentioned before.  I have to keep myself in an

23  insecure living situation, keep myself in an

24  uncomfortable living situation, keep myself in an

25
```

**JA196**

1   COMMITTEE ON CONSUMER AND WORKER PROTECTION      124

2   inadequate living situation until I have enough money

3   to pay somebody that I did not hire to move.

4       COUNCILMEMBER OSSÉ:  And I'm not sure if you

5   remember, in your search, but when you found those

6   two no-fee apartments, do you recall if they were

7   luxury buildings, or pre-war buildings?

8       MS. JOSEPH:  No, they were-- they were like

9   regular buildings in the neighborhood, like, that you

10  would find, you would look in like one of the regular

11  apartments that are like in the corner.  You know,

12  something I see every single day.  There's not really

13  that many luxury apartments in-- in Sunset Park,

14  specifically.  And something that I keep like

15  laughing at when people talk about the fact that

16  there are not develop-- enough developments going on

17  in New York City.  There are so many affordable

18  housing lottery apartments being built all throughout

19  the five boroughs.  But the problem with that is that

20  there's like, income requirements for that, so

21  they're not accessible either.  So, there are

22  apartments.  So, I don't know where that-- that's

23  coming from.

24      And I also don't know where the number, like, the

25  50% of apartments that don't have brokers fees coming

**JA197**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION       125

2    from.  Because again, in my search, I only found two

3    that did not have a broker's fee.  And usually when

4    they don't have a broker's fee, it means that they're

5    going to be more expensive in rent because they're

6    trying to, like, fit that fee in somewhere else.

7        [BACKGROUND VOICES]

8        That's not in support of y'all.

9        [GAVEL]

10       MR. SOLANO:  Councilmember, if I may add to your-

11   - Councilmember Ossé, if I can  also try to answer

12   your question.  If you look at The Williamsburg

13   market today, most of the development sites do not

14   hire brokers.  They--  If the brokers were so sought

15   after, and this was an incredible service, why aren't

16   these high in high-income markets that charges $4,000

17   to $5,000 for two bedrooms going after the brokers to

18   market their apartments?  There is an incredible

19   balance in the Williamsburg market right now.

20   There's incredible data on it that all the waterfront

21   units are being done on their own, with their own

22   team, without charging a tenant the broker fee.

23       So, there is a level of the high-income community

24   that does not have to pay the broker fee.  They get

25   net effective rent.  They get no fee.  They get

**JA198**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        126

 2   swimming pool access.  They get amenities on top of

 3   it.  They sometimes get a television from their deal.

 4   But when it comes to the lower income side of the

 5   family, we don't get the TV, we don't get the one

 6   month off, and we have to pay a broker, a broker fee

 7   for an apartment that should be being paid a broker

 8   fee by the landlord.

 9       So, there is a substantial amount of market rate

10   units in the system that is not using the service, a

11   lot of the people here in the room that call

12   themselves brokers.  They've-- The whole entire high

13   income level renters have shifted over to handle

14   their own team and not charged broker fee.

15       So, the market is responding.  The market is

16   saying, "Broker fee should either be handled by the

17   landlords, or we shouldn't be charging it at all,"

18   and that's coming from the high incomes.

19       So, what we should be doing is establishing,

20   getting the data from that, and understanding that if

21   that's working for the higher market, could be

22   working for the lower market as well.

23       MS. JOSEPH:  I want to also reference the fact

24   that they all cheered for that, but that's-- the fact

25   that landlords find sneaky ways to do things is their
```

**JA199**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        127

 2   fault as well.  They are their partnership.  It's a

 3   predatory partnership.  They're going to feed each

 4   other some way or another.  It's not because

 5   landlords are just going to do it to do it.  It's a

 6   partnership.

 7      CHAIRPERSON MENIN:  We've also been joined by

 8   Councilmember Krishnan, and I'm going to turn it over

 9   to Councilmember Nurse for a question.

10      COUNCILMEMBER NURSE:  Thank you, Chair.  One of

11   the things that was said this morning at a rally was

12   about the upfront costs, cobbling together the

13   upfront costs versus a little bit more in rent

14   monthly.  And I think it really speaks to the cash

15   flow issue that we're-- that really is the problem

16   with most with most household budgets.  They don't

17   have the cash flow.  They have very little savings.

18   If anything goes wrong, if they get hurt at work, if

19   something happens, their kid gets sick--  Like every-

20   -  So many New Yorkers are a simple accident, a

21   simple car situation away from completely depleting

22   their entire bank accounts.  And so I-- you know this

23   conversation about rolling in the rent or not, it

24   really is about the fact that cobbling together

25   thousands of dollars up front is the-- is the
```

**JA200**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        128

2    barrier.  Somebody said today, oh, $50 to $100 more

3    in rent.  That might be something they could stomach

4    because that's what the market is at, unfortunately,

5    and that's a problem that has to be fixed.  And

6    believe me, this Council works on that all the time.

7    Nobody here on this-- in this side of the table needs

8    a lecture about housing supply and housing demand.

9    We can just not waste our time talking about that, in

10   this particular instance.  But the fact that it's--

11   it's incredibly challenging to get $3,000, $2,000,

12   $1,000 extra when you don't really have anything in

13   the savings is really what we're talking about as

14   well.

15       So, can you speak to the-- the community that

16   you, that you work with and serve and their ability

17   to pull that amount of money together?

18       MR. SOLANO:  I welcome this conversation.  We-- I

19   just did it on Saturday.  I helped my-- my brother-

20   in-law, move from a fourth floor walk up to a first-

21   floor apartment five blocks away.  And I was just

22   there to bring coffee, and I ended up moving the bed

23   and the bureau with him.  I was there for two hours

24   while my wife had the two kids looking.  He only had

25   enough for the security deposit and the first month's

**JA201**

```
 1    COMMITTEE ON CONSUMER AND WORKER PROTECTION      129
 2    rent, and he has saved over two years just to be in
 3    the position.  And in his own mental felt that that
 4    was totally appropriate.  "It's the first month that
 5    I lived there, and if anything ever happens to this
 6    apartment, I know that is a security, that me and the
 7    landlord will come..."  This is on the ground.  The
 8    data will show that what I've just said as a human
 9    example, will collaborate-- collaborate, everything
10    I've just told you on.  It is almost nearly
11    impossible for everyday New Yorkers to combo together
12    our a first month's rent and a security.  And he
13    already accepted that he was not going to get the
14    security from the apartment, that he was not-- even
15    though he mopped it, cleaned it, erased every little
16    thing that was there.  He already just said, that's
17    going to take me forever.  I'm going to try, but I'm
18    probably not going to get that back.
19        So, there is an incredible need that if there was
20    another fee on top, it would have been two years just
21    to do the first month, and the security, it would
22    have been impossible just for my brother-in-law to
23    move anywhere.
24        So, to your point, I say this is an incredible
25    need to put that broker fee on the landlord.
```

**JA202**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION      130

 2       CHAIRPERSON MENIN:  Okay, thank you.

 3       COUNCILMEMBER NURSE:  It's also-- It's also the

 4   fact that sometimes people end up going into debt to

 5   cover that fee.

 6       MR. SOLANO:  Yeah.

 7       COUNCILMEMBER NURSE:  Because even if they might

 8   work out a deal where there's-- they're not only--

 9   things are rolled into their rent, but they're still

10   paying off monthly, something with a deal.

11       So, it is incredibly challenging at the household

12   level, and I really appreciate you speaking on it.

13       MR. SOLANO:  Thank you.

14       CHAIRPERSON MENIN:  Thank you very much.

15   Councilmember Oseé had another question for the

16   panel.

17       COUNCILMEMBER OSSÉ:  Just one more question for

18   Mr Tusk, in response to your point on this impacting

19   the economy.

20       From your perspective, why is passing the FARE

21   Act important, especially for young professionals who

22   may want to work in new industries in the city?

23       MR. TUSK:  Yeah.  I mean, look, I invest in tech

24   startups, early-stage tech startups all over the

25   country.  But I would always prefer to invest in New
```

**JA203**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION      131

 2   York startups.  And I have all of these companies

 3   where they want to be based here, but they have to be

 4   able to recruit talent, and they're competing with

 5   other startups all over the country and all over the

 6   world, and when the cost of living here is too high,

 7   when someone has to move here and pay exorbitant out-

 8   of-pocket fees just to get information that's already

 9   free on the internet, they end up not basing their

10   companies here, right?  And so all kinds of

11   industries, from digital health, to transportation to

12   energy, to education that are doing incredibly

13   groundbreaking things all across artificial

14   intelligence, machine learning, things like that.

15       We're not getting the benefit of that, simply

16   because we are sacrificing all of those jobs and all

17   that opportunity in order to give one constituency a

18   fee that they really, quite frankly, don't deserve.

19       COUNCILMEMBER OSSÉ:  And the last question that I

20   have for you is:  Why is it important to keep our

21   young professionals in New York and not move to other

22   cities?

23       MR. TUSK:  I mean, they're-- because the ROI, the

24   Return On Investment is really high.  I mean, these

25   tend to be people, who they're typically not in
```

**JA204**

1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        132

2   schools, so there's no cost of educating.  They're

3   not using a lot of social services.  They're spending

4   the vast majority of their disposable income on

5   entertainment and nightlife, and, you know, bringing

6   it right back into the economy.  So, they're--

7   they're paying taxes, they're putting money in the

8   economy.  They require very little from the city in

9   terms of cost or services.  These are really high-

10  value tax payers, and having them is where it gives

11  us the resources to help everybody else who needs

12  help.  And so we should do everything we can to

13  encourage them to be here.

14      COUNCILMEMBER OSSÉ:  So you would say forced

15  broker fees are bad for New York City's economy?

16      MR. TUSK:  No question about it.

17      COUNCILMEMBER OSSÉ:  Thank you.

18      MR. SOLANO:  Councilmember Ossé, may I add to the

19  economy question?  Because it's something that Sandy-

20  - Councilmember Nurse had mentioned:  The assumption

21  is that most of our tenants are paying 30% of their

22  income towards rent.  Tenants are more likely paying

23  50% to 60% to 70% of their income is going to rent.

24      This is not the days of 30% ratio that is

25  happening in New York.  The market has exploded that

**JA205**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        133

 2   people need to put-- it used to be two generations of

 3   family.  People putting four generations of family in

 4   one household, squeezing into a two-bedroom, and

 5   paying up to 70% of that family's income towards

 6   rent, and additional-- your legislation to put the

 7   broker fee into a landlord or to anyone that wants a

 8   broker fee will be life-changing to everyday New

 9   Yorkers.

10       And I just wanted one last second to say, it's

11   not every day this happens.  Over two decades that I

12   have been pushing legislation, this is an important

13   legislation that has real impact on New Yorkers, and

14   I appreciate you all today.

15       COUNCILMEMBER OSSÉ:  Thank you.  Thank you Chair.

16       CHAIRPERSON MENIN:  Okay.  Thank you very much to

17   this panel.  And we will now call the next panel.

18   Douglas Wagner, Hal Govsie, Sarah Salzberg, Melissa

19   Gomez.  If you could please come up.

20       Okay, please begin.

21       MR. WAGNER:  Hello.  I'm Douglas Wagner from BOND

22   New York.  I live in Councilmember Ossé's District

23   36.

24       I'd like to draw attention to the ideas of how

25   this would affect advertising transparency and
```

**JA206**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION      134

2    possibly create the greatest amount of shadow

3    inventory since the days of classified newspaper

4    advertising.

5        Landlords can make a business decision not to pay

6    a broker fee, and they can simply offer available

7    apartments to the brokers they do business with on an

8    open-listings basis, and then still have the tenant

9    pay the fee.  This is what happened in 2019, as was

10   previously discussed when the Department of State

11   issued guidance around HSTPA preventing a landlord's

12   agent from charging a broker fee to a tenant.  As we

13   know, that guidance was overturned, but in the

14   interim, landlords would temporarily restate their

15   relationships with real estate brokers as a way to

16   avoid paying the fee.

17       Many of the rental companies would receive

18   vacancy lists with the same apartments on them with

19   huge disclaimers prohibiting advertising, warning us

20   that we, as brokers, could list the apartments, but

21   we did not represent the landlord.  We were

22   encouraged to show these listed apartments to, and

23   bring applications from, tenants we already

24   represented and who would pay our commission.

25

**JA207**

```
1    COMMITTEE ON CONSUMER AND WORKER PROTECTION         135

2        I'm afraid the number of online apartment ads

3    would likely decrease by up to 85% when brokers are

4    no longer allowed to advertise non-exclusive

5    listings.

6        Consumers don't care whether a listing is an

7    exclusive or a non-exclusive.  They want to find out

8    what's available and how to see it.  We could go from

9    around 17,500 transparent apartment ads today to

10   about 2,500 of them in a week, removing consumers'

11   choice to search between no fee and fee-based

12   listings, effectively forcing anyone able to find

13   anything satisfactory in the remaining inventory to

14   have to hire a real estate broker and pay them the

15   fee.

16       Most brokers would continue to receive the

17   vacancy lists, but the information won't go away--

18       [BELL RINGS]

19       CHAIRPERSON MENIN:  Okay.  I'm going to ask you

20   to wrap up please.

21       MR. WAGNER:  This bill proposes to reduce tenant-

22   paid broker fees, and it would actually create more

23   of them than ever existed before.  Thank you.

24       CHAIRPERSON MENIN:  Okay.  Next speaker.

25
```

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        136

 2        MS. SALZBERG:  Hello.  I'm Sarah Salzberg.  I'm

 3   the owner of an independent firm, Bohemia Realty

 4   Group in Harlem.

 5        As New York City grapples with the housing

 6   crisis, our legislators must focus on solutions that

 7   address the root cause of this complex problem,

 8   instead of dictating how rental brokers are

 9   compensated.  Intro 360 would have myriad unintended

10   negative outcomes for tenants that will raise housing

11   costs and further limit housing access.  We have been

12   down this road before.  The 2019 passing of the

13   state's disastrous HSTPA serves as a troubling

14   reminder of another legislative attempt to keep

15   housing affordable by restricting landlords and

16   brokers, which spectacularly backfired.

17        Since 2019 rent in New York City has raised over

18   26%.  Last year alone, wages increased 1.2% while

19   rents increased 8.6% the highest of any market in the

20   country.

21        One of the many unintended consequences of HSTPA

22   is the tens of thousands of rent stabilized units

23   that sit off line due to a mandate that allows for

24   almost no rent increase, regardless of the funds

25   needed for renovations.
```

**JA209**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        137

2        City officials would better serve their

3    constituents by immediately advocating for reforms to

4    HSTPA, which would bring back 10s of thousands of

5    rent stabilized units.

6        Have there been any economic studies or analysis

7    that indicate Intro 360 would lower rents?  I think

8    we have clearly seen today:  No, there have not been.

9        Once a law is passed, it is hard to roll it back.

10   That's why we are fighting against this bill.

11       Number one:  Renters will be forced to pay more

12   in rent and in fees.  If all exclusive relationships

13   mandate that the broker fees is paid by the owner,

14   the owner will pass that cost to the tenant.  That's

15   what they do now.  Should that tenant stay longer

16   than a year, they end up paying that fee over and

17   over again.

18       Number two:  Renters will have less choice.

19   Right now, any open listing that currently pays a fee

20   to a tenant's agent, that would no longer be legal.

21   Similarly, there are many exclusives where owners may

22   prefer to keep rents lower for faster absorption.

23   Intro 360 fails to consider the flexibility that the

24   New York City market demands, and that has

25   historically benefited renters by giving them choice.

**JA210**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION       138

 2       [BELL RINGS]

 3       CHAIRPERSON MENIN:  Next speaker, thank you.

 4       MR. GOVSIE:  Thank you.  Hal Govsie with Douglas

 5   Elliman.  Thank you for having me here.  This bill

 6   will be a lose-lose for renters and agents, as it

 7   would increase rents and make it harder to apply for

 8   an apartment, while also creating a more challenging

 9   environment for agents to be paid for their work.

10       As we see, working with property owners every

11   day, most no-fee apartments do not absolve the renter

12   from paying broker compensation.  If not paid

13   directly by the renter, landlords most often include

14   broker fee costs in the rents.

15       The reality is, few owners have the time or

16   interest in handling the work that brokers do, and

17   recognize without them, apartments would not be

18   marketed, shown, and leased with the level of detail

19   and efficiency that benefits landlords and renters

20   alike.

21       With the current rental housing supply in New

22   York City so far behind demand, market history

23   suggests leasing apartments at higher rents,

24   inclusive of broker fees, will not be a challenge for

25   these owners.
```

**JA211**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        139

2        The Councilmember sponsoring this bill has even

3    acknowledged that the result of this legislation

4    would be that many landlords would include broker

5    fees in rents, arguing that the cost of a broker fee

6    would be more manageable for the renter if paid over

7    the cost of the initial lease term, rather than on

8    signing the day.  This is shortsighted.

9        While deferring broker fee costs may offer

10   momentary financial relief for some by baking fees

11   into rents, you are creating three negative

12   consequences for renters:  Immediately, you are

13   inflating average asking rents that would limit

14   negotiating power for renters in an already

15   competitive market; additionally, this bill could

16   also impact housing access with a higher base rent,

17   more renters will not meet the income requirements to

18   apply for certain units, thus further limiting their

19   options; finally, by including a previously one-time

20   payment now and rent, renters will again pay the cost

21   of the broker fee each year they resign their lease.

22       As I see my time is wrapping up here:  If

23   legislators want to curb rising apartment costs, they

24   should support tools to create more housing

25

**JA212**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        140

2    inventory, to keep up with demand, continuing to

3    advocate for failed ideas like--

4        [BELL RINGS]

5        CHAIRPERSON MENIN:  Okay.  If you could please

6    wrap up.

7        MR. GOVSIE:  -- Intro 360 distracts from

8    addressing the real causes of housing costs, increase

9    while punishing hardworking brokers and creating a

10   more challenging environment for renters.

11       CHAIRPERSON MENIN:  Okay.  And next panelist.

12       MS. GOMEZ:  Hi.  My name is Melissa Gomez.  I'm

13   actually from Southeast Queens.  I'm a member of the

14   New York State Association of Realtors.  I'm a real--

15   I am a realtor, and I'm also a small landlord as

16   well.

17       This legislation simply will not help the

18   residents of New York.  Affordable housing is a huge

19   concern for all of us, not just for this council, but

20   for real estate agents as well.  This bill attempts

21   to put a band aid on an issue, yet not really

22   resolves the problem.  Enacting a bill like this

23   would make landlords either not use a real estate

24   agent or significantly increase their base rent.

25

**JA213**

1   COMMITTEE ON CONSUMER AND WORKER PROTECTION     141

2      How do I know that it would increase rent?

3   That's because if you look on StreetEasy today, there

4   are 13,942 apartments.  Out of that 6,542 are no

5   fees.  When you're looking at the fees, the no fee,

6   rentals start at $4,893.  The ones that are

7   associated with broker fees are starting at $2,899

8   hat right there, shows you what's going to be

9   happening as far as rent is concerned.

10     Then we talk about other areas.  I looked up

11  Miami.  In Miami, tenants have to pay three months up

12  front, first month's rent, last month's rent and a

13  security deposit.  Here we only do first month's rent

14  and a security deposit to the landlord.  But Miami

15  also has different tenant laws.  For example, you can

16  give a three-day notice in Miami for eviction of non-

17  payment, whereas in New York City, 30, 60, or 90 days

18  is your notice and you're going to be in housing

19  court for a minimum of a year.

20     Next, the question is:  What will happen if we

21  discourage land was from hiring real estate agents.

22  And let's face reality.  In my experience, some

23  landlords do not feel that the same fair housing laws

24  that apply to real estate license leaves apply to

25  them.  I have often had to explain to a landlord

**JA214**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        142

 2   about the state and federal fair housing laws and how

 3   they must obey them.

 4       If this bill becomes law, the opportunity will

 5   decrease, and instead, the limited housing options

 6   that are currently available will become even more

 7   limited to the majority of people that are actually

 8   seeking shelter.

 9       This bill is an attempt to put a band aid on the

10   affordability crisis.  However, does not address

11   issues like the delays in housing court, the red tape

12   to build, modify and renovate, et cetera, that are

13   not being addressed.

14       To give an example, I own a two-family property

15   in the Bronx.  I had a gas leak.  It took me six

16   months back and forth between Con Ed in New York City

17   to get that resolved.

18       [BELL RINGS]

19       CHAIRPERSON MENIN:  Okay.  I'm going to ask you

20   to wrap up please.

21       MS. GOMEZ:  Okay, no, that's it.  You know, I

22   just at the end of the day, it's going to be baked

23   in, which is the reality.  Thank you for having-- for

24   hearing me.

25
```

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        143

2        CHAIRPERSON MENIN:  Okay.  Any questions for this

3    panel?  If not, we are going to move on.  And I also

4    want to mention, we've been joined by Councilmember

5    Brewer.  Okay, thank you to this panel.  I'm now

6    going to call the next panel.  Anna Klenkar, Michael

7    Corley, Samuel Stein, Allia Mohamed, Brendan

8    Griffith.  Please come up.  Thank you.

9        COUNCILMEMBER OSSÉ:  You may begin.  Remember to

10   turn on your mic.

11       MS. KLENKAR:  Good morning, Councilmembers.  My

12   name is Anna Klenkar, and I'm a broker who supports

13   the FARE Act.  In 2019, when this briefly became law,

14   I was primarily a rental agent, earning about $40,000

15   a year, and I welcomed this change.

16       Not only is it a fairer system, one which exists

17   almost everywhere else, but it meant I would never

18   again work with a tenant for weeks, only to give up

19   my commission when a listing agent wanted the full

20   15% fee, a fee paid by someone who actually hired me,

21   not them.

22       Since 2019, I've publicly supported this type of

23   legislation.  I'm not alone, but the official

24   industry stance has been to block these bills in

25   order to protect our income.

**JA216**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        144

 2       That's how REBNY gathered agents here to protest

 3   today by claiming this is necessary to, quote,

 4   protect our commissions.  But REBNY has also proposed

 5   as an alternative to the FARE Act helping tenants

 6   negotiate down the commissions they pay us.  It feels

 7   less like we're protecting ourselves and more like

 8   we're protecting landlords, whom REBNY also

 9   represents.

10       Notably, they do not represent tenants, which

11   makes me question some of their other claims about

12   the bill's impact.  The FARE Act does not cap agent

13   commissions.  If our incomes drop because landlords

14   pay us less than they expected tenants to pay, it

15   just shows the current system is built on

16   exploitation.

17       At the end of the day, it isn't about us.  It's

18   about removing financial hurdles that keep tenants

19   trapped in unsafe situations, which can be as serious

20   as life or death.  But while you don't need real

21   estate's permission to pass this bill, rest assured

22   that agents, as well as attorneys and other industry

23   professionals are involved, even if it was too risky

24   or intimidating to physically be here today.

25
```

**JA217**

1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        145

2       It is incredibly popular, and the longer we fight

3   it, the more we erode agents reputation and public

4   trust.  There are always unintended consequences to

5   any change, but not all of those consequences are

6   bad.  I believe this bill will help much more than it

7   hurts, and if any Councilmembers have additional

8   questions, I'm happy to speak further.  Thank you for

9   your time.

10      COUNCILMEMBER OSSÉ:  Thank you.

11      Thank you, Chair Menin, and thank you

12  Councilmember Ossé.  My name is Samuel Stein.  I'm a

13  Senior Policy Analyst at the Community Service

14  Society of New York, which is a nonprofit that's been

15  helping low-income New Yorkers for about 180 years.

16  We've always had a strong focus on housing and

17  especially on low-income tenants.

18      We support Intro 360, or the FARE Act, and I want

19  to add some data points that have not been discussed

20  before that can help inform our support.

21      The first is that the median renter household in

22  New York City makes 59% of the area median income or

23  Ami.  Owners in the city make 109% of AMI.  So,

24  there's a huge income discrepancy according to the

25  last housing and vacancy survey.

**JA218**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        146

2        The housing and vacancy survey also showed a lot

3    of movement in this city.  In fact, there was a 44%

4    increase in moving within the city from the last HVS

5    to the current one.  Over 761,000 households, more

6    than one-in-five New York City households, moved into

7    their current home in the years 2021 or 2022.  This

8    is unheard of.  57% of them moved into market-rate

9    apartments, not necessarily because they love

10   market=rate apartments, but because that's what's

11   available.

12       However, it's not an even playing field.  It is

13   much more higher income people who are able to move

14   than lower income renters.  56% of people who moved

15   into their apartment since 2021 make more than

16   $100,000.  We're just talking about rental

17   apartments.  People who make--  Renters who make over

18   $100,000 are just 36% of the city's rentals, yet they

19   were 56% of the people who were able to move.

20       There was also a racial discrepancy.  50% of the

21   people who were able to move in those last few years

22   are white, whereas white renters are just 32% of the

23   New York City tenants.  I have more data that I can

24   offer on savings as well.

25       COUNCILMEMBER OSSÉ:  Thank you.

**JA219**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION       147

 2      MS. MOHAMED:  Hello.  My name is Allia Mohamed,

 3   and I'm the Co-Founder and CEO of Open Igloo, a

 4   leasing marketplace that's helped over a million and

 5   a half New York City renters research their

 6   landlords, review their buildings, and find quality

 7   apartments.

 8      In the last four years, we've also worked

 9   alongside brokers and landlords that share our belief

10   that transparency is paramount in creating a fair and

11   functioning housing market.  And at Open Igloo, we

12   feel that the FARE Act supports that belief, and I

13   want to share a few of the perspectives that we've

14   learned from the renters, agents, and landlords that

15   are a part of our community.

16      I think many people in this room would agree that

17   whenever a New Yorker complains about their housing

18   situation, maybe it's a maintenance issue, or maybe

19   they just want a different kind of space, the common

20   response from non-New Yorkers is, "Well, if you don't

21   like it, why don't you just go find something else?"

22   And this reply is so frustrating, because we all know

23   the emotional and financial toll that comes with

24   moving in this city.  A one- or two-month broker fee

25
```

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        148

2    on top of moving costs is simply a financial

3    impossibility for many New Yorkers.

4        The FARE Act will give renters the freedom to

5    move, the freedom of choice, and keep renters from

6    being excluded from what is already a tight housing

7    market.

8        We've also learned from landlords that it is

9    better if tenants don't feel like they were forced to

10   pay a fee to a broker that did not represent their

11   interests.  Many owners agree that the FARE Act has

12   the potential to build trust and to make sure that

13   the owner-tenant relationship starts off on the right

14   foot, and that is good for business.

15       From our agent community members, including the

16   agents that work on our team, we've heard that this

17   will be an opportunity for great agents to rise above

18   the stigma and focus their energy on building long-

19   lasting relationships with the owners and renters

20   that value their expertise.

21       I understand that this is a charged debate, but

22   one thing is unequivocal, and that something needs to

23   change.  The FARE Act is the first proposal we've

24   seen that isn't going after brokers, isn't going

25   after fees, but simply trying to make the process of

1  COMMITTEE ON CONSUMER AND WORKER PROTECTION       149

2  renting more transparent and fair for all

3  stakeholders.  Thank you.

4     MR. CORLEY:  Good morning, Chairperson Menin, and

5  thank you for allowing me to come here and speak in

6  support of the fairness of the FARE Act.  My name is

7  Michael Corley.  I'm the principal broker at Corely

8  Realty Group, a boutique residential brokerage firm

9  that started in 2004.  And I'm here in support of the

10 FARE Act, because just as many of the people that are

11 here on the panel that I'm with, it establishes a

12 much fairer marketplace.

13    As a Managing Principal at Corely Realty Group,

14 Inc, I personally understand how challenging it is to

15 earn a living as a licensed real estate agent.  So,

16 it was not an easy decision in 2008 to end the

17 practice of charging renters a broker fee.  That

18 decision proved decisive, since it fostered referrals

19 from our existing leasing clients, and bought new

20 business opportunities to our firm.

21    It is my hope that as a licensed practitioner for

22 22 years, having professionally leased over 150

23 apartments, personally in my career, my testimony can

24 provide a balanced perspective that demonstrates the

25 value this legislation offers to thousands of

**JA222**

1  COMMITTEE ON CONSUMER AND WORKER PROTECTION       150

2  residents that enter the rental market each year and

3  the licensed real estate agents that broker rental

4  transactions on the path of property owners.

5      Hopefully, by the end of my testimony, members of

6  the Consumer and Worker Protection Committee and all

7  in attendance will appreciate the value agents bring,

8  and also why property owners should pay for the

9  services they offer.  Thank you.

10  MR. GRIFFITH:  Good afternoon, Chair Menin and

11  members of the Council's Committee on Consumer and

12  Worker Protection.  My name is Brendan Griffith, and

13  I am the Chief of Staff at the New York City Central

14  Labor Council, AFL-CIO.  Over 300 unions are part of

15  our coalition, and those unions represent over 1

16  million workers across all five boroughs of our city.

17      We strongly support Intro 360 which requires the

18  party retaining the services of a broker to pay the

19  broker.  Today, New York City is a city where a

20  majority of households, 69%, rent their homes.

21  Currently, the median asking rent for an apartment is

22  approximately $3,500, a staggering $42,000 per year.

23      In addition to meeting that high monthly rent,

24  most tenants who want to move into a new apartment

25  are forced to pay broker fees, even when they did not

**JA223**

```
1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        151

2    retain the services of that broker, or they were able

3    to find the apartment on their own.

4        The resulting upfront costs of moving have made

5    it even more difficult for working New Yorkers to

6    find appropriate housing within New York City.  With

7    rental costs already accounting for more than 30% of

8    some New Yorker's income, many of our members are

9    already rent burdened, or paying more than 50% are

10   severely rent burdened, and that's before even

11   accounting for substantial payments to third parties

12   that they had no choice in retaining.

13       The current state of affairs has contributed to

14   making New York City unaffordable for working

15   families.  Intro 360 eases some of that burden by

16   ensuring that, like in almost every other city in the

17   United States, the person who decides to hire a

18   broker is the one who will pay for their services.

19       By shifting the burden of some of these upfront

20   costs back to the party who hires these brokers, the

21   FARE Act brings us one step closer to ensuring that

22   everyday working families are able to live and thrive

23   in New York.

24       And I just want to end by stating that the CLC

25   and our affiliates, we appreciate the opportunity to
```

**JA224**

1  COMMITTEE ON CONSUMER AND WORKER PROTECTION        152

2  testify in support of this much-needed legislation,

3  and we look forward to continuing to work with this

4  committee to develop policies that improve the lives

5  of working people in New York City.  Thank you.

6      CHAIRPERSON MENIN:  Thank you very much.  I'm

7  going to turn it over to Councilmember Ossé for

8  questions for this panel.

9      COUNCILMEMBER OSSÉ:  Thank you.  And I do want to

10 start, because I know there was a gentleman who

11 testified earlier that said that brokers were not

12 engaged in this bill, but we actually wrote this bill

13 with brokers to get their input, who were in support

14 of the FARE Act.

15     The first question that I have is for Ms.

16 Klenkar.  What are the benefits of having brokers

17 collect their fee from the hiring party?

18     MS. KLENKAR:  Um, choice for one.  We heard

19 earlier that right now, tenants have a choice: No

20 service or full service.  And that's not even

21 entirely true.  But in a new system, each party, the

22 landlord and the tenant, get to make a decision if

23 they hire someone, who they hire, and what services

24 they're requesting for what payment.  So, for

25 example, you are moving to New York City, and you

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        153

2    might not want someone to run around with you and do

3    every single showing for 15%, but maybe you negotiate

4    something different.  Maybe you're a family that's

5    working and you don't have the funds for a full fee,

6    but you can come to an agreement with your

7    representative, where something that works for both

8    of you.

9        As a system exists today, you do not have any say

10   in that as a tenant, the only person with choice in

11   the current situation is the landlord, who's deciding

12   whether their property is listed with an agent or

13   not, and what the fee is.

14       COUNCILMEMBER OSSÉ:  I also want to reiterate

15   that the FARE Act was introduced with the intent of

16   just making real estate transactions fair for all

17   parties, including landlords, tenants, and brokers

18   who are involved.  Broker and consumer whether--

19   Yeah, I guess, tenant and landlord, if FARE were to

20   pass, how can brokers be empowered to negotiate their

21   fees from the hiring party

22       MS. KLENKAR:  The same way we negotiate

23   everything.  I mean, we have to have buyer

24   agreements, seller agreements, landlord agreements.

25   You're already sort of negotiating with a tenant or a

**JA226**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        154

2    landlord now.  This just gives you the ability to

3    say, "Look, you can't shift the entire fee to the

4    tenant.  You're going to have to pay me something, if

5    you want to hire me, and we can figure out what that

6    looks like."

7        COUNCILMEMBER OSSÉ:  And the Real Estate Board of

8    New York is stating that under FARE, brokers will

9    lose their ability to make more money, and it will

10   cap their fees.  They've said this multiple times

11   about this bill.  From your perspective as a broker,

12   how will the FARE Act impact brokers?

13       MS. KLENKAR:  Well, it doesn't cap fees.  It

14   definitely doesn't.  And REBNY does govern landlords,

15   so if they are concerned about agents getting paid,

16   they do have something to do about it, potentially.

17       But as far as what else it will impact, it really

18   just removes an exploit.  Tenants pay 15% out of

19   desperation.  No one is paying 15% because they feel

20   that that is what's fair to them, to someone who just

21   showed them an apartment once, and did a lot of

22   valuable work, but for the other party.

23       COUNCILMEMBER OSSÉ:  Thank you.  And I have a

24   question for Mr. Corley.  How long have you been a

25   broker for, again?

**JA227**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION        155

 2       MR. CORLEY:  22 years.

 3       COUNCILMEMBER OSSÉ:  Okay.  And we are hearing

 4   that the broker fee can be negotiated.  In your

 5   opinion, are renters well-equipped to negotiate down

 6   the broker fees?

 7       MR. CORLEY:  Absolutely not.  [CHUCKLES]  No.

 8       COUNCILMEMBER OSSÉ:  Do you want to speak more to

 9   that, or...?

10       MR. CORLEY:  Certainly.  Listen, I'll just share

11   with you that as a broker, if I'm listing an

12   apartment, I have at my disposal what I call a

13   gatekeeper fulcrum, meaning that because I'm the

14   access point to that apartment, I also control the

15   outcome to presenting an application, to assessing

16   default risk of that applicant, and making certain

17   that there's no other avenue for them to achieve

18   getting a lease other than through me, since I'm

19   hired by the broker.

20       For all of our clients, the people that I work

21   for, they hire me, they pay me, and those are

22   property owners, small property owners, people that

23   own two-family brownstones, three-family brownstones.

24   So they are well acquainted with the level of work

25   that I do.  And had I continued that practice of
```

**JA228**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        156

2    requiring a fee from the renter, there'd be no chance

3    of them negotiating anything to lower a fee for me.

4        COUNCILMEMBER OSSÉ:  Thank you for that.  And I

5    have another question for you:  The brokers on the

6    previous panel mentioned that there is an agreement

7    prospective tenants or renters need to sign.  Is this

8    agreement that prospective renters are signing a

9    document that renters have full knowledge and

10   information to knowingly sign?

11       MR. CORLEY:  It's at the point of sale, much like

12   when you go to the counter at CVS, and you've got all

13   your goods, and you find out how much it costs.  At

14   what point do you have to negotiate down any value at

15   that point?  You don't.  And so when a renter finds

16   out that the landlord has approved them to lease the

17   apartment from the broker, they get handed a bunch of

18   papers, forms that outline certain disclosures,

19   acknowledgements, and as a result, they are at the

20   point of which--  with so much sunk costs they can't

21   refuse to move forward.  It's an enormous task to

22   lease an apartment in this city.  And they would

23   rather go ahead and move forward rather than to begin

24   the search again.  So, no.

25

**JA229**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION      157

 2       COUNCILMEMBER OSSÉ:  And, Ms. Klenkar, I wanted

 3   to follow up on something that you said, because I've

 4   received in our push for this bill, dozens of

 5   messages, private messages from brokers who are in

 6   support of this bill and didn't feel comfortable

 7   coming to testify in support of this bill.

 8       I know you spoke a little bit to that, in terms

 9   of some of the intimidation that-- that-- and the

10   support that comes within the broker community.

11       MS. KLENKAR:  Look, sometimes it's not possible.

12   If you're an agent on a team.  I know some people who

13   speak off the record because they can't risk their

14   team's ongoing relationships with certain landlords.

15   People have been fired over this.  And REBNY actually

16   contacted my manager when they found out I would be

17   here today.

18       COUNCILMEMBER OSSÉ:  Wow.

19       MS. KLENKAR:  So, it is a little bit intimidating

20   to feel like your industry thinks you're a traitor

21   for voicing your opinion.

22       COUNCILMEMBER OSSÉ:  Another question for you is:

23   There's an argument that if landlords are forced to

24   pay for brokers, no one would hire a broker due to

25
```

1   COMMITTEE ON CONSUMER AND WORKER PROTECTION      158

2   cost.  Do you believe that is true?  And if not,

3   please elaborate why.

4       MS. KLENKAR:  I don't think it's true because I

5   do a lot of-- or have historically done a lot of no-

6   fee rentals with owners who are choosing to hire me

7   and they're paying my fee so that every tenant is

8   going to be treated kind of the same, and we can

9   evaluate who has the strongest application, and who

10  will be the best fit for their listing.

11      COUNCILMEMBER OSSÉ:  Thank you. And, Ms. Mohamed,

12  opponents say renters already have a choice to not

13  pay the broker fee because of no-fee apartments.

14  But, how many apartments in New York are considered

15  no-fee apartments?

16      MS. MOHAMED:  I know we've heard a lot of stats

17  today that it's around 50-50.  And I think looking at

18  just the StreetEasy data is a bit inaccurate, to get

19  a full picture of what the no fee listings are.

20      I would say closer to 70% of the listings in New

21  York City come with a fee, and the other 30% that

22  don't have a fee, a lot of times it's, you know,

23  landlords that have gone a different route, having

24  in-house leasing teams that are made up of agents,

25  actually, that just have a different cost structure

**JA231**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION      159

 2   that they've modeled into-- into their financials

 3   when it comes to leasing the properties.

 4       COUNCILMEMBER OSSÉ:  And what are the typical

 5   rents of no fee apartments?

 6       MS. MOHAMED:  So, it definitely varies.  It

 7   depends on neighborhood.  It depends on borough.  But

 8   you definitely see no fee apartments that happen more

 9   commonly in luxury apartments with full-fledged

10   amenities.  Those buildings come with free month

11   concessions.  They come with no fees.  Those

12   buildings have on-site teams like I shared that are--

13   that are made of agents.

14       So, definitely there isn't this full-fledged,

15   full-choice access that a renter has when they go

16   into the market.  They're really making a choice

17   between 70% of the apartments taking that completely

18   out of the list when they're looking to move.

19       COUNCILMEMBER OSSÉ:  And you would say most of

20   those no-fee apartments on the market are luxury

21   apartments?

22       MS. MOHAMED:  A big--  A big percentage of them.

23   Not all, but a large percentage of them.

24       COUNCILMEMBER OSSÉ:  So they would be--  So they

25   would be expensive anyways?
```

**JA232**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        160

2        MS. MOHAMED:  Correct.

3        COUNCILMEMBER OSSÉ:  Right.  Why are the rents

4    of-- Oh, well you answered that.  Opponents say that

5    tenants are able to negotiate-- give me one second--

6    negotiate down a broker fee, and this fee is not

7    forced.  From your research do you feel--  do you

8    feel that a renter having an ability to pay the

9    higher broker fee means they are seen as a more

10   competitive tenant, and therefore likely to be chosen

11   by the landlord for the unit?

12       MS. MOHAMED:  Yeah.  I'll echo some of the

13   comments made by the panelists.  You know, a key

14   ingredient to any negotiation is to have leverage.

15   So, it is very, very difficult for renters at the

16   11th hour when they need a new apartment next week to

17   start negotiating the broker fee in that moment.  We

18   get emails, inquiries from renters every single day,

19   asking for guidance on whether they should negotiate

20   the broker fee.  And there are many instances where

21   we'll encourage them to do that, if we think it's--

22   if we think it's smart, right?  Has the apartment

23   been on the market for 100 days?  What neighborhood

24   is it in?

25

**JA233**

1   COMMITTEE ON CONSUMER AND WORKER PROTECTION      161

2      There are brokers--  Not all brokers operate as a

3   monolith, right?  Everyone operates their business in

4   a different way.  There are some renters-- some

5   brokers that will prioritize applications that will

6   pay the highest fee.  Other brokers may not operate

7   that way.  But I would say it is very difficult for

8   renters to negotiate broker fees.

9      COUNCILMEMBER OSSÉ:  And my last question for you

10  before moving on is that we hear that units are

11  listed as no fee, but then prospective tenants will

12  find out that these units are actually requesting a

13  broker fee.  What is the reason behind this?

14     MS. MOHAMED:  We do see it happen quite-- quite

15  frequently.  And listen, there are a lot of brokers

16  in this room that are doing their business by the

17  book, following the laws to the T, making sure that

18  all the disclosures are given to the renter even in

19  the first inquiry, right?, in the first phone call or

20  email.

21     But there are some cases, and I think it's

22  important for people to acknowledge this, that you

23  will show up to a no-fee listing, and a broker might

24  tell you, "Oh, sorry.  That apartment is no longer

25

```
 1 │ COMMITTEE ON CONSUMER AND WORKER PROTECTION        162
 2 │ available.  Let me show you something else, but that
 3 │ apartment has a fee.  Would you like to see it?"
 4 │     So we do see that happen.  We do get inquiries
 5 │ from renters that are asking for guidance on this.
 6 │ "Is a broker allowed to do that?  What can I do?"
 7 │ And sometimes we're just-- we just say,
 8 │ "Unfortunately, you know, you're going to have to,
 9 │ you know, move on to another apartment."  So, it's
10 │ very difficult for renters.
11 │     COUNCILMEMBER OSSÉ:  Thank you.  And I have a
12 │ couple questions for Mr. Griffith from the Central
13 │ Labor Council.  Why is broker fee reform-- reform, in
14 │ your opinion, or from the union's perspective,
15 │ important for unionized workers?
16 │     MR. GRIFFITH:  Great.  Thank you for the
17 │ question.  You know, the reality is that the median
18 │ rents of approximately $3,500, the median annual
19 │ income of about $77,000, New York City is-- is more
20 │ and more unaffordable.  And when you have fees like
21 │ this that are paid for all intents and purposes, they
22 │ are a wage cut.  They are wage cut for workers who
23 │ are trying to change the situation to a more
24 │ appropriate apartment, as has been mentioned by
25 │ previous panelists, it might be a larger apartment
```

**JA235**

1   COMMITTEE ON CONSUMER AND WORKER PROTECTION   163

2   for a larger family, closer to home.  Many city

3   workers have residency requirements.  This is a

4   significant part of how workers in New York City

5   spend their income.

6   COUNCILMEMBER OSSÉ:  Thank you.  And what is the

7   correlation to keeping workers in New York, and

8   strengthening union power?

9   MR. GRIFFITH:  New York City is a union town.

10   You know, it's-- it's said often, and it's as true

11   today as it was 10 years ago, 20 years ago, and it

12   will be 10 years and 20 years from now.  That being

13   the case, we want to make sure that union workers in

14   this city are invested in this city as residents,

15   their families are--  You can afford to raise a

16   family in this city, and to do that, we need to make

17   sure that that housing is a cost that is controlled

18   for workers.

19   COUNCILMEMBER OSSÉ:  Thank you.  And for our last

20   panelist, Mr. Stein, from CSS's survey, quote "The

21   Unheard Third", it was reported that a majority of

22   tenants surveyed cannot afford all the expenses that

23   come from moving into a new home, and this led to

24   tenants taking on debt, borrowing money, or selling

25   possessions, which further put an undue burden on

**JA236**

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION       164

 2   them.  What do tenants feel that they have to do, all

 3   that to ensure they can meet the fees associated with

 4   moving in.

 5      MR. STEIN:  Yeah, and let me say that "The

 6   Unheard Third" survey is an annual survey we've been

 7   doing for over 20 years, and it's a scientifically

 8   rigorous study.  It's done by a professional polling

 9   firm.  Our sample size is quite large.

10      So yeah, a majority of tenant respondents said

11   that they could not cover a $400 emergency expense.

12   And as you said, they--  When we asked, you know,

13   "What would you do?"  They said, "We'll take on debt,

14   borrow from friends or family," or sell something in

15   their possession.  That's just for a $400 expense.

16   We asked how much money New Yorkers have in savings,

17   homeowners-- a majority of homeowners said more than

18   $10,000, while the most common response for public,

19   subsidized, and rent-regulated tenants was $0 to $99.

20   And you might say, well, they don't pay broker fees

21   to get into their apartments.  Well, yes, but they

22   want to pay-- they might need to pay a broker fee to

23   get to another apartment.  So, when they move, they

24   have nothing in savings.

25
```

```
 1  COMMITTEE ON CONSUMER AND WORKER PROTECTION        165

 2      And in fact, two out of five market rate tenants

 3  also said they have $0 to $99 in savings.

 4      We asked about, you know whether they worry about

 5  household expenses:  40% of homeowners said they

 6  never have to worry about family expenses.  Less than

 7  20% of renters said the same.

 8      COUNCILMEMBER OSSÉ:  Thank you.  One more

 9  question.  I'm so sorry Chair.  But Ms. Klenkar,

10  remember in the past panel, we heard that brokers or

11  landlords are just going to take their homes off of

12  these sites and will go into an age of darkness in

13  terms of finding an apartment.  Can you speak to

14  that?  Or does this bill have any correlation to how

15  that would impact?

16      MS. KLENKAR:  I think that in some situations, it

17  feels like a bluff.  Because if you're claiming that

18  instead of paying an agent a one-month fee to

19  represent enlist your apartment, or choosing to do it

20  yourself, you're going to not earn an entire year's

21  worth of rent because it's easier for you to keep it

22  vacant than have it rented if the tenant is no longer

23  paying the fee?  I find that confusing.

24      I also want to point out this bill is not passing

25  today.  There will be plenty of opportunity after
```

**JA238**

1    COMMITTEE ON CONSUMER AND WORKER PROTECTION        166

2    this to go through every single specific situation

3    with things like open listings and transparency.

4        I hope that this is the-- hope of-- or the

5    beginning of more collaboration between members of

6    the public, City Council, and people who work in real

7    estate on the ground, having more input into bills

8    that will help protect everyone.

9        COUNCILMEMBER OSSÉ:  Thank you.  And I also do

10   want to thank the hundreds of supporters who are

11   outside.  I know that they're watching on live

12   stream, who haven't made it in yet.  This committee

13   sees you, and knows where New Yorkers stand.

14       So, thank you so much to this panel.

15       CHAIRPERSON MENIN:  Okay, thank you to the panel.

16   I'm now going to call the next panel, Jason Haber,

17   Brian Hourigan, Anthony Domathoti (sorry, it's hard

18   to read this one), and Keyan Sanai.  Please come

19   forward to testify.  Thank you.

20       Okay, please begin,

21       MR. HABER:  Good morning.  Good afternoon now.

22   My name is--

23       [GAVEL]

24

25

```
 1   COMMITTEE ON CONSUMER AND WORKER PROTECTION       167

 2       CHAIRPERSON MENIN:  One second.  Ssshh.  If

 3   you're going to be speaking, please exit the chambers

 4   so we can hear.  Thank you.

 5       MR. HABER:  Thank you.  My name is Jason Haber.

 6   I'm the Co-Founder of the American Real Estate

 7   Association, and a long-time member of REBNY.  The

 8   last 25 years I've been coming before this council,

 9   championing many progressive causes.  I am a former

10   district leader, state committee member, and DNC

11   delegate, and I speak today not just as a progressive

12   with receipts, but as a real estate professional and

13   also an academic, where I've served on the adjunct

14   faculty at John Jay College, where I taught courses

15   on urban planning and affordable housing.

16       Councilmember Brewer has been-- spoken to my

17   class.  I don't think any other members of the

18   committee are, but in future classes, I'd love to

19   have you there.

20       I frequently lecture to civic groups on urban

21   planning, and I'm considered an expert in this field.

22   And so my evaluation today of this bill comes from

23   years of study and market knowledge.  It doesn't come

24   from speaking to people at diners.  Sorry, Governor.

25
```

**JA240**

```
 1  COMMITTEE ON CONSUMER AND WORKER PROTECTION       168

 2      But let me be clear for all the intentions of

 3  this bill, it's the unintended consequence, and I

 4  truly know it's unintended, but rents will go up.

 5  They will go up to historic levels, and your

 6  constituents will come to you and say, "Why is the

 7  rent too damn high?"  It will make today's rent look

 8  low.

 9      We have an obligation to not engage in tactics

10  which raise the rents.  They are already far, far too

11  high.  There are real solutions out there that I'd

12  love to discuss with you in the Q and A if you like.

13      There are agents here today who are not on the

14  clock.  They are not being paid.  They are losing

15  money because their livelihoods are also on the line.

16  We can do better.  Let's make New York more

17  affordable, and it starts by voting no on this bill.

18  Thank you.

19      [APPLAUSE]

20      [BACKGROUND VOICES]

21      CHAIRPERSON MENIN:  Okay.  Again, we've been very

22  clear what the rules are.  You cannot-- You really

23  need to remain silent.  Please.  Next speaker.  Thank

24  you.

25
```

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was filed with the Clerk using the Appellate Case Management System ("ACMS") on July 31, 2025.  All counsel of record are registered ACMS users, and service will be accomplished by the ACMS system.

*/s/ Claude G. Szyfer*
Claude G. Szyfer
