# 25-1506-cv

IN THE

## United States Court of Appeals
## for the Second Circuit

_____

REAL ESTATE BOARD OF NEW YORK, INC.; NEW YORK STATE ASSOCIATION OF REALTORS, INC.; BOHEMIA REALTY GROUP; BOND NEW YORK REAL ESTATE CORP.; REAL NEW YORK LLC; LEVEL GROUP INC.; FOUR CORNERS REALTY, LLC; 21 WEST 74 CORP.; and 8 WEST 119TH STREET HDFC,

*Plaintiffs-Appellants*,

v.

THE CITY OF NEW YORK, *a municipal entity*, and VILDA VERA MAYUGA, *as Commissioner of New York City Department of Consumer and Worker Protection*,

*Defendants-Appellees*.

_____

Appeal from the United States District Court
for the Southern District of New York

_____

**SPECIAL APPENDIX**
_____

MURIEL GOODE-TRUFANT
CORPORATION COUNSEL OF
  THE CITY OF NEW YORK
100 Church Street
New York, NY 10007
(213) 356-2490

*Counsel for Defendants-Appellees*

CLAUDE G. SZYFER
DARYA D. ANICHKOVA
HOGAN LOVELLS US LLP
390 Madison Ave.
New York, N.Y. 10017
(212) 918-3000
claude.szyfer@hoganlovells.com

*Counsel for Plaintiffs-Appellants*

*Additional counsel listed on inside cover*

RICHARD DEARING
CLAUDE S. PLATTON
JAMISON DAVIES
CORPORATION COUNSEL OF
    THE CITY OF NEW YORK
100 Church Street
New York, NY 10007
(213) 356-2490

*Counsel for Defendants-Appellees*

SEAN MAROTTA
J. ANDREW MACKENZIE
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600

*Counsel for Plaintiffs-Appellants*

## TABLE OF CONTENTS

Page

Opinion and Order (06/10/2025) (ECF 61) ...................................................... SPA1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| REAL ESTATE BOARD OF NEW YORK, INC., NEW YORK STATE ASSOCIATION OF REALTORS, INC., BOHEMIA REALTY GROUP, BOND NEW YORK REAL ESTATE CORP., REAL NEW YORK LLC, LEVEL GROUP INC., FOUR CORNERS REALTY, LLC, 21 WEST 74 CORP., 8 WEST 119TH STREET HDFC, | |
| Plaintiffs, | 24-CV-9678 (RA) |
| v. | OPINION & ORDER |
| THE CITY OF NEW YORK, *a municipal entity*, VILDA VERA MAYUGA, *as Commissioner of New York City Department of Consumer and Worker Protection*, | |
| Defendants. | |

RONNIE ABRAMS, United States District Judge:

In New York City's residential rental market, real estate brokers typically act as intermediaries between tenants and landlords. For roughly half of all residential rental properties on the market, the tenant who rents the property is expected to pay a fee—which generally ranges in amount from one month's rent to fifteen percent of the value of the lease—to the broker, even if the tenant did not hire her. New York is one of only two major American cities where this practice is commonplace. In the rest, the broker's fee is paid by the party who chooses to retain the broker.

Brokers' fees constitute a significant financial burden for renters, and in many instances limit their ability to move between properties. In November 2024, in an effort to ease that burden and increase housing mobility, the New York City Council enacted Introduction 360-A, also

SPA1

known as the Fairness in Apartment Rental Expenses Act (the "FARE Act" or the "Act"), with the goal of "align[ing] the principal-agent relationship in the rental market to ensure that the principal pays the agent for services rendered, not a third party." November 13, 2024 Committee Report at 10 ("Comm. Rep."), ECF No. 38-6. The Act prohibits brokers from imposing their fees on tenants with respect to properties for which the broker has either (1) published a listing with the landlord's permission; or (2) agreed to work on behalf of the landlord. In so doing, it effectively shifts the burden of paying brokers' fees from tenants to landlords.

Plaintiffs, a group of trade associations, real estate brokerage firms, and landlords, bring this action against the City of New York and Vilda Vera Mayuga, Commissioner of the New York City Department of Consumer and Worker Protection, seeking to enjoin the City's enforcement of the FARE Act. They allege that the Act violates their Federal and State constitutional free speech rights by burdening their ability to publish listings, that it violates the Contracts Clause of the United States Constitution by rendering existing agreements between landlords and brokers unenforceable, and that it is preempted by the provisions of New York's Real Property Law that regulate brokers. Before the Court is Defendants' motion to dismiss Plaintiffs' complaint, as well as Plaintiffs' motion for a preliminary injunction enjoining the enforcement of the FARE Act pending the resolution of this case at trial.

Although Plaintiffs frame their claims in constitutional terms, they fundamentally ask the Court to enjoin the enforcement of legislation that they view as bad policy. The "judicial function," however, "is not to second-guess the policy decisions of the legislature, no matter how appealing we may find contrary rationales." *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 521 (1981). The primary legal question before the Court, rather, is whether the FARE Act infringes Plaintiffs' speech and contract rights such that preliminary judicial relief is warranted. The Court concludes

that it does not.  Accordingly, for the reasons that follow, the motion for a preliminary injunction is denied in its entirety, and the motion to dismiss is granted in part and denied in part.

## BACKGROUND[1]

### I.  The New York City Rental Market

New York City's rental market is the largest and most complex in the country.  Complaint ¶ 27.  ("Compl.").  Rental properties dominate that market, accounting for nearly 70% of New York City's housing stock.  *Id.* ¶ 24.  In most cases, a prospective tenant seeking to rent an apartment does not engage directly with the landlord.  Instead, brokers—who are licensed by the State, *see id.* ¶ 57—act as intermediaries between landlords and prospective tenants.  Brokers provide a variety of services to landlords and tenants.  *Id.* ¶¶ 33–34, 41–46.  They stage, photograph, advertise, and show properties, process applications from prospective tenants, and assist with processing state and federal housing vouchers.  *Id.*  The relationship between landlords, brokers, and tenants takes various forms.

In some instances, a landlord may contract directly with a broker or brokerage firm to market the landlord's property on an exclusive basis.  *Id.* ¶ 30.  This type of arrangement is commonly referred to as an exclusive listing.  *Id.*  Some exclusive listings are advertised as "no-fee" listings, meaning that the landlord agrees to pay the broker's fee, and the tenant who rents the apartment bears no responsibility to pay the broker.  *Id.*  In many cases, however, the landlord does not agree to pay the broker's fee, and the exclusive listing agreement instead provides that the broker will seek compensation from the tenant.  *Id.* ¶ 31.  These arrangements are commonly referred to as "fee" or "tenant-pays" exclusive listings and are common in the New York City

---

[1] The Court draws the following facts from the complaint, accepting all "well-pleaded factual allegations" as true for purposes of deciding the motion to dismiss, *Lynch v. City of New York*, 952 F.3d 67, 74–75 (2d Cir. 2020), as well as from the FARE Act's legislative history, of which the Court takes judicial notice, *see Goe v. Zucker*, 43 F.4th 19, 29 (2d Cir. 2022) ("[A]s a fundamental matter, courts may take judicial notice of legislative history.").

residential rental market.  *Id.* ¶¶ 31–32.

Many landlords do not enter exclusive listing agreements with brokers at all, and instead rent their properties through "open listings."  *Id.* ¶ 35.  To do so, they disseminate information about available properties to various brokers and permit the brokers to market the properties on a nonexclusive basis.  *Id.* ¶ 36.  The brokers, in turn, advertise the properties to prospective tenants, often by publishing listings on their own websites and on third-party platforms such as StreetEasy. *Id.*  When they successfully broker a lease, they seek compensation from the tenant who rents the property.  *Id.* ¶¶ 36–38.

Brokers' fees generally range between one month's rent and fifteen percent of the value of the lease, *see* Comm. Rep. at 5, but they are subject to negotiation, Compl. ¶ 53.  In total, listings for which the tenant is expected to pay the broker's fee—i.e., open listings and tenant-pays exclusive listings (together, "fee listings")—comprise approximately half of all rental properties on the market.  *Id.* ¶ 47.  Fee listings generally command lower rents than no-fee listings, and the same property may be advertised on both a fee and no-fee basis, with the difference reflected in the rental price.  *Id.* ¶ 48.

## II.    The FARE Act

Few would dispute that New York City is in the midst of a "housing emergency."  *Id.* ¶ 24. Citywide, rents continue to rise each year—by 23% from 2019 to 2024, *id.* ¶ 25—while incomes have failed to keep pace, *id.* ¶ 26.  In 2022, 52.1% of New York City households spent 30% or more of their income on rent.  *Id.*  Meanwhile, rental vacancy is at a historic low: in 2023, just 1.4% of the city's rental units were available—the lowest rate in 50 years.  *Id.* ¶ 24.  The convergence of these factors has trapped many New Yorkers in an untenable position: they cannot afford to stay where they are, yet they have nowhere else in the city to go.

It was against this backdrop that the New York City Council enacted the FARE Act, which effectively prohibits brokers from imposing fees on tenants for properties rented through exclusive and open listings. The enactment process spanned nearly a year, encompassing a rigorous public hearing, a lengthy investigation into the rental market, and substantial refinements of the initial draft bill. The original version of the FARE Act was first introduced by Councilmember Chi Ossé on February 28, 2024. *See* Lulich Decl., ECF No. 38, Ex. B. It was then referred to the Council's Committee on Consumer and Worker Protection (the "Committee"), *id.*, which held a hearing on the bill on June 12, 2024, *see id.*, Ex. E. At the hearing, which lasted a full day, the Committee heard extensive testimony both in support of and in opposition to the bill. *Id.* Many of the bill's supporters testified that brokers' fees make moving prohibitively expensive and expressed frustration with being required to pay such fees despite—in their view—receiving minimal services from brokers in return. *See, e.g., id.* at 109–10, 114, 151, 154. Several members of the Committee expressed similar views. *See, e.g., id.* at 13–16 (Councilmember Ossé), 85–89 (Councilmember Powers), 127–28 (Councilmember Nurse). In opposition to the bill, brokers and landlords argued, among other things, that shifting brokers' fees to landlords will cause landlords to increase rental prices, thereby exacerbating issues with housing affordability. *See, e.g., id.* at 83–84, 94, 133–35, 136–37. The Committee also received numerous written submissions from supporters and opponents of the bill, which conveyed largely the same sentiments. *See id.*, Ex. D.

Following the June 12, 2024 hearing, the City Council's Oversight and Investigations Division conducted an investigation of brokers' fees in the residential rental market. *See* Comm. Rep. at 2. The City Council's investigators posed as prospective tenants, sent inquiries to more than 300 fee listings, and toured 50 properties. *Id.* at 2 n.2. The investigation found that brokers' fees for those properties were generally non-negotiable, and that brokers rarely required the

investigators to sign a brokerage agreement before touring a property. *Id.* at 8. It also found that many brokers failed to disclose their agency relationships, that almost two-thirds of those who did claimed to represent the landlord, and that the nature of the brokers' services was the same regardless of whether a broker claimed to represent the landlord or the prospective tenant. *Id.* at 9. Finally, it reported that, in 12% of the rentals toured by investigators, no one from the brokerage was present at the property. *Id.* at 10.

Based on this investigation, the June 12, 2024 hearing, meetings with industry stakeholders, news reports, and the results of various surveys and studies, the Committee revised the bill and issued a detailed report (the "Committee Report"). *Id.* at 2. Among other things, the Committee Report found that: (1) New York is one of only two major American cities where brokers' fees are commonly paid by the tenant regardless of whether the tenant hired the broker; (2) New York City's rental vacancy rate is the lowest it has been since 1968; (3) the annual turnover rate for New York City rental units is 41 percent lower than the national average, and the share of renters who have lived in their unit for more than 10 years is 3.5 times higher than the national rate; (4) in the year prior, "the average New York City renter moving to a new apartment spent $10,454 in upfront costs—a sum equivalent to 14 percent of the city's median household income;" (5) 60 percent of New York City renters said brokers' fees prevent them from moving into a different apartment; (6) 54 percent of the city's renters would prefer to pay a higher monthly rent in lieu of upfront brokers' fees; (7) brokers' fees, while technically negotiable, are generally nonnegotiable in practice; and (8) tenants who do not affirmatively seek to hire a broker receive little benefit from brokers' services. *Id.* at 3, 6–10. The Committee Report therefore concluded that brokers' fees pose "a significant financial burden" for renters seeking to move and "induce some individuals to remain in apartments that they no longer wish to live in." *Id.* at 7.

Accordingly, it proposed the FARE Act, the purpose of which it described as "align[ing] the principal-agent relationship in the rental market to ensure that the principal pays the agent for services rendered, not a third party." *Id.* at 10.

The City Council approved the FARE Act on November 13, 2024. *Id.*, Ex. H. The Mayor returned it to the City Council unsigned, and it thus became law on December 13, 2024. *Id.*, Ex. I. It will take effect 180 days from that date, on June 11, 2025. *See id.*, Ex. A. As relevant here, it effectively prohibits brokers from imposing fees on tenants without their consent. It does so in two ways.

First, the FARE Act bars brokers from imposing fees on tenants in connection with the rental of any property for which the broker has published a listing. It specifically provides that "any agent who publishes a listing for a rental of residential real property with the permission or authorization of the landlord for such property shall not impose any fee on, or collect any fee from, a tenant related to the rental of such property." N.Y.C. Admin. Code § 20-699.21(a)(2).[2] It defines "agent" to mean a State-licensed real estate broker or real estate salesperson who "is acting in a fiduciary capacity," and "listing" to mean "an advertisement or written notice conveying that a property is available for lease." § 20-699.20. A landlord can be held vicariously liable for an agent's violation of this provision if the agent published the listing with the landlord's "permission or authorization." § 20-699.21(b)(2). The Act creates a "rebuttable presumption" that "an agent who publishes a listing . . . does so with the permission or authorization of the landlord." § 20-699.21(e).[3] The effect of these provisions is that a broker who publishes an open listing cannot charge her fee to the tenant who ultimately rents the property—and is therefore constrained to seek

---

[2] All further section citations are to the New York City Administrative Code unless otherwise noted.
[3] State regulation prohibits brokers from publishing advertisements for the lease of property without the authorization of the property's owner. *See* N.Y.C.R.R. § 175.25(b)(2).

compensation from the landlord—even though the agent has no formal agency agreement with the landlord.

With respect to exclusive listings, the Act provides, first, that "a landlord's agent shall not impose any fee on, or collect any fee from, a tenant related to the rental of residential real property," § 20-699.21(a)(1), and second, that "[n]o person shall condition the rental of residential real property on a tenant engaging any agent, including but not limited to a dual agent," § 20-699.21(c). It defines "landlord's agent" to mean an agent "who acts . . . to find or obtain a tenant for residential real property," and defines "dual agent" to mean "an agent who is acting as a tenant's agent and a landlord's agent with respect to an agreement regarding the same residential real property." § 20-699.20.[4] A landlord can be held vicariously liable for its agent's violation of this provision. § 20-699.21(b)(1). These provisions effectively prohibit tenant-pays exclusive listings, and further prevent landlords with exclusive listing agreements from requiring prospective tenants to engage the landlord's agent as a dual agent.

The FARE Act authorizes enforcement by the New York City Department of Consumer and Worker Protection and creates a private right of action for tenants. *See* § 20-699.23–24. Violations of the above provisions are subject to civil penalties of up to $2,000. *See* § 20-699.23.

### III.    Procedural History

Plaintiffs are a group consisting of not-for-profit trade organizations, real estate brokerage firms, and landlords. The Real Estate Board of New York ("REBNY") and the New York State Association of Realtors ("NYSAR") are not-for-profit trade associations that represent, among other members, thousands of New York City real estate brokerage professionals. Compl. ¶¶ 12–

---

[4] A "tenant's agent" means "an agent who agrees to locate residential real property for a tenant or who finds a tenant for a property and presents an offer to lease to the landlord or landlord's agent and negotiates on behalf of the tenant." *Id.*

13.   Bohemia Realty Group ("Bohemia"), Bond New York Real Estate Corp. ("Bond"), Level Group Inc. ("Level"), REAL New York LLC ("REAL New York"), and Four Corners Realty, LLC ("Four Corners") are real estate brokerage firms that operate in New York City (collectively, the "Brokerage Plaintiffs"). *Id.* ¶¶ 14–18. Bohemia and REAL New York are members of NYSAR, and their licensees are members of REBNY. *Id.* ¶¶ 14, 17. Bond's and Level's licensees are also members of REBNY. *Id.* ¶¶ 15–16. Plaintiffs 21 West 74 Corp. and 8 West 119th Street HDFC each own a New York City building that contains rental properties (together, the "Landlord Plaintiffs"). *Id.* ¶¶ 19–20.

Plaintiffs commenced this action on December 16, 2024 against Defendants the City of New York and Department of Consumer and Worker Protection commissioner Vilda Vera Mayuga (the "City"), alleging that the FARE Act violates the First Amendment to United States Constitution, the Contracts Clause of the United States Constitution, and the Free Speech Clause of the New York State Constitution, as well as that it is preempted by New York State law. On January 13, 2025, pursuant to Federal Rule of Civil Procedure 65, Plaintiffs moved for a preliminary injunction enjoining the City from enforcing the FARE Act during the pendency of this litigation. *See* ECF No. 19 ("PI Mot."). On February 28, 2025, the City opposed that motion and moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. *See* ECF Nos. 36, 37 ("MTD/PI Opp'n").[5] Plaintiffs opposed the motion to dismiss, *see* ECF No. 49 ("MTD Opp'n"), and the City filed a reply, *see* ECF No. 60 ("MTD Reply"). The Court received a joint *amicus curiae* submission from the State of New York and the New York Department of State, *see* ECF No. 45, and another from Neighbors Together Corp., *see* ECF No. 40. The Court heard oral argument on the preliminary

---

[5] The City waived its right to an evidentiary hearing on Plaintiffs' preliminary injunction motion. *See* ECF No. 55.

injunction motion and motion to dismiss on May 2, 2025.

## LEGAL STANDARDS

### I.    Motion to Dismiss

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action," which are "supported by mere conclusory statements, do not suffice." *Id.* In deciding a motion to dismiss, the Court construes "the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002), although the court is "not bound to accept as true a legal conclusion couched as a factual allegation," *Twombly*, 550 U.S. at 555.[6] In reviewing a motion to dismiss, the court reviews the pleading itself, and does not consider matter outside the pleadings. *See* Fed. R. Civ. P. 12(b)(6); *Staehr v. Hartford Fin. Servs. Grp., Inc.,* 547 F.3d 406, 425–426 (2d Cir. 2008). A court may, however, "take judicial notice of legislative history," which it may properly consider on a motion to dismiss. *Goe*, 43 F.4th at 29.

### II.    Preliminary Injunction

"A plaintiff seeking injunctive relief has a 'heavier burden' than a plaintiff 'bears in pleading the plausible claim necessary to avoid dismissal.'" *Council for Responsible Nutrition v. James*, No. 24-CV-1881, 2024 WL 2137834, at *2 (S.D.N.Y. May 13, 2024) (quoting *New Hope Family Servs., Inc. v. Poole*, 966 F.3d 145, 165 (2d Cir. 2020)). To obtain a preliminary injunction,

---

[6] Unless otherwise indicated, quotations omit all internal citations, quotation marks, footnotes, and omissions, and adopt alterations.

a party must demonstrate: "(1) a likelihood of success on the merits . . . ; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in [the requesting party's] favor; and (4) that the public interest would not be disserved by the issuance of an injunction." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015).

The "purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). "A plaintiff see[k]ing injunctive relief must justify that application by evidentiary submissions." *Thurman v. Bun Bun Music*, No. 13-CV-5194, 2015 WL 2168134, at *4 (S.D.N.Y. May 7, 2015). Where the party against whom an injunction is sought waives its right to a hearing, the court may rely solely on affidavits submitted in connection with the motion. *See Fengler v. Numismatic Americana, Inc.*, 832 F.2d 745, 748 (2d Cir. 1987); *Williams v. Rosenblatt Sec. Inc.*, No. 14-CV-4390, 2016 WL 590232, at *2 (S.D.N.Y. Feb. 11, 2016).

## DISCUSSION

Plaintiffs allege that the FARE Act violates the First Amendment to the United States Constitution and the Free Speech Clause of the New York State Constitution, the Contracts Clause of the United States Constitution, and that it is preempted by New York State law. The Court considers each claim in turn. Because the City's motion to dismiss the complaint narrows the claims for which Plaintiffs may seek a preliminary injunction, thereby mooting aspects of the preliminary injunction motion, the Court considers the motion to dismiss first with respect to each claim.

### I.    First Amendment & Free Speech Clause Claims

Plaintiffs limit their First Amendment challenge to § 20-699.21(a)(2) of the FARE Act, *see* Compl. ¶ 153; MTD Opp'n at 3, which provides that, once an agent has "publishe[d] a listing for

a rental of residential real property with the permission or authorization of the landlord for such property," the agent may not "impose any fee on, or collect any fee from, a tenant related to the rental of such property," § 20-699.21(a)(2). Plaintiffs allege that, "[b]y prohibiting the Brokerage Plaintiffs from publishing a listing and seeking to receive compensation from the tenant," and "[b]y rendering the Landlord Plaintiffs potentially liable for the acts of brokers whom [they] ha[ve] not retained and do[] not control," Compl. ¶ 153, the FARE Act violates their "right to free commercial speech," *id.* ¶ 5. "[T]he New York State Constitution does not afford heightened free speech protections to commercial speech," *OTR Media Grp., Inc. v. City of New York*, 83 A.D.3d 451, 452 (N.Y. App. Div. 2011), and instead applies the same standard applicable to First Amendment claims, *see Matter of Von Wiegen*, 63 N.Y.2d 163, 172–73 (1984). Accordingly, the Court considers Plaintiff's Federal and State free speech claims together under the applicable First Amendment framework.

The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws "abridging the freedom of speech." U.S. Const. Amend. I. "Under that Clause, a government, including a municipal government vested with state authority, has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). When a law is challenged under the First Amendment, the degree of scrutiny applied by courts is often dictated by whether the law restricts speech based on its substance: content-based laws generally receive strict scrutiny whereas content neutral laws are subject to less exacting forms of judicial review. *See id.* at 172.

## A. Motion to Dismiss

### 1. Whether the FARE Act Regulates Speech

The City principally contends that Plaintiffs' First Amendment claim should be dismissed

because § 20-699.21(a)(2) does not regulate speech. "Even dry information, devoid of advocacy, political relevance, or artistic expression, has been accorded First Amendment protection." *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 446 (2d Cir. 2001). The Supreme Court has held that "the acts of disclosing and publishing information . . . constitute speech," *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001), and thus pharmaceutical prescribing data, *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011) "information on beer labels," *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 481 (1995), and credit reports, *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 759–61 (1985) (plurality opinion), are all considered speech entitled to some degree of First Amendment protection. Residential rental listings similarly constitute "'speech' within the meaning of the First Amendment." *Universal City*, 273 F.3d at 449–50.

The question remains, however, whether § 20-699.21(a)(2) regulates brokers' speech, or whether it merely regulates their conduct. In general, "restrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct." *Sorrell*, 564 U.S. at 567. The First Amendment therefore "does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech," which is "why a ban on race-based hiring may require employers to remove 'White Applicants Only signs; why an ordinance against outdoor fires might forbid burning a flag; and why antitrust laws can prohibit agreements in restraint of trade." *Id.*

Although § 20-699.21(a)(2) is primarily directed at conduct, its burden on speech is more than incidental. It prohibits a broker from charging a fee to a tenant only when the broker has previously published a listing for the rented property. The broker's speech thus serves as the predicate for the application of the prohibition, meaning that § 20-699.21(a)(2) "appl[ies] to Plaintiffs because of . . . the fact that they were engaging in speech at all." *Clementine Co., LLC*

*v. Adams*, 74 F.4th 77, 86 (2d Cir. 2023). While, as discussed in greater detail below, the provision "neither prohibits any speech nor discriminates among speakers based on the content or viewpoint of their messages, its prohibition on compensation unquestionably imposes a significant burden on expressive activity." *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 468 (1995); *see also Sorrell*, 564 U.S. at 566 ("Lawmakers may no more silence unwanted speech by burdening its utterance than by censoring its content."). Specifically, it leaves brokers and landlords with an "unwelcome choice." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 217 (1975). To avoid liability, "they must either restrict their [speech,]" or change their businesses in ways "which may be extremely expensive or even . . . impracticable." *Id.* Accordingly, the Court concludes that § 20-699.21(a)(2) regulates "speech" within the meaning of the First Amendment.

## 2. The Applicable Level of Scrutiny

Having determined that § 20-699.21(a)(2) regulates speech, the Court must next determine the applicable level of scrutiny. The parties do not dispute that § 20-699.21(a)(2) regulates commercial speech, that is, "expression related solely to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980). "The Supreme Court has held that commercial speech enjoys a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, and is subject to modes of regulation that might be impermissible in the realm of noncommercial expression." *Vugo, Inc. v. City of New York*, 931 F.3d 42, 49 (2d Cir. 2019). Thus, in general, restrictions on commercial speech are subject to the intermediate scrutiny test set forth in *Central Hudson*. *See id.* at 51. However, as the Second Circuit has recognized, the Supreme Court in *Sorrell v. IMS Health Inc.* left open the possibility that a form of "heightened scrutiny" may apply to "content- and speaker-based" restrictions that "target[] a single category of speech by a single

category of speaker." *Vugo*, 931 F.3d at 50 n.7; *see also Sorrell*, 564 U.S. at 567. Plaintiffs argue

that § 20-699.21(a)(2) is such a restriction. The Court disagrees.

"Government regulation of speech is content based if a law applies to particular speech

because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163. To

determine whether a law is content based, a court must first consider whether the law "on its face

draws distinctions based on the message a speaker conveys." *Id.* "Some facial distinctions based

on a message are obvious, defining regulated speech by particular subject matter, and others are

more subtle, defining regulated speech by its function or purpose." *Id.* If a law is not facially

content based, then the court must examine "governmental motive, including whether the

government had regulated speech because of disagreement with its message, and whether the

regulation [is] justified without reference to the content of the speech." *Id.* at 167. "A regulation

that serves purposes unrelated to the content of expression is deemed neutral, even if it has an

incidental effect on some speakers or messages but not others." *Clementine*, 74 F.4th at 87.

Finally, "while laws favoring some speakers over others demand strict scrutiny when the

legislature's speaker preference reflects a content preference, such scrutiny is unwarranted when

the differential treatment is justified by some special characteristic of the particular speaker being

regulated." *TikTok Inc. v. Garland*, 145 S. Ct. 57, 68 (2025).

Citing *Sorrell*, Plaintiffs argue that § 20-699.21(a)(2) is facially content-based and speaker-

based because it applies exclusively to *listings* posted by *brokers*. Although *Sorrell* is relevant to

other aspects of this Court's analysis, Plaintiffs' reliance on it here is misplaced. *Sorrell* involved

a Vermont law that prohibited pharmaceutical manufacturers from using pharmaceutical

prescribing data for marketing purposes. 564 U.S. at 564. The Court deemed the law facially

content based because it permitted others to use the same data for non-marketing purposes, which

demonstrated that the law targeted pharmaceutical manufacturers because of the content of their speech. *Id.* at 564–65. The *Sorrell* Court thus did not find the Vermont law to be facially content based merely because it burdened marketing. Rather, the law warranted "heightened scrutiny" because, while it regulated an entire medium of speech—namely, the use of pharmaceutical prescribing data—it burdened only a certain category of speech within that medium "based on the content of the speech and the identity of the speaker." *Id.* at 567. Similarly, in *Reed v. Town of Gilbert, Ariz.*, the Court held that a town's sign code was facially content-based not because the code regulated an entire medium of speech—signs—but because it discriminated between signs based on the message conveyed therein. 576 U.S. at 164.

Here, by contrast, § 20-699.21(a)(2) is content neutral. Although it regulates a medium of speech—listings—it does so regardless of their content. *See Vugo*, 931 F.3d at 49 n.6 ("[R]egulations that apply generally to 'advertising' (without regard for whether the advertisements are commercial) may not necessarily be content-based."). Nothing in the provision "impose[s] a restriction, penalty, or burden by reason of" a listing's content, *TikTok*, 145 S. Ct. at 67, and nothing in the legislative record suggests that the City Council was concerned with the content of listings, as opposed to their effect on the residential rental market, *see Reed*, 576 U.S. at 166–67. The provision impacts only the actions that a broker may take after publishing a listing—namely, whether or not the broker may impose a fee on the tenant. It does not, like the regulations at issue in *Sorrell* and *Reed*, tell brokers what types of listings they may publish, nor what they may say in those listings. *See TikTok*, 145 S. Ct. at 67 (holding that law was facially content neutral because it did not "regulate particular speech because of the topic discussed or the idea or message expressed."); *see also Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 644 (1994). Brokers thus "cannot avoid or mitigate" the provision's prohibitions by "altering their

speech." *TikTok*, 145 S. Ct. at 67.  It is therefore not a content-based regulation.

Nor does the provision invite heightened scrutiny because it applies only to brokers.  "It is true that speech restrictions based on the identity of the speaker are all too often simply a means to control content." *TikTok*, 145 S. Ct. at 68.  Here, however, the provision's focus on brokers is not a "means of exercising a content preference," and is therefore "not presumed invalid under the First Amendment." *Turner*, 512 U.S. at 645.  First, as discussed, the Act is content neutral, which precludes any inference that the City has targeted brokers because of the content of their listings. *See Reed*, 576 U.S. at 170 ("[L]aws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference.").  Second, although the provision applies exclusively to brokers, it does not "distinguish between speakers in the [residential real estate] market." *Turner*, 512 U.S. at 645.  Rather, it applies equally to all brokers, because brokers are primarily—if not exclusively—responsible for advertising open listings, Compl. ¶¶ 35–39, and application to any other group would thus have little practical effect.  The provision's "differential treatment" of brokers is therefore "justified by [the] special characteristics" of the New York City rental market. *See Turner*, 512 U.S. at 660–61.

An examination of the FARE Act's purposes confirms the Court's conclusion that § 20-699.21(a)(2) is content neutral.  To determine a law's purpose in this context, the Supreme Court has generally looked beyond the text to the legislature's formal findings, *see, e.g., Sorrell*, 564 U.S. at 564–65; *Turner*, 512 U.S. at 646–48.  Here, nothing in legislative record suggests that the City Council intended § 20-699.21(a)(2) to regulate the content of listings.  Instead, the Committee Report found that "in most of the United States, it is the landlord's responsibility to pay the broker's fee for listing their property and finding a tenant," which "aligns with basic norms around principal-agent relationships," because "[w]hen a principal hires an agent, like a real estate broker,

the agent's fiduciary duties rest with the principal, not with a third party." Comm. Rep. at 6. In New York, by contrast, "rental broker fees are commonly passed to the tenant regardless of whether they hired the broker." *Id.* Accordingly, the FARE Act's stated purpose is "to properly align the principal-agent relationship in the rental market to ensure that the principal pays the agent for services rendered, not a third party." *Id.* at 10.[7] As the City explained in its briefing and at oral argument, § 20-699.21(a)(2) furthers that purpose by preventing the creation of a loophole in which a landlord might retain a broker to publish an open listing, only to later claim that the broker is not his agent—thereby enabling the broker to impose a fee on the tenant. *See* MTD Reply at 5. Thus, although the provision has an effect on brokers' speech, the speech itself is not the target— the agency relationship is. Because the provision "serves purposes unrelated to the content of the regulated expression," it is "clearly a content-neutral speech restriction." *Clementine*, 74 F.4th at 87.

Accordingly, "even if strict scrutiny applie[s] to *some* commercial speech restrictions after *Sorrell*," the Court concludes that it does not "apply to this one." *Vugo*, 931 F.3d at 50 n.7. The intermediate scrutiny test set forth in *Central Hudson* thus applies.

### 3.   Application of Intermediate Scrutiny

As discussed above, the *Central Hudson* test requires a court to "determine whether: (1)

---

[7] Plaintiffs appear to argue that heightened scrutiny should apply because the City Council "expressed open hostility for brokers and their work," PI Mot. at 11, and because the FARE Act "punishes people for being brokers," and was "motivated by the City Council's unabashed loathing for brokers," MTD Opp'n 9. In support of this argument, Plaintiffs rely on certain Councilmembers' floor statements, one Councilmember's social media posts, statements of the Act's supporters during public hearings, and Councilmembers' purported inattention during brokers' hearing testimony. In determining statutory purpose, "the motivations of individual legislators, to the extent [the Court] may be able to discern them, are not dispositive," *Gen. Media Commc'ns, Inc. v. Cohen*, 131 F.3d 273, 283 n.13 (2d Cir. 1997), and "carry little weight," *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 457 F. Supp. 2d 324, 338 n.101 (S.D.N.Y. 2006), *aff'd,* 725 F.3d 65 (2d Cir. 2013). Committee reports, on the other hand, are "the authoritative source for finding the Legislature's intent," as they "represent the considered and collective understanding of those [legislators] involved in drafting and studying proposed legislation." *Garcia v. United States*, 469 U.S. 70, 76 (1984). Given the "unusually detailed statutory findings" made here, *Turner*, 512 U.S. at 646, the Court need not look beyond the Committee Report to discern the Act's purpose.

the speech restriction concerns lawful activity; (2) the City's asserted interest is substantial; (3) the prohibition directly advances that interest; and (4) the prohibition is no more extensive than necessary to serve that interest." *Vugo*, 931 F.3d at 51. The components of the test are "to a certain extent, interrelated." *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 183–84 (1999). "[T]he party seeking to uphold a restriction on commercial speech carries the burden of justifying it." *Edenfield v. Fane*, 507 U.S. 761, 770 (1993).

The parties do not dispute that the first prong is satisfied. Accordingly, the Court considers only the remaining three prongs.

### a. The Second *Central Hudson* Prong

The second prong requires the Court to "evaluate the City's *asserted* goal in enacting the regulation." *Vugo*, 931 F.3d at 51 (emphasis in original). "Unlike rational-basis review, the *Central Hudson* standard does not permit [a court] to supplant the precise interests put forward by the [City] with other suppositions." *Edenfield*, 507 U.S. at 768. However, a court may consider the "history of the law" and the "record evidence" to confirm that the government's asserted interests "are genuine and not merely post-hoc rationalizations." *Safelite Grp., Inc. v. Jepsen*, 764 F.3d 258, 265 (2d Cir. 2014). A court must not "turn away if it appears that the stated interests are not the actual interests served by the restriction." *Edenfield*, 507 U.S. at 768.

The City asserts that the goal of § 20-699.21(a)(2) is to "correct[] a market failure" that often causes tenants "to pay a fee for a broker who was retained by the landlord." MTD Reply at 2. According to the City, the effect of this market failure is to increase the "upfront cost[s]" tenants incur when renting an apartment, which "impede mobility, contribute to low housing vacancy rates, and potentially trap households in apartments that no longer meet their needs," *id.*, despite that "brokers retained by landlords . . . often [do] not provid[e] valuable services to prospective

tenants," MTD/PI Opp'n at 9.  This rationale is consistent with the purposes apparent in the legislative record.  *See Safelite*, 764 F.3d at 265 (comparing the government's asserted interest with the interests discussed in the legislative record).  The Committee Report describes the FARE Act's purpose as "properly align[ing] the principal-agent relationship in the rental market to ensure that the principal pays the agent for services rendered, not a third party."  Comm. Rep. at 10. Moreover, both the Committee Report and the transcript of the June 12, 2024 hearing indicate that the City Council was concerned with the financial burden that brokers' fees impose on renters, the de facto non-negotiability of such fees, and the minimal consideration brokers often provide prospective tenants in return.  *See id.* at 7–8; Lulich Decl., Ex. E at 13–16, 85–89, 127–28.

The City's asserted interests are undoubtedly substantial.  Governments have a substantial interest both in "eliminating restraints on fair competition," *Turner*, 512 U.S. at 664, and in "promoting . . . the economic vitality of [a] locality," *DoorDash, Inc. v. City of New York*, 750 F. Supp. 3d 285, 303 (S.D.N.Y. 2024) (collecting cases).  Moreover, the "protection of the consumer" is "probably the most substantial government interest that can be asserted to regulate commercial speech."  *United States v. Frame*, 885 F.2d 1119, 1147 (3d Cir. 1989) (Sloviter, J., dissenting); *see also Heffner v. Murphy*, 745 F.3d 56, 67 (3d Cir. 2014) ("Pennsylvania obviously has a substantial interest in . . . consumer protection."); *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. Abrams*, 684 F. Supp. 804, 806 (S.D.N.Y. 1988) ("There can [] be little debate that a substantial governmental interest is served by the State's overall efforts at consumer protection.").  The FARE Act implicates all three of these interests.  Accordingly, the second *Central Hudson* prong is satisfied.

### b.  The Third *Central Hudson* Prong

"To satisfy the third prong of *Central Hudson*, the City must demonstrate that (1) the harms it recites are real, and (2) that its restriction will in fact alleviate them to a material degree."  *Vugo*,

931 F.3d at 52.

As an initial matter, the City has substantiated the existence of the harm it seeks to address. The Supreme Court has "permitted litigants to justify speech restrictions by reference to studies and anecdotes," which need not "come accompanied by a surfeit of background information." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001). Here, the City Council observed that New York is one of only two major American cities "where rental broker fees are commonly passed to the tenant regardless of whether they hired the broker." Comm. Rep. at 6. It considered data establishing that the average upfront moving cost for New York City renters is equivalent to 14 percent of the city's median household income. *Id.* at 7. It also relied on a survey finding that 60 percent of the city's renters said broker fees prevent them from moving, and another finding that 54 percent of the city's renters would rather pay a higher monthly rent than a broker's fee. *Id.* Additionally, the City Council's investigation found, among other things, that (1) although broker fees are technically negotiable, brokers often refuse to engage in any meaningful negotiation; (2) brokers rarely require prospective tenants to sign a brokerage agreement before touring a rental property; (3) whether a broker purports to represent the landlord, the tenant, or both does not "correlate meaningfully with the provision of different services" by the broker; and (4) that in 12 percent of properties toured by investigators, no broker was present at all. *Id.* at 8–10. These "studies and anecdotes" are sufficient to support the City's contention that the misalignment of the principal-agent relationship in New York City's rental market causes "real" harm. *Vugo*, 931 F.3d at 52.

Next, the Court must consider whether § 20-699.21(a)(2) "directly and materially advances" the City's asserted interest. *Safelite*, 764 F.3d at 264. "The issue is not whether other means of [advancing the City's interest] might be adequate, because that determination is left to

the City's elected officials." *Clementine*, 74 F.4th at 88. "It suffices that the means chosen add to the effectiveness of" the City's regulatory scheme. *Id.*

The provision targets "open listings," in which a broker who has no formal agency relationship with the landlord publishes a listing for the landlord's property. The City Council found that brokers generally impose non-negotiable fees on tenants despite having no preexisting agency relationship with those tenants, and that brokers provide minimal services to tenants in return. Comm. Rep. at 8–9. It further determined this common practice to be a "market failure" that increases the upfront cost of renting and reduces housing mobility. *Id.* at 8. The challenged provision of the FARE Act undoubtedly advances the City's interest in correcting that market failure and alleviating its resultant harms. Under § 20-699.21(a)(2), renters will no longer pay brokers' fees for properties rented through open listings, which reduces the upfront cost of moving and thereby increases their ability to move.

Plaintiffs principally argue that § 20-699.21(a)(2) does not advance the City's interest— and that its burden on brokers' speech is thus unjustified—because landlords will pass the cost of brokers' fees to renters, thereby causing rents to increase and exacerbating existing housing affordability issues. They also argue that the provision will disincentivize brokers from publishing listings, creating a "shadow inventory" of available properties accessible only to prospective tenants who contact brokers directly. PI Mot. at 24; *see also* MTD Opp'n at 12.

Both arguments fail for the simple reason that "the question [the Court] face[s] today is not the law's wisdom, only its constitutionality." *TikTok*, 145 S. Ct. at 75 (Gorsuch, J., concurring). First, although individual legislators may at times have suggested that the FARE Act would not worsen—and might even improve—housing affordability, *see, e.g.,* Compl. ¶ 114, the overall legislative record makes clear that the Act was "not an attempt to solve the affordability crisis in

the city," Comm. Rep. at 10.  Instead, the City Council specifically sought to address the impact of brokers' fees on the upfront cost of moving, which it found contribute to housing immobility. *Id.* at 7.  Under *Central Hudson* scrutiny, "[i]t suffices that the means chosen add to the effectiveness of" the City's effort to increase housing mobility, which the FARE Act plainly does. *Clementine*, 74 F.4th at 88.  Whether the Act "could have been tailored differently" is therefore "beside the point."  *Id*.  Second, to the extent that the Act may indirectly reduce the accessibility of information about available properties, the balancing of that potential consequence against the Act's direct effects "is a judgment for [the City Council], not the courts." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 67 (2006).  Thus, although the FARE Act may indeed have the outcome of which Plaintiffs warn, the Court's conclusion remains the same.

Plaintiffs further contend that § 20-699.21(a)(2) is underinclusive, and thus does not materially advance the City's asserted interest, because it does not "prohibit[] all rental transactions—whether between broker and landlord, broker and tenant, or tenant and landlord— from taking place in the absence of fiduciary obligations."  MTD Opp'n at 10.  "Although a law's underinclusivity raises a red flag, the First Amendment imposes no freestanding underinclusiveness limitation." *Vugo*, 931 F.3d at 53.  "Underinclusiveness is problematic insofar as it, *inter alia*, raises doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint," or "undermine[s]" the government's asserted interest such that it "render[s]" the regulation "ineffective."  *Id.*

The FARE Act raises no such doubts.  The fact that it does not prohibit all rental transactions absent the existence of a fiduciary relationship does not render the City Council's pursuit of its goals ineffective.  Nor, as discussed above, does the Act's focus on brokers evince an effort to "disfavor[] a particular speaker or viewpoint."  *Id.*  To the extent there may be issues

in the relationships between brokers and landlords that could warrant legislative intervention—and Plaintiffs offer no suggestion as to what those might be—the City Council "is not required to make progress on every front before it can make progress on any front." *Id.* at 54.

Accordingly, the City has satisfied the third *Central Hudson* prong.

### c. The Fourth *Central Hudson* Prong

"Finally, under *Central Hudson*'s fourth prong, the City must establish that the regulation does not burden substantially more speech than is necessary to further the government's legitimate interests"—in other words, that there is a "reasonable fit between the regulation and its goal." *Vugo*, 931 F.3d at 58. The City need not show that there is "no conceivable alternative" to its approach, nor that its regulation is "the least restrictive means of advancing its asserted interests." *Id.* Moreover, the City is afforded "considerable leeway in determining the appropriate means to further a legitimate government interest," *Clear Channel Outdoor, Inc. v. City of New York*, 594 F.3d 94, 105 (2d Cir. 2010), and a court should not "second-guess [the City's] judgment to that effect," *Vugo*, 931 F.3d at 58.

Plaintiffs argue that § 20-699.21(a)(2) is overinclusive—i.e., that it burdens substantially more speech than necessary—because it "sweeps in all brokers who post an advertisement with a landlord's permission, including those that do have fiduciary obligations to the tenant." PI Mot. at 15; *see also* MTD Opp'n at 11. Thus, they argue, it effectively prevents brokers from acting as dual agents, and from assisting their own tenant clients in renting properties for which they have published a listing. *See* MTD Opp'n at 11. As an initial matter, these proposed exceptions could create loopholes in the regulatory scheme that would "replicate the precise system that has already proved" to cause the harms the City seeks to remedy. *Vugo*, 931 F.3d at 59. Nonetheless, Plaintiffs' argument fails because it concerns additional limitations on brokers' conduct, not on

brokers' speech. Brokers remain free to post any listing they choose. In the event a broker rents a property to her own client that she has previously listed, the Act simply requires her to impose her fee on the landlord—with whom it presumes she also has an agency relationship. Moreover, to the extent that a broker may prefer to receive compensation from her tenant clients, she may choose instead to communicate information about available properties to those clients directly, instead of through published listings. The provision thus "leaves open ample alternative channels of communication." *Mastrovincenzo v. City of New York*, 435 F.3d 78, 101 (2d Cir. 2006). "[W]here the regulation leaves open alternative channels for communicating the speech, they need not be perfect substitutes for those channels denied to plaintiffs by the regulation at hand." *Clementine*, 74 F.4th at 88.

Accordingly, the Court concludes that the City's determination about how to regulate broker's fees is "reasonable." *Vugo*, 931 F.3d at 58. The fourth *Central Hudson* prong is therefore satisfied.

***

In sum, the Court concludes that § 20-699.21(a)(2) satisfies the *Central Hudson* test as a matter of law, and thus Plaintiffs have failed to plausibly allege a First Amendment or Free Speech Clause claim. Accordingly, with respect to those claims, the motion to dismiss is granted and the motion for a preliminary injunction is denied as moot.

## II.  Contracts Clause

Plaintiffs next challenge the constitutionality of the FARE Act under the Contracts Clause, which provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. 1, § 10, cl. 1. Despite its seemingly absolute terms, the Contracts Clause does not give private parties the absolute right to contract without government interference; instead, courts

have interpreted it to allow limited interference in contracts, so long as that interference is in furtherance of the "inherent police power of the State to safeguard the vital interests of its people." *Energy Reserves Grp. v. Kan. Power & Light Co.*, 459 U.S. 400, 410 (1983). When deciding whether a law violates the Contracts Clause, courts in this Circuit assess: "(1) whether the contractual impairment is substantial and, if so, (2) whether the law serves a legitimate public purpose such as remedying a general social or economic problem and, if such purpose is demonstrated, (3) whether the means chosen to accomplish this purpose are reasonable and necessary." *Sullivan v. Nassau Cty. Interim Fin. Auth.*, 959 F.3d 54, 64 (2d Cir. 2020).

### A. Motion to Dismiss

Plaintiffs allege that the FARE Act substantially impairs tenant-pays existing exclusive listing agreements by prohibiting brokers from imposing fees for such listings on tenants, *see* § 20-699.21(a)(1), and by prohibiting landlords and brokers from conditioning the rental of a property upon the tenant engaging a broker, *see* § 20-699.21(c). The City argues that the complaint fails to allege facts sufficient to establish the existence of contracts impaired by the FARE Act, that the Act does not substantially impair tenant-pays exclusive listing agreements, and that even if it does, it is a reasonable means of accomplishing the City Council's goal of realigning the principal-agent relationship to address issues related to housing mobility.

#### 1. Substantial Impairment

The Court first considers the City's argument that Plaintiffs have failed to state a Contracts Clause claim because the complaint does not specifically allege the existence of any tenant-pays exclusive listing agreements affected by the Act. "The Contract Clause prohibits the impairment by the state of *existing* contracts." *Fabri v. United Techs. Int'l, Inc.*, 387 F.3d 109, 124 (2d Cir. 2004) (emphasis in original). Plaintiffs' Contracts Clause claim therefore applies only to

agreements executed before December 13, 2024—when the FARE Act became law—that remain executory beyond June 11, 2025, when the law takes effect.

The allegations in the complaint, accepted as true, provide a sufficient basis for the Court to reasonably infer that the Brokerage Plaintiffs have tenant-pays exclusive listing agreements affected by the FARE Act. Specifically, the complaint alleges that Bohemia, Bond, Level, and REAL New York's "brokers and salespersons . . . are often compensated by tenants in transactions involving listing agreements where they are appointed by a landlord to serve as the landlord's agent." Compl. ¶¶ 14–17. It further alleges several times—albeit in general terms—that the Brokerage Plaintiffs have existing exclusive listing agreements impaired by the FARE Act, *see id.* ¶¶ 137, 139, 169, 170, which it describes as "countless" in number, *id.* ¶ 139. Finally, it provides examples of the contractual terms allegedly impaired by the FARE Act, which are drawn from Bond's "Exclusive Right to Rent" agreement. *See id.* ¶¶ 138, 140. These allegations are sufficient to plausibly allege the existence of impaired contracts at the pleadings stage. *Cf. Bldg. & Realty Inst. of Westchester & Putnam Ctys., Inc. v. New York*, No. 21-2448, 2024 WL 1061142, at *5 (2d Cir. Mar. 12, 2024) (summary order) (affirming dismissal where the plaintiff "provided no facts for a court to infer that it held existing contracts affected" by the regulation).

The City next contends that the FARE Act does not substantially impair tenant-pays exclusive listing agreements. To determine whether a law substantially impairs contract rights, a court must "consider the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Melendez v. City of New York*, 16 F.4th 992, 1033 (2d Cir. 2021).

As alleged in the complaint, a tenant-pays exclusive listing agreement "give[s] [the] broker the exclusive right to market and rent a listing, but make[s] clear that the broker must seek

compensation from the renter." Compl. ¶ 31. The portion of Bond's "Exclusive Right to Rent" agreement excerpted in the complaint illustrates as much. Pursuant to that agreement, the landlord agrees to "refer . . . all inquiries, proposals and offers regarding" the property to Bond. *Id.* ¶ 140. In exchange, Bond agrees that "[i]f the [p]roperty is rented pursuant to [the] Agreement," it "will collect its fee from the tenant." *Id.* ¶ 138. Thus, in a tenant-pays exclusive listing agreement: (1) the landlord agrees, in exchange for the broker's services, to forgo its right to deal with other brokers or directly with prospective tenants; and (2) in exchange, the broker agrees to forgo its right to seek compensation for its services from the landlord, and to instead seek compensation from the tenant. This constitutes a valid contract under New York law. *See Lebedev v. Blavatnik*, 193 A.D.3d 175, 183 (N.Y. App. Div. 2021) ("A valuable consideration, in the sense of the law, may consist either in some right, interest, profit, or benefit accruing to the one party, or some forbearance, detriment, loss, or responsibility given, suffered, or undertaken by the other." (quoting *Hamer v. Sidway*, 124 N.Y. 538, 545 (1891)); *RDF Agent, LLC v. Elec. Red Ventures, LLC*, 227 A.D.3d 424, 426–27 (N.Y. App. Div. 2024) (holding that exclusivity serves as valid consideration).

The City argues that the FARE Act does not substantially impair existing tenant-pays exclusive listing agreements because it prohibits only hypothetical future contracts between brokers and tenants. The Court disagrees. The FARE Act "undermines the contractual bargain" between brokers and landlords and "interferes with [their] reasonable expectations." *Melendez*, 16 F.4th at 1033; *see also Gen. Motors Corp. v. Romein*, 503 U.S. 181, 189 (1992) ("[C]hanges in the laws that make a contract legally enforceable may trigger Contract Clause scrutiny if they impair the obligation of pre-existing contracts, even if they do not alter any of the contracts' bargained-for terms."). By prohibiting brokers from seeking compensation from tenants, the Act

"bears on the obligation" of tenant-pays exclusive listing agreements by (1) "diminish[ing] the duty" of brokers to provide their services to landlords solely in exchange for exclusivity; and (2) by "impair[ing]" the bargained-for right of landlords to obtain those services without paying for them. *Gen. Motors*, 503 U.S. at 189. Indeed, without the ability to seek compensation from tenants, a broker's forbearance of the right to seek payment from the landlord is "convert[ed] . . . into a mere promise" to provide its services free of charge, "thereby impairing the contract's obligatory force." *Id.* After all, brokers who have existing tenant-pays exclusive listing agreements cannot be expected to work for free.

"[T]he reasonableness of expectations [also] depends, in part, on whether legislative action was foreseeable, and this, in turn, is affected by whether the relevant party operates in a heavily regulated industry." *Sullivan*, 959 F.3d at 64. The City argues that the FARE Act was foreseeable to Plaintiffs because: (1) in 2020, the New York Department of State promulgated administrative guidance—which was subsequently invalidated—interpreting the Housing Security and Tenant Protection Act of 2019 to prohibit brokers acting on behalf of landlords from imposing their fees on tenants, *see Real Estate Bd. of N.Y., Inc. v. New York Dep't of State*, Index No. 901586-20, April 9, 2021, Lulich Decl., Ex. K; (2) New York State Senate and New York City Council bills introduced in 2023 proposed eliminating the practice, *see* New York State Senate Bill 2023-S2783; New York City Council Int. No. 1105-2023; and (3) a New York City Council bill introduced in 2019 proposed placing a cap on brokers' fees, *see* New York City Council Int. No. 1423-2019. These unsuccessful efforts do not establish that the FARE Act was foreseeable to Plaintiffs. The "reasonable expectations" element of the Contracts Clause analysis does not require contracting parties to survey the legislative landscape and structure their affairs based on laws that the legislature might someday enact. *See DoorDash, Inc. v. City of New York*, 692 F. Supp. 3d 268,

290 n.2 (S.D.N.Y. 2023) ("[A] discussion regarding the possibility of [future legislation] does not establish that Plaintiffs operated in an area subject to state regulation at the time."). Instead, the question is whether the plaintiff entered a contract "in an industry that is already regulated in the particular to which he now objects." *Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 993 (2d Cir. 1997). The City Council has not previously enacted legislation regulating brokers' fees, despite several attempts to do so. And as discussed in greater detail below with respect to Plaintiffs' state law preemption claim, although brokers are regulated at the state level by Article 12-a of New York's Real Property Law ("RPL"), that law's provisions relate primarily to brokers' licensing, conduct, and ethical obligations, and have no bearing on the amount of fees brokers may charge or to whom they may charge them. *Cf. Kraebel v. New York City Dep't of Hous. Pres. & Dev.*, 959 F.2d 395, 403 (2d Cir. 1992) (finding rent regulation foreseeable in light of the state's existing rent stabilization and control programs). Accordingly, because "the City chose to intervene in a marketplace that was previously unregulated in an unprecedented manner," Plaintiffs "plausibly plead that the legislation interfered with their reasonable expectations." *DoorDash*, 692 F. Supp. 3d at 290.

### 2. Legitimate Public Purpose

The next step in the inquiry asks whether "the law serves a legitimate public purpose such as remedying a general social or economic problem[,] and if such purpose is demonstrated." *Sullivan*, 959 F.3d at 64. As the Court discussed in considering the provisions of the FARE Act that focus on open listings, the legislative record demonstrates that the City Council's goal of realigning the principal-agent relationship was intended to serve the purpose of reducing the upfront cost of moving, thereby improving housing mobility amongst renters. Realigning the principal-agent relationship with respect to exclusive listings serves the same purpose.

That purpose is legitimate under the Contracts Clause.  "[C]ontrolling precedent recognizes the mitigation of economic emergencies as a public purpose that can support contract impairment." *Melendez*, 16 F.4th at 1036.  As the Act's sponsor, Councilmember Ossé, noted during the June 12, 2024 hearing, "[t]he Council has passed numerous resolutions declaring an emergency with the city's housing crisis.  Therefore, this is a public need we need to address, and there can be legislation like the FARE Act that seeks to address this public need."  Lulich Decl., Ex. E at 44. Plaintiffs themselves concede that "City officials have acknowledged the current situation as a housing emergency."  Compl. ¶ 24.  Moreover, "emergency is not required to support every impairment of contract," *Melendez*, 16 F.4th at 1036, and thus legislation "enacted to deal with a broad, generalized economic or social problem" may serve a legitimate public purpose under the Contracts Clause, *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 250 (1978).  The FARE Act plainly satisfies that standard.

### 3.  Reasonable and Appropriate Means

The Court next considers whether Plaintiffs have plausibly alleged that the FARE Act is not "drawn in an appropriate and reasonable way to advance" the City's professed public purpose. *Ashley Sveen v. Kaye Melin*, 584 U.S. 811, 819 (2018).  Plaintiffs allege that the FARE Act's impairment of existing tenant-pays exclusive listing agreements will have a detrimental effect on New York City's housing market, Compl. ¶¶ 111–23, and will exact significant harm on brokers and landlords, *id.* ¶¶112, 124–25.  They also claim that the City Council failed to adequately consider less burdensome alternatives.  *Id.* ¶¶ 128–35.  These allegations involve issues of fact, and "raise[] reasonableness concerns precluding dismissal of plaintiffs' Contracts Clause claim as a matter of law."  *Melendez*, 16 F.4th at 1040.

Accordingly, the motion to dismiss is denied with respect to the Contracts Clause claim.

### B. Preliminary Injunction

Having denied the motion to dismiss Plaintiffs' Contracts Clause claim, the Court next considers the motion for a preliminary injunction with respect to that claim. "A plaintiff seeking injunctive relief has a heavier burden than a plaintiff bears in pleading the plausible claim necessary to avoid dismissal." *Council for Responsible Nutrition*, 2024 WL 2137834, at *2. "In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence." *Park Irmat Drug Corp. v. Optumrx, Inc.*, 152 F. Supp. 3d 127, 132 (S.D.N.Y. 2016). "Injunctive relief is only appropriate when a litigant has established a likelihood of success on the merits of his case and a likelihood of irreparable harm if the requested relief is denied." *Manrique v. State Farm Mut. Auto. Ins. Co.*, No. 21-CV-224, 2021 WL 5745717, at *8 (S.D.N.Y. Dec. 2, 2021).

### 1. Likelihood of Success on the Merits

As the Court has already discussed at length, the FARE Act substantially impairs existing tenant-pays exclusive listing agreements and serves a significant and legitimate public purpose. Accordingly, to demonstrate a likelihood of success on the merits of their Contracts Clause claim, Plaintiffs must establish that the means employed by the City were not reasonable and appropriate to advance that purpose. "That standard is more demanding than the rational basis review that applies when legislation is challenged under the Due Process Clause." *Melendez*, 16 F.4th at 1032. However, "[w]hen a law impairs a private contract, substantial deference is accorded to the legislature's judgment as to the necessity and reasonableness of a particular measure." *Buffalo Tchrs. Fed'n v. Tobe*, 464 F.3d 362, 369 (2d Cir. 2006).

In *Melendez v. City of New York*, the Circuit identified at least five relevant factors useful in determining whether a law is a reasonable and appropriate means of accomplishing a legitimate

public purpose: (1) whether the law impairs contract rights on a "temporary" or "limited" basis, or whether it "permanently and entirely extinguishes them;" (2) whether there is "some record basis to link" the legislature's purpose and its chosen means; (3) whether, if the burden of contractual impairment comes at the "expense of a discrete group of private persons," it is "tailored to the party causing the public harm that the state sought to mitigate;" (4) whether the relief provided by the law is "conditioned on need" and, if not, whether the legislature adequately considered the extent to which the party burdened by the contractual impairment is "better positioned financially" than the relieved party to bear that burden; and (5) whether the law provides "compensat[ion] for damages or losses sustained as a result of [the] impairment." 16 F.4th at 1038–46. These considerations are non-exhaustive. *Id.* at 1046. While the Court analyzes each factor in turn, "it is the totality" that determines whether Plaintiffs have demonstrated a likelihood of success on the merits of their Contracts Clause claim. *Id.* at 1038.

First, the FARE Act's impairment of existing tenant-pays exclusive listing agreements is neither "temporary" nor "limited." *Id.* Instead, it "work[s] a severe [and] permanent . . . change in [landlords' and brokers'] relationships—irrevocably and retroactively." *Allied Structural Steel*, 438 U.S. at 250. This factor therefore weighs against a finding of reasonableness, although it is not dispositive. *Melendez*, 16 F.4th at 1039–40.

The second factor weighs in favor of the FARE Act's reasonableness and appropriateness, as there is a clear basis in the record to link the Act's prohibition of tenant-pays exclusive listing agreements with increased housing mobility. *See id.* at 1040. As discussed with respect to the First Amendment claim, the City Council sought to "address[] a market failure stemming from the fact that tenants are often forced to pay a broker's fee despite lacking a meaningful ability to negotiate the amount of those fees." Comm. Rep. at 8. The City Council determined that that

market failure "induce[s] some individuals to remain in apartments that they no longer wish to live in," thus contributing to the City's low vacancy rate and housing immobility. *Id.* at 7.

Plaintiffs nonetheless argue that the FARE Act should have exempted existing agreements, and that there is no record basis to conclude that abrogating such agreements will advance the City's purpose any more than prohibiting only future agreements would. PI Mot. at 22. "[F]or impairment to be reasonable and necessary. . . , it must be shown that the state did not (1) consider impairing the contracts on par with other policy alternatives or (2) impose a drastic impairment when an evident and more moderate course would serve its purpose equally well . . . [.]" *Buffalo Tchrs.*, 464 F.3d at 371. The City Council considered—and rejected—an exemption for existing agreements. An earlier version of the Act specifically provided that it would "only appl[y] to residential real estate transactions involving the rental of real property entered into on or after the effective date of th[e] law." *See* Szyfer Decl., Ex. F. Moreover, as the City points out, such an exemption would have permitted landlords and brokers to enter long-term tenant-pays exclusive listing agreements while the bill was pending, which would have significantly reduced the Act's effectiveness. Accordingly, this factor weighs in favor of the Act's reasonableness.

Third, although the FARE Act's impairment of tenant-pays exclusive listing agreements comes "at the expense of a discrete group of private persons: [residential] landlords," it is those landlords who "caus[e] the public harm that the [City Council] sought to mitigate." *Melendez*, 16 F.4th at 1042. Landlords can—and in many circumstances do—pay brokers' fees. *See* Wagner Decl. ¶ 7; Rahmanian Decl. ¶ 7; Foregger Decl. ¶ 9; Saltzerg Decl. ¶ 8. When they instead choose to enter tenant-pays exclusive listing agreements, they impose an upfront cost on prospective tenants that the City Council found increases housing immobility and contributes to the ongoing housing emergency. While landlords may have legitimate reasons for doing so, such as their own

thin profit margins, *see* Porco Decl. ¶ 22; Foregger Decl. ¶ 7, they are nonetheless the "persons . . . responsible for the circumstances warranting relief," *Melendez*, 16 F.4th at 1042. The City Council's decision to allocate the full economic burden of brokers' fees to landlords is therefore not unreasonable.

Fourth, the Court considers whether the law is conditioned on need and, if not, whether the City Council adequately considered the extent to which landlords are better positioned than tenants to absorb the cost of brokers' fees. As an initial matter, the Act applies equally to all tenants and is thus not explicitly conditioned on need. However, the legislative record indicates that the City Council determined that the New Yorkers most likely to benefit from the FARE Act's prohibitions are those most in need of its relief. *Cf. Melendez*, 16 F.4th at 1044 ("The record indicates little Council discussion on the subject of guarantor need."); *see also id.* ("Certainly, legislatures may act based on 'the general or typical situation,' even if 'there are, or may be, individual cases of another aspect.'" (quoting *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 446 (1934)). Specifically, the City Council relied on reports that (1) "no-fee" listings, which account for about half of all rental listings on the market, "tend to be in luxury buildings with amenities such as doormen, in-unit laundry and fitness centers," Comm. Rep. at 5; and (2) "tenants who moved from 2021 to 2023 [we]re more likely to . . . have higher incomes than those who remained in their homes," *id.* at 7. Thus, the City Council could reasonably have concluded that the effect of brokers' fees on housing mobility weighs disproportionately on low-income New Yorkers, making a need condition unnecessary.

Nonetheless, in light of the absence of any need condition, the Court considers whether the City Council adequately assessed the degree to which landlords are better situated than tenants to bear the burden of brokers' fees. Plaintiffs argue, echoing objections raised during the legislative

hearing, that many landlords already operate on thin margins, and thus the added cost of brokers'

fees will cause them to (1) increase rents where possible, including for market-rate apartments;

and (2) shelve rent-stabilized inventory for which rents cannot be raised to cover the cost of

brokers' fees. *See, e.g.,* Lulich Decl, Ex. E at 83–84, 94, 133–35, 136–37; Chandan Decl. ¶¶ 30–

34. The Court does not doubt that the cost of brokers' fees will impose a significant burden on

landlords. But to the extent landlords are unable to pay those fees, they have a mechanism by

which to pass the cost to tenants—namely, increased rent. Tenants, by contrast, cannot pass the

cost of brokers' fees to landlords. While it may be true that this will worsen existing issues with

housing affordability, the City Council explicitly disclaimed any interest in "solv[ing] the

affordability crisis." Comm. Rep. at 10. Instead, it made a policy decision to address the causes

of housing immobility notwithstanding the Act's potential negative consequences for affordability.

The Contracts Clause "does not require courts to reexamine all of the factors underlying the

legislation at issue and to make a *de novo* determination whether another alternative would have

constituted a better statutory solution to a given problem." *Buffalo Tchrs.*, 464 F.3d at 370. Rather,

the Court must "defer to legislative judgment[.]" *Melendez*, 16 F.4th at 1041. Accordingly, this

factor weighs in favor of the FARE Act's reasonableness.

Fifth, the FARE Act does not provide for landlords to be compensated for the cost of

brokers' fees sustained as a result of the impairment of existing tenant-pays exclusive listing

agreements. *See id.* at 1045. Although this factor weighs against reasonableness, it is not

dispositive, *id.* at 1046, and it is mitigated by the fact that landlords are "not left without

compensation," *Blaisdell*, 290 U.S. at 445. Indeed, as stated above, Plaintiffs themselves contend

that landlords will recoup their losses by passing the cost of brokers' fees to tenants through

increased rent. *See* Chandan Decl. ¶ 30.

Finally, the Court notes an additional factor that weighs against Plaintiffs' Contracts Clause claim. *See Melendez*, 16 F.4th at 1046 (noting that circumstances other than the five factors may be relevant to the reasonable and appropriate means analysis). Although the Act may indeed have the negative consequences of which Plaintiffs warn, their economic arguments concern the effect of the FARE Act as a whole, which includes its application to open listings and its prohibition of *future* tenant-pays exclusive listing agreements. Plaintiffs' Contracts Clause claim, however, is limited to agreements executed before December 13, 2024 that remain executory beyond June 11, 2025. *See Fabri*, 387 F.3d at 124. The universe of properties that fall within the scope of Plaintiffs' claim is therefore miniscule compared to the infinite number of potential future agreements the Act prohibits. Plaintiffs offer no evidence that the Act's application to this small subset of properties alone will have a statistically significant effect on affordability or mobility. Common sense suggests it will not.

In sum, although the FARE Act permanently and retroactively abrogates existing agreements between landlords and brokers, the record reflects that the City Council adequately considered alternative measures, tailored the Act's burden to the party causing the public harm it sought to mitigate, and fairly reasoned that landlords have a mechanism to absorb the cost of brokers' fees in a way that tenants do not. Plaintiffs' economic arguments fail to distinguish the Act's future effects on the rental market—including those caused by the Act's regulation of open listings and future exclusive listing agreements—from any effects caused by the impairment of existing agreements. At base, Plaintiffs take issue with the policy underlying the FARE Act, and ask the Court to act as a "superlegislature[], overturning laws as unconstitutional when [it] believe[s] the legislature acted unwisely." *Buffalo Tchrs.*, 464 F.3d at 371. The Court declines that invitation.

Although Plaintiffs' complaint pleads sufficient facts to plausibly allege a violation of the Contracts Clause, they have failed to satisfy the "heavier burden" applicable to their motion for a preliminary injunction. *Council for Responsible Nutrition*, 2024 WL 2137834, at *2. Specifically, Plaintiffs have failed to establish that they are likely to prove that the FARE Act's impairment of existing tenant-pays exclusive listing agreements is not a reasonable and appropriate means of improving housing mobility. They have therefore failed to establish a likelihood of success on the merits. Accordingly, the motion for a preliminary injunction is denied with respect to the Contracts Clause claim.

### III.    State Law Preemption Claim

Finally, Plaintiffs allege that the FARE Act is preempted by Article 12-a of the RPL and its attendant regulations, which they claim "occupy the field with respect to the law governing real-estate transactions and real-estate brokers." Compl. ¶ 161.

#### A.  Motion to Dismiss

Under New York law, state law preempts local law "where there is a direct conflict with a state statute (conflict preemption) or where the legislature has indicated its intent to occupy the particular field (field preemption)." *Garcia v. New York City Dep't of Health & Mental Hygiene*, 31 N.Y.3d 601, 617 (2018). "Field preemption prohibits a local government from legislating in a field or area of the law where the legislature has assumed full regulatory responsibility." *Police Benevolent Ass'n of City of New York, Inc. v. City of New York*, 40 N.Y.3d 417, 423 (2023). "The state legislature's intent to preempt local legislation need not be expressly stated." *Id.* "Intent to occupy a field to the exclusion of local legislation can be implied from a declaration of state policy, the state's enactment of a comprehensive and detailed regulatory scheme in a particular area, or from the nature of the subject matter being regulated and the purpose and scope of the state

legislative scheme, including the need for state-wide uniformity in a given area." *Id.* at 423–24.

"Article 12-a, entitled 'Real Estate Brokers and Real Estate Sales[persons],' is a regulatory statute setting up a comprehensive plan to assure, by means of licensing, that standards of competency, honesty and professionalism are observed by real estate brokers and sales[persons]." *2 Park Ave. Assocs. v. Cross & Brown Co.*, 36 N.Y.2d 286, 289 (1975); *see also DiFrancesco v. Cnty. of Rockland*, 41 A.D.3d 530, 531 (N.Y. App. Div. 2007) ("[A]rticle 12-A of the Real Property Law [] was enacted to regulate the activities and licensing of real estate brokers and salespeople for the prevention of fraud."). To that end, Article 12-a sets forth requirements for obtaining and renewing a real estate broker or salesperson license.[8] *See* RPL §§ 440-a–441-F. Section 443 of the Article requires real estate brokers to disclose in writing whose interests they represent in a transaction and the duties they owe as a result. *See id.* §§ 443, 443-a. Additionally, Article 12-a prohibits brokers from splitting their commissions or fees with unlicensed brokers and salespeople, *id.* § 442, and prohibits a real estate salesperson from receiving compensation from anyone other than a licensed broker with whom they are associated, *id.* § 442-a. Finally, it establishes a State Real Estate Board—comprised in part of real estate brokers—and authorizes both that board and the Secretary of State to promulgate rules and regulations pursuant to the Article. *See* §§ 442-i, 442-k, 442-h. As relevant here, the Secretary of State has issued regulations governing the form and content of broker advertising, *see* N.Y.C.R.R. § 175.25, as well as a regulation that requires a broker to "make it clear for which party he is acting," and prohibits a broker from "receiv[ing] compensation from more than one party except with the full knowledge and consent of the broker's client," *id.* § 175.7.

As an initial matter, Article 12-a does not expressly state the legislature's intent to occupy

---

[8] A real estate salesperson works under the authority of a licensed broker to assist in buying, selling, and renting properties. *See* RPL § 440(3).

the field with respect to broker compensation.  Nor does it contain a declaration of state policy from which such intent can be implied.  *Cf. Vatore v. Comm'r of Consumer Affs. of City of New York*, 83 N.Y.2d 645, 649–650 (1994); *Consol. Edison Co. of New York v. Town of Red Hook*, 60 N.Y.2d 99, 105 (1983).

Although Plaintiffs may be correct that Article 12-a establishes "an integrated and comprehensive system of laws" regulating brokers' licensing, conduct, and ethical obligations, the FARE Act's regulation of broker compensation does not unduly intrude into that area.  *Police Benevolent Ass'n*, 40 N.Y.3d at 424.  Where Article 12-a regulates compensation, it does so only to ensure that unlicensed brokers and salespersons cannot collect or share in fees and commissions, which prevents circumvention of the licensing scheme.  *See* RPL §§ 442, 442-a; *see also id.* § 442-d (requiring a person suing to recover an allegedly unpaid real estate commission to establish that they were "a duly licensed real estate broker or real estate salesperson" when the cause of action arose).  Its provisions say nothing about the amount in fees that licensed brokers may collect, nor from whom they may collect fees, nor whether they may collect such fees at all.  New York courts have declined to find field preemption in similar circumstances.  *See, e.g., Hertz Corp. v. City of New York*, 80 N.Y.2d 565, 569–70 (1992) (holding that a local law prohibiting car rental companies from imposing additional fees based on a renter's place of residence was not preempted by a state legislative scheme that limited the charges that may be imposed in a car rental transaction and prohibited discrimination on the basis of various protected characteristics).  Moreover, to the extent that the FARE Act's provisions overlap with state regulation of broker advertising and disclosures, the fact that "[s]tate and local laws touch upon the same area is insufficient to support a determination that the State has preempted the entire field of regulation in a given area."  *Jancyn Mfg. Corp. v. Suffolk Cnty.*, 71 N.Y.2d 91, 99 (1987).  Thus, because Article 12-a "do[es] not

address the question" of whether brokers may impose fees on tenants in residential rental transactions, the Court cannot conclude that the legislature "enacted a comprehensive and detailed regulatory scheme in the field" of broker compensation that preempts the FARE Act.  *Hertz*, 80 N.Y.2d at 570.

Accordingly, with respect to Plaintiffs' state law preemption claim, the motion to dismiss is granted, and the motion for a preliminary injunction is denied as moot.

## CONCLUSION

In enacting the FARE Act, the City Council made clear that it sought to address a specific harm: the detrimental impact on housing mobility caused by the practice of imposing brokers' fees on tenants.  Although the Act is not primarily intended to target speech and has only a relatively minimal impact on existing contracts, Plaintiffs have sought to enjoin its enforcement on the basis that it violates the First Amendment and the Contracts Clause.  In their telling, the Act will wreak havoc on the City's residential rental market, cause rents to rise, put brokers out of work, and make it exponentially more difficult for New Yorkers to rent apartments.  Plaintiffs' discontentment with the Act, however, stems not from its effects on their constitutional rights, but from a fundamental disagreement with its underlying policy.  The law is clear, though, that "[w]hether the legislation is wise or unwise as a matter of policy is a question with which [the Court cannot be] concerned." *Blaisdell*, 290 U.S. at 447–48.  Thus, although some of Plaintiffs' prophecies may prove true, Plaintiff's remedy is through the political process, not in court.

\*\*\*

For the foregoing reasons, the motion to dismiss is granted with respect to Plaintiffs' First Amendment, New York State Constitution, and state law preemption claims, and denied with respect to Plaintiffs' Contracts Clause claim.  The motion for a preliminary injunction is denied in

its entirety.

The Clerk of Court is respectfully directed to terminate the motions pending at ECF Nos.

19 and 36.

SO ORDERED.

Dated:    June 10, 2025
          New York, New York

_____
Ronnie Abrams
United States District Judge

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was filed with the Clerk using the Appellate

Case Management System ("ACMS") on July 31, 2025.  All counsel of record are

registered ACMS users, and service will be accomplished by the ACMS system.

*/s/ Claude G. Szyfer*
Claude G. Szyfer