# 25-1506

## 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
## 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔖𝔢𝔠𝔬𝔫𝔡 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

REAL ESTATE BOARD OF NEW YORK, INC., NEW YORK STATE ASSOCIATION OF REALTORS, INC., BOHEMIA REALTY GROUP, BOND NEW YORK REAL ESTATE CORP., LEVEL GROUP, INC., REAL NEW YORK LLC, FOUR CORNERS REALTY, LLC, 21 WEST 74 CORP., 8 WEST 119TH STREET HDFC,

*Plaintiffs-Appellants*,

*against*

THE CITY OF NEW YORK, a municipal entity, VILDA VERA MAYUGA, as Commissioner of New York City Department of Consumer and Worker Protection,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Southern District of New York

## BRIEF FOR APPELLEES

MURIEL GOODE-TRUFANT
*Corporation Counsel*
*of the City of New York*
Attorney for Appellees
100 Church Street
New York, New York 10007
212-356-2490
jdavies@law.nyc.gov

RICHARD DEARING
CLAUDE PLATTON
JAMISON DAVIES
    *of Counsel*

September 18, 2025

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES..............................................................iv

PRELIMINARY STATEMENT...........................................................1

ISSUES PRESENTED......................................................................3

STATEMENT OF THE CASE.............................................................3

    A. The FARE Act ....................................................................3

    B. The legislative record before the City Council regarding
       the problem of tenant-pay brokers fees in New York City.4

        1. The record showing the unfairness to tenants of
           paying someone they did not hire for a service they
           did not request.............................................................7

        2. The record supporting the FARE Act's goal of
           improving housing mobility.......................................11

        3. The record regarding the FARE Act's effect on the
           cost of rent .................................................................16

        4. The record establishing the need to close a potential
           loophole involving open listings .................................19

       C. This suit and the district court's order denying a
        preliminary injunction and dismissing the complaint in
        part ...........................................................................20

SUMMARY OF ARGUMENT AND STANDARD OF REVIEW .....24

ARGUMENT.................................................................................28

POINT I ......................................................................................28

    THE DISTRICT COURT CORRECTLY DISMISSED
    PLAINTIFFS' FIRST AMENDMENT CLAIM ......................28

i

# TABLE OF CONTENTS (cont'd)

**Page**

A. The challenged provision does not implicate the First Amendment. ................................................................29

B. If the challenged provision implicated the First Amendment, it would warrant intermediate scrutiny. ....34

C. If intermediate scrutiny applies, the challenged provision satisfies that test. ...........................................39

    1. The City Council properly concluded that the FARE Act would increase housing mobility. ........................41

    2. The City Council properly concluded the FARE Act would improve the fairness and transparency of broker fees. ................................................................45

    3. The City Council properly concluded that the FARE Act aligned the principal-agent relationship. .............47

POINT II ........................................................................50

THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THEIR CONTRACTS CLAUSE CLAIM ...........................................50

A. To the extent that plaintiffs have substantiated any threshold impairment of contracts, their request for a preliminary injunction is moot as of October 31, 2025. .51

B. The FARE Act would satisfy Contracts Clause scrutiny...54

    1. The Act serves a legitimate public purpose.................54

    2. The Act is a reasonable and appropriate means to achieve its goals. .........................................................56

# TABLE OF CONTENTS (cont'd)

**Page**

POINT III ........................................................................... 62

    THE REMAINING FACTORS WEIGH AGAINST AN
    INJUNCTION ...................................................................... 62

CONCLUSION ................................................................... 65

CERTIFICATE OF COMPLIANCE ................................................. 66

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Structural Steel Co. v. Spannaus,*
438 U.S. 234 ................................................................ 53

*Arcara v. Cloud Books,*
478 U.S. 697 (1986)...................................................... 31

*Ashfield Health LLC v. Jacobson,*
No. 21-1885, 2022 U.S. App. LEXIS 29350 (2d Cir. Oct.
21, 2022)...................................................................... 52

*Bd. of Trs. v. Fox,*
492 U.S. 469 (1989)...................................................... 39

*Brandt v. Griffin,*
147 F.4th 867, 2025 U.S. App. LEXIS 20402 (8th Cir.
2025)............................................................................ 31

*Buffalo Teachers Fed'n v. Tobe,*
464 F.3d 362 (2d Cir. 2006) ............................... 55, 58, 60

*Central Hudson Gas & Electric v. Public Service
Commission,*
447 U.S. 557 (1980)........................... 34, 35, 36, 46

*Church of the Am. Knights of the KKK v. Kerik,*
356 F.3d 197 (2d Cir. 2004) ....................................... 31

*Clementine Co., LLC v. Adams,*
74 F.4th 77 (2d Cir. 2023) ........................... 29, 31, 33, 46

*Conn. State Police Union v. Rovella,*
36 F.4th 54 (2d Cir. 2022) ............................................ 53

*Dexter 345, Inc. v. Cuomo,*
663 F.3d 59 (2d Cir. 2011) .......................................... 62

*Fabri v. United Techs. Int'l, Inc.,*
387 F.3d 109 (2d Cir. 2004) ......................................... 51

*Freedom Holdings, Inc. v. Spitzer,*
408 F.3d 112 (2d Cir. 2005) ......................................... 62

*Goe v. Zucker,*
43 F.4th 19 (2d Cir. 2022) ........................................... 26

# TABLE OF AUTHORITIES (cont'd)

Page(s)

*Greater Phila. Chamber of Commerce v. City of Phila.*,
  949 F.3d 116 (3d Cir. 2020) ........................................... 35

*Hudson Shore Assocs. Ltd. P'ship v. New York*,
  139 F.4th 99 (2025) ..................................................... 25

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
  480 U.S. 470 (1987) ........................................... 55, 60, 61

*Lotes Co. v. Hon Hai Precision Indus. Co.*,
  753 F.3d 395 (2d Cir. 2014) ........................................... 29

*Loveridge v. Pendelton Woolen Mills, Inc.*,
  788 F.2d 914 (2d Cir. 1986) ........................................... 63

*Lusk v. Vill. of Cold Spring*,
  475 F.3d 480 (2d Cir. 2007) ........................................... 25

*Maryland v. King*,
  567 U.S. 1301 (2012) .................................................. 62

*Melendez v. City of New York*,
  16 F.4th 992 (2d Cir. 2021) ......................... 23, 56, 59, 61

*Mo. Broadcasters Ass'n v. Lacy*,
  846 F.3d 295 (8th Cir. 2017) ......................................... 36

*N.Y.C. Envtl. Justice All. v. Giuliani*,
  214 F.3d 65 (2d Cir. 2000) ........................................... 52

*Nat'l Ass'n for Gun Rights v. Lamont*,
  Nos. 23-1162, 23-1344, 2025 U.S. App. LEXIS 21570
  (2d Cir. Aug. 22, 2025) ................................................ 62

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
  585 U.S. 755 (2018) .................................................... 31

*Netchoice, LLC v. Bonta*,
  No. 25-146, ___ F.4th ___, 2025 U.S. App. LEXIS
  23261 (9th Cir. Sept. 9, 2025) ....................................... 38

*New Hope Family Servs. v. Poole*,
  966 F.3d 145 (2d Cir. 2020) ........................................... 61

*Perez v. Arnone*,
  600 F. App'x 20 (2d Cir. 2015) ....................................... 52

v

## TABLE OF AUTHORITIES (cont'd)

Page(s)

*Reed v. Town of Gilbert,*
576 U.S. 155 (2015) ........................................................ 38

*Resource Grp. Ltd. v. Chishti,*
91 F.4th 107 (2d Cir. 2024) ............................................ 25

*Retail Dig. Network, LLC v. Prieto,*
861 F.3d 839 (9th Cir. 2017) ......................................... 35

*Sal Tinnerello & Sons, Inc. v. Town of Stonington,*
141 F.3d 46 (2d Cir. 1998) ............................................. 58

*Sanitation & Recycling Indus. v. City of N.Y.,*
107 F.3d 985 (2d Cir. 1997) ............................... 53, 58, 60

*Sorrell v. IMS Health, Inc.,*
564 U.S. 552 (2011) .................................... 34, 35, 36, 37

*Sullivan v. Nassau Cnty. Interim Fin. Auth.,*
959 F.3d 54 (2d Cir. 2020) ...................................... 50, 56

*The Art & Antique Dealers League of Am., Inc. v. Seggos,*
121 F.4th 423 (2d Cir. 2024) ................................... 41, 46

*TikTok Inc. v. Garland,*
604 U.S. 56 (2025) ................................................... 29, 38

*Tom Doherty Assocs. v. Saban Entm't, Inc.,*
60 F.3d 27 (2d Cir. 1995) ............................................... 63

*Turner Broad. Sys., Inc. v. FCC,*
512 U.S. 622 (1994) ........................................................ 37

*U.S. Trust Co. v. New Jersey,*
431 U.S. 1 (1977) ............................................................ 50

*United States v. Caronia,*
703 F.3d 149 ................................................................... 36

*United States v. National Treasury Employees Union,*
513 U.S. 454 (1995) ................................................. 33, 34

*Veterans Guardian VA Claim Consulting LLC v. Platkin,*
133 F.4th 213 (3d Cir. 2025) ........................... 31, 32, 33, 39

vi

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Vugo, Inc. v. City of New York,*
  931 F.3d 42 (2d Cir. 2019) ...................................................*passim*

*Winter v. Nat. Res. Def. Council,*
  555 U.S. 7 (2008)........................................................................ 24

*Zauderer v. Off. of Disciplinary Counsel,*
  471 U.S. 626 (1985)...................................................................... 4

**Statutes**

N.Y.C Administrative Code § 26-699.20 ............................................. 37

N.Y.C Administrative Code § 20-699.21(a)..................................*passim*

N.Y.C Administrative Code § 20-699.21(c)............................ 22, 27, 49

N.Y.C Administrative Code § 20-699.23 .............................................. 4

N.Y.C Administrative Code § 20-699.24 .............................................. 4

N.Y. Real Prop. L. § 440(1).............................................................. 37

N.Y. Real Prop. L. § 440-a ............................................................... 37

N.Y. Real Prop. L. § 443(a) .............................................................. 37

**Other Authorities**

19 N.Y. Codes, Rs. & Regs. § 175.15................................................. 52

Commonwealth of Massachusetts, *Attorney General
  Advisory on Landlord-Tenant Broker Fees, available at*
  https://www.mass.gov/doc/broker-fee-
  advisory/download ........................................................................ 4

Fed. R. Civ. P. 12(b)(6)..................................................................... 27

U.S. Const., Art. I, § 10, cl. 1............................................................ 50

## PRELIMINARY STATEMENT

Until June 2025, New York was one of only two major U.S. cities where prospective tenants routinely paid a broker who was not hired by them and provided them few-to-no services. Broker fees often totaled thousands of dollars, inflating the up-front costs of moving and reducing housing mobility. In response, the City enacted Local Law 119 of 2024, known as the FARE Act, to prohibit a broker who is a landlord's agent, or who publishes an apartment listing with the landlord's permission, from charging the tenant a fee. Plaintiffs—landlords, real-estate brokers, and trade groups—opposed the FARE Act before the City Council. After losing that battle, they reframed their policy objections as constitutional claims and sued to block the FARE Act on First Amendment and Contracts Clause grounds, among others. The U.S. District Court for the Southern District of New York (Abrams, J.) denied a preliminary injunction and dismissed the First Amendment claim.

This Court should affirm. To start, the district court correctly dismissed the First Amendment claim. Though plaintiffs insistently refer to the provision they challenge as a "publication bar," it does not bar the publication of anything by anyone. Instead, it provides that, if a broker lists an apartment with the landlord's permission, the broker cannot require that its fee is paid by a tenant to rent that apartment. Brokers are

still free to advertise any apartment, and landlords are free to retain brokers to market their properties. The provision thus does not even implicate the First Amendment. And, if the challenged provision did impose some burden on plaintiffs' speech, it would easily satisfy intermediate scrutiny under the commercial-speech doctrine, as the district court held. The provision advances the goal of increasing housing mobility by freeing tenants from often-exorbitant fees and prevents circumvention of other provisions of the legislation, without dictating anyone's speech.

As to the Contracts Clause claim, the district court correctly found that plaintiffs failed to establish that they are likely to succeed on the merits. The law minimally impairs existing contracts. Indeed, plaintiffs identified only one affected contract, which will expire before this matter is heard, rendering their injunction request moot. And the law is a reasonable means to advance a legitimate purpose in any event. The legislature is accorded substantial deference as to the means it uses to achieve its ends, even if they impair existing contracts. Plaintiffs cannot overcome that deference. Their arguments to the contrary are based on a willful blindness to the contents of the legislative record and a refusal to engage with the Council's reasons for passing the law and the evidence in its favor. Plaintiffs lost the political fight and now seek rescue from the federal courts. But they lack any basis for relief.

## ISSUES PRESENTED

1. Did the district court properly dismiss plaintiffs' First Amendment claim because the challenged provision does not regulate speech or, in the alternative, because it satisfies intermediate scrutiny?

2. Did the district court properly conclude that plaintiffs are unlikely to succeed on the merits of their Contracts Clause claim?

3. Do the remaining factors weigh against granting the extraordinary remedy of a preliminary injunction?

## STATEMENT OF THE CASE

### A.  The FARE Act

The City Council passed the Fairness in Apartment Rental Expenses Act, referred to as the "FARE Act," Local Law 119 of 2024, on November 13, 2024, by a vote of 42 to 8 (Joint Appendix ("JA") 730). The FARE Act provides that "a landlord's agent shall not impose any fee on, or collect any fee from, a tenant related to the rental of residential real property." N.Y.C. Administrative Code ("Admin. Code") § 20-699.21(a)(1). The law also provides that "any agent who publishes a listing for a rental of residential real property with the permission or authorization of the landlord for such property shall not impose any fee on, or collect any fee from, a tenant related to the rental of such property." Admin. Code § 20-699.21(a)(2). Likewise, the law creates a

3

"rebuttable presumption that an agent who publishes a listing for a rental of residential real property does so with the permission or authorization of the landlord of such property." *Id.* § 20-699.21(e). And it is also unlawful for any person, including a landlord, to condition the rental of an apartment on the tenant engaging an agent. *Id.* § 20-699.21(c).[1] The law provides for civil penalties and a private cause of action. *Id.* §§ 20-699.23-24.

The Act's effective date was deferred until 180 days after enactment to provide affected businesses and individuals time to prepare for the change (JA752).[2]

## B. The legislative record before the City Council regarding the problem of tenant-pay brokers fees in New York City

Before the enactment of the FARE Act, New York City was distinct from every other major city in the country except for Boston[3] in that

---

[1] Separately, § 20-699.21(d) prohibits "post[ing] a listing for the rental of residential real property that represents that fees must be paid in a manner that would violate this section." That provision is not at issue here. In any event the government may regulate "commercial speech that … proposes an illegal transaction." *Zauderer v. Off. of Disciplinary Counsel*, 471 U.S. 626, 638 (1985).

[2] The FARE Act was enacted by operation of law on December 13, 2024, 30 days after it passed, because the Mayor neither signed nor vetoed it (JA877).

[3] Massachusetts has since banned tenant-pay broker fees, effective August 1, 2025. *See* Commonwealth of Massachusetts, *Attorney General Advisory on Landlord-Tenant Broker Fees*, *available at* https://www.mass.gov/doc/broker-fee-advisory/download.

4

tenants generally paid fees to brokers who were hired by, and worked for, the landlord (JA91). The most common situations where tenants paid the brokers' fees were so-called "open listings." In open listings, multiple brokers are permitted by a landlord to advertise an available unit, with the expectation that they will collect a fee from the tenant if they provide the tenant who ultimately rents the apartment (JA23-24). And those fees could be astronomical, ranging from one month's rent (8.3% of annual rent) up to "15% of the annual rent or more" (JA84). Combined with other costs, the average tenant spent "over $10,000" to move to a new apartment (JA87, 90, 436 n.9; 673). As a result, "the annual turnover rate for New York City rental units is 41 percent lower than the national average" (JA673).

Tenants often paid substantial fees even though they found the apartment with little or no assistance from a broker (*see*, *e.g.*, JA92, 128-29, 182). In many instances, tenants faced a bait-and-switch, where units were advertised as "no-fee," but a fee was nonetheless imposed before the prospective tenant could rent the unit (*see* JA169, 175-76, 192, 234-35).

In light of these and other concerns, the Council introduced the FARE Act in early 2024 (JA755). After the bill's introduction, the City Council amassed an extensive legislative record, hearing a full day's

worth of testimony from interested parties, both for and against (JA73-393), and accepting hundreds of pages of written submissions (JA395-665). The speakers and submissions overwhelmingly favored the measure, with the notable exception of the plaintiffs, their representatives, and other real estate brokers (though several brokers testified in favor) (*see*, *e.g.*, JA180-81, 217, 227, 229, 234, 363-64, 462-63).

After reviewing the submissions for and against the FARE Act, the City Council's Committee on Consumer and Worker Protection issued a report on the bill (JA667-78). The report noted that, even after the hearing, "the Council continued to meet with stakeholders including real estate associations, real estate marketplaces, real estate brokers, property owners, tenants and legal advocates," including representatives of one of the plaintiffs here, "to gather feedback on the legislation" (JA668). And the "Council's Oversight and Investigations Division (OID) conducted an investigation of brokers' fees in the residential rental market" (*id.*).

Several key themes emerge from the legislative record.

### 1. The record showing the unfairness to tenants of paying someone they did not hire for a service they did not request

Many of the bill's proponents pointed to the fundamental unfairness of tenants paying a huge fee for an unrequested service, to a person they did not hire, who often performed minimal work on their behalf or, in some cases, no work at all.

A frequently expressed sentiment was that a "common-sense element of fairness" dictates that "the party that chooses the broker should pay the fee" (JA174). Many others echoed the unfairness of paying a huge fee for a service that someone had not requested, to a broker they did not choose (*see*, *e.g.*, JA92, 144, 174, 182, 187, 197, 216, 225, 255, 397, 399, 419, 422). The bill's co-sponsor explained that the it would ensure that "whoever hired a broker pays" and that tenants should "compensate a broker only when they hire one to represent them" (JA92). New York City's system contrasted with every other major city, where "it is the landlord's responsibility to pay the broker's fee for listing their property and finding a tenant" (JA672). That "almost universal system aligns with basic norms around principal-agent relationships," where the principal is responsible for paying the agent (*id.*).

The legislative record also establishes that, despite taking a large fee, brokers often performed little-to-no work on behalf of the tenants

7

who paid them. Many individuals explained they never even met or saw the broker they had to pay (*see*, *e.g.*, JA128-29, 318, 414-15, 459, 492). One representative of a fair-housing organization cited "many, many, many hundreds of stories of tenants who would [pay] a month's rent just to receive a lockbox code from the broker" (JA182). Others described brokers providing minimal services and refusing to attend meetings or showings or answer basic questions (*see, e.g.*, JA188, 374 (broker did not provide the keys but "left them at a restaurant for [the tenant] to pick up")). As one experienced broker testified, "[t]enants pay 15% out of desperation," not because "they feel that that is what's fair," noting that the broker "did a lot of valuable work ... for the [landlord]," not for the tenant (JA227). She explained that, "[a]s [the] system exists today, ... the only person with choice in the current situation is the landlord" (JA226).

The Committee report confirmed these concerns, noting that, in instances where agents claimed to represent the tenant, "Council investigators were not given any more specialized service," and the "difference in agency relationship did not correlate meaningfully with the provision of different services being provided by the broker" (JA675). And, while opponents of the bill claimed it was "exceedingly rare" for a tenant to pay a fee to a broker they never met, "in 12 percent of the rentals

toured by Council investigators, no one from the brokerage was present at the unit but instead left tours to building superintendents or even left the door unlocked for the prospective tenants to let themselves in" (JA675-76).

The record showed that tenants often did not voluntarily retain brokers and agree to pay their fees. Despite testimony from the industry representatives that "every person signs a brokerage agreement in advance of seeing that apartment, which clearly sets forth what the broker fee is," investigators toured 50 rentals "and on not one of those tours was the 'prospective tenant' required to sign an agreement in advance which clearly set forth the agency relationship and broker fee" (JA674).

Beyond that, the record contains numerous examples where the broker fee was disclosed only at the last moment, after an individual had already devoted significant time, effort, and nonrefundable money to securing the apartment they wished to rent. In one instance, an individual testified that they were told there was "actually a broker's fee" after they paid a "non-refundable $1,000" deposit, and they were then "scrambling to pay for a service [they] never requested" (JA295). As one broker pointed out, the contract obligating the tenant to pay the fee was provided "at the point of sale, much like when you go to the counter at CVS, and you've got all your goods, and you find out how much it costs"

(JA229). In that case, the "landlord has approved them to lease the apartment [through] the broker, they get handed a bunch of papers, forms that outline certain disclosures, acknowledgements, and as a result, they are at the point ... they can't refuse to move forward" (*id.*; *see also* JA363-64 (another broker referring to the last-minute fee disclosure as an "extortive measure")). OID investigators confirmed this as well. The Committee report found that there was "substantial variation between whether brokers engaged by the landlord ever disclose their agency relationships and, when they do disclose their relationships, who they claim to represent" (JA675).

In other instances, an apartment was advertised as no fee, but a prospective tenant found out that a fee was required only after spending the time to see the unit. The CEO of a large online leasing marketplace (JA220), explained that it was "quite frequent[]" that a unit is "listed as no fee, but then prospective tenants will find out that these units are actually requesting a broker fee" (JA234; *see also* JA297-98, 316, 337). Some brokers requested a fee for an apartment that was listed as no fee as a condition of putting a prospective tenant ahead of other applicants (*see* JA379 ("Once, a broker told me that he had another offer from another candidate, but he liked me, so the no-fee unit became a half-fee unit.")).

10

### 2. The record supporting the FARE Act's goal of improving housing mobility

Many witnesses spoke to the fact that broker's fees were a significant barrier to housing mobility—*i.e.* the ability to easily move apartments, separately from the total amount they paid for housing. As the bill's sponsor said at the hearing's outset, the FARE Act would "help the NYC housing market become more elastic" by allowing tenants to "move more easily and affordably" with less "upfront rental costs" (JA91-92, 398).

The witnesses' testimony was consistent with that conclusion. As one individual testified, he had lived with his mother in a "very insecure living situation where the threat of eviction basically hangs over [their] head every single day" but was "about to enter a new income bracket" and could afford to move (JA186-87). But, though his income would be sufficient to move, paying the broker's fee up front would be "basically impossible," and he would "have to save money for at least six to eight months" to compensate "the person [the landlord] hired, not that I hired" (JA187).

Others, too, spoke to the lack of flexibility and housing mobility. As one witness put it, "if I want to move within New York City, I can't move freely" (JA196). Another spoke about a relative who "had saved

11

over two years" to afford a "security deposit and the first month's rent," for whom an additional fee would have made it "impossible ... to move anywhere" (JA201-02). That issue was naturally exacerbated for low-income renters less likely to have substantial savings (JA219-21, 361, 416, 424-25, 435-36, 451, 464). And high fees harmed those who are forced to move suddenly through no fault of their own—for example, where a landlord decided to sell a building—and sometimes forced people to leave the City altogether (*e.g.*, JA552).

Additional witnesses, both individuals and organizations, explained that high upfront costs prevent people from moving out of precarious or dangerous living situations (*see* JA517 ("[P]aying a broker prevented me from moving out of a dangerous situation."); JA594 ("The financial hurdle of a broker's fee discourages people from leaving dangerous, bad or harmful situations ...."). One "REBNY affiliated real estate agent" submitted written testimony that she had attempted to leave an emotionally and physically abusive man with whom she was living "once [she] saved up enough to pay first month's rent and the security deposit," but "was stuck" because she "didn't have enough money to pay the broker fee" (JA462). Indeed, the inability to escape situations involving domestic violence because of high upfront moving fees was a recurring theme (JA272, 377). In many instances, "the additional burden

of a broker fee is the difference between being able to move and having to remain in a home that is … not safe" (JA432).

The Council also heard that high upfront costs were a significant barrier to luring qualified workers to New York City. For example, a witness for a union representing postdoctoral researchers noted that its members "are coming to New York City to contribute to science" and to "study cures for cancer, study neurodegenerative diseases" (JA194-95). Often they are relocating from another country and already face high moving costs (JA195). Being forced to pay a "broker fee on top of" those costs limits the ability of these high-skill workers to relocate to New York City (*id.*).

Similarly, one venture capital representative explained that companies "have to be able to recruit talent, and they're competing with other startups all over the country and all over the world," and, because of high up-front fees, "they end up not basing their companies here" (JA204). So, the City loses out on the benefits of "groundbreaking" industries ranging from "digital health, to transportation to energy, to education," to "artificial intelligence [and] machine learning" and "sacrific[es] all of those jobs … to give one constituency a fee" (*id.*; *see also* JA188-89, JA476).

Much of the testimony noted the potential tradeoff between up-front broker fees and higher rents, and witnesses explained that, even if broker fees are ultimately passed on by landlords, higher rent could be preferable for various reasons. One Councilmember noted that it would be easier to pay "a little more in rent monthly" versus having to "cobbl[e] together the upfront costs all at once" (JA200). The upfront costs are "the barrier" (JA201). The Council was also, through other measures, working on reducing rent costs and addressing "housing supply and housing demand," but "the fact that it's … incredibly challenging to get" thousands of dollars "when you don't really have anything in … savings is really what we're talking about" (JA200-01).

As one tenant explained, if a landlord "didn't want to pay that fee and wanted to pass it on to me over the course of the year of a lease, I would be very amenable to that" (JA339). She noted that the bill is "not being presented as a solve for the affordable housing crisis in New York, and I'm not looking at it to lower my rent" (*id.*). Instead, the legislation was a "solution to alleviate *upfront* financial burden on renters" (*id.* (emphasis added)).

One advocacy organization submitted detailed evidence about this tradeoff. It noted that only 22% of New Yorkers could "afford high up-front moving costs out of pocket," and the rest rely on "gifts from family

14

and loans" (JA436). While it acknowledged that part of the broker fee may be incorporated into the rent, "any rent increases that do occur would be [amortized] over a 12- or 24-month lease, which is preferable to paying a large sum up front and could still reduce tenants' long-run costs and increase their future bargaining power" (JA438; *see also* JA507 (explaining that "even if landlords passed costs on through increased rent, the overall financial impact on tenants would be mitigated by spreading these costs over the term of the lease")).

Thus, the organization concluded that "the benefits of improved tenant mobility and housing accessibility gained by avoiding up-front broker fees outweigh potential rent increases" (JA438). The key issue presented by a broker fee is "how significantly it increases [a tenant's] one-time costs" (*id.*). The report also noted that "[l]andlords also will not need to raise rents by the same amount as a full broker's fee spread over the term of a lease, because they still won't owe broker fees for tenants who choose to renew" (*id.*) And it explained that when "landlords were required to pay their own broker fees in the past, they did not raise rents as much as a full broker's fee" (*id.*). Another written submission cited a survey finding that 60% of renters said broker fees prevent them from moving into a different apartment and "over half of the city's renters (54%) would be willing to pay a higher monthly rent if they

15

didn't have to pay upfront broker fees" (JA504; *see also* JA673 (Committee report citing same study)).

### 3. The record regarding the FARE Act's effect on the cost of rent

Witnesses and Councilmembers also addressed the potential effects of the FARE Act on housing affordability—*i.e.* the cost of rent. Many witnesses, particularly those submitting testimony on behalf of the plaintiffs here and their representatives, argued that the FARE Act would increase rents because landlords would pass the broker fees on to tenants through higher rent (*e.g.* JA130, 212, 215). Opponents also argued that those increases would compound over time, as new rents would increase based on the initial, higher rent (*id.*). They also contended that the law could reduce housing mobility in circumstances where, as a result of increased rents, individuals looking to move might no longer meet income requirements (*e.g.* JA212).

As discussed above, many of those supporting the bill recognized these tradeoffs and argued that the law was still justified, even if rents increased. The Committee report also addressed objections from opponents of the bill that it was "not a solution to the affordable housing crisis in the city" (JA676). As the report explained, the bill is "not an

attempt to solve the affordability crisis in the city," which the Council was working to address via "multiple other avenues" (*id.*).

Other submissions pointed to empirical evidence and economic logic suggesting that rents would not rise, or at least not by the full amount of the brokers' fees. The FARE Act gives "renters more leverage to negotiate a better rate on lease renewals," both because they can move more easily and because, when the lease comes up for renewal, "the cost of filling any vacancy will fall on the landlord" (JA505). And landlords avoid the broker fee for tenants who opt to renew (JA438). Making it easier for tenants to move "increas[es] their bargaining power and incentiviz[es] landlords to keep rent increases more modest" (JA439). Others pointed to the fact that New York's highly competitive rental market means that rents were already at the maximum the market could bear (JA472, 504, 507). And, of course, for rent-stabilized units, landlords are limited in how much they can legally raise rents (JA339, 438).

Several submissions suggested that impaired housing mobility itself contributes to higher rents. An "enormous financial barrier" to moving creates an effect where "[p]eople cannot afford to move to or within the city, creating less housing turnover, which keeps the rental housing supply down and pushes rent prices up" (JA504; *see also* JA527 ("[T]he constant broker fee hits can make it very prohibitive to the point of

17

locking people into bad housing arrangements and giving even more leverage to landlords.")).

Indeed, as one person put it, his landlord was able to "raise[] [his] rent by nearly 30%, and neglected to make much needed repairs because he knows that moving within New York City is a huge burden" (JA313, 448). Lower costs of moving increase tenants' bargaining power as against their current landlords because the threat of moving becomes much more realistic (JA438). On the other hand, high up-front costs dramatically undercut tenants' bargaining position. As another witnesses memorably put it, when attempting to negotiate a fair rent, the "leasing agent quite literally said to me 'are you sure you want to move and let that broker fee you paid last year go to waste?'" (JA523).

Even if a tenant who paid a broker's fee upfront saves money on the rent, those savings could be illusory. As noted throughout the record, because many tenants cannot afford the broker fee using savings, they often borrow money to pay it (*e.g.* JA203, 236-37, 340, 423-24). The cost of servicing that debt over time could easily outweigh any savings on monthly rent. This is especially so because lower-income renters are the ones least likely to be able to afford upfront fees (JA219), while also facing the highest borrowing costs.

18

### 4. The record establishing the need to close a potential loophole involving open listings

The Committee report also noted that brokers and others who had discussed the bill with the Committee, including representatives of some of the plaintiffs here, detailed concerns that the original version of the bill "did not articulate what it means to hire a broker, and ... did not address the relationship between parties in an open listing" (JA677). Representatives of some of the plaintiffs in this case also testified before the Council that this change was necessary because the bill's original text would have made it such that "open listing[s] would result in a fee to the tenant" if they were published with the landlord's authorization, but the broker had not specifically been hired by the landlord (JA402 (testimony of Sarah Salzberg of Bohemia Realty); JA403 (testimony of Douglas Wagner of Bond New York noting that, under prior text, if landlords offered open listings, it would require tenants to "pay our commission")).

As the Committee report explained, the bill therefore was amended to prohibit a broker who is the "landlord's agent" or who was "authorized by the landlord to list the property on the landlord's behalf" from collecting a fee from a tenant (JA677).

### C. This suit and the district court's order denying a preliminary injunction and dismissing the complaint in part

Shortly after the FARE Act passed, plaintiffs sued to invalidate the law (JA13-58). They alleged that one provision of the FARE Act violates the First Amendment and the Free Speech Clause of the New York Constitution, two other provisions violate the Contracts Clause of the U.S. Constitution, and that it is preempted by state law. Nearly a month later, plaintiffs sought a preliminary injunction (JA68-69). Defendants opposed the preliminary injunction and moved to dismiss. The district court granted the motion to dismiss the First Amendment, New York State free speech, and preemption claims, denied the motion to dismiss the Contracts Clause claim, and denied the motion for a preliminary injunction in full (Special Appendix ("SPA") 41-42).

As to the First Amendment claim, the district court first found that the challenged provision, Administrative Code § 20-699.21(a)(2), burdens speech because a broker's speech, in the form of a listing, is a "predicate for the application of the prohibition" (SPA13). The court then concluded that the provision is subject to intermediate scrutiny as a regulation of commercial speech (SPA18). The court found that the law affects listings "regardless of their content," addressing "only the *actions* that a broker may take after publishing a listing" (SPA16 (emphasis added)).

20

And it does not impose a suspect speaker-based limitation, though it applies only to brokers, because that limit reflects that only brokers advertise relevant apartment listings (SPA17).

The court concluded that the FARE Act was subject to intermediate scrutiny as a regulation of commercial speech—and satisfied such scrutiny. First, the court determined that the City's asserted interest is substantial (SPA20). The law's goal is to correct a market failure and reduce punishing upfront costs for tenants seeking apartments. The legislative record supports that concern, showing that there was a significant "financial burden that brokers' fees impose on renters," the fees were not negotiable, and brokers provided "minimal consideration" to "prospective tenants in return" (*id.*).

Next, the court found that the City "substantiated the existence of the harm it seeks to address" and that the law would alleviate those harms "to a material degree" (SPA20-21). The court recounted evidence supporting the "City's contention that the misalignment of the principal-agent relationship in New York City's rental market causes real harm" (SPA21 (cleaned up)).[4] And the law directly and materially advances the City's interest in addressing that harm. It aims to improve housing

_____

[4] "Cleaned up" indicates that internal quotation marks, alterations, or citations have been omitted from quotations.

mobility, among other things, and the means chosen meet that goal (SPA23). Whether the law might have been "tailored differently" was "beside the point"—the City was not "required to make progress on every front before it can make progress on any front" (SPA23-24 (cleaned up)).

Finally, the court held that the regulation did not burden "substantially more speech than is necessary to further the government's legitimate interests" (SPA24 (cleaned up)). Rather, "[b]rokers remain free to post any listing they choose" (SPA25). Likewise, the law leaves open alternative channels for communication because brokers could communicate information about available properties directly to their clients, rather than by publishing a listing (*id.*).

As to the Contracts Clause claim, which challenges the provision of the law prohibiting brokers from imposing fees for existing, exclusive listings on tenants and the provision prohibiting landlords and brokers from conditioning the rental of a property upon the tenant engaging a broker, Administrative Code § 20-699.21(a)(1), (c), the court concluded that plaintiffs stated a claim, but a preliminary injunction should not issue (SPA26-38).

First, the court noted that the plaintiffs' claim could apply only to "agreements executed before December 13, 2024—when the FARE Act

22

became law—that remain executory beyond June 11, 2025, when the law takes effect" (SPA27). The court decided that, though the complaint posited the existence of such contracts only in "general terms," it sufficiently alleged that plaintiffs "have existing exclusive listing agreements impaired by the FARE Act" (*id.*). And it found that the complaint plausibly alleged that the FARE Act substantially impaired those contracts by undermining the portion of the agreement where the broker promises to seek its fee from the tenant (SPA27-30).

Next, the court found that the law served a legitimate public purpose (SPA30-31). It noted that the legislative record demonstrated that the FARE Act was "intended to serve the purpose of reducing the upfront cost of moving, thereby improving housing mobility amongst renters" (SPA30). Finally, the court concluded briefly that there were "issues of fact" as to whether the FARE Act was drawn in a reasonable and appropriate way to advance its purpose (*id.*).

While the court allowed the Contract Clause claim to proceed, it denied the request for a preliminary injunction on that claim. It began by noting that a "plaintiff seeking injunctive relief has a heavier burden than a plaintiff bears in pleading the plausible claim necessary to avoid dismissal" (SPA32 (cleaned up)). After applying the five factors set forth in *Melendez v. City of New York*, 16 F.4th 992 (2d Cir. 2021), the court

concluded that plaintiffs failed to show a likelihood of success on the merits (SPA32-38). Instead, the court found that plaintiffs "take issue with the policy underlying the FARE Act, and ask the Court to act as a superlegislature, overturning laws as unconstitutional when it believes the legislature acted unwisely" (SPA37). The court declined to do so.[5]

Ultimately, the court concluded, plaintiffs' objections to the FARE Act reflected a "fundamental disagreement with its underlying policy" not any "effects on their constitutional rights" (SPA41). But whether the FARE Act is good policy is irrelevant to its constitutionality (*id.*).

Plaintiffs then moved for an injunction pending appeal in the district court solely as to § 20-699.21(a)(2), which that court denied (SDNY ECF No. 78). They renewed that motion here, and this Court denied it as well (ECF No. 36)

## SUMMARY OF ARGUMENT
## AND STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). A plaintiff seeking a preliminary injunction must show: "(1) a likelihood of success on the merits; (2) that the plaintiff is likely to

---

[5] The court also dismissed plaintiffs' preemption claim and denied their request for a preliminary injunction on that basis as moot (SPA41). Plaintiffs do not challenge that determination on appeal.

suffer irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of the injunction." *Resource Grp. Ltd. v. Chishti*, 91 F.4th 107, 114 (2d Cir. 2024) (cleaned up). This Court reviews the district court's denial of a preliminary injunction for abuse of discretion. *Id.* A district court abuses its discretion if it (1) bases its ruling on an erroneous view of the law, (2) makes a clearly erroneous assessment of the evidence, or (3) renders a decision that cannot be located within the range of permissible decisions. *Id.* This Court reviews questions of law implicated in a request for a preliminary injunction de novo. *Lusk v. Vill. of Cold Spring*, 475 F.3d 480, 484-85 (2d Cir. 2007).

As to plaintiffs' First Amendment claim, because the district court refused to grant a preliminary injunction on the basis that plaintiffs failed to state a claim, this Court evaluates the claim the same way it would on an appeal from a motion to dismiss. *Hudson Shore Assocs. Ltd. P'ship v. New York*, 139 F.4th 99, 107 (2d Cir. 2025). To survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," drawing all reasonable inferences in the plaintiffs' favor. *Id.* (cleaned up). On a motion to dismiss, the Court may take judicial notice of the

legislative history and documents on which the complaint "relies heavily." *Goe v. Zucker*, 43 F.4th 19, 29 (2d Cir. 2022) (cleaned up). Here, that includes the Committee report and the oral and written testimony to the City Council.

First, the district court correctly found that plaintiffs failed to state a First Amendment claim. Though plaintiffs repeatedly refer to § 20-699.21(a)(2) as a "publication bar," that provision does not bar any publication. Instead, it provides that, if a broker lists an apartment with a landlord's permission, the broker cannot later collect a fee from the tenant. Admin. Code § 20-699.21(a)(2). Brokers are free to advertise any listing they like, landlords are free to retain brokers to list their apartments, and tenants are free to hire brokers to represent them if they so choose. The provision thus does not implicate the First Amendment.

Even if § 20-699.21(a)(2) implicated the First Amendment, it would be subject to the intermediate scrutiny test for regulations of commercial speech. The provision satisfies that test because it is a reasonable means to serve the Council's interests in improving housing mobility, increasing transparency and fairness in brokers' fees, and aligning principal-agent relationships. The legislative record amply supports the fit between all of those goals and the FARE Act.

26

Second, the district court correctly denied a preliminary injunction as to plaintiffs' Contracts Clause claim, challenging separate provisions of the FARE Act, § 20.699-21(a)(1) and (c), barring a "landlord's agent" from imposing a broker's fee or conditioning the rental of a property on the tenant hiring a broker. Though the court found that plaintiffs' claim passed the minimal pleading hurdle under Federal Rule of Civil Procedure 12(b)(6), it still has little likelihood of success. The FARE Act does not substantially burden any contract identified by plaintiffs. Indeed, the lone affected contract that plaintiffs identified expires at the end of October, such that their request for a preliminary injunction as to that contract will be moot by the time this appeal is decided.

In any event, the FARE Act is a reasonable and appropriate means of achieving valid public-policy ends, including increasing housing mobility and fairness in broker fees. As this Court and the Supreme Court have routinely held, the legislature is accorded significant deference in making that determination. Plaintiffs' repackaged policy objections do not make out a constitutional claim with a sufficient likelihood of success to merit a preliminary injunction.

Finally, while the district court did not consider them, plaintiffs nonetheless request this Court decide whether they have satisfied the

27

remaining preliminary-injunction factors in the first instance. But, if this Court finds that the district court erred on likelihood of success, it should remand for the district court to address the remaining factors. In any event, those factors support denial of a preliminary injunction. Plaintiffs invoke the harm from deprivation of constitutional rights, but they are unlikely to succeed in showing any such deprivation. Otherwise, they assert only injury to their bottom line, which is not a basis for injunctive relief. The City, meanwhile, has a strong interest in enforcing its laws, and the public has an interest in seeing a popular piece of legislation, that passed the City Council by an overwhelming majority, remain in effect throughout this litigation.

## ARGUMENT

### POINT I

### THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS' FIRST AMENDMENT CLAIM

The district court properly dismissed plaintiffs' First Amendment claim and, as a result, correctly denied their request for a preliminary injunction. First, § 20-699.21(a)(2) does not implicate the First Amendment. Second, even if the provision did regulate speech, it would easily satisfy intermediate scrutiny under the commercial-speech doctrine, as the district court held (SPA19-25).

28

## A. The challenged provision does not implicate the First Amendment.

Plaintiffs' First Amendment claim fails at the threshold because § 20-699.21(a)(2) is a regulation of conduct that does not burden protected speech. Though plaintiffs refer to the provision as a "publication bar," it bars no publication and does not dictate what anyone may say. It provides only that, if a broker publishes a listing with a landlord's authorization, she cannot collect her fee from the tenant; consequently, the broker must look to the landlord for compensation. By its plain terms, it prohibits *no* speech whatsoever.[6]

Thus, § 20-699.21(a)(2) is not subject to First Amendment scrutiny because it does not "directly regulate[] protected expressive activity[] or conduct with an expressive component" or "impose a disproportionate burden upon those engaged in protected First Amendment activities." *TikTok Inc. v. Garland*, 604 U.S. 56, 68 (2025) (cleaned up); *see Clementine Co., LLC v. Adams*, 74 F.4th 77, 85 (2d Cir. 2023) (policy did not implicate First Amendment where it affected only what plaintiffs "must do," not what they "may or may not say" (cleaned up)).

---

[6] This Court may "affirm on any basis for which there is sufficient support in the record, including grounds not relied on by the district court." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 413 (2d Cir. 2014) (cleaned up).

The district court concluded otherwise, despite finding that the provision "impacts only the *actions* that a broker may take after publishing a listing" (SPA16 (emphasis added)). The court reasoned that the prohibition on charging a fee to the tenant applies to brokers "because of the fact that they were engaging in speech at all" (SPA13 (cleaned up)). But the FARE Act prohibits charging a fee to a tenant whenever the landlord engages a broker's services or authorizes a broker to post a listing. Admin. Code § 20-699.21(a)(1)-(2). A broker's publication of a listing with the consent of the landlord functions as one way of establishing that a broker is providing services to the landlord (*see* JA678), such that the prohibition isn't contingent on speech at all.

Moreover, and in any event, innumerable laws provide that parties' legal relationships are affected "because of the fact that they were engaging in speech at all" (SPA13 (cleaned up)); that does not mean that those laws *regulate* speech. For example, offering or agreeing to a contract, saying "I do" at the altar, or identifying oneself in court as a party's attorney all affect legal rights and obligations that govern downstream conduct. But that does not mean the entirety of contract law, matrimonial law, and the attorney-client law is subject to First Amendment scrutiny.

30

Thus, as this Court and the Supreme Court have routinely held, a conduct-based regulation does not become a speech-based regulation simply because some speech is involved. *Clementine*, 74 F.4th at 86. The mere fact that a person subject to a challenged law "happen[s] to be engaged in a business involving speech" is of no moment—the question is whether the speech is the "regulatory object" of the law. *Id.*

Here, the "regulatory object" is the charging of a fee to a tenant, not a broker's listing of a property. Even assuming the bar on collecting a fee from a tenant could conceivably have "some effect on the First Amendment activities" of a broker, that does not, by itself, trigger First Amendment scrutiny. *Arcara v. Cloud Books*, 478 U.S. 697, 706 (1986); *see also Nat'l Inst. of Family & Life Advocates v. Becerra*, 585 U.S. 755, 769 (2018) (First Amendment "does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech" (cleaned up)); *Church of the Am. Knights of the KKK v. Kerik*, 356 F.3d 197, 209 (2d Cir. 2004) (rejecting proposition that "the First Amendment is implicated every time a law makes someone … less willing to exercise his or her free speech rights"); *Brandt v. Griffin*, 147 F.4th 867, 2025 U.S. App. LEXIS 20402, at *36 (8th Cir. 2025) (en banc) (referral for a medical procedure not "part of the 'speech process,'" though referrals involve "elements of speech").

Plaintiffs' contrary argument (Brief for Appellants ("App. Br.") 23-24) relies primarily on *Veterans Guardian VA Claim Consulting LLC v. Platkin*, 133 F.4th 213 (3d Cir. 2025), which considered a challenge to a state law prohibiting anyone from receiving "compensation for advising or assisting" with "the preparation, presentation, or prosecution of any claim for veterans benefits," unless they were federally accredited. *Id.* at 217-18 (cleaned up). The court there opined that the plaintiff had "a reasonable probability" of showing that its "services are speech." *Id.* at 219.

It is telling that plaintiffs lean so heavily on a hedged conclusion in a single out-of-circuit opinion addressing a quite distinct law. The law at issue in *Veterans Guardian* was reasonably seen as aimed directly at speech because the state's fundamental goal was to stop unlicensed consultants from providing advice to veterans by preventing them from receiving any compensation. *Id.* at 218. Here, by contrast, the law does not aim to reduce the number of apartment listings that brokers post, and brokers falling within the provision's coverage remain free to collecting fees for their services, just not from the tenant. Moreover, unlike in *Veterans Guardian*, the speech act of posting a listing here at most contributes to triggering the restriction on the conduct of collecting a fee

from the tenant. In *Veterans Guardian*, by contrast, the regulation barred compensation for speech itself. *Id.*

Though plaintiffs contend that any law that "makes speech less profitable" implicates the First Amendment (App. Br. 23), that cannot be so. *Veterans Guardian*, which involved a total ban on compensation, did not present that much broader question. And, in *Clementine*, the plaintiffs claimed that the requirement to check customers' vaccination status made their speech less profitable because they were "required to process multiple refunds at every performance" and had to "hire more staff," and the law made it "less likely that these customers w[ould] return after the restrictions are lifted." 74 F.4th at 82 (cleaned up). Yet this "financial hardship" did not trigger First Amendment scrutiny. *Id.* at 82, 85. Plus, any argument that the FARE Act makes their speech less profitable directly contradicts the testimony of plaintiffs and their representatives at the hearing, where they claimed that they will recoup their fees from landlords (*see*, *e.g.*, JA130, 212, 215).

The other case that plaintiffs invoke (App. Br. 23-24), *United States v. National Treasury Employees Union*, 513 U.S. 454 (1995), is even further afield. There, the Supreme Court struck down a regulation barring federal employees from accepting compensation for making speeches, publishing scholarly articles, or even writing novels. *Id.* 457,

464-65. The burden on employees' expression was direct, and the law explicitly targeted their expression by means of the "wholesale deterrent" of ensuring they could not be paid for it. *Id.* at 467. There could be no question that the law was aimed at speech, and employees had to "curtail their expression if they wish[ed] to continue working for the Government." *Id.* at 469. The FARE Act presents no comparable restrictions on brokers' expression.

### B. If the challenged provision implicated the First Amendment, it would warrant intermediate scrutiny.

If § 20-699.21(a)(2) is subject to First Amendment scrutiny, it is intermediate scrutiny under *Central Hudson Gas & Electric v. Public Service Commission*, 447 U.S. 557 (1980). If the provision were deemed to regulate speech, it would unquestionably be commercial speech, as the district court held (SPA15).

Plaintiffs' argument to the contrary relies on a distorted reading of *Sorrell v. IMS Health, Inc.*, 564 U.S. 552 (2011). To start, plaintiffs describe *Sorrell* as applying "heightened scrutiny" to commercial speech in certain circumstances (App. Br. 25), but never explain what level of scrutiny should apply. In any event, *Sorrell* didn't create a new tier of scrutiny or mandate heightened scrutiny where it wasn't previously

required. The statute at issue sought to discourage prescribing brand-name drugs by imposing "content- and speaker-based restrictions on the sale, disclosure, and use of prescriber-identifying information" by pharmaceutical manufacturers and marketers, without similarly limiting other speakers such as "researchers, journalists, and the State itself." 564 U.S. at 563-64, 573. The Court suggested that this content- and viewpoint-based discrimination might warrant "a stricter form of judicial scrutiny." *Id.* at 571. But it nonetheless applied the *Central Hudson* test because "the outcome [was] the same." *Id.* Thus, even as to a law that had blatant content- and viewpoint-based restrictions, the Court did not hold that "heightened scrutiny" was necessarily required. *See Vugo, Inc. v. City of New York*, 931 F.3d 42, 50 (2d Cir. 2019) ("*Sorrell* leaves the *Central Hudson* regime in place[.]").

Moreover, plaintiffs assert that the heightened scrutiny suggested by *Sorrell* is triggered by regulations directed at certain content and speakers (App. Br. 25-26). But we are aware of no court of appeals that has applied that rule. *See, e.g.*, *Greater Phila. Chamber of Commerce v. City of Phila.*, 949 F.3d 116, 138 (3d Cir. 2020) ("[T]he Supreme Court has consistently applied intermediate scrutiny to commercial speech restrictions, even those that were content- and speaker-based[.]"); *Retail Dig. Network, LLC v. Prieto*, 861 F.3d 839, 847-48 (9th Cir. 2017) (en

35

banc) (holding that the "content-and speaker-based distinction is relevant only insofar as parties dispute whether the law regulates speech" and rejecting argument that "*Sorrell*'s references to 'heightened scrutiny' mean something greater than intermediate scrutiny applies in commercial speech cases"); *Mo. Broadcasters Ass'n v. Lacy*, 846 F.3d 295, 300 n.5 (8th Cir. 2017) (content- and speaker-based commercial-speech restrictions are evaluated under *Central Hudson*). Instead, regulations of commercial speech are commonly content-based and often regulate specific types of speakers, in the same sense that this provision might be said to do so, if it were thought to regulate speech at all. *See*, *e.g*., *Vugo*, 931 F.3d at 49-50; *United States v. Caronia*, 703 F.3d 149, 180 (2d Cir. 2012 ("*Every* commercial speech case, by its very nature, involves both content- and speaker-based speech restrictions."). And *Sorrell* itself relied on the fact that the law at issue went "beyond mere content discrimination, to actual viewpoint discrimination." *Sorrell*,

564 U.S. at 565 (cleaned up). Even then, it applied *Central Hudson*. *Id.* at 571.[7]

Nor does § 20-699.21(a)(2) resemble the law at issue in *Sorrell*. As plaintiffs note, that law sought to "diminish the effectiveness of marketing by manufacturers of brand-name drugs" (App. Br. 27 (cleaned up)). In other words, it was a legislative thumb on the scale against pharmaceutical marketing by direct means (limiting marketers' use of prescription data) and indirect means (preventing pharmacies from selling the data for marketing purposes). *Sorrell*, 564 U.S. at 577-78. The problem was that the government "burdened a form of protected expression that it found too persuasive" and, at the same time, "unburdened those speakers whose messages are in accord with its own views." *Id.* at 580.

That analysis is inapplicable to § 20-699.21(a)(2), which does not take sides between competing messages or speakers. The FARE Act poses no risk of "excising certain ideas or viewpoints from the public

---

[7] Plaintiffs mangle a quote from this Court's decision in *Caronia* to purportedly establish the proposition that "content- and speaker-based restrictions on [commercial] speech [are] subject to heightened scrutiny" (App. Br. 26 (alterations in original)). But there, this Court in fact explained that *Sorrell* "did not decide the level of heightened scrutiny to be applied, that is, strict, intermediate, or some other form of heightened scrutiny." *Caronia*, 703 F.3d at 164. Plus, the Court noted that *Sorrell* "turned to *Central Hudson*" to analyze the claim there. *Id.* at 164. In any event, *Caronia* held that the challenged law was invalid even under intermediate scrutiny. *Id.* at 165-69. The case also had the additional wrinkle that it involved a criminal prosecution, and "[c]riminal regulatory schemes … warrant even more careful scrutiny." *Id.* at 163.

dialogue." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994). And the law does not target any disfavored speakers for their speech. Instead, its application is limited to brokers because brokers are the only people likely to post apartment listings with landlords' authorization and then seek to collect fees from tenants (SPA17). Indeed, brokers are the only people *allowed* to offer apartments in New York State and charge a broker fee. *See* N.Y. Real Prop. L. §§ 440(1), 440-a.[8]

In other words, the provision does not affect brokers because they are disfavored speakers, but rather because they are the only relevant individuals to whom it could apply (SPA17). *See TikTok*, 145 S. Ct. at 68 (heightened scrutiny unwarranted if differential treatment is "justified by some special characteristic of the particular speaker being regulated" (cleaned up)). Indeed, as the Supreme Court has held, "[c]haracterizing a distinction as speaker based is only the beginning—not the end—of the inquiry." *Reed v. Town of Gilbert*, 576 U.S. 155, 170 (2015). A "speaker preference is problematic only if it 'reflects a content preference.'" *Netchoice, LLC v. Bonta*, No. 25-146, ___ F.4th ___, 2025 U.S. App. LEXIS 23261, at *26-27 (9th Cir. Sept. 9, 2025) (quoting *Reed*, 576 U.S. at 170)).

---

[8] The FARE Act's definition of "agent" tracks state law. *Compare* Admin. Code § 26-699.20, *with* N.Y. Real Prop. L. § 443(a).

Nor do plaintiffs' arguments about the provision of truthful information get them anywhere (App. Br. 28-30). Unlike in the cases plaintiffs cited, the FARE Act does not bar anyone from giving truthful information, and plaintiffs make no serious claim that it does (*see id.*). Though they assert that they are not "permitted to advertise their tenant-pay listings" (*id.* at 28), that is plainly wrong (*see* SPA25 ("Brokers remain free to post any listing they choose.")). They can advertise to and be retained by a tenant. They simply cannot advertise a listing on behalf of a landlord and then require a tenant to pay a fee to rent that apartment.

### C. If intermediate scrutiny applies, the challenged provision satisfies that test.

The challenged provision satisfies intermediate scrutiny. Intermediate scrutiny requires a court to "determine whether: (1) the speech restriction concerns lawful activity; (2) the City's asserted interest is substantial; (3) the prohibition 'directly advances' that interest; and (4) the prohibition is no more extensive than necessary to serve that interest." *Vugo*, 931 F.3d at 51. In determining whether a prohibition is "no more extensive than necessary" the court should be "loath to second-guess the [g]overnment's judgment." *Bd. of Trs. v. Fox*, 492 U.S. 469, 478 (1989); *see also Vugo*, 931 F.3d at 58 (holding that court "must defer to the

39

City's judgment" about the "appropriate means to further [its] legitimate governmental interest" (cleaned up)); *Veterans Guardian*, 133 F.4th at 220 (regulations of "professional conduct" are "reviewed more deferentially" even if that "conduct incidentally involves speech" (cleaned up)). Moreover, the fourth prong incorporates consideration of how much speech is restricted compared to the interests advanced. *See Vugo*, 931 F.3d at 58.

As the district court held, § 20-699.21(a)(2) addresses several substantial government interests, directly advances those interests, and is not more extensive than necessary to serve them (SPA19-25). The City has a substantial interest in addressing "the financial burden that brokers' fees impose on renters, the de facto non-negotiability of such fees, and the minimal consideration brokers often provide prospective tenants in return" (SPA20). And the provision serves that interest because "renters will no longer pay brokers' fees for properties rented through open listings, which reduces the upfront cost of moving and thereby increases their ability to move" (SPA22). As even some of plaintiffs' own representatives acknowledged in Council testimony (JA402-03), § 20-699.21(a)(2) advances the City's interest in ensuring that tenants only pay a fee for a broker whom they have retained by focusing on the act of publication as an indication that the broker provides services to the

40

landlord (JA677). The law also does not burden more speech than nec-
essary because "[b]rokers remain free to post any listing they choose"
(SPA25).

Plaintiffs dispute the district court's conclusion by attacking three
of the City's asserted interests in passing the FARE Act. A running theme
is that the FARE Act must be perfectly tailored to the concerns the Coun-
cil identified (*see* App. Br. 35-36, 40-43). But this Court considers
whether the means chosen to accomplish the legislature's ends are "in
proportion to the interest served," not whether they are "necessarily the
single best disposition." *The Art & Antique Dealers League of Am., Inc.
v. Seggos*, 121 F.4th 423, 439 (2d Cir. 2024) (cleaned up). With that
framework in mind, none of plaintiffs' arguments carry the day.

### 1. The City Council properly concluded that the FARE Act would increase housing mobility.

Plaintiffs dispute whether the Council intended the law to serve an
interest in housing mobility and whether § 20-699.21(a)(2) serves that
interest (App. Br. 38-41). They incorrectly argue that the Committee re-
port "expressly disclaimed housing mobility as an interest" because the
report dismissed concerns the bill would "reduce housing mobility" as
"misunderstand[ing] the purpose of the bill" (*id.* at 38). In fact, the re-
port did *not* disclaim that the legislation would address housing

41

*mobility* (JA676; SPA22-23), and references to improving housing mobility permeate the legislative history. What the report described as "misunderstand[ing] the purpose of the bill" were criticisms that it would not address "the affordable housing crisis in the city" (JA676; SPA22-23). The report makes clear that affordability was not a target this legislation, but rather was a separate problem "being explored by the Council in multiple other avenues" (JA676).

Plaintiffs badly misstate the record in arguing that the concern with housing mobility is a post hoc rationalization and that the Council had "no evidence" that the Act would address it (App. Br. 38; *but see supra* 11-15). The bill's sponsor and other Councilmembers said that the FARE Act would increase mobility (JA91-92, 200-01, 710-11, 720-22). Numerous witnesses also testified that the bill would increase mobility and explicitly noted the potential tradeoff between lower upfront costs and potentially higher rent (*see*, *e.g.*, JA339, 343-44, 438).

The Council also received objective evidence, submitted by multiple tenant-advocacy organizations, that "the benefits of improved tenant mobility and housing accessibility gained by avoiding up-front broker fees outweigh potential rent increases" (JA438). As one of those organizations explained, the key issue presented by a broker fee is "how significantly it increases [a tenant's] *one-time costs* to move into a new

42

apartment" (*id.* (emphasis added)). Another submission cited a survey, on which the Committee report also relied, finding that 60% of renters said broker fees prevent them from moving into a different apartment and "over half of the city's renters (54%) would be willing to pay a higher monthly rent if they didn't have to pay upfront broker fees" (JA504, 673).

Further, the Committee report is replete with evidence that broker fees reduce housing mobility, from which the Council could draw the inference that eliminating those fees would increase mobility (JA677-79; *see also* SPA22 (noting that Committee found that tenant-paid broker fees "increase[] the upfront cost of renting and reduce[] housing mobility")). Far from being post hoc "linguistic gymnastics," as plaintiffs assert (App. Br. 21, 39), the straightforward distinction between housing mobility and housing affordability was drawn by supporters of the law throughout the legislative record (*see also* SDNY ECF No. 78 at 6 (in denying injunction pending appeal, noting Council's "conclusion that

eliminating such unsolicited fees would improve mobility was ... a logical inference drawn from the ample evidence before it" (cleaned up)).[9]

Plaintiffs note that some opponents of the bill argued that it would reduce mobility (App. Br. 39). That is both true and unsurprising. In a democracy, there are often conflicting opinions about the likely effects of a controversial law. But the disagreement of the bill's opponents does not mean that the Council had "no evidence" (App. Br. 38) that the FARE Act would improve housing mobility. Nor does plaintiffs' refusal to confront that body of evidence remove it from the record.

Further, though plaintiffs assume that rents will increase based on the "analysis" contained in their own self-serving declarations (App. Br. 40), numerous witnesses disputed whether and to what extent rents would rise (*see* JA313, 438-39, 448, 472, 504, 506, 523, 527). Thus, though plaintiffs fault the district court for purportedly failing to "grapple" with their analysis (App. Br. 40), the court properly "defer[red] to the City's judgment" about the appropriate means to further its legitimate governmental interest. *Vugo*, 931 F.3d at 58.

---

[9] Indeed, plaintiffs' own expert agreed. He noted there was a "likelihood that the FARE Act will lower total upfront costs to renters but lead to higher rents for some share of renters" (JA812). And he concluded that "the upfront cost of the broker fee is a transaction cost that contributes to lower mobility for renters" (JA814; *see also id.* (noting that "a new tenant will face a lower total upfront cost under the FARE Act")).

Plaintiffs also misleadingly cite the testimony of the City's Deputy Commissioner of Housing Preservation and Development (HPD) (App. Br. 21, 40), who unsurprisingly had no information about the effect of broker fees because he testified that HPD does not deal with them (JA100-01). The Deputy Commissioner was present as a representative of the Mayor, and, as he explained, the administration was still "evaluating this legislation" and "do[ing] its due diligence" (JA396).[10] The fact that one witness had "no data" (App. Br. 40 (citing JA110)) does not diminish the wealth of testimony and data the Council went on to collect over the course of the hearing and composing the Committee report (*see supra* 11-16).

### 2. The City Council properly concluded the FARE Act would improve the fairness and transparency of broker fees.

Plaintiffs again rely on a crabbed reading of the legislative record when they contend that the FARE Act fails to address the Council's interest in improving the fairness and transparency of brokers' fees. As the Committee report explained, in many cases brokers did not disclose the terms of the relationship, and in others did not ever even meet with the

---

[10] The administration had not taken a position on the bill at that point, and, as noted above (*supra* n.2), the legislation ultimately went into effect without the Mayor's signature (JA877).

45

Committee's investigators posing as prospective tenants (JA675-76). Plaintiffs brush this aside as "anecdotal" (App. Br. 42). But "[t]he Supreme Court has permitted litigants to justify speech restrictions by reference to studies and anecdotes[.]" *Vugo*, 931 F.3d at 52 (cleaned up)). And the investigators' experience dovetailed with extensive testimony from members of the public and organizations establishing the same point (*see supra* 4-11).

Plaintiffs go on to catalogue services they contend brokers routinely provide to tenants, and they argue that fees, despite being essentially fixed, are set by "robust market competition" (App. Br. 42-43). But the Council was not required to credit their assertions over contrary testimony supporting the law. Many witnesses disputed both arguments, and it was the Council's place to hear from all interested parties and make a legislative judgment. *See Seggos*, 121 F.4th at 441 (government bodies have "considerable leeway in determining the appropriate means to further a legitimate governmental interest, even when enactments incidentally limit commercial speech" (cleaned up)); *Vugo*, 931 F.3d at 58. Plaintiffs' argument again simply recasts their policy dispute as a purported constitutional defect.

Finally, plaintiffs argue that the City's interests could have been sufficiently advanced by just the FARE Act's separate fee-disclosure

46

requirements (App. Br. 44). But the Committee report explained why the disclosure requirements alone were not sufficient (JA678). As explained (*supra* 19-20), § 20-699.21(a)(2) addresses a separate concern that representatives of some of these very plaintiffs identified and plaintiffs now seek to ignore. Under *Central Hudson* scrutiny, "[i]t suffices that the means chosen add to the effectiveness of" the City's effort to increase housing mobility, which the FARE Act plainly does. *Clementine*, 74 F.4th at 88 (cleaned up). Whether the Act "could have been tailored differently" is "beside the point." *Id.*

### 3. The City Council properly concluded that the FARE Act aligned the principal-agent relationship.

Among the justifications for enacting the FARE Act, the City Council noted that the law would accord with the commonsense principle that the party who retains a service provider should be the one who pays them (JA675). Plaintiffs respond by contending that § 20-699.21(a)(2) is a poor fit for the Council's concerns and burdens more speech than necessary, asserting that it should instead just have required brokers to collect fees from the party employing them (App. Br. 31). As a threshold point, nothing about plaintiffs' critique on this score undercuts the fact that the law is a reasonable means of serving interests

in housing mobility, fairness, and transparency as just discussed—and those interests are more than enough by themselves to sustain it.

If plaintiffs' concerns about principal-agent aspect of the law are reached, they should be rejected. The district court rightly credited the Council's judgment that their posited approach of focusing solely and generally on who "employs" the broker, which was reflected in the original version of the legislation, would have failed to accomplish the legislation's goals. That approach would have left a loophole where "a landlord might retain a broker to publish an open listing, only to later claim that the broker is not his agent" (SPA18). Indeed, representatives of some of the plaintiffs in this lawsuit testified that the bill's original text would have failed to prevent the imposition of fees on the tenant (JA402-03), and the Committee report noted that § 20-699.21(a)(2) was added to address this concern (JA677).

Plaintiffs next engage in a rhetorical sleight-of-hand. They correctly note that the district court identified § 20-699.21(a)(2) as addressing a situation where a *landlord* may "claim that the broker is not his agent," but, in the next sentence, plaintiffs then fault the City Council for failing to substantiate a purported concern that "*brokers* would lie about their existing fiduciary obligations" (App. Br. 32 (emphasis added)). But, as the district court's opinion makes plain, the concern was

48

not about *brokers* lying about their obligations, but about *landlords* disclaiming an obligation to pay a broker they had not formally retained (SPA18).[11] Section 20-699.21(a)(2) ensures that, if that occurs, the tenant cannot be forced to pay the broker's fee. Plaintiffs' arguments about preexisting state-law disclosure requirements for *brokers* thus have no bearing on this issue (App. Br. 33).

Finally, plaintiffs appear to contend that § 20-699.21(a)(2) fails to advance an interest in aligning the principal-agent relationship because it applies in the open-listing context when a broker is "acting solely as a tenant's agent" (App. Br. 37-38). But their argument imagines that the world sorts neatly into doctrinal categories, whereas the Council was addressing real-world complexities. As the extensive record compiled by the Council shows, the realities of the City's rental market were that tenants were being forced to pay fees to brokers who were really serving the landlord, functionally speaking. Brokers themselves explained that it was common practice to require tenants to sign a paper agreement with the broker at the end of the process, after the deal was essentially done

---

[11] Contrary to plaintiffs' argument, the City has not "abandoned" the rationale it pressed in the district court—the same rationale the district court adopted and is repeated here (*see* SDNY ECF No. 37 at 12 ("This provision is necessary to avoid creating a loophole whereby *landlords* retain brokers who represent their interests" but then "purport" to disclaim a relationship with the broker (emphasis added)).

(*see* JA229, 363-64). Section 20-699.21(a)(2) addresses such real-world concerns by making clear that brokers who publish open listings with a landlord's permission are acting on behalf of the landlord, thus aligning the principal-agent relationship with underlying functional realities.

## POINT II

### THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THEIR CONTRACTS CLAUSE CLAIM

The district court also correctly held that plaintiffs are not entitled to a preliminary injunction on their Contracts Clause claim, which focuses on separate provisions of the FARE Act, § 20.699-21(a)(1) and (c), that bar a "landlord's agent" from imposing a broker's fee and prohibits conditioning the rental of a property upon the tenant engaging a broker. The Contracts Clause restricts the power of the States to disrupt contractual arrangements by forbidding the passage of "any ... Law impairing the Obligation of Contracts." U.S. Const., Art. I, § 10, cl. 1. But the prohibition on contractual impairment is "not an absolute one and is not to be read with literal exactness like a mathematical formula." *U.S. Trust Co. v. New Jersey*, 431 U.S. 1, 21 (1977) (cleaned up). Legislatures retain "broad power" to adopt generally applicable laws "without being

concerned that private contracts will be impaired, or even destroyed, as a result." *Id*. at 22.

To determine whether a plaintiff is likely to succeed on a merits of a claim under the Contracts Clause, the Court considers "(1) whether the contractual impairment is substantial" and, if so, "(2) whether the law serves a legitimate public purpose such as remedying a general social or economic problem" and, if such purpose is demonstrated, "(3) whether the means chosen to accomplish that purpose are reasonable and necessary." *Sullivan v. Nassau Cnty. Interim Fin. Auth.*, 959 F.3d 54, 63 (2d Cir. 2020) (cleaned up). While the district court concluded that plaintiffs' Contracts Clause claim passes Rule 12(b)(6)'s low bar, it correctly found that they were not entitled to a preliminary injunction because they are unlikely to succeed on the merits (SPA38). None of their arguments on appeal justify revisiting that conclusion.

## A. To the extent that plaintiffs have substantiated any threshold impairment of contracts, their request for a preliminary injunction is moot as of October 31, 2025.

As an initial point, plaintiffs have only minimally substantiated any threshold impairment of an existing contract, and as to that lone contract their request for a preliminary injunction will become moot shortly after this brief's filing. An essential ingredient of any Contract

51

Clause claim is that the challenged law substantially impairs "existing contracts." *Fabri v. United Techs. Int'l, Inc.*, 387 F.3d 109, 124 (2d Cir. 2004). Plaintiffs identified only one contract that arguably met that standard, and it is due to expire on October 31, 2025 (JA913), at which point the preliminary injunction request based on that contract will be moot.

The Contracts Clause in no way restricts laws that regulate future contracts. Thus, plaintiffs concede that contracts violating the FARE Act that were entered into during its "pendency" would not be enforceable, as they cannot be the subject of a viable Contracts Clause challenge (App. Br. 52). That means their claim encompasses only contracts that were signed before, at the latest, December 13, 2024 (SPA27). And, though plaintiffs' complaint alleged "in general terms" that they had existing contracts affected by the FARE Act (SPA27), their preliminary injunction record ultimately produced only one example of an existing contract that was even arguably affected (JA913). All the other contracts plaintiffs produced post-date the law's enactment (JA915-21). Therefore, they carried their evidentiary burden on the threshold "substantial impairment" element only as to a single contract. *See N.Y.C. Envt'l Justice All. v. Giuliani*, 214 F.3d 65, 72 (2d Cir. 2000) (plaintiffs must "present evidence" permitting the court to conclude they have a likelihood

of success on all elements of their claim); *Perez v. Arnone*, 600 F. App'x 20, 23 (2d Cir. 2015) (same).

The lone affected contract produced expires by its own terms on October 31, 2025, before this case will be heard and before any preliminary injunction could issue on remand. Thus, plaintiffs' request for a preliminary injunction will be moot by the time this case is heard. *See, e.g.*, *Ashfield Health LLC v. Jacobson*, No. 21-1885, 2022 U.S. App. LEXIS 29350, at *3 (2d Cir. Oct. 21, 2022) (when contract expires, request for preliminary injunction to enforce contract "is moot").

In any event, even if plaintiffs could rely on some unnamed contracts that might remain outstanding,[12] where contracts are "about to expire by [their] terms, the impairment caused by the law will be slight," *Sanitation & Recycling Indus. v. City of N.Y.*, 107 F.3d 985, 994 (2d Cir. 1997), such that the first element of a Contracts Clause claim is not met.

---

[12] Notably, New York State regulations bar any broker from entering into "an exclusive listing contract" containing "an automatic continuation of the period of such listing beyond the fixed termination date set forth therein." 19 N.Y. Codes, Rs. & Regs. § 175.15.

### B. The FARE Act would satisfy Contracts Clause scrutiny.

#### 1. The Act serves a legitimate public purpose.

If the Court reaches the second prong of the Contracts Clause inquiry, it should affirm the district court's determination that the FARE Act serves a legitimate public purpose (SPA30-31). "In general, a legitimate public purpose is one that is aimed at remedying an important general social or economic problem." *Conn. State Police Union v. Rovella*, 36 F.4th 54, 63 (2d Cir. 2022) (cleaned up); *see Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 250 (law serves a legitimate public purpose when it is "enacted to deal with a broad, generalized economic or social problem"). The FARE Act "was intended to serve the purpose of reducing the upfront cost of moving, thereby improving housing mobility amongst renters. Realigning the principal-agent relationship with respect to exclusive listings serves the same purpose" (SPA 30). That purpose is "legitimate under the Contracts Clause" because it both mitigates an economic emergency and was enacted to deal with a broad, generalized economic and social problem (SPA31).

In response, plaintiffs rehash their argument that the legislative record does not support an interest in housing mobility and that the Council purportedly "disclaimed an interest in improving housing

mobility" (App. Br. 48). As shown above (*supra* 11-16, 41-45), those arguments are belied by the record.

Likewise, their argument that "ending tenant-pay fees will make moving harder, not easier" recapitulates the policy dispute that plaintiffs' representatives presented to the Council. They again claim there was no "record basis to link purpose and means" (App. Br. 49 (quoting *Melendez*, 16 F.4th at 1041)). But as explained above, and as the district court found (SPA22), there was an ample basis in the record to link the purpose of increasing housing mobility with the means chosen—ending tenant-pays brokers fees. Once again, plaintiffs' insistence on ignoring the evidence does not remove it from the legislative record. And, at any rate, whether the law will be effective at meeting its goals is distinct from whether its purpose is legitimate.

Moreover, plaintiffs do not address the other public purposes of the law at all. Beyond mobility, the law also aims to align principal-agent relationships in accordance with commonsense principles and improve fees' transparency and fairness (*see supra* 6-10). Plaintiffs offer no argument on these points (*see* App. Br. 49-51).

Finally, plaintiffs do not even attempt to link their references to some purported "hostility" to brokers on the part of two Councilmembers (of the 42 who voted for the bill) and some of the FARE Act's

supporters to any legal basis for finding they are likely to succeed on their claim that the law lacks a legitimate public purpose (App. Br. 49-50). And, as the district court found, in "determining statutory purpose, 'the motivations of individual legislators, to the extent [the Court] may be able to discern them, are not dispositive'" (SPA18 (quoting *Gen. Media Commc'ns, Inc. v. Cohen*, 131 F.3d 273, 283 n.13 (2d Cir. 1997))).

### 2. The Act is a reasonable and appropriate means to achieve its goals.

Lastly, the FARE Act is a reasonable and appropriate means of achieving the City Council's goals. Where, as here, "a law impairs a private contract, substantial deference is accorded to the legislature's judgment as to the necessity and reasonableness of a particular measure." *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 369 (2d Cir. 2006); *see also Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 505 (1987) (Supreme Court has "repeatedly held that unless the State is itself a contracting party, courts should properly defer to legislative judgment as to the necessity and reasonableness of a particular measure" (cleaned up)). Whether the "legislation is wise or unwise as a matter of policy" is a question with which the Court is "not concerned" if the "governmental action [was] intended to serve the public good, as the government saw it." *Sullivan*, 959 F.3d at 69 (cleaned up).

The district court applied this Court's decision in *Melendez*, noting the "five features" of the law at issue there that lead to the conclusion that the Contracts Clause claim could not be dismissed "as a matter of law." *Melendez*, 16 F.4th at 1038. The "five features" are (1) whether the law impairs contracts permanently and entirely extinguishes contractual rights; (2) whether there is some record basis to link the legislature's purpose and its chosen means; (3) whether, if the burden of contractual impairment comes at the expense of a discrete group, it is tailored to the party causing the public harm that the state sought to mitigate; (4) whether the relief provided by the law is conditioned on need and, if not, whether the legislature adequately considered the extent to which the party burdened by the contractual impairment is better positioned financially than the relieved party to bear that burden; and (5) whether the law provides compensation for damages or losses sustained as a result of the impairment. *Melendez*, 16 F.4th at 1038-46. This Court noted it was the "totality" of the five features that precluded dismissal in that case. *Id.* at 1038.

Here, the totality of these factors confirms that the FARE Act is a reasonable and appropriate means of achieving the Council's goals. To the extent the FARE Act impairs any actual, existing contract, we do not dispute for the purposes of this appeal that the impairment is not

57

"temporary," though, as the court noted, this factor is "not dispositive" (SPA33). On the second factor, there was a "clear basis in the record to link the Act's prohibition of tenant-pays exclusive listing agreements with housing mobility" (SPA33). Beyond that, plaintiffs contend that the law could have exempted existing contracts, which they assert would have served the Council's purpose equally well (App. Br. 52). As the district court explained, however, the City considered this option and rejected it, because "such an exemption would have permitted landlords and brokers to enter long-term tenant-pays exclusive listing agreements while the bill was pending" (SPA34). Plaintiffs' concession that "[c]ontracts entered into during the pendency of the FARE Act would not be enforceable under the rule that foreseeable impairments do not violate the Contracts Clause" (App. Br. 52) was not in front of the Council.

In any event, the legislature is accorded significant deference as to the appropriate means to achieve its goals—it is not obligated to enact the precise statute that a challenger might prefer. This Court has cautioned against "reexamin[ing] all of the factors underlying the legislation," with the benefit of hindsight, and "ma[king] a *de novo* determination whether another alternative would have constituted a better statutory solution." *Buffalo Teachers*, 464 F.3d at 370; *see also Sal Tinnerello & Sons, Inc. v. Town of Stonington*, 141 F.3d 46, 54 (2d Cir. 1998) ("[I]t

is not the province of this Court to substitute its judgement for that of ... a legislative body[.]"); *Sanitation & Recycling*, 107 F.3d at 994 ("[O]ur analysis is carried out with a healthy degree of deference to the legislative body that enacted the measure.") The fit between the law and the problem it aims to alleviate merely has to be reasonable; the legislature is not obliged to rule out every possible alternative. *Buffalo Teachers*, 464 F.3d at 370.

As to the third factor, the Court found that the impairment did come at the expense of landlords, but that they were the "persons ... responsible for the circumstances warranting relief" (SPA35 (quoting *Melendez*, 16 F.4th at 1042)). True, landlords are not the sole cause of the City's housing crisis but, as the district court concluded, in the instance of tenant-pays exclusive-listing agreements, they were causing the harm identified. Those listings present significant barriers to housing mobility for tenants. Landlords had no incentive to push for lower fees given that the tenant ultimately would pay. And unlike in open listings, there is a single broker for a given unit, so tenants do not even have the potential for competition to lower fees.

Fourth, although the district court noted that the FARE Act was not explicitly conditioned on "need" (SPA35), the court explained that "the legislative record indicates that the City Council determined that

the New Yorkers most likely to benefit from the FARE Act's prohibitions are those most in need of its relief" (*id.*). Because tenants who moved were more likely to have higher incomes and because luxury buildings were more likely to be no-fee, the "Council could reasonably have concluded that the effect of brokers' fees on housing mobility weighs disproportionately on low-income New Yorkers, making a need condition unnecessary" (SPA35).

In any event, *Melendez*'s point about need is a poor fit as applied to this case. There, the question was whether a personal guarantor could be held liable for a tenant's rent if the tenant defaulted on a commercial lease, *Melendez*, 16 F.4th at 1004-05, a much more limited set of circumstances than residential real estate. In that case, it was more feasible to consider whether the guarantor had the "ability to pay," or was in true need of financial relief. *Id.* at 1043. In enacting broad regulations, legislatures may consider the "general or typical situation." *Id.* at 1044. And the court noted that the record supported the conclusion that landlords, as a whole, are better able to bear the cost of fees, even if there are exceptions (SPA36).

On this point, plaintiffs somewhat puzzlingly quibble with the Council's reliance on "third-party sources cited in the Committee Report" (App. Br. 54). But essentially all the facts in front of a legislature

necessarily come from third parties. Plaintiffs again, at root, take issue with the Council's ability to consider the legislative record before it and make legislative judgments about that record, as well as with the decision that the Council ultimately made. As the district court put it, plaintiffs' "discontent with the Act … stems not from its effects on their constitutional rights, but from a fundamental disagreement with its underlying policy" (SPA41).

Finally, the district court explained that although "the FARE Act does not provide for landlords to be compensated for the cost of brokers' fees," plaintiffs "themselves contend that landlords will recoup their losses by passing the cost of brokers' fees to tenants" (SPA36). Thus, this factor weighed somewhat against reasonableness, but it was not dispositive. And, indeed, in nearly every Contracts Clause challenge where the law was upheld, there is no compensation provided. *See*, *e.g.*, *DeBenedictis*, 480 U.S. at 505; *Sanitation & Recycling*, 107 F.3d at 994; *Buffalo Teachers*, 464 F.3d at 370.

In sum, it is the "totality" of the factors that determines plaintiffs' likelihood of success. *Melendez*, 16 F.4th at 1038. Here, the universe of contracts that might be affected is tiny, and the legislature made a reasonable determination about the means chosen to achieve the valid ends of increasing housing mobility, increasing transparency and fairness,

and aligning the law with commonsense principles of commerce. That determination is entitled to significant deference, *DeBenedictis*, 480 U.S. at 505, and plaintiffs have little likelihood of success on the claim.

## POINT III

## THE REMAINING FACTORS WEIGH AGAINST AN INJUNCTION

Lastly, the other preliminary-injunction factors counsel against relief. As a threshold matter, though plaintiffs request that this Court direct the district court to grant an injunction (App. Br. 59), because the court did not consider the factors outside of likelihood of success on the merits, even if plaintiffs could succeed on appeal, the proper and customary course under the Court's precedents would be to remand for consideration of the remaining factors by the district court in the first instance. *See*, *e.g.*, *New Hope Family Servs. v. Poole*, 966 F.3d 145, 180-81 (2d Cir. 2020).

Regardless, the other factors do not support injunctive relief. While, in general, deprivation of First Amendment rights is presumed to be an irreparable harm, that does not extend to plaintiffs' Contracts Clause claim (*contra* App. Br. 56). The "Supreme Court has never applied this presumption outside the First Amendment context." *Nat'l Ass'n for Gun Rights v. Lamont*, Nos. 23-1162, 23-1344, ___ F.4th ___,

62

2025 U.S. App. LEXIS 21570, at *63 (2d Cir. Aug. 22, 2025). Even in the First Amendment context, this "Court has not axiomatically applied the presumption that plaintiffs alleging deprivations of First Amendment rights have satisfied the requirement of irreparable harm." *Id.* And the Court has routinely affirmed the denial of motions for preliminary injunctions in cases raising constitutional questions solely on irreparable-harm grounds. *See*, *e.g.*, *Dexter 345, Inc. v. Cuomo*, 663 F.3d 59, 63 (2d Cir. 2011); *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112 (2d Cir. 2005).

The remaining factors are the public interest and the interest of the City, which, in cases involving government regulations, tend to merge. The City would suffer an irreparable injury if it is "enjoined by a court from effectuating statutes enacted by representatives of its people." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (cleaned up). The FARE Act passed by an overwhelming majority, and the bulk of the comments on the law were in its favor. The public has an interest in the enforcement of valid, democratically enacted laws. This is particularly so where the law has little-to-no impact on either plaintiffs' speech or their "existing contracts" (SPA41).

Plaintiffs also assert ongoing harm to their businesses (App. Br. 57). But lost profits are not enough for irreparable harm. *Tom Doherty*

*Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995); *see Loveridge v. Pendelton Woolen Mills, Inc.*, 788 F.2d 914, 917 (2d Cir. 1986) (irreparable harm from financial loses only where a company "stands to lose its entire business" pending the outcome of litigation). The mere fact that a business may be "less profitable" is insufficient, *Loveridge*, 788 F.2d at 917, and that is all plaintiffs have alleged.

Plaintiffs also point to purported "public benefits" of a preliminary injunction, based on their self-serving speculation about the effect of the law on the rental market (App. Br. 57-58). But the Court need not, and should not, credit their dire predictions in the absence of actual evidence, especially in light of the City Council's reasoned judgment to the contrary. The FARE Act has now been in effect for months, the market has shifted in response, and there is no sound basis to disturb the status quo.

## CONCLUSION

The district court's opinion and order should be affirmed.

Dated:  New York, New York
September 18, 2025

Respectfully submitted,

MURIEL GOODE-TRUFANT
*Corporation Counsel*
*of the City of New York*
Attorney for Appellees

By:  /s/ Jamison Davies
JAMISON DAVIES
Assistant Corporation Counsel

100 Church Street
New York, New York 10007
212-356-2490
jdavies@law.nyc.gov

RICHARD DEARING
CLAUDE PLATTON
JAMISON DAVIES
*of Counsel*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was prepared using Microsoft Word, and according to that software, it contains 13,966 words, not including the table of contents, table of authorities, this certificate, and the cover.

<u>/s/ Jamison Davies</u>
JAMISON DAVIES