# 26-1506

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

REAL ESTATE BOARD OF NEW YORK, INC.; NEW YORK STATE ASSOCIATION OF REALTORS, INC.; BOHEMIA REALTY GROUP; BOND NEW YORK REAL ESTATE CORP.; REAL NEW YORK LLC; FOUR CORNERS REALTY, LLC; 21 WEST 74 CORP.; AND 8 WEST 119TH STREET HDFC,

*Plaintiffs-Appellants*,

v.

THE CITY OF NEW YORK, *a municipal entity*, and VILDA VERA MAYUGA, *as Commissioner of the New York City Department of Consumer and Worker Protection*,

*Defendants-Appellees*.

*On Appeal from the United States District Court
for the Southern District of New York*

## BRIEF OF AMICUS CURIAE NEIGHBORS TOGETHER CORP. IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE

Evan Henley
Edward Josephson
The Legal Aid Society
49 Thomas Street, Floor 5
New York, NY 10013
212-298-5233
ewhenley@legal-aid.org

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Neighbors Together Corp. is not owned by a parent corporation, and no

publicly held corporation owns more than ten percent of Neighbors Together Corp.

## <u>TABLE OF CONTENTS</u>

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION AND STATEMENT OF INTEREST ....................................... 1

ARGUMENT ....................................................................................................... 4

    I.  The Need for the FARE Act ....................................................................... 4

    II.  What the Fare Act Prohibits ..................................................................... 9

    III.  What the FARE Act Does Not Prohibit .................................................. 11

    IV.  The District Court correctly denied Appellants' motion for a preliminary injunction. ................................................................................................ 12

        A.  The District Court properly dismissed Appellants' First Amendment claim ................................................................................................. 13

            1.  The FARE Act's prohibition on tenant-pays open listings does not implicate the First Amendment. ........................................... 14

            2. The FARE Act is valid under *Central Hudson* .................................... 17

        B.  Appellants' Contract Clause claim has no chance of success. ............... 18

        C.  Appellants do not face irreparable harm. ............................................... 25

        D.  The FARE Act promotes the public interest, and the equities militate against blocking it. ........................................................................... 27

CONCLUSION ................................................................................................. 29

CERTIFICATE OF COMPLIANCE .................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*A.H. v. French*, 985 F.3d 165 (2d Cir. 2021)............................................................12

*A-1 Realty Corp. v. State Div. of Human Rights*, 318 N.Y.S.2d 120 (N.Y. App. Div. 1970)......................................................................................................11

*Airlines Reporting Corp. v. Barry*, 825 F.2d 1220 (8th Cir. 1987) .........................27

*Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234 (1978)................................23

*Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986).......................................... 14, 16

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)....................................................................13

*Baker Elec. Coop., Inc. v. Chaske*, 28 F.3d 1466 (8th Cir. 1994) ...........................27

*Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362 (2d Cir. 2006) ................................19

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557 (1980) .....17

*Cmty. Hous. Improvement Program v. City of New York*, 492 F. Supp. 3d 33 (E.D.N.Y. 2020), *aff'd* 549 F.4th 540 (2d Cir. 2023) ................................... 22, 24

*Cmty. Hous. Improvement Program v. City of New York*, 59 F.4th 540 (2d Cir. 2023).............................................................................................................2

*Conason v. Megan Holding, LLC*, 29 N.E.3d 215 (N.Y. 2015) ...............................25

*Conn. State Police Union v. Rovella*, 494 F. Supp. 3d 210 (D. Conn. 2020)..........26

*De Mejias v. Malloy*, 353 F. Supp. 3d 162 (D. Conn. 2018)...................................20

*Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400 (1983).......24

*Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110 (2d Cir. 2009)..........25

*Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60 (2d Cir. 2007) ...........25

*Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398 (1934) .................................18

*Hudson Shore Assocs. L.P. v. New York*, 139 F.4th 99 (2d Cir. 2025) ...................13

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995) .14

*Int'l Franchise Ass'n v. City of Seattle*, 803 F.3d 389 (9th Cir. 2015)............. 14, 16

*Iowa Utilities Bd. v. FCC*, 109 F.3d 418 (8th Cir. 1996) ........................................27

*Kavasutra 6th St., Inc. v. Adams*, No. 24-15, 2024 U.S. App. LEXIS 32181 (2d Cir. Dec. 19, 2024) (summary order) ...........................................................................29

*Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470 (1987)......... 20, 24

*Linmark Assocs., Inc. v. Willingboro*, 431 U.S. 85 (1977)......................................16

*Local Div. 589, Amalgamated Transit Union v. Massachusetts,* 666 F.2d 618 (1st Cir. 1981)...............................................................................................................19

*Loveridge v. Pendleton Wooden Mills, Inc.*, 788 F.2d 914 (2d Cir. 1986) ............26

*McCracken v. Hayward*, 43 U.S. 608 (1844) .................................................... 20, 23

*Melendez v. Sirius XM Radio, Inc.*, 50 F.4th 294 (2d Cir. 2022) ...........................13

*Nat'l Ass'n for Gun Rights v. Lamont,* Nos. 23-1162, 23-1344, 2025 U.S. App. LEXIS 21570 (2d Cir. Aug. 22, 2025) .......................................................... 13, 28

*Newson v. Vivaldi Real Estate Ltd.*, 226 N.Y.S.3d 6 (N.Y. App. Div. 2025) .........11

*Nken v. Holder*, 556 U.S. 418 (2009) .....................................................................27

*Nw. Nat'l Life Ins. Co. v. Tahoe Reg'l Plan. Agency*, 632 F.2d 104 (9th Cir. 1980) ...........................................................................................................................22

*Ogden v. Saunders*, 25 U.S. 213 (1827) .................................................................20

*Perfect Puppy, Inc. v. City of E. Providence*, 98 F. Supp. 3d 408 (D.R.I. 2015)..21, 22

*Pineman v. Oechslin*, 637 F.2d 601 (2d Cir. 1981) .................................................20

*Preseault v. I.C.C.*, 494 U.S. 1 (1990)......................................................................2

iv

*Ragin v. N.Y. Times Co.*, 923 F.2d 995 (2d Cir. 1990)............................................17

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004) ..............................27

*Reichenbach v. Jacin Invs. Corp.*, 232 N.Y.S.3d 89 (N.Y. App. Div. 2025)..........25

*Sal Tinnerello & Sons, Inc. v. Town of Stonington*, 141 F.3d 46 (2d Cir. 1998) ....24

*Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197 (2d Cir. 1970) ...............26

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ............................................. 14, 17

*S. Terminal Corp. v. EPA*, 504 F.2d 646 (1st Cir. 1974)................................. 19, 21

*Sturges v. Crowninshield*, 4 Wheat. 122 (1819)......................................... 18, 19, 21

*Sven v. Melin*, 584 U.S. 811 (2018) ........................................................................19

*Tom Doherty Assocs. v. Saban Ent., Inc.*, 60 F.3d 27 (2d Cir. 1995).....................27

*Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025)........................................................28

*U.S. Tr. Co. v. New Jersey*, 431 U.S. 1 (1977) ......................................................24

*United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454 (1995).......................16

*United States v. Williams*, 553 U.S. 285 (2008) ....................................................17

*Veterans Guardian VA Claim Consulting LLC v. Platkin*, 133 F.4th 213 (3d Cir. 2025)..............................................................................................................15

*Washington v. Glucksberg*, 521 U.S. 702 (1997) ......................................................2

*Waste Mgmt. Holdings, Inc. v. Gilmore*, 64 F. Supp. 2d 537 (E.D. Va. 1999) 19, 20, 21

*Wine & Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36 (1st Cir. 2005) ..........15

**Statutes**

N.Y.C. Admin. Code § 20-699.20 ...........................................................................12

N.Y.C. Admin. Code § 20-699.21 .................................................................... passim

N.Y.C. Admin. Code § 20-699.22 ...........................................................11

N.Y.C. Admin. Code § 20-699.23 ...........................................................11

**Constitutional Provisions**

U.S. Const. art. I, § 10............................................................................18

**Regulations**

N.Y. Comp. Codes R. & Regs. tit. 19, § 175.10.......................................... 6, 11, 15

**Other Authorities**

David Brand, *A Rent-Stabilized 1 Bedroom Apartment for $1,100? In NYC? The Broker's Fee is $15K*, Gothamist (Feb. 8, 2024), https://gothamist.com/news/a-rent-stabilized-1-bedroom-apartment-for-1100-in-nyc-the-brokers-fee-is-15k.....5

David DeTurris & Nicole Rosenthal, *New Yorkers Hit with up to $4.2K in Mystery Fees as Sneaky Real Estate Agents Flout New Broker Fee Law: 'Exploiting a Loophole,'* N.Y. Post (June 20, 2025), https://nypost.com/2025/06/20/us-news/nycs-new-broker-fee-law-already-being-flouted-by-sneaky-real-estate-agents-tenants-say-exploiting-a-loophole .........................................................25

Hilary Wilson & Debipriya Chatterjee, Cmty. Serv. Soc'y, *Teetering on the Edge* (Oct. 2024), *available at* https://www.cssny.org/publications/entry/teetering-on-the-edge-unheard-third-survey-reveals-pervasive-financial-insecurity-new-york.6

Kenny Lee, *FARE Act Will Cut Upfront Costs for NYC Rentals by More Than 40%*, StreetEasy.com (Dec. 9, 2024), https://streeteasy.com/blog/fare-act-will-cut-upfront-costs-40-percent/ ..................................................................... 5, 6, 28

Kenny Lee, *NYC Rental Market Remains Stable Since the FARE Act*, StreetEasy.com (July 11, 2025), https://streeteasy.com/blog/nyc-rental-market-stable-since-fare-act/.........................................................................2, 27

Kenny Lee, *The Average New Yorker Spends $10,454 in Upfront Costs for a Rental*, StreetEasy.com (Feb. 10, 2024), https://streeteasy.com/blog/new-yorkers-spend-over-10k-in-upfront-rental-costs/ .................................................5

N.Y.C. Dep't of Hous. Pres. & Dev., *2023 Housing and Vacancy Survey Selected Initial Findings*, *available at* https://www.nyc.gov/assets/hpd/downloads/pdfs/about/2023-nychvs-selected-initial-findings.pdf ................................................................................6

*Speaker Adrienne Adams, Council Members, and Advocates Announce City for All Housing Plan to Advance Comprehensive Housing Solutions for All New Yorkers with Focus on Affordability*, N.Y.C. Council (Nov. 1, 2024), https://council.nyc.gov/press/2024/11/01/2732/ ................................................18

StreetEasy Team, *NYC Broker Fee Changes: What the FARE Act Means for Agents* (June 11, 2025), https://streeteasy.com/blog/nyc-broker-fee-changes-what-the-fare-act-means-for-agents/ ....................................................................2

## <u>INTRODUCTION AND STATEMENT OF INTEREST</u>[1]

Before the Fairness in Apartment Rental Expenses Act ("FARE Act" or "the Act"), broker fees greatly increased tenants' upfront moving costs. They typically represented over one month's rent and therefore required prospective tenants to have saved additional thousands of dollars before they could obtain an apartment. Tenants had to pay these fees even when the broker had listed the apartment at the instance or with the authorization of the landlord, and the disparity in bargaining power between suppliers and seekers of housing meant that there was little opportunity to negotiate them. The result was decreased tenant mobility and widespread dissatisfaction with a practice that many tenants felt forced them to pay for services that the landlord requested and that benefited the landlord. Additionally, tenants who had to move due to lease expiration or eviction faced homelessness if they could not afford broker fees.

In response, the New York City Council passed a law intended to protect consumers: the FARE Act. The Act prohibits certain brokers—those whom landlords have engaged to market apartments or whom landlords have authorized to

---

[1] All parties have consented to the filing of this amicus brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(4), no party's counsel authored the brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person—other than the amicus curiae, its members, or its counsel—contributed money that was intended to fund preparing or submitting the brief.

publish listings—from charging prospective tenants broker fees. Brokers remain free to seek compensation from the party who benefits from their services—the landlord. Both landlords and brokers are responsible for compliance with the Act.

Plaintiffs-Appellants ("Appellants") spent the bulk of their complaint arguing that the FARE Act is a "profoundly misguided piece of legislation." (JA14). However, legislation must only be "rationally related to legitimate government interests," *Cmty. Hous. Improvement Program v. City of New York*, 59 F.4th 540, 557 (2d Cir. 2023) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 728 (1997)), and rational basis review is not a vehicle for judges to "second guess legislative judgment," even where that judgment may conflict with the opinions of some experts, *id.* (citing *Preseault v. I.C.C.*, 494 U.S. 1, 18 (1990)).[2] Implicitly recognizing that a rational basis challenge to the Act would be futile, Appellants grasped for other arrows in their quiver of constitutional arguments. Because each missed the mark, the District Court correctly denied their motion for a preliminary

---

[2] Many disagree with Appellants' dire predictions regarding the FARE Act, including StreetEasy, which has published multiple blog posts supporting the policies underlying the Act. *See, e.g.*, Kenny Lee, *NYC Rental Market Remains Stable Since the FARE Act*, StreetEasy.com (July 11, 2025), https://streeteasy.com/blog/nyc-rental-market-stable-since-fare-act/ (last visited Sept. 17, 2025); StreetEasy Team, *NYC Broker Fee Changes: What the FARE Act Means for Agents* (June 11, 2025), https://streeteasy.com/blog/nyc-broker-fee-changes-what-the-fare-act-means-for-agents/ (last visited Sept. 17, 2025).

2

injunction based on their First Amendment and preemption claims, which it dismissed, and their Contract Clause claim, which it did not.

Now, Appellants have appealed the District Court's denial of their motion for a preliminary injunction, and by extension, seek review of the District Court's dismissal of their First Amendment claim. This Court should affirm.

First, the FARE Act provision that Appellants challenge on First Amendment grounds does not contain a "publication bar." It does not prevent brokers from listing apartments and does not regulate those listings' content. It merely prohibits brokers from advertising a certain business arrangement that is now illegal—requiring tenants to pay brokers who secure open listings. Even if the Act does implicate the First Amendment, it satisfies intermediate scrutiny.

Second, Appellants' contracts provide that the brokers "will collect their fee from the tenant." Particularly because this term does not create any legal obligation between landlords and brokers, the FARE Act does not "impair" it, and Appellants' Contract Clause claim has no chance of success. To the extent that the Act precludes future contracts between brokers and tenants that require payment of a fee, it does not violate the Contract Clause.

Third, Appellants do not face irreparable harm, and the public interest and equities favor enforcement of the FARE Act. A preliminary injunction would especially harm the low-income tenants whom the Act benefits.

Founded in 1982, Neighbors Together is a non-profit organization dedicated to ending hunger and poverty. The core of Neighbors Together is its members, who both use and run its programs. Neighbors Together provides direct services and engages in policy advocacy. In the past decade, Neighbors Together's work has focused increasingly on housing and especially on housing vouchers. Many of Neighbors Together's members are homeless or stuck in unstable housing situations despite having housing vouchers. One obstacle to stable housing was the prevalence of broker fees. Broker fees created hardships for Neighbors Together's members and kept them homeless or unstably housed for longer. They also undermined Neighbors Together's efforts to achieve policies and practices that improve vouchers' effectiveness. As a result, Neighbors Together's members decided to support the FARE Act, and Neighbors Together testified in support of it. The FARE Act is already helping Neighbors Together's members.

## **ARGUMENT**

### I. **The Need for the FARE Act**

Pre-FARE Act, broker fees ranked among the primary obstacles that New York City residents faced when searching for an apartment. Nearly uniquely among American cities, to obtain an apartment in New York City, many tenants had to first

pay a fee to the broker who listed the apartment.[3] (JA672). Fees charged by brokers varied, but they typically equaled 15% of the apartment's annual rent. David Brand, *A Rent-Stabilized 1 Bedroom Apartment for $1,100? In NYC? The Broker's Fee is $15K*, Gothamist (Feb. 8, 2024).[4] These fees significantly increased upfront moving costs. In 2024, the average upfront cost for a tenant to move into a unit with a broker fee was $12,951—seventeen percent of New York City's median household income. Kenny Lee, *FARE Act Will Cut Upfront Costs for NYC Rentals by More Than 40%*, StreetEasy.com (Dec. 9, 2024).[5]

By increasing transaction costs, broker fees had an obvious impact on tenant mobility and access to housing. Some people who wanted or needed to move could not afford to move. *See* Kenny Lee, *The Average New Yorker Spends $10,454 in Upfront Costs for a Rental*, StreetEasy.com (Feb. 10, 2024);[6] *see also* Hilary Wilson

---

[3] Tenants can also hire their own broker to help them search for an apartment. As discussed *infra*, the FARE Act does not affect this practice.

[4] *Available at* https://gothamist.com/news/a-rent-stabilized-1-bedroom-apartment-for-1100-in-nyc-the-brokers-fee-is-15k (last visited Sept. 17, 2025). As this article notes, while broker fees typically equaled fifteen percent of the annual rent, sometimes they were far more.

[5] *Available at* https://streeteasy.com/blog/fare-act-will-cut-upfront-costs-40-percent/ (last visited Sept. 17, 2025).

[6] *Available at* https://streeteasy.com/blog/new-yorkers-spend-over-10k-in-upfront-rental-costs/ (last visited Sept. 17, 2025).

5

& Debipriya Chatterjee, Cmty. Serv. Soc'y, *Teetering on the Edge* 9-10 (Oct. 2024)[7] (describing 2023 survey findings that forty-eight percent of low-income New Yorkers had less than $500 in savings and only forty-one percent of moderate- and high-income New Yorkers had at least $10,000 in savings). Tenants who moved between 2021 and 2023 were more likely to have higher incomes than those who stayed in their apartments. N.Y.C. Dep't of Hous. Pres. & Dev., *2023 Housing and Vacancy Survey Selected Initial Findings* 46-47.[8] Moreover, broker fees disproportionately affected apartment seekers who were searching for moderately priced units—and therefore the low- and moderate-income New Yorkers who can only afford these apartments. While approximately forty-seven percent of New York City's rentals charged tenants broker fees, fifty-seven percent of rentals priced below the City's median rent did. *FARE Act Will Cut Upfront Costs for NYC Rentals by More Than 40%*.

New York City tenants typically had to pay brokers whom they only met because the broker marketed the apartment for the landlord[9] (or never met at all).

---

[7] *Available at* https://www.cssny.org/publications/entry/teetering-on-the-edge-unheard-third-survey-reveals-pervasive-financial-insecurity-new-york.

[8] *Available at* https://www.nyc.gov/assets/hpd/downloads/pdfs/about/2023-nychvs-selected-initial-findings.pdf.

[9] Even in an "open listing," where the landlord and broker do not form an agency agreement, the broker lists the apartment with the landlord's authorization. N.Y. Comp. Codes R. & Regs. tit. 19, § 175.10.

6

(JA675-676). These broker fee arrangements created a consumer protection issue, especially given broker fees' cost and impact: tenants did not seek to hire the listing broker, had no meaningful opportunity to negotiate fees with the broker, and paid for services that primarily benefited the landlord, no matter how the broker characterized the agency relationship. (JA674-675). It is utterly unsurprising that sixty percent of renters reported to StreetEasy that broker fees prevented them from moving, and fifty-four percent said they would be willing to pay a higher monthly rent if they did not have to pay a broker fee upfront. (JA673).

After hearing extensive testimony, communicating with stakeholders, and performing a thorough investigation into broker practices that involved obtaining ninety-nine applications and touring fifty rental units, (JA668), the New York City Council passed the FARE Act. The Act took effect on June 11, 2025. It significantly reduces upfront transaction costs and prevents tenants from having to pay for a service that they do not want or need.

Neighbors Together's experience underscores the need for the Act. Among other programs, Neighbors Together runs a housing search clinic. Its Housing Services Specialist, Joel Gil, assists members with housing vouchers. Most are homeless or are at risk of eviction. Each month, Mr. Gil holds approximately thirty to forty "live search session" appointments during which he actively helps members search for apartments and secure viewings. He continues to aid members until they

7

move into an apartment. Before the FARE Act, Mr. Gil spent many hours shepherding each member through the application and voucher approval process even though ninety percent of the apartments that members applied for required them to pay broker fees.

Broker fees were a significant barrier for those members with housing vouchers who had to pay all or part of the fee. While members could obtain a security voucher from the New York City Human Resources Administration to satisfy their security deposit, they had to pay the broker fee in cash. Because no member had sufficient savings to pay the fee themselves, broker fees complicated and delayed the move-in process. Once a landlord accepted a member's application for an apartment, and the voucher agency approved the apartment, Mr. Gil helped the member seek funds for the broker fee. During this time, the member remained homeless or in an unstable living situation. Brokers and landlords became upset due to the delay and threatened to cancel the rental. Sometimes, the landlord did cancel the rental, forcing the member to restart the housing search process.

Although Neighbors Together's members paid broker fees, the brokers were aligned with the landlord, and the brokers' services primarily benefited landlords, not members. The member (assisted by Mr. Gil) had to act and advocate on their own behalf, while the broker served as an intermediary for the landlord by communicating information about the apartment, providing access to the apartment

8

for a viewing,[10] and receiving application materials. Given the choice, no member would have paid for a broker.

The FARE Act removed a significant impediment to the voucher approval and move-in process and has already positively affected Neighbors Together's members. Members now apply for apartments without concern about paying broker fees, move into apartments without broker fee-related delays, and are not indebted by a broker fee assistance grant. And Mr. Gil uses the fifteen hours a month he previously spent applying for broker fee assistance to help more members find stable housing faster.

## II. **What the Fare Act Prohibits**

Simply put, the FARE Act prohibits a broker who acts on a residential landlord's behalf to find or obtain a tenant from charging the tenant a fee. A broker acts on a landlord's behalf either when they serve as the landlord's agent for the rental or publish a listing for the rental (and therefore market the rental) with the landlord's permission or authorization. *See* N.Y.C. Admin. Code § 20-699.21(a)(1)-(2). This proscription addresses the City Council's concern regarding market conditions that forced tenants to pay fees for a broker whom they did not seek to hire—a broker who, at least by virtue of having received authorization for an open listing, had a prior relationship with the landlord. (*See* JA674-676). Pre-FARE Act,

---

[10] In some instances, a superintendent showed the apartment to a member, not the broker. The Council investigators had a similar experience. (JA676).

prospective tenants did not seek to hire a broker, had little to no chance to negotiate broker fees, and "were not given any more specialized service by the agents who claimed that they were the tenant's agent,"[11] (JA674-675), yet had to pay thousands in broker fees all the same. This is the "market failure" that the FARE Act addresses, (JA674), and what the Committee Report means when it says that the Act's purpose is to "properly align the principal-agent relationship in the rental market," (JA676). By forbidding landlords from requiring tenants to pay the brokers who market the apartment for the landlord, whether through an exclusive or open listing, the FARE Act both ensures that any tenant-broker agreement is voluntary and removes a significant barrier to housing mobility.

The rest of the FARE Act serves these objectives. Landlords and brokers cannot condition a rental on a tenant engaging an agent. *See* N.Y.C. Admin. Code § 20-699.21(c). Otherwise, they could easily circumvent the Act by requiring the tenant to hire and pay a broker in order to secure an apartment. Similarly, a listing cannot announce that a tenant must pay a broker fee because such an arrangement would be illegal and because the listing could either discourage prospective tenants who are not familiar with the FARE Act from applying or induce them to pay an illegal fee. *See id.* § 20-699.21(d). The requirement that listings disclose the total

---

[11] The Council investigators did not discern a difference in the services they received from brokers, whether the broker characterized themselves as a tenant's agent, a dual agent, or a landlord's agent. (JA675).

fees that a prospective tenant must pay to rent the apartment provides transparency and prevents brokers and landlords from imposing broker fees under the guise of another type of fee. *See id.* § 20-699.22.

Finally, the FARE Act imposes liability for violations. *See id.* § 20-699.23. Imposing vicarious liability on landlords for the acts of their agents, including brokers, is a basic common law principle. *See, e.g.*, *A-1 Realty Corp. v. State Div. of Human Rights*, 318 N.Y.S.2d 120, 121 (N.Y. App. Div. 1970); *see also Newson v. Vivaldi Real Estate Ltd.*, 226 N.Y.S.3d 6, 11 (N.Y. App. Div. 2025) (discussing landlords' use of brokers). And imposing liability on landlords for listings that they authorize ensures that landlords review the content of open listings before they permit them, *see* N.Y. Comp. Codes R. & Regs. tit. 19, § 175.10, and only do business with brokers who follow the law.

## III.  **What the FARE Act Does Not Prohibit**

The FARE Act's only direct effects are shifting who has to pay for services that brokers provide on behalf of landlords and requiring listings to disclose any fees that tenants must pay. Otherwise, brokers can continue providing the same services under the same general conditions and can continue to be compensated for those services by the landlords who benefit from their efforts.

First, landlords and brokers can still use exclusive listings, and the obligation to refer any inquiring tenants to the listing broker can remain intact. In this situation,

the listing broker now serves solely as the landlord's agent and cannot charge the tenant. N.Y.C. Admin. Code § 20-699.20, .21(a)(2). Second, landlords and brokers can still use open listings. Again, if a broker whom a landlord authorizes to publish a listing secures a tenant, the tenant cannot pay their fee. *See* N.Y.C. Admin. Code § 20-699.21(a)(2). In other words, the FARE Act proscribes so-called "tenant-pays" listings, where the tenant must engage and/or pay a broker to rent a unit. (JA21 para. 31; JA23 para. 36). Now, landlords themselves compensate brokers for the marketing, advertising, and application services that brokers provide to landlords.

Third, the FARE Act places no limits on a tenant's agent. Prospective tenants who decide that they want a broker's services can engage one and pay the agreed-upon fee. Fourth, brokers can still serve as dual agents; landlords and brokers just cannot require a tenant to engage a dual agent to secure an apartment. *See* N.Y.C. Admin. Code § 20.699.20, .21(c). A dual agent can collect a fee from a tenant so long as they do not publish a listing for the subject rental unit. *See id.* § 20.699.21(a)(2).

## IV. The District Court correctly denied Appellants' motion for a preliminary injunction.

To obtain a preliminary injunction, a movant must clearly demonstrate (1) a likelihood of success on the merits; (2) irreparable harm; (3) the public interest favors granting the injunction; and (4) the equities weigh in favor granting the preliminary injunction. *A.H. v. French*, 985 F.3d 165, 176 (2d Cir. 2021); *see also*

*Nat'l Ass'n for Gun Rights v. Lamont,* Nos. 23-1162, 23-1344, 2025 U.S. App. LEXIS 21570, at *61 (2d Cir. Aug. 22, 2025) ("An injunction does not follow from [a likelihood of] success on the merits as a matter of course . . . . Rather, plaintiffs must make a clear showing on the remaining factors . . . .") (citations and internal quotation marks omitted).

This Court reviews a district court's denial of a motion for a preliminary injunction "for abuse of discretion and the legal conclusions underlying that decision de novo." *Hudson Shore Assocs. L.P. v. New York*, 139 F.4th 99, 106 (2d Cir. 2025). It can affirm "on any ground supported by the record." *Id.*

This Court should affirm the District Court's denial of Appellants' motion for a preliminary injunction. The District Court properly dismissed Appellants' First Amendment claim, Appellants' Contract Clause claim has no chance of success, Appellants do not face irreparable harm, and the public interest and equities favor denying the motion.

### A. *The District Court properly dismissed Appellants' First Amendment claim.*

"To survive a motion to dismiss, a complaint must . . . state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)*.* "A claim is plausible on its face when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Melendez v. Sirius XM Radio, Inc.*, 50 F.4th 294, 299 (2d Cir. 2022)

13

(citation and internal quotation marks omitted). The "plausibility standard . . . asks for more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. Appellants did not plead a plausible First Amendment claim.

### 1. The FARE Act's prohibition on tenant-pays open listings does not implicate the First Amendment.

"[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011); *see also Int'l Franchise Ass'n v. City of Seattle*, 803 F.3d 389, 408 (9th Cir. 2015). Economic regulations that do not target speech do not trigger First Amendment scrutiny, even if the regulations' criteria relate to speech in some manner. *Int'l Franchise Ass'n*, 803 F.3d at 408 (quoting *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 707 (1986)). Moreover, a "business agreement or business dealing[]" is not conduct with a "significant expressive element" that receives First Amendment protection. *Id.* (citing *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 570 (1995)).

The FARE Act does not target speech or any message that brokers or landlords may express. The challenged provision prohibits a certain business practice ("tenant-pays open listings"), where a landlord authorizes a broker to market an apartment yet requires the tenant to pay the broker fee. *See* N.Y.C. Admin. Code § 20-699.21(a)(2), (e). The City Council decided to prohibit such arrangements to correct a market failure and its attendant ills. (JA674-676). The FARE Act does not target

14

the listing itself; the listing serves as reliable evidence of the authorization that triggers the prohibition because brokers need a landlord's authorization to publish a listing. *See* N.Y. Comp. Codes R. & Regs. tit. 19, § 175.10. Indeed, the Act's prohibitions on charging tenants do not only apply to a broker who publishes a listing; they also apply to a broker who is a landlord's agent. N.Y.C. Admin. Code § 20-699.21(a)(1).

Appellants nonetheless claim that the First Amendment protects the tenant-pays open listing model (Apps.' Br. 23-26, Dkt. Entry 29.1). Their claims suffer from three main errors:

First, the FARE Act does not burden "communication between the [broker] and the intended audience;" it makes a certain type of business arrangement unlawful, which in turn may theoretically decrease the demand for brokers' services. *See Wine & Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 47 n.3 (1st Cir. 2005). But "the First Amendment does not guarantee that speech will be profitable to the speaker or desirable to its intended audience." *Id.* at 47-48. The cases Appellants cite are readily distinguishable because they involve "direct imposition of financial burdens on the dissemination of particular kinds of speech." *See id.* at 47 n.3. In other words, these cases involve variants of bans on receiving payment for speech. *See Veterans Guardian VA Claim Consulting LLC v. Platkin*, 133 F.4th 213, 219 (3d Cir. 2025); *see also United States v. Nat'l Treasury Emps. Union*, 513 U.S.

15

454, 468 (1995). The Act does not ban charging for speech. Depending on the circumstances, brokers can charge both landlords and tenants for their services, most of which are not speech-based. (*See* JA24-26). One service that brokers provide to landlords is posting a listing, and brokers can continue to charge landlords for this service.

The FARE Act contains no "publication bar." The Act does not restrain listings. Instead, it dictates what landlords and brokers can lawfully do after publishing a listing. *See* N.Y.C. Admin. Code § 20-699.21(a)(2). If the FARE Act has an incidental effect on speech, this effect does not warrant First Amendment scrutiny. *See Int'l Franchise Ass'n*, 803 F.3d at 408 (quoting *Arcara*, 478 U.S. at 708).

Second, the FARE Act is not content based. A listing's content is irrelevant; its connection to a particular rental unit is. A township's limitation on posting "for sale" signs was content based because it had not prohibited other types of lawn signs. *Linmark Assocs., Inc. v. Willingboro*, 431 U.S. 85, 94 (1977). Conversely, the FARE Act does not prohibit any listings except for those that advertise an illegal transaction, and it does not seek to prevent listings' "primary effect"—that prospective tenants will respond to them. *See id.* It just prevents tenants from paying for the services of the brokers who posted them. N.Y.C. Admin. Code § 20-699.21(a)(1).

Third, Appellants' claims that the FARE Act discriminates against both speaker and message to "tilt public debate in a preferred direction," (Apps.' Br. 29 (quoting *Sorrell*, 564 U.S. at 578)), and "bans advertising a lawful transaction," (*id.* at 28), ignore the import of the City Council's determination that "tenant-pay fees are bad for tenants," (*id.*). In fact, the Council has outlawed tenant-pays arrangements, *see* N.Y.C. Admin. Code § 20.699.21(d), so tenant-pays listings advertise an *unlawful* transaction. "Offers to engage in illegal transactions are categorically excluded from First Amendment protection." *United States v. Williams*, 553 U.S. 285, 297 (2008); *see Ragin v. N.Y. Times Co.*, 923 F.2d 995, 1002-1003 (2d Cir. 1990). Appellants may continue to oppose the FARE Act and trumpet the benefits of pre-FARE Act practices. But brokers cannot advertise tenant-pay listings because they are illegal.

### 2. The FARE Act is valid under *Central Hudson*.

Assuming that the FARE Act is subject to First Amendment scrutiny, it passes intermediate scrutiny for the reasons given in the District Court's thorough opinion. SPA20-25; *see Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980). Appellants attack this ruling by disaggregating the Council's goals and then examining each objective through a myopic lens. (*See* Apps.' Br. 31-44). However, as the District Court recognized, the interplay between the FARE Act's closely related interests informed the Council's approach to correcting the "market

17

failure" that impeded housing mobility and imposed a non-negotiable financial burden on renters, who received little in return. (*See* SPA19-20). Prohibiting tenant-pays listings is a direct and effective solution because it cuts through the thicket of fiduciary law and institutes a clear and common-sense rule. Pre-FARE Act, broker fees kept renters from moving[12] and renters' legal relationship with brokers did not correspond to the services they received. (JA673-676). Now, renters know exactly what to expect when responding to a listing and face fewer obstacles to moving.

B.  *Appellants' Contract Clause claim has no chance of success.*

The Contract Clause provides that no state shall pass any "Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. Importantly, the constitutional limitation is on laws that impair the *obligation* of contracts, or "the law which binds the parties to perform their agreement." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 429 (1934) (citing *Sturges v. Crowninshield*, 4 Wheat. 122, 197 (1819)). *Sturges* defines an obligation of contract:

> A contract is an agreement, in which a party undertakes to do, or not to do, a particular thing. The law binds him to perform his undertaking, and this is, of

---

[12] "Housing mobility" is not a "post-hoc rationalization" for the FARE Act. The Council clearly indicated what it meant by another term, "affordability." It explained that the Act did not propose to "solv[e] the affordability crisis" by citing the "City for All" plan, which focuses on increasing and preserving the stock of affordably-priced housing and strategies for improved voucher utilization, among other things. (JA676 n.39 (citing *Speaker Adrienne Adams, Council Members, and Advocates Announce City for All Housing Plan to Advance Comprehensive Housing Solutions for All New Yorkers with Focus on Affordability*, N.Y.C. Council (Nov. 1, 2024), https://council.nyc.gov/press/2024/11/01/2732/ (last visited Sept. 18, 2025)).

course, the obligation of his contract. In the case at bar, the defendant has given his promissory note to pay the plaintiff a sum of money, on or before a certain day. *The contract binds him to pay that money, on that day; and this is its obligation.* Any law which releases a part of this obligation, must, in the literal sense of the word, impair it.

4 Wheat. at 197 (emphasis added). Although the test for a Contract Clause claim has changed over the past two hundred years, *see Melendez v. City of New York*, 16 F.4th 992, 1022-1023 (2d Cir. 2021), the definition of an obligation of contract has not, *see, e.g.*, *Local Div. 589, Amalgamated Transit Union v. Massachusetts,* 666 F.2d 618, 637 (1st Cir. 1981); *S. Terminal Corp. v. EPA*, 504 F.2d 646, 680 (1st Cir. 1974).

To gauge whether a law violates the Contract Clause, courts answer three questions: (1) Is the contractual impairment substantial? (2) If so, does the law serve a legitimate public purpose? (3) If it does, are the means used to accomplish this purpose reasonable and necessary? *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 367-373 (2d Cir. 2006) (citations omitted). In turn, to evaluate whether a contractual impairment is substantial, courts consider "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating [their] rights." *Sven v. Melin*, 584 U.S. 811, 819 (2018). Appellants' Contract Clause analysis is flawed because they do not pause to consider what the Clause actually prohibits. *See Waste Mgmt. Holdings, Inc. v. Gilmore*, 64 F. Supp. 2d 537, 545 (E.D. Va. 1999) ("[T]he first step

19

risks confusing the impairment of a contract with the impairment of its 'obligation,' which is all that the Contract Clause forbids." (citing *Ogden v. Saunders*, 25 U.S. 213, 256 (1827))).

Any Contract Clause analysis begins by "identifying the precise contractual right that has been impaired and the nature of the statutory impediment." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 504 (1987). Appellant Bond New York's standard exclusive listing agreement states that "[i]f the Property is rented pursuant to this Agreement, BOND will collect its fee from the tenant." (JA50 para. 140; *see also* JA913-914 (REAL New York LLC listing agreement)).[13]

Fundamentally, the FARE Act does not substantially impair Appellants' contracts because it does not impair an obligation of contract at all. "Obligation of contract" refers to the contracting parties' rights and duties vis à vis each other. *See De Mejias v. Malloy*, 353 F. Supp. 3d 162, 171 (D. Conn. 2018) (citing *Pineman v. Oechslin*, 637 F.2d 601, 604 (2d Cir. 1981)); *Gilmore*, 64 F. Supp. 2d at 546; *see also McCracken v. Hayward*, 43 U.S. 608, 612 (1844) ("If any subsequent law affect to diminish the duty, or to impair the right, it necessarily bears on the obligation of

---

[13] Appellants' complaint contains an additional Contract Clause allegation—that the prohibition on conditioning a rental on the tenant engaging an agent makes it "impossible for landlords to fulfill their explicit contractual obligation to refer all inquiries regarding their property to the broker." (JA50 para. 139). Nothing in the FARE Act bars landlords from making these referrals so long as the tenant is not required to also engage the broker and does not pay a broker fee. *See* Section III, *supra*.

the contract, in favour of one party, to the injury of the other . . . ."). The threshold question is whether the law changes the relative position of the contracting parties. *See S. Terminal Corp.*, 504 F.2d at 680. A law that changes the relative position of a contracting party vis à vis third parties does not impair an obligation of contract and thus does not violate the Contract Clause. *See id.* (rejecting claim that a restriction on parking space rentals impaired obligations of existing construction and indenture contracts); *Perfect Puppy, Inc. v. City of E. Providence*, 98 F. Supp. 3d 408, 413, 423-424 (D.R.I. 2015) (rejecting claim that a ban on commercial transactions in dogs and cats impaired the obligation of a lease for a space to be used "only for the purposes of a Puppy Sales store"). A law does not violate the Contract Clause because it makes a contract "less profitable than expected or make[s] performance less desirable, or even impossible." *Gilmore*, 64 F. Supp. at 546. That is what happened here.

The tenant-pays provisions in Appellants' listing agreements, (JA50 para. 140; JA913), do not create any rights or duties between the broker and the landlord. If the broker fails to successfully collect a fee from a tenant, the contracts contain no obligation that the broker may enforce against the landlord. Similarly, should the broker choose not to seek a fee from a tenant, the landlord would have no rights against it. In other words, this term does not "bind" the broker to the landlord, or vice versa. *See Sturges*, 4 Wheat. at 197.

21

Any obligation on the part of tenants to pay broker fees is not a term of the contract between the landlord and the broker—the tenants are not parties to the contract—and cannot be "impaired" by the FARE Act. At most, the Act prevents Appellants from forming some future contracts with tenants that would require them to pay such fees. The Contract Clause does not limit the regulation of future contracts. *Cmty. Hous. Improvement Program v. City of New York*, 492 F. Supp. 3d 33, 53 (E.D.N.Y. 2020), *aff'd* 549 F.4th 540 (2d Cir. 2023).

As in *Perfect Puppy*, the FARE Act has not altered the respective obligations of the parties to an exclusive listing agreement, even if it does prevent them from fully achieving their aim when forming these agreements. *See* 98 F. Supp. 3d at 424. The landlord's primary contractual obligations are to give the broker the sole and exclusive right to rent the property and to refer all inquiries, offers, and proposals regarding the property to the broker, and the broker's primary contractual obligation is to represent the landlord with respect to the rental. (*E.g.*, JA913-914). The Act has not altered any of these obligations. It has made the exclusive listing agreement less desirable. This effect is not a Contract Clause violation. *See Nw. Nat'l Life Ins. Co. v. Tahoe Reg'l Plan. Agency*, 632 F.2d 104, 106 (9th Cir. 1980).

While the FARE Act may affect an exclusive listing agreement's consideration, this does not mean that it impairs an obligation of contract, especially because the affected consideration is the broker and landlord's mutual agreement to

place a burden on a third party, the tenant. As shown by this lawsuit, making the tenant pay the broker fee benefited both brokers and landlords; in forbidding that practice, the Act does not advantage one contracting party over another. *See McCracken*, 43 U.S. at 612. There are many other situations where a landlord and a counterparty could burden tenants as part of the consideration for a contract (for example, setting minimum rents in a mortgage agreement). While the Contract Clause protects contracting parties' rights to "order their personal and business affairs according to their particular needs and interests," *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245 (1978), its protections cannot extend to the decision to place a burden on third parties such as tenants. If it did, this would be a serious limitation on the state's police powers to protect tenants, to the mutual benefit of landlords and their counterparties. That is not what the Contract Clause intends. *See id.* at 241-242.

Finally, even if the FARE Act did substantially impair a contractual obligation, Appellants cannot demonstrate that the Act flunks the second and third prongs of the test. In a city with over 2.3 million renter-occupied units,[14] the City's objectives in reducing barriers to housing mobility and protecting prospective tenants from unexpected and unwanted fees, (JA672-676), are necessarily directed at remedying a "broad and general social or economic problem," rather than

---

[14] *2023 Housing and Vacancy Survey Selected Initial Findings* 7; JA20 para. 24

providing a benefit to a special interest, *see, e.g.*, *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411-412 (1983); *cf. Cmty. Hous. Improvement Program*, 492 F. Supp. 3d at 52-54 (stating that legislative goals related to neighborhood stability and continuity are valid).

The Court should grant substantial deference to the Council's legislative judgment that the FARE Act is a reasonable and necessary means to further these interests, as is "'customary when reviewing economic or social regulation . . . .'" *Energy Reserves Grp., Inc.*, 459 U.S. at 412-413 (quoting *U.S. Tr. Co. v. New Jersey*, 431 U.S. 1, 22-23 (1977)). The government need not prove it made the best choice among available alternatives, *Sal Tinnerello & Sons, Inc. v. Town of Stonington*, 141 F.3d 46, 55 (2d Cir. 1998), and courts may not second-guess the legislature's determination, *Keystone*, 480 U.S. at 506.

Under these standards, Appellants cannot demonstrate that the Act is unreasonable or unnecessary within the meaning of the Contract Clause. The Contract Clause simply does not require the Council to make a finding that landlords are better equipped to pay for brokers' services. (*See* JA56 para. 174; Apps.' Br. 53). The Council logically concluded that, given the features of New York City's real estate market and the challenges faced by prospective tenants such as Neighbors Together's members, it is preferable for the landlord to pay the costs of marketing and renting that unit. (JA676). Nor does the Contract Clause require the City to apply

a "means test" and restrict the FARE Act's protections to low-income New Yorkers. (Apps.' Br. 53-54). No matter their income, all tenants benefit from having a choice about whether to engage a broker and pay their fees and from lower upfront housing costs. Finally, "grandfathering in" exclusive listing agreements that predated the Act would have confused tenants and opened the door to deception and exploitation. Such conduct is unfortunately common in New York City's housing market. *See, e.g.*, *Conason v. Megan Holding, LLC*, 29 N.E.3d 215, 217-218 (N.Y. 2015); *Reichenbach v. Jacin Invs. Corp.*, 232 N.Y.S.3d 89, 93-94 (N.Y. App. Div. 2025); *see also* David DeTurris & Nicole Rosenthal, *New Yorkers Hit with up to $4.2K in Mystery Fees as Sneaky Real Estate Agents Flout New Broker Fee Law: 'Exploiting a Loophole,'* N.Y. Post (June 20, 2025).[15]

      C.   *Appellants do not face irreparable harm.*

Irreparable harm is an injury that monetary damages cannot remedy. *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 71 (2d Cir. 1996). The irreparable injury must be concrete and imminent, not remote or speculative. *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)). A "mere assertion of a constitutional injury is insufficient to automatically trigger a finding of irreparable

---

[15] *Available at* https://nypost.com/2025/06/20/us-news/nycs-new-broker-fee-law-already-being-flouted-by-sneaky-real-estate-agents-tenants-say-exploiting-a-loophole/.

harm. Rather, in order to show irreparable injury, [the] plaintiff must show a likelihood of success on the merits of its constitutional claim." *Conn. State Police Union v. Rovella*, 494 F. Supp. 3d 210, 219-220 (D. Conn. 2020) (citations and internal quotation marks omitted).

As explained above, Appellants have not shown a constitutional injury. Nor do their other alleged irreparable harms pass muster. The FARE Act affects all participants in New York City's rental market, who must adapt to changed market conditions. Broker fee arrangements in New York City are now like the rest of the country. Appellants assert that these changes will cause some brokerages to close or lose market share. But none of Appellants' declarations or exhibits presents any concrete evidence regarding their imminent closure or changes to their relative market share. (*See* JA775-840). Appellants can adjust their business practices, deliver their services differently, and seek out new brokers, landlords, and tenants for business relationships. This stands in stark contrast to the cases where courts have found a likelihood of irreparable harm due to the destruction of a business: these cases largely involve dealerships that rely on one supplier. *See, e.g.*, *Loveridge v. Pendleton Wooden Mills, Inc.*, 788 F.2d 914, 916 (2d Cir. 1986); *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970).

Appellants assert that the FARE Act will cause irreparable harm because brokers will receive less revenue (which they did not plausibly allege) and landlords

will incur more costs (which would be easy to calculate). (*See, e.g.*, JA780-782 paras. 20, 25; JA791-792 paras. 22-23). Even if true, these impacts would be quintessential monetary damages.[16] *See Tom Doherty Assocs. v. Saban Ent., Inc.*, 60 F.3d 27, 37-38 (2d Cir. 1995). Appellants have not explained why these damages would be difficult to measure or establish. *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004).

> D. *The FARE Act promotes the public interest, and the equities militate against blocking it.*

The final two preliminary injunction factors merge because the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). After studying the issue, the City Council determined that the FARE Act was in the public interest. (JA667-678). Appellants have speculated that the Act will lead to fewer listings, decreased transparency, and increased rents, but their catastrophic predictions have not come true. *See NYC Rental Market Remains Stable Since the FARE Act* (stating that rents have remained stable post-FARE Act, even among listings that now forego broker fees, and that the number of listings is "well within the range of prior market trends"). As StreetEasy noted prior to the FARE Act's effective date, decreased

---

[16] "Unrecoverable" monetary damages typically refer to damages that would be impossible for a successful plaintiff to recover because, for example, the defendant has sovereign immunity or is insolvent. *See Iowa Utilities Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996) (citing *Baker Elec. Coop., Inc. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir. 1994); *Airlines Reporting Corp. v. Barry*, 825 F.2d 1220, 1227 (8th Cir. 1987)).

upfront costs should lead to more tenants moving, meaning that brokers should have more customers. *FARE Act Will Cut Upfront Costs for NYC Rentals by More Than 40%.* In addition, rental data shows that properties that stopped charging tenants broker fees between 2012 and 2024 did not increase rents beyond market trends, *id.*, which further undercuts Appellants' assertion that shifting responsibility for broker fees will drive higher rents.

New York is a city of renters, and the FARE Act promises to benefit millions of households, including Neighbors Together's members. Blocking the Act would particularly harm low-income New York City residents who would have to pay broker fees during the pendency of the litigation. Some would be unable to move due to these fees. Others would remain homeless or unstably housed for longer. All would face significant upfront burdens that make a complicated process even more arduous. Plus, New York City would be injured if "enjoined . . . from effectuating statutes enacted by representatives of its people." *See Nat'l Ass'n for Gun Rights*, 2025 U.S. App. LEXIS 21570, at *64 (quoting *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2562 (2025)). These harms outweigh any harms to Appellants.

There is much support for the City Council's determination that the FARE Act is in the public interest. This Court should not rely on Appellants' doomsday predictions to substitute its judgment about what is best for New York City. *See Kavasutra 6th St., Inc. v. Adams*, No. 24-15, 2024 U.S. App. LEXIS 32181, at *6

(2d Cir. Dec. 19, 2024) (summary order). It should affirm the denial of Appellants'

motion.

## **CONCLUSION**

For these reasons, this Court should affirm the denial of Appellants' motion

for a preliminary injunction.

New York, NY
September 18, 2025

Respectfully submitted,


/s/ Evan Henley
_____

Evan Henley
Edward Josephson
THE LEGAL AID SOCIETY
49 Thomas Street, Floor 5
New York, NY 10013
Phone: 212-298-5233
Facsimile: 646-616-4198
ewhenley@legal-aid.org
*Counsel for Amicus Curiae*
*Neighbors Together Corp.*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the limitations of Federal Rule of Appellate Procedure 29(a)(5) and Local Rule 29.1(c). It contains 6,978 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). It has been prepared in a proportionally spaced typeface, 14-point Times New Roman, using Microsoft Word.

/s/ Evan Henley
Evan Henley